UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                    Chapter 11

EVERYDAY LOGISTICS LLC,                                   Case No. 10-22026 (RDD)

                          Debtor.
------------------------------------------------------------x

**AMENDED DISCLOSURE STATEMENT IN CONNECTION WITH
CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR**


       **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL
CREDITORS AND PARTIES IN INTEREST OF EVERYDAY LOGISTICS, LLC
("DEBTOR").  THE DISCLOSURE STATEMENT CONTAINS INFORMATION THAT
MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE DEBTOR'S
PLAN OF REORGANIZATION.  ALL CREDITORS ARE URGED TO READ THIS
DISCLOSURE STATEMENT CAREFULLY.  ALL CAPITALIZED TERMS
CONTAINED IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED
HEREIN SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS
CONTAINED IN THE PLAN OF REORGANIZATION ANNEXED TO THE
DISCLOSURE STATEMENT AS EXHIBIT A.**


       **COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT
CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.**


Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
489 Fifth Avenue
New York, New York 10017
Telephone: (212) 593-1100
Fascimile: (212) 644-0544


ATTORNEYS FOR THE DEBTOR

## <u>INTRODUCTION</u>

1.      The Debtor submits this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of its Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as <u>Exhibit "A"</u>.  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  <u>All capitalized terms used but not defined herein shall have the meaning set forth in the Plan.</u>

2.      This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the terms and implications of the Plan.  Every effort has been made to fully explain the various aspects of the Plan as it affects all Creditors.  To the extent a Creditor has any questions, the Debtor urges you to contact its counsel and every effort will be made to assist you.

**3.      THE DEBTOR URGES YOU TO VOTE IN FAVOR OF THE PLAN. THE DEBTOR'S GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN. IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE DEBTOR INTENDS TO SEEK CRAMDOWN OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT CONFIRMATION OF THE PLAN.**

4.      On April ___, 2011, after notice and a hearing, the Bankruptcy Court entered an order approving this Disclosure Statement pursuant to Section 1125 (a) of the Bankruptcy Code  as containing information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable Creditors whose votes are being solicited to make an informed judgment whether to accept or reject the Plan.

5.      Creditors should read this Disclosure Statement in its entirety prior to voting on the Plan.  No solicitation of votes may be made except pursuant to this Disclosure Statement.

**6.      EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.**

**7.      THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR.  THE DEBTOR'S BOOKS**

**AND RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION
CONCERNING THE DEBTOR'S FINANCIAL CONDITION AS SET FORTH IN THIS
DISCLOSURE STATEMENT.  BASED UPON THE INFORMATION MADE
AVAILABLE, DEBTOR'S COUNSEL HAS NO INFORMATION TO INDICATE THAT
THE INFORMATION DISCLOSED HEREIN IS INACCURATE.  NEITHER THE
DEBTOR NOR ITS COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY
THAT THERE IS NO INACCURACY HEREIN OR THAT FUTURE EVENTS MAY
NOT RENDER THE INFORMATION CONTAINED HEREIN INACCURATE.**

8.    After reviewing this Disclosure Statement indicate your vote to accept or
to reject the Plan on the enclosed ballot, and return the ballot to counsel for the Debtor so as to be
received on or before _____, 2011 at 4:00 p.m.

9.    The Bankruptcy Court has entered an Order fixing
_____, 2011 at 10:00 a.m., at the United States Bankruptcy Court, 300
Quarropas Street, White Plains, New York, as the date, time and place for the hearing on
confirmation of the Plan, and fixing _____, 2011 at 4:00 p.m. as the last date
for the filing of any objections to confirmation of the Plan.

## GENERAL INFORMATION REGARDING THE DEBTOR AND THE PLAN

1.    On January 7, 2010, the Debtor filed a Chapter 11 petition.

2.      The Debtor's sole asset is the Hudson Valley Resort & Spa (the "Hotel") located at 400 Granite Road, Kerhonkson, New York.  The Hotel has 323 rooms, 100,00 square feet of common area, including lobby, convention space, restaurant, and spa, a golf course, and employees approximately 150 workers.

3.      The Debtor purchased the Hotel from Minnewaska Company, L.L.C. in March 2006.  The Debtor financed the purchase with a number of lenders, and subsequently incurred additional secured debt.  Thus, the Property appears to be now encumbered by six mortgages (the "Mortgages") totaling in excess of $22.5 million.  The first mortgage is in favor Kennedy Funding Inc. ("Kennedy" or "Kennedy Funding") in an amount in excess of $16.6 million as of April 30, 2011.  The second mortgage is in favor of Park National Funding LLC in the amount of approximately $4 million.  The third mortgage is in favor of the seller Minnewaska Company, LLC in the amount of approximately $2.5 million.  The fourth mortgage is in favor Stone Mountain Holdings LLC in the amount of approximately $3 million.  The fifth mortgage is in favor Yaakov Friedman in the amount of approximately $1 million, and the sixth mortgage is in favor of CYB Trust in the amount of approximately $2.1 million.  The mortgagees are collectively referred to herein as the "Lenders."

4.      At the time the Debtor purchased the Hotel, Everyday had grand plans to develop the Hotel and the Hotel's property into a special destination.  Indeed, Everyday had contracted with golfing great Vijay Singh to develop a professional golf course surrounding the

Hotel.  Everyday entered into negotiations with the Marriot hotel chain to upgrade and operate

the Hotel.  The financial projections made at the time the Debtor acquired the Hotel estimated the

value of the Hotel and its property would appreciate to a value in excess of $100 million, and the

Lenders obviously believed in Everyday's long-term goals.

5.     Notwithstanding the foregoing, the economic downturn halted Everyday's

opportunities to develop the Hotel and its property.  Indeed, at the time that Everyday entered

into its loan agreements, it was anticipated, particularly by the First Mortgagee, that Everyday

would promptly repay its obligations and/or refinance a portion of the amounts owed.  Thus,

Everyday anticipated obtaining secondary financing in order to fully upgrade the Hotel and

develop the Hotel's property thereby causing the Hotel and its property to realize their full

financial potential.

6.     A basic assumption underlying Everyday's payment obligations was the

expectation and belief that there would not be a global economic meltdown that would devastate

the hospitality business and freeze mortgage credit availability; particularly for domestic hotel

resort development.  Contrary to these assumptions, beginning in the Summer and Fall of 2008,

market conditions declined so severely that a worldwide freeze on the issuance of new credit in

fact developed, regardless of the qualifications of the borrower, and has essentially continued to

date.  But for the existence of the credit crisis, Everyday would have obtained the refinancing it

sought, which was necessary, inter alia, to pay the amounts due under the agreements to the

Lenders.

7.      The Hotel nonetheless continues to operate and to provide its guests with refurbished accommodations, banquet facilities, complete spa services, indoor and outdoor heated pools, full fitness center, tennis courts, and a golf course; all at competitive rates. The Hotel specializes in group events, hosting numerous business and social occasions, including those that require observance of kosher dietary restrictions.

8.      The first mortgage is a high interest bridge loan which matured and could not be refinanced.  Ultimately, Kennedy Funding filed a foreclosure action and a receiver was appointed therein.  By agreement of the parties, the receiver order was stayed until January 7, 2010 to facilitate negotiations.  Settlement negotiations were ongoing up until the Chapter 11 filing herein.  In order to avoid the disruption of the Debtor's business that a receivership could cause, not to mention the expense of a receivership, the Debtor filed its Chapter 11 petition.

9.      The Debtor's total amount of unsecured debt, including mortgage deficiency claims is estimated to be in excess of $13.8 million.

10.      The Debtor's objective in the filing this Chapter 11 was to protect and preserve the Hotel, to maintain and increase income, and to restructure the existing loan to facilitate a realistic scenario for all interested parties.

11. Since filing this case, the Debtor has explored many plan alternatives. A number of options that first appeared promising turned out to be unfeasible. The Plan is now based upon a loan restructuring with Kennedy as set forth in greater detail below.

## DEBTOR'S PLAN OF REORGANIZATION
## CLASSIFICATION AND TREATMENT OF CLAIMS

### Class 1: Kennedy Funding

12. **Classification** -- Class 1 consists of the Secured Claim held by Kennedy Funding, the first mortgagee. The Class 1 Claim totals $16,603,984 as of April 30, 2011 plus certain unliquidated costs and fees.

13. **Treatment** – The Class 1 Claim shall be paid pursuant to the Note and Mortgage Modification Agreement annexed the Plan as Exhibit A. Without limiting the more detailed terms of the agreement, the essential terms are summarized as follows:

(a)     Maturity date extended to April 30, 2014;

(b)     interest rate modified as follows: (i) 5% interest only accruing from May 1, 2011 through and including April 30, 2012, (ii) 6% interest only accruing from May 1, 2012 through and including April 30, 2013, (iii) 7% interest only from May 1, 2013 through and including April 30, 2014;

(c)     payment rate modified as follows: (i) $21,000.00 per month on each of May 1, October 1, November 1, December 1, 2011, and January 1, February 1, March 1, and April 1, 2012, and $71,000.00 per month on each of June 1, July 1, August 1, and September 1, 2011; and (ii) $25,000.00 per month on each of May 1, October 1, November 1 and December 1 of each of 2012 and 2013, and January 1, February 1, March 1 and April 1 of each of 2013 and 2014, and $76,000.00 per month on each of June 1, July 1, August 1, and September 1 of each of 2012 and 2013;

8

(d)    Any interest accrued which is not required to be paid currently above shall be deferred and paid on the Maturity Date;

(e)    All principal, interest and other sums due shall be due and payable in full on the Maturity Date;

(f)    Option.  Provided that no event of default shall have occurred, borrower or its designee shall have the option to purchase the Note for the following amounts:  (i) $12,100,000 if the purchase is closed prior to the first anniversary of the date hereof; (ii) $12,200,000 if the purchase is closed prior to the second anniversary of the date hereof; and (iii) $12,300,000 if the purchase is closed prior to the third anniversary of the date hereof, in all cases time being of the essence.

14.    **Voting** – The holder of the Class 1 Claim is impaired and is entitled to vote to accept or reject the Plan.

## Class 2: General Unsecured Claims

15.    **Classification** -- Class 2  consists of Allowed General Unsecured Claims. The General Unsecured Claims asserted against the Debtor presently total approximately $13,805,000.

16.    **Treatment** -- Upon the sale or refinancing of the Property, each holder of an Allowed Class 2 Claim shall be entitled to receive its pro-rata share of 25% of the net proceeds after accounting for payment of (a) the amounts due to the Class 1 Claimant at that time and (b) the principal and interest amounts due to the Investor Entity.  In the event of a refinancing, after making the payments provided for in (a) and (b) of the preceding sentence, commencing on May 1, 2014, each holder of an Allowed Class 2 Claim shall be entitled to an

annual distribution equal to its pro-rata share of 25% of the net profits from the Debtor's post-

confirmation operations.  Such payments will commence indefinitely thereafter until Class 2

Claims are paid in full with interest at the legal rate from the Petition Date, or until the Property

is sold.  For purposes of the Plan, "net profit" shall be defined as the sum remaining after

payment of all expenses including capital expenses, maintenance and operating expenses, wages,

salaries, workers compensation and unemployment insurance premiums, and employee insurance

benefits expenses; all federal, state and local taxes, including income, withholding, payroll,

franchise, property and sales taxes; installment payments on amounts owed to secured lenders or

other ongoing payments under the Plan.

As set forth below, the Investor Entity is required to advance $650,000 to the

Debtor on the Effective Date.  Those funds will be used to fund administration claims and

closing costs in the estimated amount of $200,000, Kennedy's initial Plan payment of $250,000

and a new roof and lobby furniture for the Debtor in the amount of $200,000.  The Investor

Entity will be entitled to 8% annual interest on its loan amount, plus 100% of the net profit until

its loan amount is paid in fulll, and 65% of the net profit thereafter.  In the event of a sale or

refinance of the Property, the Investor Entity shall be entitled to 65% of the excess proceeds after

payment of Kennedy and payment of the Investor Entity loan amount due.

As part of the Plan, each Class 2 Claimant shall have the option of purchasing an

percentage interest in the Investor Entity equal to its percentage share of all Class 2 Claims.  The

purchase price for such membership interest will be its $650,000 multiplied by the percentage

share of Class 2 Claims held by the particular Class 2 Claimant.  To the extent that any Class 2

Claimants elects not purchase its share of the Investor Entity, such shares shall be purchased by

Eliot Spitzer or his designee(s).

17.    **Voting** -- Holders of the Class 2 Claims are impaired and are entitled to

vote to accept or reject the Plan.

**Class 3: Interest Holders**

18.    **Classification** -- Class 3 consists of the Debtor's members.

19.    **Treatment** -- The Class 3 Interest Holder shall be entitled to no

distribution under the Plan, its Interests shall be cancelled, and the Investor Entity shall be the

sole post-confirmation Interest Holder.

20.    **Voting** -- The Holder of Class 3 Interests is deemed to have rejected the

Plan under 1126(g) of the Bankruptcy Code.

**ADMINISTRATIVE EXPENSES**

21.    Allowed Administrative Expenses, including without limitation,

Bankruptcy Fees, shall be paid in full, in cash on the later of the Effective Date, or the date such

Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the

extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

22.     Total unpaid administration claims are projected to be approximately $175,000 .

## PRIORITY CLAIMS

23.     Allowed Priority Claims, including all Claims under Sections 507(a)(2), (3),(4),(5),(6),(7),and (8) of the Bankruptcy Code,  shall be paid in full in Cash on the Effective Date.  The Debtor estimates that the Allowed Priority Claims total approximately $1,200 on account of claims made by the State of New York and the United States Internal Revenue Service.

## MISCELLANEOUS

24.     All outstanding United States Trustee fees and any applicable interest will be paid on or before the Effective Date.   Thereafter, all such fees and any interest shall be paid as they become due.

## MEANS FOR IMPLEMENTATION OF THE PLAN

25.    On the Effective Date of the Plan, the Debtor shall enter into the
agreement with Kennedy annexed to the Plan as Exhibit A, and a new operating agreement, a
copy of which is annexed to the Plan as Exhibit B.

26.    The Effective Date payments shall be funded by the Investor Entity in the
amount of $650,000. $250,000 of this amount shall be paid to satisfy the Debtor's Effective Date
obligation to Class 1.  $200,000 shall be paid to satisfy administration Claims. $200,000 shall be
used to fund a new roof for the property and new furniture for the lobby.

27.    Each Class 2 Claimant shall be entitled to purchase its pro-rata share of the
Investor Entity in exchange for payment of its pro-rata share of the $650,000 amount, as
described above in the section describing Class 2 Treatment.  To the extent that any Class 2
Claimants elects not to purchase its share of the Investor Entity, such amounts will be contributed
by Eliot Spitzer or his designee(s).  The funds to be distributed under the Plan on the Effective
Date shall be held in an IOLA account maintained by Backenroth Frankel & Krinsky, LLP until
the Effective Date.  On the Effective Date, such funds will be turned over to the Debtor and the
Debtor shall be the disbursing agent under the Plan.

28.    **Filing of Documents.**  Each and every federal, state and local
governmental agency or department shall be authorized to accept and record any and all

13

documents and instruments necessary, useful or appropriate to effectuate, implement and

consummate the transaction contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and/or the Confirmation Order.

29.    **11 U.S.C. 1146**.  Under the Plan, pursuant to Bankruptcy Code

§ 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the

creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or

assignment of any lease or sublease or the making or delivery of any deed or other instrument of

transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without

limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the

Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting,

transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of,

or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of

indebtedness by such means, and the making, delivery or recording of any deed or other

instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with

the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a)

exemption, each recorder of deeds or similar official for any county, city or governmental unit in

which any instrument hereunder is to be recorded, any instrument of transfer of the title to the

Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the

payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax,

mortgage tax, intangible tax or similar tax, including without limitation New York State

Documentary Tax.


## LITIGATION ANALYSIS


30.     The Debtor's review of its books and records indicates that there are no

material avoidance actions that are economically feasible to prosecute.  The Debtor, however,

reserves the right to prosecute any such claims to ensure the most efficient and economical

administration of the estate.


## OBJECTIONS TO CLAIMS/TREATMENT OF DISPUTED CLAIMS


### Objections to and Estimation of Claims and Prosecution of Disputed Claims


31.     The Debtor has not yet completed its review of the Claims asserted in this

case. Under the Plan, the Debtor may object, on appropriate grounds, to the allowance of any

Claim up to one hundred twenty (120) days following the Effective Date of the Plan subject to

extension by Order of the Bankruptcy Court. Under the provisions of the Plan, and unless

otherwise ordered by the Bankruptcy Court, the Debtor reserves the exclusive right to, and shall

object to the allowance of, Claims listed in the Debtor's schedules or filed with the Bankruptcy

Court with respect to which it disputes liability in whole or in part. All objections shall be

litigated to Final Order. The Plan reserves the right of the Debtor to compromise, settle,

withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

   32.  Under the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  All of the aforementioned claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

<u>Distribution on Disputed Claims</u>

   33.  The Plan provides that no distribution shall be made with respect to a Disputed Claim until the resolution of such dispute by Final Order or by compromise, settlement, withdrawal or resolution by any other method approved by the Bankruptcy Court thereby becoming an Allowed Claim.  In terms of distribution, the Plan provides that, as soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan.

Reserve for Disputed Claims

34.     The Plan further provides that, if Disputed Claims exist as of the Effective

Date, the Debtor shall hold for the benefit of each holder of a Disputed Claim, cash in amount

equal to the distributions which would have been made to the holder of such Disputed Claim if it

were an Allowed Claim as of the Effective Date in an amount equal to the lesser of: (i) the

amount listed in the schedules; (ii) the amount filed with the Bankruptcy Court; or (iii) the

amount as estimated by the Bankruptcy Court pursuant to §502(c) of the Bankruptcy Code.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

35.     At least 10 days prior to the Confirmation Hearing, the Debtor shall

designate those executory contracts and unexpired leases that the Debtor shall assume and assign

to the appropriate post-confirmation successor entity under the Plan.   Such designation shall be

made by the filing of a notice in the docket of this case and by service by overnight delivery to

the counterparties to such agreements.  All unexpired leases and executory contracts not so

designated shall be deemed rejected under the Plan.

36.     In the event of a rejection of any Executory Contract which results in

damage to the other party or parties to the Executory Contract, a Proof of Claim for such

damages must be filed by the damaged party with the Court within sixty (60) days after the

Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract shall

be treated as a General Unsecured Claim.

## MANAGEMENT OF THE DEBTOR

37.    Eliot Spitzer has managed the Debtor both before and during the pendency

of this case.  Post-confirmation, Mr. Spitzer will manage the Effective Date disbursement of Plan

payments.  Mr. Spitzer or a management entity under his control will manage the Debtor post-

confirmation.  Management compensation for Mr. Spitzer or his management entity will be

$200,000 per year, plus 10% of the net profits on a yearly basis under the same terms that Class 3

General Unsecured creditors are entitled to 25% of net profits as set forth above, plus, in the

event of a sale or refinancing of the Property, 10% of the net profits after payment of (a) the

amounts due to the Class 1 Claimant at that time, and (b) the principal and interest amounts due

to the Investor Entity.

## FINANCIAL PROJECTIONS AND LIQUIDATION ANALYSIS

38.    Annexed hereto as Exhibit B are projections indicating that the post-

confirmation Debtor will have sufficient cash flow to satisfy the obligations to Kennedy under

the Plan and to make ultimately make distributions to unsecured creditors.  Also annexed as part

of Exhibit B are a balance sheet and liquidation analysis.  In the event of a liquidation, Kennedy,

as first mortgagee, holds as senior secured position and would be entitled to virtually all of the

Debtor's assets.

## TAX CONSEQUENCES

39.     The Debtor does not believe that there will be any negative tax

consequences to the Debtor or to Creditors under the Plan.

40.     **THE DEBTOR DOES NOT PURPORT, THROUGH THIS
DISCLOSURE STATEMENT, TO ADVISE THE CREDITORS OR INTEREST
HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF
THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS
AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL
CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE
PLAN.**

## VOTING PROCEDURES AND REQUIREMENTS

41.     A ballot to be used for voting to accept or reject the Plan is enclosed with

this Disclosure Statement.  Each creditor is entitled to execute the ballot, and return it to the

undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in

order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must

be received no later than _____, 2011 at 4:00 p.m. (the "Voting Deadline") at

the following address:

>Backenroth Frankel & Krinsky, LLP
>489 Fifth Avenue
>New York, New York  10017
>Attn:  Mark A. Frankel, Esq.

42.     Each Creditor of the Debtor whose Claim is impaired under the Plan is

entitled to vote, if either (i) its Claim has been scheduled by the Debtor, or (ii) it has filed a Proof

of Claim on or before the last date set by the Bankruptcy Court for such filings.

43.     Class 1 and Class 2 Creditors are impaired under the Plan and are eligible,

subject to the limitations set forth above, to vote to accept or reject the Plan.

44.     Any Claim as to which an objection has been filed (and such objection is

still pending) is not entitled to vote, pursuant to Section 1126(a) of the Bankruptcy Code, unless

the Bankruptcy Court temporarily allows the Claim, pursuant to Bankruptcy Rule 3018, in an

amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by

a Creditor whose Claim is subject to an objection.  Such motion must be heard and determined

by the Bankruptcy Court prior to the Voting Deadline in order for any such Creditor's vote to be

counted.

45.     A Creditor's vote may be disregarded, pursuant to Section 1126(e) of the

Bankruptcy Code,  if the Bankruptcy Court determines that the Creditor's acceptance or rejection

was not solicited or procured in good faith or in accordance with the provisions of the

Bankruptcy Code.


46.     Section 1126(c) of the Bankruptcy Code defines acceptance of a Plan by a

class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in

number of the Claims of that class which actually cast ballots for acceptance or rejection of the

Plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the

Creditors actually voting cast their ballots in favor of acceptance.


47.     Section 1126(d) of the Bankruptcy Code defines acceptance of a Plan by a

class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of

such class held by holders of such interests.


## INJUNCTION, DISCHARGE AND PROPERTY OF THE ESTATE


48.     Discharge.  The confirmation of this Plan shall discharge the Debtor from

any Claim that accrued or arose on or before the Confirmation Date pursuant to 11 U.S.C.

§1141(d)(1).


49.     Vesting of Property.  Except as otherwise provided in the Plan, on the

Effective Date title to all of the Debtor's assets shall pass to the Debtor or its designee free and

clear of all Liens, Claims and Interests, including, without limitation, all liens and mortgages

subordinate to the Class I Claimant's mortgage, in accordance with Section 1141 of the

Bankruptcy Code.

## CONFIRMATION OF THE PLAN

50.    Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy

Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing").

Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

51.    By order of the Bankruptcy Court dated _____,

2011, the Confirmation Hearing has been scheduled for _____, 2011 at

10:00 a.m., in Judge Drain's Courtroom, United States Bankruptcy Court, 300 Quarropas Street,

White Plains, New York.  The Confirmation Hearing may be adjourned from time to time by the

Bankruptcy Court without further notice except for an announcement made at the Confirmation

Hearing or any adjourned Confirmation Hearing.  Any objection to confirmation of the Plan must

be made in writing and filed with the Bankruptcy Court, with a copy to chambers, with proof of

service and served upon the following on or before _____, 2011 at

4:00 p.m.:

> Backenroth Frankel & Krinsky, LLP
> 489 Fifth Avenue
> New York, New York  10017
> Mark A. Frankel, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

52.     At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.  The applicable requirements are as follows: (a) the Plan complies with the applicable provisions of the Bankruptcy Code, (b) the Debtor has complied with the applicable provisions of the Bankruptcy Code, (c) the Plan has been proposed in good faith and not by any means forbidden by law; (d) any payment made or promised or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider; (f) with respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or interest property of a value, as of the Effective Date of the Plan, in an amount that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the

23

Bankruptcy Code, (g) each class of Claims or interests has either accepted the Plan or is not impaired under the Plan, (h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date, (i) at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class; and (j) Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

53.     The Debtor believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

54.     The Debtor contends that holders of all Claims impaired under the Plan will receive payments under the Plan having a present value as of the Effective Date in amounts not less than the amounts likely to be received if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

## CRAMDOWN

55.     In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

## THE DEBTOR INTENDS TO INVOKE THE CRAMDOWN PROVISIONS OF SECTION 1129(b) AS TO ANY IMPAIRED CLASS THAT DOES NOT ACCEPT THE PLAN.

56.     A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or equity interests.  "Fair and equitable" has the following meanings for General Unsecured Claims:

(a)     each impaired General Unsecured Creditor  receives or retains property of a  value equal to the amount of its Allowed Claim; or

(b)     the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

57.     In the event one or more classes rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## **CONCLUSION**

The Debtor urges the Debtor's Creditors to vote to accept the Plan and to evidence

such acceptance by returning their ballots so that they will be received no later than

_____, 2011 at 4:00 p.m.


Dated:  New York, New York
        July 28, 2011


                              **Everyday Logistics, LLC, by Hotel K LLC, its**
                              **Managing Member**


                    By:     s/Eliot Spitzer, Managing Member


                              **BACKENROTH FRANKEL & KRINSKY,**
                              **LLP**,   **Attorneys for the Debtor**


                    By:     s/Mark Frankel_____
                              489 Fifth Avenue
                              New York, New York 10017
                              (212) 593-1100

Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re                                                                    Chapter 11

EVERYDAY LOGISTICS LLC,                                  Case No. 10-22026

                              Debtor.
------------------------------------------------------------x


### AMENDED DEBTOR'S PLAN OF REORGANIZATION


**BACKENROTH, FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, New York  10017
(212) 593-1100
Counsel to the Debtor-in-Possession

## <u>INTRODUCTION</u>

Everyday Logistics, LLC ("<u>Debtor</u>"), proposes this Plan of Reorganization for the Debtor. **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR, EACH OF THE DEBTOR'S CREDITORS, AND THE INTEREST HOLDERS (AS ALL SUCH TERMS ARE DEFINED BELOW)**.

## ARTICLE 1
## <u>DEFINITIONS</u>

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1      **"<u>Administrative Expense</u>"** Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code.

1.2      **"<u>Administrative Expense Claim</u>"**  A claim for payment of an Administrative Expense.

1.3      **"<u>Allowance Date</u>"** shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

2

1.4     **"Allowed Claim"** shall mean a Claim against the Debtor: (a) to the extent

that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party

in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the

Debtor's schedules or any amendments thereto but which is not listed therein as disputed,

unliquidated or contingent.


1.5     **"Allowed Secured Claim"** shall mean an Allowed Claim for which a

Claimant asserts and is determined by a Final Order to hold a valid, perfected and enforceable

Lien, security interest or other interest or encumbrance in property in which the Debtor has an

interest not subject to avoidance or subordination under the Bankruptcy Code or applicable non-

bankruptcy law, or an Allowed Claim for which a Claimant asserts a setoff under Section 553 of

the Bankruptcy Code and such Claim is allowed by Final Order, but in any event only to the

extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the

Claimant's interest in the Debtor's interest in the property or to the extent of the amount subject to

such setoff, as the case may be.


1.6     **"Allowed Unsecured Claim"** shall mean an Unsecured Claim to the

extent same is allowed.


1.7     **"Bankruptcy Case"** shall mean this Chapter 11 bankruptcy case of the

Debtor.

3

1.8    **"Bankruptcy Code"** shall mean Title 11 of the United States Code (11.

U.S.C. § 101 et. seq.), as in effect on the Petition Date and as amended during the Bankruptcy

Case.

1.9    **"Bankruptcy Court"** shall mean the Court as defined below.

1.10    **"Cash"** shall mean all cash and cash equivalents which evidence

immediately available funds in United States dollars.

1.11    **"Claim"** shall mean a right to payment as set forth in § 101(5) of the

Bankruptcy Code.

1.12    **"Claimant"** shall mean the holder of a Claim.

1.13    **"Confirmation Date"** shall mean the date of the entry of the

Confirmation Order.

1.14    **"Confirmation Hearing"** shall mean the hearing pursuant to the

Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation

of the Plan.

1.15    **<u>"Confirmation Order"</u>** shall mean the order of the Court confirming the

Plan.

1.16    **<u>"Court"</u>** shall mean the United States Bankruptcy Court for the Southern

District of New York.

1.17    **<u>"Creditor"</u>** shall mean any entity that holds a claim against the Debtor.

1.18    **<u>"Debtor"</u>** shall mean Everyday Logistics, LLC.

1.19    **<u>"Disputed Claim"</u>** shall mean the whole or any portion of any claim

against the Debtor to which an objection is timely filed as to which a Final Order has not been

entered allowing or disallowing such Claim or any portion thereof.

1.20    **<u>"Effective Date"</u>** shall mean no later than the Date upon which the

Confirmation Order is a Final Order.

1.21    **<u>"Estate"</u>** shall mean the estate of the Debtor created upon the

commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.22    **<u>"Executory Contracts"</u>** shall mean "executory contracts" and "unexpired

leases" as such terms are used within Section 365 of the Bankruptcy Code.

1.23    **"Final Order"** shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

1.24    **"Interest"** shall mean an existing ownership interest in Debtor.

1.25    **"Interest Holder"** shall mean a holder and owner of an existing Interest in Debtor.

1.26    **"Investor Entity"** shall mean an entity to be created to take post-confirmation ownership of the Debtor's membership Interests.

1.27    **"Legal Rate"** shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Confirmation Hearing.

1.28    **"Lien"** shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.29    **"Petition Date"** shall mean January 7, 2010, the date of the filing of the Bankruptcy Case by the Debtor.

6

1.30    **"Plan"** shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

1.31    **"Secured Claim"** shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

1.32    **"Secured Creditor"** shall mean the owner or holder of a Secured Claim.

1.33    **"Unsecured Claim"** shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of the Debtor or the Debtor's Estate; (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim  includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code.

1.34    **"Unsecured Creditor"** shall mean the owner or holder of an Unsecured Claim.

## ARTICLE 2

## CLASSIFICATION AND TREATMENT OF CLAIMS

## Class 1: Kennedy Funding

7

2.1    **Classification** -  Class 1 consists of the Secured Claim held by Kennedy

Funding, the first mortgagee.


2.2    **Treatment** - The Class 1 Claim shall be paid pursuant to the Note and

Mortgage Modification Agreement annexed the Plan as Exhibit A.  Without limiting the more

detailed terms of the agreement, the essential terms are summarized as follows:

(a)        Maturity date extended to April 30, 2014;

(b)        interest rate modified as follows: (i) 5% interest only accruing from May 1, 2011
           through and including April 30, 2012, (ii) 6% interest only accruing from May 1,
           2012 through and including April 30, 2013, (iii) 7%  interest only from May 1,
           2013 through and including April 30, 2014;

(c)        payment rate modified as follows: (i) $21,000.00 per month on each of May 1,
           October 1, November 1, December 1, 2011, and January 1, February 1, March 1,
           and April 1, 2012, and $71,000.00 per month on each of June 1, July 1, August 1,
           and September 1, 2011; and  (ii) $25,000.00 per month on each of May 1, October
           1, November 1 and December 1 of each of 2012 and 2013, and January 1,
           February 1, March 1 and April 1 of each of 2013 and 2014, and $76,000.00 per
           month on each of June 1, July 1, August 1, and September 1 of each of 2012 and
           2013;

(d)        Any interest accrued which is not required to be paid currently above shall be
           deferred and paid on the Maturity Date;

(e)        All principal, interest and other sums due shall be due and payable in full on the
           Maturity Date;

(f)        Option.  Provided that no event of default shall have occurred, borrower or its
           designee shall have the option to purchase the Note for the following amounts:  (i)
           $12,100,000 if the purchase is closed prior to the first anniversary of the date
           hereof; (ii) $12,200,000 if the purchase is closed prior to the second anniversary
           of the date hereof; and (iii) $12,300,000 if the purchase is closed prior to the third
           anniversary of the date hereof, in all cases time being of the essence.

8

2.3    **Voting** – The holder of the Class 1 Claim is impaired and is entitled to vote to accept or reject the Plan.

## Class 2: Unsecured Claims

2.4    **Classification** - Class 2 consists of Allowed Unsecured Claims.

2.5    **Treatment** – Upon the sale or refinancing of the Property, each holder of an Allowed Class 2 Claim shall be entitled to receive its pro-rata share of 25% of the net proceeds after accounting for payment of (a) the amounts due to the Class 1 Claimant at that time and (b) the principal and interest amounts due to the Investor Entity.  In the event of a refinancing, after making the payments provided for in (a) and (b) of the preceding sentence, commencing on May 1, 2014, each holder of an Allowed Class 2 Claim shall be entitled to an annual distribution equal to its pro-rata share of 25% of the net profits from the Debtor's post-confirmation operations.  Such payments will commence indefinitely thereafter until Class 2 Claims are paid in full with interest at the legal rate from the Petition Date, or until the Property is sold.  For purposes of the Plan, "net profit" shall be defined as the sum remaining after payment of all expenses including capital expenses, maintenance and operating expenses, wages, salaries, workers compensation and unemployment insurance premiums, and employee insurance benefits expenses; all federal, state and local taxes, including income, withholding, payroll, franchise, property and sales taxes; installment payments on amounts owed to secured lenders or other ongoing payments under the Plan.

9

As set forth below, the Investor Entity is required to advance $650,000 to the Debtor on the Effective Date.  Those funds will be used to fund administration claims and closing costs in the estimated amount of $200,000, Kennedy's initial Plan payment of $250,000 and a new roof and lobby furniture for the Debtor in the amount of $200,000.  The Investor Entity will be entitled to 8% annual interest on its loan amount, plus 100% of the net profit until its loan amount is repaid in full, and 65% of the net profit thereafter.  In the event of a sale or refinance of the Property, the Investor Entity shall be entitled to 65% of the excess proceeds after payment of Kennedy and payment of the Investor Entity loan amount due.

As part of the Plan, each Class 2 Claimant shall have the option of purchasing an percentage interest in the Investor Entity equal to its percentage share of all Class 2 Claims.  The purchase price for such membership interest will be $650,000 multiplied by the percentage share of Class 2 Claims held by the particular Class 2 Claimant.  To the extent that any Class 2 Claimants elects not purchase its share of the Investor Entity, such shares shall be purchased by Eliot Spitzer or his designee(s).

2.6    **Voting** – Class 2 is impaired and is entitled to vote accept or reject the Plan.

**Class 3: Interest Holders**

      2.7    **Classification** – Class 3 consists of the Debtor's members.

      2.8    **Treatment** -- The Class 3 Interest Holder shall be entitled to no distribution under the Plan, its Interests shall be cancelled, and the Investor Entity shall be the sole post-confirmation Interest Holder.

      2.9    **Voting** – The Holders of Class 3 Equity Interests are deemed to have rejected the Plan, under 1126(g) of the Bankruptcy Code.

# ARTICLE 3

## ADMINISTRATIVE EXPENSES, PRIORITY CLAIMS, AND STATUTORY FEES

      3.1    Allowed Administrative Expenses shall be paid in full, in Cash on the Effective Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

11

3.2     Allowed Priority Claims, including all Claims under Sections 507(a)(2), (3),(4),(5),(6),(7),and (8) of the Bankruptcy Code,  shall be paid in full in Cash on the Effective Date.  The Debtor estimates that the Allowed Priority Claims total approximately $1,200 on account of claims made by the State of New York and the United States Internal Revenue Service.

3.3     All outstanding United States Trustee fees and any applicable interest will be paid on or before the Effective Date.   Thereafter, all such fees and any interest shall be paid as they become due.

# ARTICLE 4

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     On the Effective Date of the Plan, the Debtor shall enter into the agreement with Kennedy annexed to the Plan as Exhibit A, and a new operating agreement, a copy of which is annexed to the Plan as Exhibit B.

4.2     The Effective Date payments shall be funded by the Investor Entity in the amount of $650,000. $250,000 of this amount shall be paid to satisfy the Debtor's Effective Date obligation to Class 1.  $200,000 shall be paid to satisfy administration Claims. $200,000 shall be used to fund a new roof for the property and new furniture for the lobby.  Each Class 2 Claimant shall be entitled to purchase its pro-rata share of the Investor Entity in exchange for payment of

12

its pro-rata share of the $650,000 amount, as described above in the section describing Class 2

Treatment.  To the extent that any Class 2 Claimants elects not to purchase its share of the

Investor Entity, such amounts will be contributed by Eliot Spitzer or his designee(s).


    4.3    Eliot Spitzer or a management entity under his control will manage the

Debtor post-confirmation.  Management compensation for Mr. Spitzer or his management entity

will be $200,000 per year, plus 10% of the net profits on a yearly basis under the same terms that

Class 3 General Unsecured creditors are entitled to 25% of net profits as set forth above, plus, in

the event of a sale or refinancing of the Property, 10% of the net profits after payment of (a) the

amounts due to the Class 1 Claimant at that time, and (b) the principal and interest amounts due

to the Investor Entity.


    4.4    The funds to be distributed under the Plan on the Effective Date shall be

held in an IOLA account maintained by Backenroth Frankel & Krinsky, LLP until the Effective

Date.  On the Effective Date, such funds will be turned over to the Debtor and the Debtor shall be

the disbursing agent under the Plan..


    4.5    **Filing of Documents.**  Each and every federal, state and local

governmental agency or department shall be authorized to accept and record any and all

documents and instruments necessary, useful or appropriate to effectuate, implement and

consummate the transaction contemplated by the Plan, including, but not limited to any and all

notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly

preserved by the Plan, and/or the Confirmation Order.

4.6     **11 U.S.C. 1146**.  Under the Plan, pursuant to Bankruptcy Code

§ 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the

creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or

assignment of any lease or sublease or the making or delivery of any deed or other instrument of

transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without

limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the

Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting,

transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of,

or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of

indebtedness by such means, and the making, delivery or recording of any deed or other

instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with

the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a)

exemption, each recorder of deeds or similar official for any county, city or governmental unit in

which any instrument hereunder is to be recorded, any instrument of transfer of the title to the

Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the

payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax,

mortgage tax, intangible tax or similar tax, including without limitation New York State

Documentary Tax.

## ARTICLE 5

## PROVISIONS FOR THE RETENTION, ENFORCEMENT
## AND SETTLEMENT OF CLAIMS BELONGING TO THE
## DEBTOR OR THE DEBTOR'S ESTATE

5.1     All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy
Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent
transfer claim pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-
petition transactions under Section 549 of the Bankruptcy Code are hereby preserved for the
benefit of the Debtor.  Prosecution and settlement of such Claims shall be the exclusive
responsibility of Debtor and all proceeds from such actions shall vest in and be the property of
the Debtor.

## ARTICLE 6

## PROVISIONS FOR THE RESOLUTION OF DISPUTED
## CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

6.1     **Objections to Claims**.  The Debtor may object, on appropriate grounds, to
the allowance of any Claim up to one hundred twenty (120) days following the Effective Date of
the Plan subject to extension by Order of the Bankruptcy Court.  Unless otherwise ordered by the
Bankruptcy Court, the Debtor reserves the exclusive right to, and shall object to the allowance of,
Claims listed in the Debtor's schedules or filed with the Bankruptcy Court with respect to which
it disputes liability in whole or in part.  All objections shall be litigated to Final Order. The Plan

15

reserves the right of the Debtor to compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

6.2    The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  All of the aforementioned claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

6.3    <u>Distribution on Disputed Claims</u>.  No distribution shall be made with respect to a Disputed Claim until the resolution of such dispute by Final Order or by compromise, settlement, withdrawal or resolution by any other method approved by the Bankruptcy Court thereby becoming an Allowed Claim.  As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan.

6.4    <u>Reserve for Disputed Claims</u>.  If Disputed Claims exist as of the Effective Date, the Debtor shall hold for the benefit of each holder of a Disputed Claim, cash in amount equal to the distributions which would have been made to the holder of such Disputed Claim if it

were an Allowed Claim as of the Effective Date in an amount equal to the lesser of: (i) the

amount listed in the schedules; (ii) the amount filed with the Bankruptcy Court; or (iii) the

amount as estimated by the Bankruptcy Court pursuant to §502(c) of the Bankruptcy Code.


# ARTICLE 7

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES


7.1    **Assumption**.  At least 10 days prior to the Confirmation Hearing, the

Debtor shall designate those executory contracts and unexpired leases that the Debtor shall

assume and assign to the appropriate post-confirmation successor entity under the Plan.   Such

designation shall be made by the filing of a notice in the docket of this case and by service by

overnight delivery to the counterparties to such agreements.  All unexpired leases and executory

contracts not so designated shall be deemed rejected under the Plan.


7.2    **Claims Upon Rejection**.  In the event of a rejection of any Executory

Contract which results in damage to the other party or parties to the Executory Contract, a Proof

of Claim for such damages must be filed by the damaged party with the Court within sixty (60)

days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory

Contract shall be treated as a General Unsecured Claim.


7.3    **Failure to File**.  Any Claim arising from the rejection of any Executory

Contract not filed with the Court within the time period provided in the preceding paragraph

above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

## ARTICLE 8

## RETENTION OF JURISDICTION

8.1     **Retention of Jurisdiction**.  The Court shall have jurisdiction over all matters arising under, arising in, or relating to Debtor Bankruptcy Case including, but not limited to, proceedings:

8.1.1     To consider any modification of the Plan under section 1127 of the Bankruptcy Code;

8.1.2     To hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157.

8.1.3     To hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtor or the Debtor's estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

8.1.4     To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

8.1.5     To value assets of the Estate.

18

8.1.6   To enforce the Confirmation Order, the final decree, and all injunctions therein;

8.1.7   To enter an order concluding and terminating the Bankruptcy Case;

8.1.8   To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

8.1.9   To determine all questions and disputes regarding title to the assets of the Debtor and liens against such assets.

8.1.10   To re-examine Claims which may have been allowed for purposes of voting, and to determine objections which may be filed to any Claims;

## ARTICLE 9

## GENERAL PROVISIONS

9.1  **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

9.2  **Contents of Confirmation Order**.  The Confirmation Order may contain such injunctions and other orders as may be necessary to implement the Plan.

9.3  **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a

19

creditor holding a Disputed Claim, until such Claim, or any part thereof, becomes an Allowed

Claim, if ever.


9.4    **Discharge of Claims not Classified**.  Any Claim not specifically

classified within this Plan shall not receive distributions under the Plan on account of such

Claim, and shall be deemed discharged and forever barred.


9.5    **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated

herein for purposes of calculating the dates set forth herein.


9.6    **Other Actions**.  Nothing contained herein shall prevent the Debtor,

Interest Holders, or Creditors from taking such actions as may be necessary to consummate the

Plan, although such actions may not specifically be provided for within the Plan.


# ARTICLE 10

# MODIFICATIONS


10.1    **Modification of Plan.**  The Debtor may seek amendments or

modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time

prior to the Confirmation Date.  After the Confirmation Date, the Debtor may seek to remedy any

defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in

such manner as may be necessary to carry out the purposes and intent of the Plan.

# ARTICLE 11

## INJUNCTION, DISCHARGE AND PROPERTY OF THE ESTATE

11.1    **Discharge**.  The confirmation of this Plan shall discharge the Debtor from

any Claim that accrued or arose on or before the Confirmation Date pursuant to 11 U.S.C.

§1141(d)(1).

11.2 **Vesting of Property**.  Except as otherwise provided in the Plan, on the

Effective Date title to all of the Debtor's assets shall pass to the Debtor or its designee free and

clear of all Liens, Claims and Interests, including, without limitation, all liens and mortgages

subordinate to the Class I Claimant's mortgage, in accordance with Section 1141 of the

Bankruptcy Code.

21

# ARTICLE 12

## CLOSING THE CASE

12.1    Upon substantial consummation, the Debtor may move for a final decree
to close the Bankruptcy Case and to request such other orders as may be just.


Dated:    New York, New York
          July 28, 2011


**Everyday Logistics, LLC, by Hotel K LLC,
its Managing Member**


By:    s/Eliot Spitzer, Managing Member


**BACKENROTH FRANKEL & KRINSKY,
LLP, Attorneys for the Debtor**


By:    s/Mark Frankel
       Mark A. Frankel
       489 Fifth Avenue
       New York, New York 10017
       (212) 593-1100

# Exhibit A

## <u>NOTE AND MORTGAGE MODIFICATION AGREEMENT</u>

THIS NOTE AND MORTGAGE MODIFICATION AGREEMENT (the "Agreement"), dated as of _____ ___, 2011, is made by and among **Kennedy Funding, Inc., as agent for Co-Lenders** ("Lender"), Two University Plaza, Hackensack, New Jersey 07601; **Everyday Logistics, Inc.,** a New York limited liability company, with an address at 400 Granite Road, Kerhonkson, New York 12446 ("Borrower"), and **Elliot Spitzer**, an individual, with an address at _____, [and **Michael Steinberg**] ("Guarantor").

<u>R E C I T A L S</u>:

**WHEREAS**, Borrower has previously borrowed from Lender a loan in the original principal amount of Nine Million Seven Hundred Eighty Thousand **($9,780,000.00) DOLLARS** (the "Loan"), which Loan is evidenced by a Promissory Note from Borrower to Lender (as may be amended, restated or modified from time to time, the "Note");

**WHEREAS,** the Borrower has filed for protection under Chapter 11, which matter is pending in the United States Bankruptcy Court (the "Court"), Southern District of New York, Proceeding No. 10-22026;

**WHEREAS,** Borrower has filed a Plan of Reorganization (the "Plan") with the Court which has issued its Final Approval of the Plan;

**WHEREAS**, the Plan calls for the Loan, as modified hereby, to be secured by certain instruments, agreements and documents, including, but not limited to, those items identified in the Loan Documents as set forth on <u>Schedule B</u> hereto and made a part hereof;

**WHEREAS**, capitalized terms not otherwise defined herein shall have those meanings assigned to them in the Loan Documents; and

**WHEREAS**, Lender, Borrower and Guarantor have agreed to modify the Loan on the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the foregoing and of the covenants and conditions hereinafter set forth, Borrower, Lender and Guarantor hereby agree as follows:

<u>A G R E E M E N T</u>:

## **ARTICLE I**

## EXISTING DOCUMENTS; CERTAIN MODIFICATIONS

Section 1.01 Ratification of Existing Agreements. The Obligors' Obligations to the Lender as evidenced by or otherwise arising under the Loan Documents, as modified in this Agreement upon the terms set forth herein and therein, are, by Obligors' execution of this Agreement, ratified and confirmed in all respects by Obligors.  The Obligors each hereby acknowledge that all of Borrower's and Guarantor's Obligations to the Lender under the Loan Documents are joint and several.  In addition, by Obligors' execution of this Agreement, they each represent and warrant that no counterclaim, right of set-off or defense of any kind exists or is outstanding with respect to such Obligations.  As of April 30, 2011, the aggregate principal amount ("Principal Amount") of the Obligors' Obligations to the Lender under the Note is $9,780,000.00 plus accrued but unpaid interest of $6,823,984.00 (accrued through April 30, 2011) (for a total, as of April 30, 2011, of $16,603,984.00) and all other costs incurred by the Lender under the Loan Documents and in connection with this Agreement, including, without limitation, all legal fees and expenses.  Obligors acknowledge that the mortgage lien security interests securing their Obligations to the Bank constitute valid and enforceable liens and that the Obligors shall take no action to impair or invalidate said security interests.  Except as expressly provided herein, the Loan Documents remain in full force and effect.

Section 1.02 Maturity Date.  The Maturity Date as set forth in the Note is hereby extended to April 30, 2014, or such earlier date as otherwise provided in the Note, at which time all Obligations due and owing thereunder shall become automatically due in full, TIME BEING OF THE ESSENCE.

Section 1.03 Payment Obligations.  The accrual of interest and the obligations to pay principal and interest as set forth in the Note shall be amended as follows:

(A)     Interest only at the rate per annum equal to five (5%) percent on the Principal Amount outstanding hereof shall accrue from May 1, 2011 through and including April 30, 2012.

(B)     Interest only at the rate per annum equal to six (6%) percent on the Principal Amount outstanding hereof shall accrue from May 1, 2012 through and including April 30, 2013.

(C)     Interest only at the rate per annum equal to seven (7%) percent on the Principal Amount outstanding hereof shall accrue from May 1, 2013 through and including April 30, 2014.

(D)     Commencing on May 1, 2011, interest payments shall be made to Lender monthly in arrears as follows:

2

(i)     $21,000.00 per month on each of May 1, October 1, November 1, December 1, 2011, and January 1, February 1, March 1, and April 1, 2012, and $71,000.00 per month on each of June 1, July 1, August 1, and September 1, 2011; and

(ii)    $25,000.00 per month on each of May 1, October 1, November 1 and December 1 of each of 2012 and 2013, and January 1, February 1, March 1 and April 1 of each of 2013 and 2014, and $76,000.00 per month on each of June 1, July 1, August 1, and September 1 of each of 2012 and 2013.

(E)     Any interest accrued which is not required to be paid currently as set forth in Clause (D) above shall be deferred and paid on the Maturity Date.

(F)     All principal, interest and other sums due hereunder and not yet paid shall be due and payable in full on the Maturity Date.

Section 1.04 Option.  Notwithstanding anything contained herein to the contrary, provided that no Event of Default shall have occurred, Lender agrees that Borrower or its designee shall have the option to purchase the Note for the following amounts:  (i) $12,100,000 if the purchase is closed prior to the first anniversary of the date hereof; (ii) $12,200,000 if the purchase is closed prior to the second anniversary of the date hereof; and (iii) $12,300,000 if the purchase is closed prior to the third anniversary of the date hereof, in all cases time being of the essence.

Section 1.05 Certain Payments.  Prior to the date hereof, Borrower has made two (2) payments  of $10,000.00 each on account of interest for each of  February  and March 2011, and two (2) payments of $21,000.00 each on account of interest for each of April and May 2011. Simultaneously herewith, Borrower is making a payment to Lender of $250,000.00 on account of interest payments which shall become due from May 1, 2011 through April 1, 2012 as required pursuant to Section 1.03(D)(i).

Section 1.06 Retention of Jurisdiction.  The parties agree that the Court shall retain jurisdiction over any disputes arising under this Agreement or the Loan Documents.

## ARTICLE II

## CLOSING

Section 2.01 Closing Date.  Provided all conditions precedent set forth in Section 2.02 hereof been satisfied, this Agreement shall become effective [_____] ___, 2011 (the "Closing Date").

3

Section 2.02 Conditions of Closing.  Unless and until the following conditions have been fully satisfied, Lender shall have no obligation whatsoever to close the transactions contemplated under and provided for in this Agreement:

(A)    Lender has received evidence from the issuer of its existing Mortgagee Policy of Title Insurance that the Property is not encumbered by any encumbrances other than the Permitted Encumbrances and such endorsements (including, without limitation, survey endorsements as requested by Lender);

(B)    The Borrower has executed and delivered the Conveyance Documents as required hereunder and delivered them in escrow to Lender;

(C)    On the Closing Date, the Borrower shall not be in default in the performance of any covenant or agreement to be performed by the Borrower under this Agreement; and

(D)    All representations, warranties and covenants of the Borrower contained in this Agreement shall be true and correct as of the Closing Date and the Borrower shall have performed and satisfied all covenants contained herein required to have been satisfied on or before the Closing Date, including the delivery of such information and documentation as required by this Agreement.

(E)    Borrower shall have delivered a Certificate executed by the Borrower certifying that, to the best of the Borrower's knowledge except as disclosed in writing to and accepted by Lender, the Borrower has paid all accounts payable relating to the Property which have accrued to, or were due and payable and for which invoices were received prior to, the Closing Date;

(F)    Borrower shall have delivered an opinion from the Borrower's counsel dated as of the Closing Date in form and substance satisfactory to Lender (or its designee) and its counsel and to the effect that: (i) the Borrower is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York; (ii) the consummation of the transactions hereunder will not conflict with the Articles of Organization and any other organizational documents of the Borrower; (iii) the Borrower has the requisite authority to enter into this Agreement and consummate the transactions hereunder; and (iv) this Agreement and the Conveyance Documents have been duly executed and delivered by the Borrower and are legal, binding and enforceable obligations of the Borrower and Guarantor;

4

If the Closing shall not have occurred in accordance with the terms hereof and all conditions precedent herein satisfied or waived in writing by Lender on or before [_____], 2011, then this Agreement and all other Conveyance Documents shall be automatically rendered null and void and of no force and effect and nothing herein or in any Conveyance Documents shall be deemed to waive, modify or alter any of the respective rights, remedies or obligations of Lender or the Borrower as exist between themselves under the Loan Documents which shall be deemed unaffected by the terms, conditions or provisions of this Agreement or any of the Conveyance Documents.

Section 2.03 The Borrower's Obligations at Closing. The Borrower will execute and deliver into escrow or the Borrower will cause to be executed and delivered into escrow the following Conveyance Documents at Closing, all in form, substance and scope satisfactory to Lender:

(A)    The executed and acknowledged Deed(s) conveying the Property, subject only to the Permitted Encumbrances and the Loan Documents;

(B)    The executed Bill of Sale and General Assignment;

(C)    The Release;

(D)    A certificate of non-foreign status executed by the Borrower and the Guarantor.

Section 2.04 Closing Costs. Borrower has paid all escrow fees, title insurance costs, recording fees, attorneys' fees and any and all other costs and expenses contemplated or incurred hereby except as otherwise set forth in this Section 2.04.

## ARTICLE III

### CONVEYANCE TO ESCROW; RELEASE FROM ESCROW

Section 3.01 Agreement to Convey Into Escrow. Contemporaneously herewith, the Borrower shall convey to Lender or its nominee, to be held in escrow subject to the terms and conditions set forth herein, the documents necessary to convey the following real and personal property which shall be free of any right of redemption or other right of interest of the Borrower or anyone claiming by, through or under the Borrower:

(A)    A Deed conveying Borrower's right, title and interest in and to the Property, any and all improvements thereon, and all tenements, hereditaments, privileges and appurtenances in any way belonging or appertaining thereto (the "Deed") in the form of Exhibit A attached hereto and incorporated herein for all purposes, subject only to the Permitted Encumbrances (herein so called) set forth on Exhibit B attached hereto and incorporated herein for all purposes;

5

(B)     All personal property (collectively, the "Personal Property") located on the Property and not owned by tenants of the Property pursuant to a Bill of Sale in the form attached hereto as <u>Exhibit C-1</u>, along with all of Borrower's rights, title, and interest in and to all contracts, management agreements, warranties, guaranties and other accounts and agreements relating to any portion of the Property or the Personal Property by Assignment of Contracts, Warranties, Receivables, Licenses, Security Deposits, Leases, Subleases, Rents and Assumed Names in the form attached as <u>Exhibit C-2</u> and incorporated herein for all purposes (the "General Assignment"):

(C)     All policies of insurance owned by Borrower pertaining to the Property, the Personal Property, or any part thereof, and all proceeds payable under those policies;

(D)     All security deposits, rents and other income of any nature whatsoever derived from or relating to the Property or Personal Property and held by or for the benefit of Borrower, and all unpaid balances or amounts owing with respect to all invoices, obligations, costs, bills, claims, and other expenses incurred or to be incurred in connection with the acquisition, ownership, construction, leasing, maintenance, management or operation of the Property against any party relating thereto, all as shown on the Scheduled Accounting (the "Scheduled Accounting") attached hereto as <u>Exhibit D</u> and incorporated herein for all purposes; and

(E)     All escrow accounts or any other accounts of any nature whatsoever for ad valorem taxes, casualty or other insurance premiums, hold-backs, and/or other expenses held by or for the benefit of the Borrower or Mortgagor and any lienholders with respect to the Property or Personal Property, all as set forth in the Scheduled Accounting.

    <u>Section 3.02</u> <u>Conveyance Documents.</u>  Good and indefeasible fee simple title to the Property shall be conveyed and assigned by Owner to an entity to be designated pursuant to (i) the Deed, subject only to the Permitted Encumbrances, (ii) the Bill of Sale, and (iii) the General Assignment.  In addition, the Borrower shall transfer good title to all of the Borrower's interests in all contracts, agreements, permits, rights, certificates, licenses and approvals to Lender or its designee by a duly executed assignment or separate assignments free and clear of all liens, security interests and adverse claims.  The Deed, the Bill of Sale and the General Assignment, together with all other documents evidencing the conveyance of the Property to Lender, and all other documents executed in connection with this Agreement including, without limitation, the Release of All Claims by and between Lender, Borrower and Guarantor (the "Release"), in the form attached hereto as <u>Exhibit E</u> shall herein be collectively called the "Conveyance

6

Documents". The terms of all Conveyance Documents are fully incorporated into this Agreement by reference, expressly including any representations contained therein.

Section 3.03 Merger Not Intended. The parties hereto acknowledge and agree that:

7

(A)     The Conveyance Documents, and the conveyances to be made thereby, shall be interpreted and construed as an absolute conveyance to Lender of all of the Borrower's rights, titles and interests in the Property, including specifically but without limitation, any equity or rights of redemption of the Borrower therein or thereto;

(B)     The lien of the Mortgage is not intended to be, and shall not be, released or relinquished in any manner or respect whatsoever on account of this Agreement, the transaction contemplated hereby, or delivery of the Conveyance Documents out of escrow to Lender, which Mortgage shall remain valid and continuous and in full force and effect for the benefit of Lender, and its successors and assigns, and the priority of such Mortgage is maintained, until the Mortgage is expressly released by written instrument ("Release Instrument") executed by Lender, or its successors and assigns, specifically referring to the provision of this Section 3.03 or of the Deed, and expressing (and not merely implying) an intent to release and relinquish the Mortgage, which Release Instrument shall be recorded in the Office of the Register of _____ County, New York; and Lender, or its successors and assigns, shall have the right and option, but not the obligation, to execute a Release Instrument as, if and when Lender, or its successors and assigns, shall determine to do so in the exercise of its or their sole discretion;

(C)     Neither Lender nor the Borrower intend that there be, and there shall not in any event be, a merger of the Mortgage with the title or other interest of Lender in and to the Property acquired by virtue of the Conveyance Documents, and the parties expressly intend and provide that the interests of Lender in the Mortgage, on one hand, and Lender's title to the Property, on the other hand, be and remain at all times SEPARATE and DISTINCT;

(D)     The title and other interest in and to the Property under the Deed, the Bill of Sale and the General Assignment will not merge with the liens and security interests in the Property created in favor of Lender under the Mortgage, and for purposes of priority as between (i) intervening or inferior liens and encumbrances, if any, on or against the Property, and (ii) the Mortgage, and any and all rights of the Lender to exercise its remedies of foreclosure by private power of sale pursuant to nonjudicial foreclosure or by judicial foreclosure of the Mortgages or any other remedies are expressly preserved hereby and thereby and for purposes of limitations and any other applicable time bar defense, are expressly extended as evidenced by this Agreement;

(E)     The priority of the Mortgage is intended to be and shall remain in full force and effect and nothing herein or in any instruments executed in

8

connection herewith shall be construed to subordinate the priority of the Mortgage to any other liens, encumbrances, restrictions or other matters whatsoever (other than if caused by the actions of Lender, its successors, assigns, the affiliates of the foregoing or the creditors of any of the foregoing not contemplated by this Agreement or the Conveyance Documents).  Nothing in this Section 3.03(E) shall be construed as in any way limiting Lender's right to make any mortgage or lien held by it inferior or superior to any lease pursuant to the terms of the lease or any other agreement; and

(F)     If the conveyance of the Property from the Borrower is voided, avoided or set aside for any reason whatsoever, then (i) if the Mortgage shall have been previously released, in whole or in part, the same shall be automatically revived and reinstated; (ii) Lender shall have the right to foreclose the Mortgage and take such other action permitted thereby or pursuant to the other Loan Documents; and (iii) all costs of Lender incurred in connection with this Agreement, the transactions contemplated hereby and any other costs of enforcement of the rights and remedies of Lender shall be deemed a part of the indebtedness secured by the Mortgage, except if the conveyance of the Property from the Borrower is voided, avoided or set aside due to Lender's gross negligence, willful misconduct, breach of this Agreement or the exercise of its sole option not to release the Conveyance Documents pursuant to Section 3.05 of this Agreement.

Section 3.04 Currently Subsisting Liens.  The Borrower hereby agrees that the Mortgage is hereby ratified and confirmed, is currently valid and subsisting, and in full force and effect, and there are currently no liens, security interests or other encumbrances of any nature, intervening between the Mortgage and the Conveyance Documents which have been created by or as a result of any action or inaction taken or permitted by the Borrower.

Section 3.05 Release from Escrow. Borrower is executing and delivering into escrow the Conveyance Documents.  At Lender's sole option upon an Event of Default, the Conveyance Documents shall be released from escrow and delivered to Lender on the date to be determined by Lender, such date to be referred to as the "Release Date".  In the event the Conveyance Documents are released from escrow and Lender is entitled to record the Deed, it is Lender's present intent to deliver the Deed in the name of either Lender's affiliate (which affiliate has not been created as of the date of this Agreement) or a third party to be identified by Lender (collectively, the "Designated Grantee").  In the event Lender is entitled to receive delivery of the Conveyance Documents and record the Deed pursuant to the terms of this Agreement, by execution of this Agreement, Borrower and Guarantor shall be deemed to irrevocably consent to Lender filling in the name of the Designated Grantee on the Deed and other Conveyance Documents to reflect

9

the identity of the entity taking title to the Property pursuant to the Deed.  Upon release of the Conveyance Documents from escrow to Lender in accordance with the terms of this Agreement, by virtue of their execution of this Agreement, (i) Borrower and Guarantor waive any claim, if any, that the Deed was not properly delivered due to failure to identify the Designated Grantee as of the date of the execution of this Agreement, (ii) Borrower and Guarantor shall at their sole cost and expense agree to execute and/or acknowledge any documentation required by the title company insuring the Deed in connection with the issuance of a title policy in favor of, and in form and substance reasonably acceptable to Lender and Designated Grantee.

Section 3.06 Absolute Conveyance.  The Borrower hereby acknowledges and agrees that the delivery out of escrow to Lender of the Conveyance Documents as provided in Section 3.05 shall constitute the conveyance of the Property to Lender or Lender's designee, is an absolute conveyance of all rights, titles and interests in and to the Property and is not now intended to be, nor shall it ever be, construed as being a deed of trust, mortgage, trust conveyance,  or other security agreement of any nature whatsoever, and that neither the Borrower, nor anyone claiming by, through or under the Borrower shall have any further interest, including specifically, but without implied limitation, any rights of redemption, or claims in and to the Property or to the rents, issues or profits and other proceeds that may be derived therefrom of any kind whatsoever.  The Borrower is not retaining, nor being given, any right to occupy, redeem, encumber or purchase the Property.

## ARTICLE IV

## [Intentionally Omitted]

## ARTICLE V

## BORROWER/GUARANTOR REPRESENTATIONS AND WARRANTIES

As an inducement to Lender to enter into the transactions contemplated by this Agreement, Borrower represents and warrants to Lender that:

Section 5.01  Authority. Borrower and Guarantor are duly authorized to execute and deliver this Agreement, the Conveyance Documents, the Release and each of the other related documents and instruments, as applicable, and to consummate the transactions and perform the obligations contemplated hereby and thereby.

Section 5.02  Binding Authority; No Breach. This Agreement constitutes the legal, valid and binding obligation of Borrower and Guarantor enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws or by legal or equitable principles relating to or limiting creditors' rights generally.  Neither the execution and delivery of this Agreement, nor the

10

consummation of the transactions contemplated hereby will (i) violate any judgment, order, ruling, injunction, decree or award of any court, administrative agency or governmental body against, or binding upon, Borrower or Guarantor; or (ii) to the best of Borrower's knowledge, constitute a violation by Borrower and/or Guarantor of any law or regulation of any jurisdiction as such law or regulation relates to or affects Borrower and/or Guarantor or their properties or businesses.

Section 5.03  Mechanics' Liens.  No action has been taken, suffered or permitted by or on behalf of Borrower, the effect of which would be to establish or cause the inception or priority of any mechanics' or materialmen's lien, statutory, constitutional or otherwise, or other lien, charge or encumbrance upon the Property or any part thereof or interest therein, other than the liens evidenced by the Loan Documents in favor of Lender and any other matters set forth in the Permitted Encumbrances.  Except as expressly disclosed in writing in this Agreement, Borrower has not entered into any contracts or agreements relating to the use or ownership of the Property or by which any person or entity has agreed to provide labor, services, or materials in regard to the Property or the business of Borrower.

Section 5.04  Advice of Counsel.  This Agreement, the Conveyance Documents and the Release were reviewed by Borrower and Guarantor who acknowledge and agree that they (i) understand fully the terms of this Agreement and the Conveyance Documents and the consequences of the issuance hereof and thereof; (ii) have been afforded an opportunity to have this Agreement, the Conveyance Documents and the Release, and to discuss all such documents with such attorneys and other persons as they may wish; and (iii) have entered this Agreement and executed and delivered the Conveyance Documents and the Release, of their own free will and accord and without threat or duress.

Section 5.05  Litigation.  There are no pending, or to the best knowledge of Borrower and Guarantor, threatened actions, suits, or proceedings before or by any court or administrative agency (i) which question the validity of this Agreement, the Loan Documents, the Conveyance Documents, the Release or any instrument or agreement executed in connection herewith or therewith; (ii) which seek to restrain or prohibit, or to obtain damages or a discovery order in respect of, this Agreement, the Loan Documents, or the consummation of the transactions contemplated hereby or thereby; or (iii) which are likely in any case or in the aggregate to adversely affect the complete consummation of the transactions contemplated hereby or thereby.

Section 5.06  Full Disclosure.  No representation or warranty by the parties contained in this Agreement, the Conveyance Documents or any other instrument in connection herewith, delivered on behalf of the Borrower and/or Guarantor, contains any untrue statement of any material fact or omits any material fact or statement necessary to make the facts or statements contained herein or therein not false or misleading.

11

Section 5.07 True and Correct. All information and documents previously furnished by Borrower and/or Guarantor to Lender, or to be furnished to Lender pursuant to this Agreement, are true, accurate, and complete.

Section 5.08  Title. Borrower owns record and beneficial indefeasible title in fee simple absolute, in and to the Property and to the Personal Property, all free and clear of any encumbrances, encroachments, overlaps, special assessments, claims, leases, tenancies, other adverse interest or defects upon or affecting the Property other than the Permitted Encumbrances.

Section 5.09  Good Faith. This Agreement, each of the Conveyance Documents, the Release and all documents and instruments to be executed and delivered in connection herewith and therewith and all information furnished to Lender, is made and furnished in good faith, for value and valuable consideration, and have not been made under or induced by any fraud, duress, or undue influence exercised by Lender or any other person.

Section 5.10 Currently Subsisting Liens. The liens and security interests evidenced by the Loan Documents are currently valid and subsisting liens, and are in full force and effect. There are no liens, security interests, or other encumbrances of any nature intervening between the Loan Documents and the Conveyance Documents.

Section 5.11 Taxes. Except as otherwise set forth on Exhibit D attached hereto, no federal, state, or municipal taxes are due and unpaid with respect to the Property or the Personal Property, and no liens for such taxes are in effect against any portion of the Property or the Personal Property.

Section 5.12 Expenses. Borrower and/or Guarantor has paid all operating expenses relating to the Property and the Personal Property and/or the operation and maintenance thereof, that have accrued through the Closing Date, except as may be disclosed in the Scheduled Accounting attached hereto as Exhibit D.  Unless otherwise explicitly set forth in the Scheduled Accounting, any expenses disclosed on the Scheduled Accounting and all other expenses from the date hereof to and including the Closing Date, covering the operation, management or maintenance of the Property will be paid in full by the Borrower on or before the Closing Date and Borrower agrees to indemnify and hold Lender, its successors and assigns, harmless from and against any and all unpaid balances owed by Borrower arising and accruing prior to the Closing Date with respect to all such expenses, fees, charges and other similar costs.

Section 5.13 No Loan Document Claims. Borrower and Guarantor hereby represent and warrant to Lender that they have no defenses, counterclaims, or offsets to the Note, Mortgage, the Guaranty or any of the other Loan Documents.

12

Section 5.14 <u>No</u> <u>Entity</u> <u>Change</u>. The limited liability company Agreement governing Borrower is in full force and effect and has not been amended nor changed, and no proceeding is pending, planned or threatened for the dissolution or annulment of Borrower.  Borrower is a limited liability company duly organized and validly existing and in good standing under the laws of the State of New York.

Section 5.15 <u>No Pending Bankruptcy or Receivership Proceedings</u>. Other than Proceeding No. 10-22026, there is no bankruptcy or receivership proceeding pending or threatened against Borrower.  Borrower represents and warrants to Lender that Borrower is not insolvent.  Lender is entitled to rely, and has relied, upon these representations and warranties in the execution and delivery of this Agreement and all other documents and instruments executed and delivered by Lender in connection with this Agreement.

Section 5.16 <u>No</u> <u>Bankruptcy</u> <u>Filing</u> <u>Intended</u>. Borrower hereby represents and warrants to Lender that it has no intention as of the Closing Date to do any of the following within at least 180 days after said date: (i) seek entry of any order for relief as a debtor and a proceeding under the Code, (ii) seek consent to or not contest the appointment of a receiver or trustee for itself or for all or any part of its property, (iii) file a petition seeking relief under any bankruptcy, arrangement, reorganization or other debtor relief laws, or (iv) make a general assignment for the benefit of its creditors. Lender is entitled to rely, and has relied, upon this representation and warranty in the execution and delivery of this Agreement and all other documents and instruments executed and delivered by Lender in connection with this Agreement.  Borrower hereby agrees not to invoke and hereby waives the protection of any automatic stay should the Borrower be subject to any further bankruptcy proceedings.

Section 5.17 <u>Affirmations Concerning Covenants, etc</u>. To the best of Borrower's knowledge and belief, there have been no violations of any covenants, conditions, exceptions, encumbrances, restrictions, restrictive covenants, zoning or land use ordinances, environmental laws and regulations, or other reservations which pertain to or affect the Property.

The continued validity of the representations and warranties contained above and elsewhere in this Agreement will be a condition precedent to all obligations of Lender set forth herein.  If any of the representations and warranties prove to be incorrect at the time made or as of the Closing Date, Lender may then notify the Borrower that it intends to terminate this Agreement. All representations and warranties contained in this <u>Section 5</u>, or elsewhere in this Agreement will survive the Closing Date and the consummation of the transactions contemplated hereby, including, without limitation, the execution, delivery and acceptance of the Deed, the Bill of Sale and the General Assignment.

**ARTICLE VI**

## INDEMNIFICATION OF LENDER.

Section 6.01  Pre-Release Date Claims. Borrower and Guarantor agree that Lender's acceptance of title to the Property and Personal Property under the Conveyance Documents will not create any liability on Lender's part to third parties that have claims of any kind against Borrower and/or Guarantor in connection with the Property or the Personal Property. Lender does not, under this Agreement, the Conveyance Documents, or otherwise, assume or agree to discharge any liabilities pertaining to the Property or Personal Property that accrued prior to the Closing Date. Borrower and Guarantor agree to indemnify and hold Lender harmless and defend Lender, from and against any losses, damages or expenses (including attorneys' fees and court costs) pertaining to claims arising out of the Property or Personal Property, and arising from events that occurred prior to the Closing Date. This Agreement does not confer any third party benefits on persons not a signatory to this Agreement.

Section 6.02 Misrepresentation. Borrower and Guarantor shall indemnify and hold Lender harmless and defend Lender from and against any losses, damages, costs or expenses (including attorneys' fees) incurred by Lender as a direct or indirect result of (a) breach of any representation or warranty of Borrower and/or Guarantor contained in this Agreement, or (b) any breach or default by Borrower and/or Guarantor under any of the covenants or agreements contained in this Agreement to be performed by Borrower or Guarantor, all of which shall survive the Closing Date. If Lender discovers after the Closing Date that any of the representations or warranties of Borrower and/or Guarantor contained in this Agreement are not true and correct, Lender may, in addition to any other remedy available to it hereunder, under the Loan Documents, or at law or in equity, reinstate the Loan Documents and all obligations of Borrower and Guarantor under the Loan Documents, and Borrower and Guarantor hereby expressly consent to such reinstatement under the circumstances described above.

Section 6.03 Other Indemnified Expenses.

Borrower and Guarantor shall indemnify and hold Lender harmless and defend Lender from and against any and all liability, loss, cost, damage, or expense, including reasonable attorneys' fees, arising out of or in connection with any of the following: (a) the breach of any warranties of title set forth in the Deed; (b) any lien, charge, or encumbrance on the Property in existence as of the Closing Date and which was not disclosed to Lender in writing on Exhibit D attached hereto; (c) ad valorem taxes on the Property from the date of acquisition of the Property by Borrower through the Closing Date; (d) the breach of any representation or warranty of Borrower and/or Guarantor set forth in this Agreement; (e) the failure of Borrower and/or Guarantor to perform any covenant or agreement of Borrower and/or Guarantor set forth in this Agreement; and (f) any and all claims of third parties relating to claims arising out of the Property, and from events that occurred prior to the Closing Date, including, without limitation, any claim, by whoever asserted, arising from the deposit disposal, spillage, leakage, or storage of

14

any hazardous substance or hazardous waste (as such terms or similar terms are used or defined under or pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended *("CERCLA"),* the Resource Conservation and Recovery Act of 1976, as amended *("RCRA")*, and under other applicable environmental laws).

## ARTICLE VII

## GENERAL PROVISIONS

Section 7.01 <u>Brokerage Commissions.</u>  Each party represents to the other that no broker has been involved in this transaction.  It is agreed that if any claims for brokerage commissions or fees are ever made against the Borrower or Lender in connection with this transaction, all such claims shall be handled and paid by the party whose actions or alleged commitments form the basis of such claim and the party against whom the claim is made shall indemnify and hold harmless the other from and against any and all such claims or demands including, without limitation, reasonable attorneys' fees, with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm or corporation in connection with this Agreement or the transactions contemplated hereby.

Section 7.02 <u>Survival.</u>  All representations, warranties, covenants and agreements of the parties made in this Agreement shall survive the execution and delivery of this Agreement, the Closing Date, the Release Date, the Deed and the other documents contemplated herein.

Section 7.03 <u>Successors and Assigns.</u>  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.  No assignment of this Agreement or the rights hereunder may be made by the Borrower without the prior written consent of Lender.  No assignment of this Agreement or any of the rights hereunder by the Borrower shall be effective unless and until said assigning party receives the prior written consent of Lender to such assignment.  Lender shall have the right to assign this Agreement to an affiliated entity.  No assignment by either party shall relieve the assigning party of any of its obligations or liabilities hereunder.

Section 7.04 <u>Modifications and Waivers.</u>  No delay on the part of Lender in exercising any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any waiver of any right, power or privilege hereunder operate as a waiver of any other right, power or privilege hereunder, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power or privilege hereunder.  All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies which the parties hereto may otherwise have at law or in equity.  Lender shall have the right to waive any

15

of the conditions precedent to its obligations under this Agreement.  No such waiver, nor any modification, discharge or amendment of this Agreement, will be valid in the absence of the written and signed consent of the party against which enforcement of such is sought, except as otherwise provided herein.

Section 7.05 Entire Agreement.  This Agreement and the documents executed pursuant hereto contain the entire agreement between the parties relating to the transactions contemplated hereby.  All prior agreements, understandings, representations and statements with respect to the deed transaction contemplated herein, whether written or oral, are merged herein.

Section 7.06 Captions.  All article and section titles or captions contained in this Agreement, in any exhibit annexed hereto or in any schedule referred to herein or for convenience only, shall not be deemed a part of this Agreement and shall not affect the meaning or interpretation of this Agreement.

Section 7.07 Exhibits and Schedules.  All exhibits attached hereto and all schedules and documents referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

Section 7.08 Governing Law; Venue.  This Agreement shall be construed in accordance with the laws of the State of New Jersey and applicable federal law.  Venue for any action in connection herewith shall be proper in Bergen County, New Jersey.

Section 7.09 Good Faith.  This Agreement and each of the Conveyance Documents to be executed and all information furnished to or by the Borrower and Lender, is made and furnished in good faith, for value and valuable consideration, and have not been made under or induced by any fraud, duress or undue influence exercised by any party or any other person.

Section 7.10 Advice of Counsel.  This Agreement, the Conveyance Documents and the other documents contemplated hereby were reviewed by the Borrower who, including the Borrower's partners executing this Agreement, acknowledge and agree that they: (i) understand fully the terms of this Agreement and the Conveyance Documents and the consequences of the issuance hereof and thereof; (ii) have been afforded an opportunity to have this Agreement and the Conveyance Documents contemplated hereby including, without limitation, the Release, reviewed by its attorneys and to discuss all such documents with such attorneys and other consultants as it may wish; and (iii) have entered into this Agreement and executed and issued the Conveyance Documents and the other documents contemplated hereby including, without limitation, the Release, of their own free will and accord and without threat or duress.

16

Section 7.11 Further Assurances.  The Borrower shall execute and deliver to Lender such other documents and instruments and perform such further acts as reasonably requested by Lender to effectuate the transactions contemplated hereby.

Section 7.12 Notices.  All notices, demands or requests given or required to be given hereunder shall be personally delivered or sent registered or certified mail, return receipt requested, with postage prepaid, to the parties at the following addresses (or to such other or further addresses as the parties may hereafter designate by like notice similarly sent):

If to Borrower and/or Guarantor:

_____
_____
_____

with a Copy to:

_____
_____
_____


If to Lender:

Kennedy Funding, Inc.
Two University Plaza
Hackensack, New Jersey 07601
Attention:  Mr. Kevin Wolfer

with a Copy to:

Michael R. Leighton, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
25 Main Street
Hackensack, New Jersey 07601

All notices sent by mail as set forth above shall be deemed effectively given on the third business day after the day such notice shall be deposited in any official depository of any post office or branch post office regularly maintained by the United States Government. Any notices sent by overnight courier, telex, cable or telegram shall be deemed to have been given on the date sent.  All notices personally delivered shall be deemed effectively given on the date of such delivery.

17

Section 7.13 Appointment of Designee.  Lender does hereby reserve the right to appoint or select a designee or designees to accept title to the Property prior to the Release Date.  Such designees may take the form of a trust, corporation or a partnership, whether a general partnership or a limited partnership, or both, and may be an unaffiliated third party.  Subject to the foregoing limitation, the Borrower hereby agrees that all representations, warranties, covenants and indemnifications shall inure to the benefit of Lender and such designee or designees and their respective successor and assigns.

Section 7.14 Time for Performance.  Whenever under the terms and provisions of this Agreement the time for performance of a condition or the giving of a notice falls upon a Saturday, Sunday or holiday, such time or performance or for the giving of notice shall be extended to the next business day.

Section 7.15 Limitation of Liability.  Neither Lender, Borrower nor any present or future officer, director, employee, venturer or general or limited partner of Lender or Borrower or their assigns and successors hereunder, nor any of their partners, officers, agents or employees, shall have any personal liability of any kind or nature for or by reason of any matter or thing whatsoever under, in connection with, arising out of, or in any way related to this Agreement or the transactions herein provided and both Lender and the Borrower on their behalf, hereby waive any and all right to sue or recover on account of any such personal liability, whether real or claimed.  This limitation of liability is in addition to, and not in limitation of, any other limitation on liability applicable to Lender and Borrower, their permitted assigns, and their partners, officers and agents, under law or any other contract, agreement, or instrument.  This limitation of liability shall in no way affect the obligations of either Lender, Borrower or Guarantor set forth in this Agreement or in any document or instrument delivered pursuant hereto.

Section 7.16 Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered as of the ____ day of _____, 2011.

**LENDER:**

**KENNEDY FUNDING, INC.**


By:   _____
        Name:
        Title:

31392/0450-7421128v5

**BORROWER:**

**EVERYDAY LOGISTICS, LLC**


By:_____
Name: _____
Title: _____


**GUARANTOR**

_____
Eliot Spitzer

**GUARANTOR**

_____
Michael Steinberg

<u>Attachments</u>

Schedule A - Description of Property

Exhibit A - Deed

Exhibit B - Permitted Encumbrances

Exhibit C-1 - Bill of Sale

Exhibit C-2 - General Assignment

Exhibit D – Scheduled Accounting

Exhibit E - Release

20

## SCHEDULE A

## LEGAL DESCRIPTION

**[description of remaining units to be inserted]**

21

## EXHIBIT A

## DEED [IN LIEU OF FORECLOSURE]

## [BRACKETED LANGUAGE APPLICABLE ONLY IF LENDER/LENDER SPE]

THIS INDENTURE, made as of the _____ day of _____, 2011,

BETWEEN **2056 Fifth Avenue Associates, LLC**, a New York limited liability company, with an address at 111 West 57th Street, Suite 520, New York, New York 10019,

party of the first part,

AND

_____,                                    a
_____,           with        an        address        at
_____,

party of the second part,

WITNESSETH, that the party of the first part, in consideration of TEN ($10.00) DOLLARS paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the City, County and State of New York, bounded and described as set forth on Schedule "A", attached hereto:

The Street Address of the property is: 2056 Fifth Avenue, Units [_____], New York, New York.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any sheets and roads abutting the above described premises to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

BEING THE SAME PREMISES conveyed to the party of the first part by Deed dated [_____] given by [_____], and recorded in the New York City Register in Deed Book _____, at Page ___.

22

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatever, except as aforesaid and as set forth on Exhibit A attached hereto,

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of' the improvement before using any part of the total of the same for any other purpose.

**[Deed in Lieu of Foreclosure**. As this Deed is being executed and delivered in lieu of foreclosure of the Mortgages (as defined below), the party of the first part hereby makes the following representations and warranties:   This Deed is an absolute conveyance of the title to the Property, in effect as well as in form, and is not intended as a mortgage, conveyance in trust or as a hypothecation of any kind or character; that the possession of the Property has been surrendered to the party of the second part, and title to the Property has been conveyed to the party of the second part; that the conveyance herein is freely and fairly made; that the party of the first part has no option to purchase or any other right, title or interest in or to the Property; that the Property is encumbered by (a) Mortgage and Security Agreement (Acquisition) in the principal amount of $3,375,000 dated February 28, 2005 and recorded on April 19, 2005 in the Office of the City Register of the City of New York ("Register's Office") as City Register File No. ("CRFN") 2005000226116, (b) Gap Mortgage and Security Agreement (Acquisition) in the principal amount of $200,000 dated November 17, 2006 and recorded on December 13, 2006 as CRFN 2006000682917, (c) Consolidation and Extension Agreement dated November 17, 2006 and recorded on December 13, 2006 in the Register's Office as CRFN 2006000682918, (d) Mortgage and Security Agreement (Construction) in the principal amount of $6,375,000 dated February 28, 2005 and recorded on April 19, 2005 in the Register's Office as CRFN 2005000226117, (e) Gap Mortgage and Security Agreement (Construction) in the principal amount of $2,500,000 dated November 17, 2006 and recorded on December 13, 2006 in the Register's Office as CRFN 20069000682920, (f) Gap Mortgage and Security Agreement (Construction) in the principal amount of $1,200,000 dated March 5, 2008 and recorded on March 11, 2008 in the Register's Office as CRFN 2008000098766, and (g) Consolidation and Extension Agreement dated March 5, 2008 and recorded on March 11, 2008  in the Register's Office as CRFN 2008000098767 (collectively, the "*Mortgages*"); that this conveyance is not made in fraud upon the rights of any creditors of the party of the first part, or of any other person or persons whomsoever; and that each, all and every of the representations of the party of the first part herein made are, and each of them is made, for the benefit of

any person hereafter acquiring any rights, title or interest in or to the Property and of any title insurance company which may insure rights, title or interest of any such person, and each of such persons is, and all of them are, authorized to rely upon each, all and every of the foregoing representations, which are freely and fairly made without menace, fraud, duress or undue influence on the part of any person whomsoever.  The foregoing representations and warranties are acknowledged by the party of the first part to be material, and are made by the party of the first part to induce the party of the second part to accept this Deed in lieu of foreclosure, with the knowledge and expectation that the party of the second part will rely on each and every one of the foregoing representation and warranties.]

[THE PARTIES HEREIN DO NOT INTEND THAT ACCEPTANCE OF THE DEED IN LIEU OF FORECLOSURE BE DEEMED TO CONSTITUTE A MERGER OF THE MORTGAGES REFERRED TO IN THE PRECEDING PARAGRAPH WITH THE FEE CONVEYED HEREBY BUT THAT THE MORTGAGES SHALL REMAIN AS GOOD AND VALID MORTGAGES SEPARATE AND APART FROM ANY OTHER INTEREST OF GRANTEE IN FEE.  FURTHER, THE TRANSFER CONTEMPLATED BY THIS DEED SHALL NOT CONSTITUTE A FULL OR PARTIAL SATISFACTION, WAIVER OR RELEASE OF THE INDEBTEDNESS EVIDENCED BY ANY INSTRUMENT SECURED BY OR MADE IN CONJUNCTION WITH THE MORTGAGES.]

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK - SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed this deed the day and year first above written.

Signed, Sealed and Delivered
in the presence of                    **2056 FIFTH AVENUE ASSOCIATES LLC**

_____        By: _____
                                           Name:
                                           Title:

STATE OF NEW YORK   )

                    )

COUNTY OF_____)

On the — day of _____ in the year 2011 before me, the undersigned, a Notary Public for said state, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.

_____

__

Notary Public

Property Address: 2056 Fifth Avenue, Units [_____]
                  New York, New York
Section      : [_____]
Block: [_____]
Lot:   [_____]

25

SCHEDULE A

LEGAL DESCRIPTION

31392/0450-7421128v5

**EXHIBIT B**

**PERMITTED ENCUMBRANCES**

# EXHIBIT C-1

## BILL OF SALE

**THIS BILL OF SALE** (**"Bill of Sale"**), dated as of _____ ____, 2011, by and between **2056 Fifth Avenue Associates, LLC,** a New York limited liability company, with an address at 111 West 57th Street, Suite 520, New York, New York 10019 (**"Seller"**) and _____, a _____, with an address at _____ (**"Purchaser"**).

### WITNESSETH:

**WHEREAS,** Seller agreed to sell to Purchaser certain real property, and the improvements located thereon, as more particularly described in **Schedule A** attached hereto and incorporated herein by this reference (collectively, the **"Real Property"**); and

**WHEREAS,** by deed of even date herewith, Seller conveyed the Real Property to Purchaser; and

**WHEREAS,** in connection with the above described conveyance Seller desires to sell, transfer and convey to Purchaser certain items of tangible personal property as hereinafter described.

**NOW, THEREFORE,** in consideration of the receipt of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration paid in hand by Purchaser to Seller, the receipt and sufficiency of which are hereby acknowledged, Seller has GRANTED, CONVEYED, SOLD, TRANSFERRED, SET OVER and DELIVERED and by these presents does hereby GRANT, SELL, TRANSFER, SET OVER and DELIVER to Purchaser, its legal representatives, successors and assigns, all right, title and interest in and to all tangible personal property owned by Seller, located on the Real Property, including, without limitation, any and all furniture, equipment, carpeting, supplies and other items of personal property, and used in the ownership, operation and maintenance of the Real Property, including, without limitation, all items set forth on Schedule A attached hereto and made a part hereof (herein collectively called the **"Personal Property"**), to have and to hold, all and singular, the Personal Property unto Purchaser forever.

[SIGNATURE PAGE FOLLOWS]

28

**IN WITNESS WHEREOF,** the undersigned have executed this Bill of Sale as of the date first set forth hereinabove.

**2056 FIFTH AVENUE ASSOCIATES LLC,**
a New York limited liability company

By: _____
     Name:
     Title:

# SCHEDULE A

## PERSONAL PROPERTY

**[to be provided by Borrower, if any]**

30

**Exhibit C-2**

**GENERAL ASSIGNMENT**

**ASSIGNMENT OF CONTRACTS, WARRANTIES, RECEIVABLES, LICENSES, SECURITY DEPOSITS, LEASES, SUBLEASES, AND RENTS**

THIS ASSIGNMENT OF CONTRACTS, WARRANTIES, RECEIVABLES, LICENSES, SECURITY DEPOSITS, LEASES, SUBLEASE AND RENTS, dated as of _____ __, 2011 (this "**Assignment and Assumption Agreement**"), by and between **2056 Fifth Avenue Associates, LLC**, a New York limited liability company, with an address at 111 West 57th Street, Suite 520, New York, New York 10019 ("**Assignor**") and _____, a _____, with an address at _____ ("**Assignee**").

WHEREAS, Assignor has agreed to convey certain real property, and the improvements located thereon, as more particularly described in **Schedule A** attached hereto and incorporated herein by this reference (collectively, the "**Real Property**");

WHEREAS, Assignor desires to convey unto Assignee all of Assignor's right, title and interest in and to all contracts, management agreements, warranties, guaranties and other accounts and agreements relating to any portion of the Property and/or the personal property (collectively, the "Personal Property") located on the Property and not owned by tenants of the Property (collectively, the "Intangible Property") as hereinafter provided; and

WHEREAS, Assignee desires to assume the duties and obligations of Assignor with respect to the Intangible Property.

NOW, THEREFORE, in accordance with the Agreement and in consideration of the sum of Ten Dollars ($10.00), the sufficiency and receipt of which are hereby acknowledged, the parties do hereby covenant and agree as follows and take the following actions:

1.    Assignor does hereby convey unto Assignee all of the Assignor's right, title and interest in and to the following property to the extent the same is transferable by Assignor (collectively, "Intangible Property"):

(a)    any and all leases, tenancies, licenses and other rights of occupancy or use of or for any portion of the Real Property or the Personal Property (including all amendments, renewals and extensions thereof), in effect as of the date of this Assignment and Assumption Agreement (collectively, "Leases");

31

(b)     any and all contracts and agreements of any kind for the management, repair or operation of the Property (other than Leases) in effect as of the date of this Assignment and Assumption Agreement (collectively, "Contracts");

(c)     any and all licenses, permits, authorizations, certificates of occupancy and other approvals that are in effect as of the date of this Assignment and Assumption Agreement and necessary for the current use and operation of the Property (collectively, "Permits");

(d)     any and all warranties, telephone exchange numbers, architectural or engineering plans and specifications, and development rights that exist as of the date of this Assignment and Assumption Agreement and relate to the Real Property or the Personal Property (collectively, "General Intangibles");

(e)     all security deposits, rents and other income of any nature whatsoever derived from or relating to the Real Property or Personal Property and held by or for the benefit of Assignor, and all unpaid balances or amounts owing with respect to all invoices, obligations, costs, bills, claims, and other expenses incurred or to be incurred in connection with the acquisition, ownership, construction, leasing, maintenance, management or operation of the Real Property against any party relating thereto, all as shown on the Scheduled Accounting (the "Scheduled Accounting") attached hereto as Exhibit B and incorporated herein for all purposes;

(f)     all escrow accounts or any other accounts of any nature whatsoever for ad valorem taxes, casualty or other insurance premiums, hold-backs, and/or other expenses held by or for the benefit of the Assignor and any lienholders with respect to the Property or Personal Property, all as set forth in the Scheduled Accounting; and

(g)     any and all utility deposits held on behalf of Assignor by utility companies with respect to the Property (collectively, "Utility Deposits").

In addition, if and to the extent required by applicable law, Assignor does hereby convey unto Assignee all of Assignor's right, title, and interest in and to any and all refundable tenant deposits (and required interest thereon, if any) in Assignor's possession with respect to the Leases and Contracts as of the date of this Assignment and Assumption Agreement (collectively, the "Tenants' Deposits").  "Intangible Property" means the Leases, Contracts, Permits, General Intangibles, Scheduled Accounting and Utility Deposits, and, if and to the extent quitclaimed hereunder, Tenants' Deposits.

2.     Assignee hereby accepts the foregoing assignment of the Intangible Property and hereby assumes all duties and obligations of Assignor with respect to (a) the Intangible Property for the period on and after the date of this Assignment and Assumption Agreement, and (b) any and all refundable deposits paid by tenants and contractors (and required interest on those deposits, if any) under the Leases and

31392/0450-7421128v5

Contracts as of the date hereof, whether Buyer has received those deposits or interest or a credit therefore at Closing or not.

3.     This Assignment and Assumption Agreement shall be (a) binding upon, and inure to the benefit of, the parties to this Assignment and Assumption Agreement and their respective heirs, legal representatives, successors and assigns, and (b) construed in accordance with the laws of the jurisdiction in which the Real Property is located, without regard to the application of choice of law principles, except to the extent such laws are superseded by federal law.

[BALANCE OF THIS PAGE INTENTIONALLY LEFT BLANK - SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, this Assignment and Assumption Agreement has been signed and delivered by the parties as of the date first above written.

ASSIGNOR:

**2056 FIFTH AVENUE ASSOCIATES LLC**,
a New York limited liability company

By: _____
        Name:
        Title:

**[SIGNATURES CONTINUED ON NEXT PAGE]**

ASSIGNEE:

_____

By: _____
Name:
Title:

33

EXHIBIT A

DESCRIPTION OF REAL PROPERTY

EXHIBIT B

SCHEDULED ACCOUNTING

31392/0450-7421128v5

**EXHIBIT D**

**SCHEDULED ACCOUNTING**

**[to be provided by Borrower]**

**EXHIBIT E**

**MUTUAL RELEASE**

This Mutual Release ("Release") is made on this __ day of _____, 2011 by and among:

**2056 Fifth Avenue Associates, LLC**, a New York limited liability company, with an address at 111 West 57th Street, Suite 520, New York, New York 10019 *("Borrower")*,

**Arthur Fefferman**, an individual, with an address at _____ *("Guarantor"), and*

**Wells Fargo Bank, N.A. (successor-by-merger to Wachovia Bank, National Association)**, 375 Park Avenue, New York, New York 10152 *("Lender")*.

(Borrower, Guarantor and Lender are collectively referred to herein as the "Parties").

RECITALS

**WHEREAS,** Lender has made loans in the aggregate maximum principal sum of $13,650,000 to Borrower which loans are evidenced by that certain Promissory Note (Acquisition) in the amount of $3,575,000 dated November 17, 2006, that certain Promissory Note (Construction) dated November 17, 2006 in the amount of $8,875,000, and that certain Promissory Note (Construction) dated March 5, 2008 in the amount of $1,200,000 (collectively, the "*Notes*").

**WHEREAS, t**he Notes are secured by (a) Mortgage and Security Agreement (Acquisition) in the principal amount of $3,375,000 dated February 28, 2005 and recorded on April 19, 2005 in the Office of the City Register of the City of New York ("Register's Office") as City Register File No. ("CRFN") 2005000226116, (b) Gap Mortgage and Security Agreement (Acquisition) in the principal amount of $200,000 dated November 17, 2006 and recorded on December 13, 2006 as CRFN 2006000682917, (c) Consolidation and Extension Agreement dated November 17, 2006 and recorded on December 13, 2006 in the Register's Office as CRFN 2006000682918, (d) Mortgage and Security Agreement (Construction) in the principal amount of $6,375,000 dated February 28, 2005 and recorded on April 19, 2005 in the Register's Office as CRFN 2005000226117, (e) Gap Mortgage and Security Agreement (Construction) in the principal amount of $2,500,000 dated November 17, 2006 and recorded on December 13, 2006 in the Register's Office as CRFN 20069000682920, (f) Gap Mortgage and Security Agreement (Construction) in the principal amount of $1,200,000 dated March 5, 2008 and recorded on March 11, 2008 in the Register's Office as CRFN 2008000098766, (g) Consolidation and Extension Agreement dated March 5, 2008 and recorded on March 11, 2008 in the Register's Office as CRFN 2008000098767

37

(collectively, the "*Mortgages*") covering real property in the City, County and State of New York, more particularly described therein (the "*Property*"); and

**WHEREAS,** as a condition of Lender making the Loan, Guarantor has delivered that certain Guaranty Agreement dated February 28, 2005, that certain Amended and Restated Guaranty Agreement dated November 17, 2006 and that certain Second Amended and Restated Guaranty Agreement dated March 5, 2008 (collectively, the "*Guaranties*") (the Notes, the Mortgages, the Guaranties and all other documents securing the Notes are sometimes hereinafter collectively referred to as the "*Loan Documents*"); and

**WHEREAS**, Lender, Borrower and Guarantor executed that certain Deed in Lieu of Foreclosure Escrow Agreement dated as of February ___, 2011 (the "Agreement") which required, among other things, delivery by Borrower of a deed to Lender and the Parties' execution of a release agreement with respect to certain claims and liabilities as more particularly set forth hereafter.

NOW THEREFORE, in consideration of the mutual promises and releases granted herein, the Parties hereby agree as follows:

1. **Release in Favor of Lender.** Effective as of the date hereof, Borrower and Guarantor release and forever discharge Lender and its respective predecessors, successors and assigns, their parents, subsidiaries, officers, directors, shareholders, employees, representatives and attorneys, and any affiliated corporations, its officers, directors, shareholders and employees, from any and all causes of action, suits, liabilities, debts, damages, controversies, agreements, trespasses, judgments, executions, demands and claims of any nature whatsoever, whether in law or in equity, whether known or unknown, and any and all rights, duties, liabilities and obligations, whether presently enforceable or enforceable in the future, by reason of any matter or cause whatsoever from the beginning of time to the date of their execution of this Release, which arise out of or are in any way connected with the Loan Documents, the Property or the Agreement, except as may be related to the enforcement of the Agreement by Borrower and Guarantor.

2. **Release in Favor of Borrower and Guarantor.** Effective as of the date hereof, Lender releases and forever discharges Borrower and Guarantor and their predecessors, successors and assigns, their parents, subsidiaries, officers, directors, shareholders, employees, representatives and attorneys, and any affiliated corporations, their officers, directors, shareholders and employees, from any and all causes of action, suits, liabilities, debts, damages, controversies, agreements, trespasses, judgments, executions, demands and claims of any nature whatsoever (collectively, "Claims"), whether in law or in equity, whether known or unknown, and any and all rights, duties, liabilities and obligations (collectively, "Obligations"), whether presently enforceable or enforceable in the future, by reason of any matter or cause whatsoever from the beginning of time to the date of their execution of this Release, which arise out of or are

in any way connected with the Loan Documents.  Notwithstanding anything herein to the contrary, the aforesaid release shall not apply to: (a) any of Borrower's or Guarantor's covenants, representations, warranties and/or obligations under the Agreement; (b) any Claims and/or Obligations arising from any environmental condition or environmental problem existing on the Property and covered by any environmental indemnity contained in the Loan Documents, (c) any Claims and/or Obligations arising from any past or present tenants, licensee or occupants, contractors or vendors of the Property, and (d) any Claims and/or Obligations arising from the condition of the Property as of the Release Date, including, without limitation, any problems or issues set forth in that certain [Property Condition Assessment] dated [_____ __, 20__] prepared by [_____]**[RONAL TO PROVIDE]**.

**3.     Who is Bound.**  The Parties, as well as their former, present and future successors, heirs and assigns, parents, subsidiaries, divisions, and affiliated companies are bound by this Release.  Anyone who succeeds to the Parties' rights and responsibilities, or who may claim an interest in the subject matter of this Release, such as the representatives, officers, directors, shareholders, successors, transferees, or assigns of the Parties, is also bound.

**4.     Without Force or Duress.** The Parties acknowledge and represent that this Release is entered into without force or duress, in the free will of the Parties, and in consideration of the receipt of substantial consideration.

**5.     Legal Counsel.**  The Parties have had the opportunity to consult with legal counsel concerning the form and legal effect of this Release.

**6.     Competent and Authorized Signatures.**  The Parties further declare and affirm that they are competent to execute this Release and that they are authorized to execute this Release.

**7.     Waiver of Jury.**   THE PARTIES TO THIS RELEASE HEREBY EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (1) ARISING UNDER THIS RELEASE, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES WITH RESPECT TO THIS RELEASE, THE LOAN DOCUMENTS OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.   THE PARTIES HERETO HEREBY AGREE AND

CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY.

**8.** **Governing Law.** This Release shall be governed by and construed in all respects according to the laws of the State of New York without application of principles of conflict of laws.

**9.** **Counterparts.** This Release may be executed in counterparts, such counterparts together constituting but one and the same agreement.

**10.** **Entire Agreement.** This Release represents the Parties' entire agreement with respect to the subject matter hereof. This Release may only be changed by a single writing signed by all the Parties.

[Remainder of Page Left Intentionally Blank - Signature Page to Follow]

**IN WITNESS WHEREOF,** the parties have caused this Release to be duly executed and delivered as of the date set forth above.

**<u>LENDER:</u>**

**WELLS FARGO BANK, N.A.**

By: _____
    Name:
    Title:

**<u>BORROWER:</u>**

**2056 FIFTH AVENUE ASSOCIATES LLC**

By:_____
Name: _____
Title: _____

**<u>GUARANTOR</u>**

_____

___

_____
Arthur Fefferman

40

STATE OF NEW YORK    )
                     )
COUNTY OF_____)

On the ___ day of _____ in the year 2011 before me, the undersigned, a Notary Public for said state, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.


_____

                                         Notary Public


STATE OF NEW YORK    )
                     )
COUNTY OF_____)

On the ___ day of _____ in the year 2011 before me, the undersigned, a Notary Public for said state, personally appeared _____ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.


_____

                                         Notary Public


STATE OF NEW YORK    )
                     )
COUNTY OF_____)

On the ___ day of _____ in the year 2011 before me, the undersigned, a Notary Public for said state, personally appeared Arthur Fefferman, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or person upon behalf of which the individual acted, executed the instrument.


_____

41

Notary Public

## SCHEDULE 5.11

## OUTSTANDING TAXES

Exhibit B

# OPERATING AGREEMENT

# OF

# Everyday Logistics LLC

# A

# LIMITED LIABILITY COMPANY

## TABLE OF CONTENTS

### ARTICLE I
### DEFINITIONS

| | | |
|---|---|---|
| 1.1 | **Act** | 1 |
| 1.2 | **Additional Contribution** | 1 |
| 1.3 | **Additional Contribution Share** | 1 |
| 1.4 | **Agreement** | 1 |
| 1.5 | **Articles** | 1 |
| 1.6 | **Assignee** | 1 |
| 1.7 | **Bankrupt Person** | 1 |
| 1.8 | **Business Day** | 1 |
| 1.9 | **Capital Account** | 2 |
| 1.10 | **Capital Contribution** | 2 |
| 1.11 | **Commitment** | 2 |
| 1.12 | **Company** | 2 |
| 1.13 | **Default Interest Rate** | 2 |
| 1.14 | **Delinquent Member** | 2 |
| 1.15 | **Disposition (Dispose)** | 2 |
| 1.16 | **Dissociation** | 2 |
| 1.17 | **Dissolution Event** | 2 |
| 1.18 | **Distribution** | 2 |
| 1.19 | **Effective Date** | 2 |
| 1.20 | **Fiscal Year** | 2 |
| 1.21 | **Initial Capital Contribution** | 2 |
| 1.22 | **Initial Membership Interest** | 2 |
| 1.23 | **Initial Sharing Ratio** | 2 |
| 1.24 | **Management Right** | 3 |
| 1.25 | **Member** | 3 |
| 1.26 | **Membership Interest** | 3 |
| 1.27 | **Net Cash Flow** | 3 |
| 1.28 | **Organization** | 3 |
| 1.29 | **Person** | 3 |
| 1.30 | **Principal Office** | 3 |
| 1.31 | **Proceeding** | 3 |
| 1.32 | **Property** | 3 |
| 1.33 | **Schedule A** | 3 |
| 1.34 | **Sharing Ratio** | 3 |
| 1.35 | **Substitute Member** | 4 |
| 1.36 | **Tax Characterization and Additional Tax Terms** | 4 |
| 1.37 | **Unit** | 6 |

### ARTICLE II
### FORMATION

| | | |
|---|---|---|
| 2.1 | **Organization** | 6 |

2.2   **Agreement**................................................................................... 6
2.3   **Name**.......................................................................................... 6
2.4   **Term** ......................................................................................... 6
2.5   **Registered Agent and Office** ...................................................... 7
2.6   **Principal Office** .......................................................................... 7
2.7   **Publication** ................................................................................ 7

ARTICLE III
PURPOSE; NATURE OF BUSINESS

ARTICLE IV
ACCOUNTING AND RECORDS

4.1   **Records to be Maintained** .......................................................... 7
4.2   **Reports to Members** ................................................................... 8
4.3   **Tax Returns and Reports** ............................................................ 8

ARTICLE V
NAMES AND ADDRESSES OF MEMBERS

ARTICLE VI
RIGHTS AND DUTIES OF MANAGERS

6.1   **Management Rights**.................................................................... 8
6.2   **Certain Powers of Managers**....................................................... 9
6.3   **Liability for Certain Acts** ………………………………………10
6.4   **Liability of Managers** ................................................................ 10
6.5   **Indemnification** ………………………………………………...10
6.6   **Meeting of Managers** ................................................................ 11
6.7   **Actions Taken At Meeting 11**
6.8   **Compensation of Managers 12**
6.9   **Resignation/Removal of Managing Member 12**

ARTICLE VII
RIGHTS AND OBLIGATIONS OF MEMBERS

7.1   **Liability for Company Debt 12**
**7.2**   **Rights of Approval 12**
**7.3**   **Representations and Warranties 12**
7.4   **Conflicts of Interest 12**
**7.5**   **Member's Standard of Care 13**
**7.6**   **Indemnification 14**
**7.7**   **Management Rights 14**

ARTICLE VIII
CONTRIBUTIONS AND CAPITAL ACCOUNTS

8.1   **Initial Contributions**................................................................. 13
8.2   **Additional Contributions** .......................................................... 14
8.3   **Defaults in Contributions** ......................................................... 14
8.4   **Capital Account**........................................................................ 15

8.5    **No Obligation to Restore Deficit Balance** ........................................ 16
8.6    **Withdrawal; Successors** ....................................................................... 16
8.7    **Interest** .................................................................................................. 16
8.8    **Investment of Capital Contributions** ................................................. 16
8.9    **No Personal Liability** ........................................................................... 16

ARTICLE IX
ALLOCATIONS AND DISTRIBUTIONS

9.1    **Profits and Losses** ................................................................................ 17
9.2    **Profits** ................................................................................................... 17
9.3    **Losses** ................................................................................................... 17
9.4    **Special Allocations** .............................................................................. 18
9.5    **Curative Allocations** ............................................................................ 20
9.6    **Other Allocation Rules** ....................................................................... 20
9.7    **Distribution of Net Cash Flow** ........................................................... 21

ARTICLE X
TAXES

10.1    **Tax Matters Partner** ........................................................................... 22
10.2    **Mandatory Section 754 Election** ....................................................... 22

ARTICLE XI
TRANSFER OF MEMBERSHIP INTEREST

11.1    **Compliance with Securities Laws** ...................................................... 22
11.2    **Transfer of Economic Interest** ........................................................... 23
11.3    **Transfer of Membership Interest and Admission of Substitute
        Member** ................................................................................................. 23
11.4    **Status of Transferee** ............................................................................ 24
11.5    **Death, Dissolution, Bankruptcy or Incompetency of a Member** ..... 24
11.6    **Dispositions not in Compliance with this Article Void** ..................... 24

ARTICLE XII
DISSOCIATION OF A MEMBER

12.1    **Dissociation** ......................................................................................... 24
12.2    **Rights of Dissociating Member** .......................................................... 25

ARTICLE XIII
DISSOLUTION AND WINDING UP

13.1    **Dissolution** ........................................................................................... 26
13.2    **Effect of Dissolution** ........................................................................... 26
13.3    **Distribution of Assets on Dissolution** ................................................ 26
13.4    **Winding Up and Filing Articles of Dissolution** ................................. 27

ARTICLE XIV
MISCELLANEOUS

14.1    **Notices** .................................................................................................. 27
14.2    **Headings** ............................................................................................... 27
14.3    **Entire Agreement** ................................................................................ 27

14.4    **Binding Agreement** ........................................................................ 28
14.5    **Saving Clause** ................................................................................ 28
14.6    **Counterparts** ................................................................................. 28
14.7    **Governing Law** .............................................................................. 28
14.8    **No Membership Intended for Nontax Purposes** ............................. 28
14.9    **No Rights of Creditors and Third Parties under Agreement** ......................... 28
14.10   **General Interpretive Principles** ..................................................... 28

**Limited Liability Company Operating Agreement**

**of**

Everyday Logistics **LLC**

This Limited Liability Company Operating Agreement of Everyday Logistics LLC, a limited liability company organized pursuant to the New York Limited Liability Company Law, is entered into and shall be effective as of the Effective Date, by and among the Company and the persons executing this Agreement.

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement (as defined below), unless the context clearly indicates otherwise, the following terms shall have the following meanings:

I.1    **Act**.  The New York Limited Liability Company Law and all amendments to the Act.

I.2    **Additional Contribution**.  An additional Capital Contribution payable by the Members to the Company pursuant to Article VII.

I.3    **Additional Contribution Share.**  A Member's proportionate share of an Additional Contribution, (i) equal to the product of (A) such Member's Initial Sharing Ratio (set forth in Schedule A to this Agreement) and (B) such Additional Contribution or (ii) as otherwise agreed by the Members under Section 7.2.

I.4    **Agreement**.  This Limited Liability Company Operating Agreement including all amendments adopted in accordance with the Agreement and the Act.

I.5    **Articles.**  The Articles of Organization of the Company, as amended from time to time, and filed with the Department of State of New York.

I.6    **Assignee**.  A transferee of a Membership Interest who has not been admitted as a Substitute Member.

I.7    **Bankrupt Person.**  A Person who: (1) has become the subject of an Order for Relief under the United States Bankruptcy Code by voluntary or involuntary petition, or (2) has initiated, either in an original Proceeding or by way of answer in any state insolvency or receivership Proceeding, an action for liquidation, arrangement, composition, readjustment, dissolution, or similar relief.

I.8    **Business Day**.  Any day other than Saturday, Sunday or any legal holiday observed in the State of New York.

1.9    **Business Expense**  Shall include but not be limited to, salaries, office expenses, travel related to business of Everyday Logistics LLC, marketing expenses and other expenses concerning the operation of Everyday Logistics LLC.

I.10    **Capital Account.**  The account maintained for a Member or Assignee determined in accordance with Article VII.

I.11    **Capital Contribution**.  Any contribution of Property or services made by or on behalf of a Member or Assignee.

I.92    **Commitment.**  The Capital Contributions that a Member is obligated to make, including a Member's Initial Capital Contribution and any Additional Contribution Share of a Member.

I.103    **Company**.  The company named at beginning of this Operating Agreement, a limited liability company formed under the laws of New York, and any successor limited liability company.

I.114    **Default Interest Rate**.  The prime rate published by the Wall Street Journal for the last Business Day on which a Commitment is payable.

1.15    **Defaulting Member.**  Shall have the meaning as set forth in Article 8.

I.16    **Delinquent Member**.  A Member who has failed to meet the Commitment of that Member.

I.17    **Disposition (Dispose)**.  Any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

I.18    **Dissociation**.  Any action which causes a Person to cease to be a Member as described in Article XI hereof.

I.19    **Dissolution Event**.  An event, the occurrence of which will result in the dissolution of the Company under Article XII.

I.20    **Distribution**.  A transfer of Property to a Member on account of a Membership Interest as described in Article VIII.

I.21    **Effective Date**.  The date of filing of the Articles of Organization or such other date as set forth in the Articles of Organization.

I.22    **Fiscal Year**.  The calendar year.

I.23    **Initial Capital Contribution**.  The Capital Contribution agreed to be made by the Members as described in Article VII.

I.24    **Initial Membership Interest**.    The Initial Membership Interest set forth in Schedule A.

I.25    **Initial Sharing Ratio**.  The Initial Sharing Ratio set forth in Schedule A.

1.26    **Manager or Managing Member.**    Shall mean those charged with the management of the Company as set forth in Article 6.

I.27    **Management Right**.  The right of a Manager to participate in the management of the Company, to vote on any matter, and to grant or to withhold consent or approval of actions of the Company.

I.28    **Member**.  A Person executing the Agreement as a Member, and a Substitute Member.

I.29    **Membership Interest**.  The rights of a Member to Distributions (liquidating or otherwise) and allocations of the profits, losses, gains, deductions, and credits of the Company, and, to the extent permitted by this Agreement, to possess and exercise Management Rights.

1.30    **Member-Manager.**  Shall mean a Manager who is also a Member.

I.31    **Net Cash Flow**.  With respect to any fiscal period of the Company, all revenues of the Company during that period decreased by (a) cash expenditures for operating expenses, (b) capital expenditures to the extent not made from reserves, (c) reserves for contingencies and working capital, established in such amounts as the Members may determine, (d) repayment of principal on any financing and (e) taxes.

I.32    **Organization**.  A Person other than a natural person, including without limitation corporations (both non-profit and other corporations), partnerships (both limited and general), joint ventures, limited liability companies, business trusts and unincorporated associations, but the term does not include joint tenancies and tenancies by the entirety.

I.33    **Person**.  An individual, trust, estate, or any Organization permitted to be a member of a limited liability company under the laws of the State of New York.

I.34    **Principal Office**.  The Principal Office of the Company set forth in Section 2.6.

I.35    **Proceeding**.  Any administrative, judicial, or other adversary proceeding, including without limitation litigation, arbitration, administrative adjudication, mediation, and appeal or review of any of the foregoing.

I.36    **Property**.  Any property, real or personal, tangible or intangible, including money, and any legal or equitable interest in such property, but excluding services and promises to perform services in the future.

I.37    **Schedule A**.  Schedule A to this Agreement setting forth the name, address, Initial Capital Contribution, number of Units, Initial Membership Interest and Initial Sharing Ratio of each Member, and the Member designated as the Tax Matters Partner.

I.38    **Sharing Ratio.**  With respect to any Member, as of any date, the ratio (expressed as a percentage) of (i) such Member's Capital Contribution to (ii) the aggregate Capital Contributions of all Members, or such other ratio as shall be agreed by all Members from time to time.  The Initial Membership Interest and Sharing Ratio of each Member is set forth in Schedule A hereof, and Schedule A shall be amended as necessary to conform to any changes thereof agreed to by the Members.  In the event all or any portion of a Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Membership Interest and Sharing Ratio of the transferor to the extent it relates to the transferred Membership Interest.

I.39    **Substitute Member.**  An Assignee who has been admitted to all of the rights of membership pursuant to Section 10.3 of the Agreement.

I.40    **Tax Characterization and Additional Tax Terms**.    It is intended that the Company be characterized and treated as a partnership for, and solely for, federal, state and local income tax purposes.  For such purpose, (i) the Company shall be subject to all of the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code, (ii) all references to a "Partner," to "Partners" and to the "Partnership" in this Agreement (including the provisions of Section 7.4 and the provisions of Article VIII) and in the provisions of the Code and Tax Regulations cited in this Agreement shall be deemed to refer to a Member, the Members and the Company, respectively.  In addition, the following terms shall have the following meanings:

(a)    <u>Adjusted Capital Account Deficit</u> shall mean, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account the minimum gain chargeback that such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations; and

(ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations and shall be interpreted consistently therewith.

(b)    <u>Code</u> shall mean the Internal Revenue Code of 1986.

(c)    <u>Nonrecourse Deductions</u> has the meaning set forth in Section 1.704-2(b)(1) of the Tax Regulations.

(d)    Nonrecourse Liability has the meaning set forth in Section 1.704-2(b)(3) of the Tax Regulations.

(e)    Partner Nonrecourse Debt has the meaning set forth in Section 1.704-2(b)(4) of the Tax Regulations.

(f)    Partner Nonrecourse Debt Minimum Gain means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Tax Regulations.

(g)    Partner Nonrecourse Deductions has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Tax Regulations.

(h)    Partnership Minimum Gain has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Tax Regulations.

(i)    Profits and Losses shall mean, for each Fiscal Year, an amount equal to the Company's taxable income or loss for such Fiscal Year, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i) shall be added to such taxable income or loss;

(ii)    Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) of the Code expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Tax Regulations, and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.36(i), shall be subtracted from such taxable income or loss;

(iii)    Notwithstanding any other provisions of this definition, any items which are specially allocated pursuant to Sections 8.4 or 8.5 shall not be taken into account in computing Profits or Losses.

The amounts of the items of Partnership income, gain, loss, or deduction available to be specially allocated pursuant to Sections 8.4 or 8.5 shall be determined by applying rules analogous to those set forth in clauses (i) through (iii) above.

(j)    Tax Regulations shall mean the federal income tax regulations promulgated by the United States Treasury Department under the Code as such Tax Regulations may be amended from time to time.  All references herein to a specific section of the Tax Regulations shall be deemed also to refer to any corresponding provision of succeeding Tax Regulations.

I.41    **Unit**.  The solo unit of Membership Interest that is authorized to be issued under this Agreement.  Each Unit represents a Membership Interest with an Initial Sharing Ratio of one hundred percent (100 %), subject to adjustment as provided herein.  A Unit is divisible into fractional parts.  References to Units herein shall be solely for the purpose of certificating the Membership Interests authorized hereunder.  Voting, the granting or withholding of consents or approvals, and allocation of Profits and Losses and Distributions shall be made pursuant to the applicable provisions of this Agreement without reference to the number of Units held by Members.

ARTICLE II
**FORMATION**

II.1    **Organization.**  The Member hereby organizes the Company as a New York limited liability company pursuant to the provisions of the Act and have caused Articles of Organization to be filed with the New York Department of State on February , 2011.

II.2    **Agreement**.  For and in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Member executing the Agreement hereby agrees to the terms and conditions of the Agreement, as it may from time to time be amended.  It is the express intention of the Member that the Agreement shall be the sole source of agreement of the parties, and, except to the extent a provision of the Agreement expressly incorporates federal income tax rules by reference to sections of the Code or Tax Regulations or is expressly prohibited or ineffective under the Act, the Agreement shall govern, even when inconsistent with, or different than, the provisions of the Act or any other law or rule.  To the extent any provision of the Agreement is prohibited or ineffective under the Act, the Agreement shall be deemed to be amended to the least extent necessary in order to make the Agreement effective under the Act.  In the event the Act is subsequently amended or interpreted in such a way to make any provision of the Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

II.3    **Name**.  The name of the Company is Everyday Logistics LLC (the "Company") DBA Hudson Valley Resort and all business of the Company shall be conducted under that name.

II.4    **Term**.  The Company shall be dissolved and its affairs wound up in accordance with the Act and the Agreement on a date fifty (50) years from the date of the execution of this Agreement hereof, unless the term shall be extended by amendment to the Agreement and the Articles, or unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or the Agreement.

II.5    **Registered Agent and Office**.  The registered agent for the service of process and the registered office shall be that person and location reflected in the Articles of Organization.  The Member, may, from time to time, change the registered agent or office through appropriate filings with the Department of State of New York.  In the event the registered agent ceases to act as such for any reason or the registered office shall change, the Members shall promptly designate a replacement registered agent or file a notice of change of address as the case may be.

II.6    **Principal Office.**  The Principal Office of the Company shall be located at 400 Granite Road Kerhonkson NY 12446.

II.7    **Publication.**  Within 120 days after the Effective Date, the Members shall cause a notice containing the substance of the Articles, in the form required by the Act, to be published once in each week for six successive weeks in two newspapers of the County in which the Principal Office is located.

ARTICLE III
**PURPOSE; NATURE OF BUSINESS**

The business purpose of the Company is solely to (a) to own and operate the business know as The Hudson Valley Resort. A 323 room hotel spa resort with an 18 hole golf course, 500 acres of land, with many amenities included.

The Company shall have the authority to do all things necessary or convenient to accomplish its purpose and operate its business as described in this Article III.  The Company exists only for the purpose specified in this Article III, and may not conduct any other business without the majority consent of the Members.  The authority granted to the Managing Member(s) hereunder to bind the Company shall be limited to actions necessary or convenient to this business.

ARTICLE IV
**ACCOUNTING AND RECORDS**

IV.1    **Records to be Maintained**.  The Company shall maintain the following records at the Principal Office:

(a)    a current list of the full name set forth in alphabetical order and last known mailing address of each Member, together with the information set forth on Schedule A relating to each Member's Initial Capital Contribution, number of Units, Membership Interest and Sharing Ratio;

(b)    a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any such amendment has been executed;

(c)    a copy of the Company's federal, state and local income or information tax returns and reports for the three most recent Fiscal Years;

(d)    a copy of this Agreement including all amendments thereto; and

(e)    the Company's books and records, including financial statements of the Company, which shall be open to inspections by the Members or their agents at reasonable times.

IV.2    **Reports to Members**.  The Manager(s) shall provide reports, including a balance sheet, statement of profit and loss and changes in Members' accounts, and a statement of cash

flows, at least annually to the Members at such time and in such manner as the Managers may determine reasonable.

IV.3     **Tax Returns and Reports**.  The Managing Member(s), at Company expense, shall prepare and timely file income tax returns of the Company in all jurisdictions where such filings are required, and the Company shall prepare and deliver to each Member, within ninety (90) days after the expiration of each Fiscal Year, and at Company expense, all information returns and reports required by the Code and Tax Regulations and Company information necessary for the preparation of the Members' federal income tax returns.

ARTICLE V
**NAMES AND ADDRESSES OF MEMBERS**

The names and addresses of the Members are as stated on Schedule A.

ARTICLE VI
**RIGHTS AND DUTIES OF MANAGERS**

VI.1     **Management Rights.**  Management of the Company shall be vested in         Eliot Spitzer, who shall manage the Company in its capacity as the managing member ("Managing Member") of the Company.  The Managing Member shall serve in its capacity until such Managing Member is removed pursuant to the terms of this Agreement.  The Managing Member shall have authority to bind the Company in the ordinary course, provided that (i) the Manager shall have approved such action in accordance with this Agreement or the Act and (ii) the person with whom such Manager is dealing has no knowledge that the action has not been so approved. Unless otherwise expressly authorized by this Agreement or the Managing Member as set forth herein, the act of a Manager that is not apparently for carrying on the Company's business in the ordinary course shall not bind the Company.  Except as otherwise expressly provided in this Agreement or the Act, the Members shall have no right to control or manage, nor shall they take any part in the control or management of, the property, business or affairs of the Company. Except where the Members' approval is expressly required by this Agreement or the Act, the Managing Member shall have the authority to manage and control the day-to-day business, affairs, and properties of the Company. Subject to the terms of this Agreement, the Managing Member may delegate to one or more Members, or officers of the Company the right and duty to perform any and all acts or activities customary or incident to the management of the Company's day-to-day business. Any matter that requires the vote or consent of the Members shall be decided by the Members holding at least a majority of the Membership Interests, except that (a) the assignment of a Membership Interest and the admission of a Substitute Member shall require the approvals set forth in Sections 11.2 and 11.3, and (b) the following actions shall require the consent of Majority Member:

(a)     any amendment to the Agreement or to the Articles;

(b)     the sale of Company Property other than in the ordinary course of business;

(c)     the merger or consolidation of the Company with any other Person;

(d)    the continuation of the Company after a Dissolution Event;

(e)    the borrowing of funds or the pledging, mortgaging or otherwise encumbering of any Company Property, except in the ordinary course of business; and

(f)    the admission of a new Member;

VI.2    **Certain Powers of Managers.**  Without limiting the generality of Section VI.1, but subject to the rights of Members of Everyday Logistics LLC as set forth herein, the Managing Member shall have the power and authority, on behalf of Everyday Logistics LLC, to:

(a) establish bank accounts in the name of the Company and establish the identity of all signatories entitled to draw against such accounts for the benefit of the Company;

(b) employ and fix the terms of employment and termination of, employees of the Company (including Members of Affiliates of Members or Managers), and accountants, legal counsel and other consultants for the Company (but not including Managers in their capacity as such);

(c) execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, [documents providing for the acquisition or disposition of the Company's property] assignments, bills of sale, leases, partnership agreements, and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company and relating to transactions that have been approved in accordance with this agreement;

(d) enter into any and all other agreements on behalf of the Company with any other Person (including Members, Managers or Affiliates of any thereof), for any purpose in the ordinary course, in such forms as the Manager may approve;

(e) institute, prosecute and defend legal, administrative or other suits or proceedings in the Company's name;

(f) establish pension, benefit and incentive plans for any or all current or former Members, Managers, employees, and/or agents of the Company, on such terms and conditions as the Managers may approve, and make payments pursuant thereto;

(g) do and perform any and all other lawful acts as may be necessary or appropriate to conduct the Company's business; and

VI.3    **Liability for Certain Acts.**  The Manager shall perform his duties in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.  A Manager who so performs his duties shall not have any liability by reason of being or having been a Manager.  [A Manager shall not be liable to the Company or to any Member for any loss or damage unless it shall have been the result of fraud, [gross] negligence, willful misconduct, bad faith or a wrongful taking by the Manager].

{00018425.DOCX}

VI.4    **Liability of Managers**.  No Manager shall be personally liable as such for any debts, losses or obligations of the Company by reason of being a Member, except to the extent of his/its Capital Contribution and any obligation to make a Capital Contribution.

VI.5    **Indemnification.**    To the fullest extent permitted by applicable law from time to time in effect:

(a)    the Company shall indemnify and hold harmless the Managers, Members and their respective directors, trustees, shareholders, officers, employees, agents and other affiliates, against all costs, liabilities, claims, expenses, including reasonable attorneys' fees, and damages (collectively "Losses") paid or incurred by any such Person in connection with the conduct of the Company's business; and

(b)    the Company shall indemnify, defend and hold each Manager harmless from and against, and may, upon the approval of the Members, indemnify, defend and hold the Company's and the Manager's respective Affiliates, agents, employees, consultants and other independent contractors (collectively "Indemnitees"), harmless from and against, all losses arising from any demands, claims or lawsuits against any of the Indemnities in connection with, or resulting from, his acts or omissions in his capacity as Manager, or as such an Affiliate, agent, employee, consultant or other independent contractor of the Company or the Manager, or in connection with, arising from or relating to, business or activities undertaken on behalf of the Company, including, without limitation, any demands, claims or lawsuits initiated by a Member, unless such acts or omissions are found by a Court of competent jurisdiction upon entry of a final judgment to be in bad faith, or to constitute fraud, willful misconduct or a knowing violation of law or to have violated such lesser standard of conduct as under applicable law affirmatively prevents indemnification hereunder.  The termination of any action, suit or proceeding by judgment, order, settlement, plea of *nolo contender* or its equivalent or conviction shall not, of itself, create a presumption that an Indemnitee shall not be entitled to indemnification hereunder or that the Indemnitee did not act in good faith and in a manner which it reasonably believed to be in, or not opposed to, the best interests of the Company.

VI.6    **Meeting of Managers.**    The Manager(s) shall meet for the purposes of organization and the transaction of other business as soon as practicable after each annual meeting of the Members, on the same day and at the same place where such annual meeting is held.  In addition to the annual meetings required by this section, regular monthly meetings of the Managers shall be held at such times and places within or without the State of New York as the Managers may from time to time determine.  Special meetings may be called at any time by any Manager and shall be held at such times and places within or without the State of New York as the Managers may from time to time determine.  Notice of said Special meeting shall be delivered to each Manager, either personally (including by courier) or by telephone, telegraph or facsimile twenty-four (24) hours before the time at which such Special meeting is to be held, or

{00018425.DOCX}

shall be mailed to each Manager by first-class mail, postage prepaid, addressed to it at its mailing address as set forth in the records of the Company, at least three days before the day on which such meeting is to be held.

VI.7    **Actions Taken At Meeting.**  Except as otherwise provided in this Agreement, all Managing Members present in person at any meeting of Managing Members, shall constitute a quorum for the transaction of business at such meeting.  However, Managing Members may participate in a meeting by conference telephone or similar communications equipment, by means of which all persons participating in the meeting can hear each other and such participation, shall constitute presence in person at such meeting.  In the absence of such a quorum the meeting shall not be held and must be adjourned to a new date and place.  Except as otherwise expressly required by the Act, if a quorum is present, the affirmative vote of the Managing Members shall be the act of the Managing Members.

VI.8    **Compensation of Managers.**  No Manager shall be prevented from receiving compensation for the performance of duties as Manager because it is a Member.  To that end, the Managing Member shall also be reimbursed for all reasonable out-of-pocket expenses incurred in managing the Company.  Further, the Managing Member shall only be required to devote as much time as shall be necessary or appropriate for proper management of the Company.

VI.9    **Resignation and/or Removal of Managing Member.**  A Managing Member shall not have a right to resign.  Managing Members may be removed by a Managing Member or Non-Managing Members if (i) said Managing Member becomes either physically or mentally incapacitated; or, (ii)  "cause" exists, as such is reasonably determined by the non-managing member or Managing Members as the case may be; or (iii) the Managing Member commits a material breach of this Agreement (other than a breach constituting "cause" hereunder) which breach is not cured within thirty (30) days after notice of the possible existence of breach is given to the Managing Member in accordance with this Agreement; provided, however, that the Managing Member shall have an additional thirty (30) days to correct or cure such noticed breach If (a) such breach cannot be reasonably corrected or cured within thirty (30) days, (b) the Managing Member is diligently undertaking to correct or cure such breach, and (c) the Managing Member has provided the non-breaching Member with security or assurance reasonably satisfactory to it that an extended cure period will not cause any further loss of economic value to the Company. For purposes of this Section, the term "cause" means fraud, self dealing which is not approved by the Company, and/or misappropriation of Company funds or property.  Written notice of the Managing Member's removal shall be served by the Company upon the Managing Member in accordance with this Agreement.  That Notice shall set forth the day on which the removal is to be effective, which date shall not be less than thirty (30) days after the service of notice on the Managing Member, and shall include a statement as to the reason or "cause" for such removal.  Upon the removal notice, the Managing Member shall not transact any business on behalf of the Company except in the ordinary course of business to the extent necessary to effect an orderly transition to the new Managing Member or except pursuant to binding agreements of the Company in effect prior to receipt of such notice.  If the removal of a Managing Member does not cause dissolution of the Company, such removal shall cause that Managing Member's Interest in the Company to be converted to that of a Non-Managing Member, provided that the interest in Profits, Losses and distributions of the former Managing Member shall remain unchanged, and references to Non-Managing Members thereafter shall include such convened Managing Member.

{00018425.DOCX}

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF MEMBERS

VII.1   **Liability for Company Debt.**  No Member shall be personally liable for any debts, losses or obligations of the Company by reason of its being, except to the extent of its Capital Contribution and any obligation to make a Capital Contribution.

VII.2   **Rights of Approval.**  The Majority Member shall have all rights with respect to the management of the property, business and affairs of the Company, and such other powers, as are specified in this Agreement or under the Act.

VII.3   **Representations and Warranties**.  Each Member, and in the case of a trust or other entity, the person(s) executing the Agreement on behalf of the entity, hereby represents and warrants to the Company and each other Member that: (a) if that Member is an entity, it has power to enter into the Agreement and to perform its obligations hereunder and that the person(s) executing the Agreement on behalf of the entity has the power to do so; and (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without an intent to distribute the interest.  The Members acknowledge that their interests in the Company have not been registered under the Securities Act of 1933 or any state securities laws, and may not be resold or transferred without appropriate registration or the availability of an exemption from such requirements.

VII.4   **Conflicts of Interest.**

(a)     No Member shall be entitled to enter into any transactions, directly or indirectly, that may be considered to be competitive with the Company, solicit or attempt to solicit business of any customers of the Company for products or services the same or similar to those offered, sold or produced at any time by the Company, otherwise divert or attempt to divert from the Company any business whatsoever, solicit or attempt to solicit for any business endeavor any employee or prior employee of the Company or interfere with any business relationship between the Company and any other Person.

(b)     Because the Company does not have an adequate remedy at law to protect the Company's business from any breach of the obligations in this section, the Company and its members shall be entitled to injunctive relief, in addition to such other remedies and relief that would, in such event, be available to it or them.

(c)     A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest.  A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a person who is not a Member, subject to other applicable law. No transaction with the Company shall be voidable solely because a Member has a direct or indirect interest in the transaction if the transaction is fair and reasonable to the Company.

VII.5   **Member's Standard of Care.**  Each Member shall discharge the Member's duties to the Company and the other Members in good faith and with that degree of care that an ordinarily prudent person in a similar position would use under similar circumstances.   In discharging its duties, a Member shall be fully protected in relying in good faith upon the records required to be maintained under Article IV and upon such information, opinions, reports or statements by any Person as to matters the Member reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits or losses of the Company or any other facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid.  The Company shall indemnify and hold harmless each Member against any loss, damage or expense (including attorneys' fees) incurred by the Member as a result of any act performed or omitted on behalf of the Company or in furtherance of the Company's interests without, however, relieving the Member of liability for failure to perform his or her duties in accordance with the standards set forth herein.  The satisfaction of any indemnification and any holding harmless shall be from and limited to Company Property and the other Members shall not have any personal liability on account thereof.

VII.6   **Indemnification.**   A Member shall indemnify the Company for any costs or damages incurred by the Company as a result of any unauthorized action by such Member.

VII.7   **Management Rights.**  Only Managing Member and with Consent from Majority Member the Managing Member shall have any authority to bind the Company.

## ARTICLE VIII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

VIII.1   **Initial Contributions**.  Members shall be required to make Capital Contributions to the Company, cure deficit Capital Accounts, and receive a return of all or any portion of any Capital Contributions as such is provided on Schedule A, and as otherwise provided herein.

VIII.2   **Capital Account**.  A separate capital account shall be maintained for each Member throughout the term of the Company in accordance with the rules of Section 1.704C1(b)(2)(iv) of the Tax Regulations as in effect from time to time, and, to the extent not inconsistent therewith, to which the following provisions apply:

(a)     To each Member's Capital Account there shall be credited (i) the amount of money contributed by such Member to the Company (including liabilities of the Company assumed by such Member as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations); (ii) the fair market value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Profits and items of income and gain that are specially allocated.

(b)     To each Member's Capital Account there shall be debited (i) the amount of money distributed to such Member by the Company (including liabilities of such Member

assumed by the Company as provided in Section 1.704-1(b)(2)(iv)(c) of the Tax Regulations) other than amounts which are in repayment of debt obligations of the Company to such Member; (ii) the fair market value of property distributed to such Member (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code); and (iii) such Member's share of Losses or items of loss or deduction that are specifically allocated.

(c)     The Capital Account of a transferee Member shall include the appropriate portion of the Capital Account of the Member from whom the transferee Member's interest was obtained.

(d)     In determining the amount of any liability, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Tax Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Tax Regulations, and shall be interpreted and applied in a manner consistent with such Tax Regulations. In the event the Members shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member), are computed in order to comply with such Tax Regulations, the Members may make such modification, provided that it is not likely to have a material effect on the amounts distributable to any Member pursuant to Article XII hereof upon the dissolution of the Company.   The Members also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Section 1.704-1(b)(2)(iv)(g) of the Tax Regulations and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Section 1.704-1(b) of the Tax Regulations.

VIII.3  **No Obligation to Restore Deficit Balance**.  Members shall be required to restore any deficit balance in their Capital Account upon ten-days' notice by Certified Mail/RRR given to each Member.

VIII.4  **Withdrawal; Successors**.  A Member shall not be entitled to withdraw any part of his/her Capital Account or to receive any distribution from the Company, except as specifically provided in the Agreement, and no Member shall be entitled to make any capital contribution to the Company other than the Commitments.   Any Member, including any additional or Substitute Member, who shall receive an interest in the Company or whose interest in the Company shall be increased by means of a transfer to it of all or part of the interest of another Member, shall have a Capital Account with respect to such interest initially equal to the Capital Account with respect to such interest of the Member from whom such interest is acquired except as otherwise required to account for any step up in basis resulting from a termination of the Company  under Section 708 of the Code by reason of such interest transfer.

VIII.5   **Interest**.  Except as otherwise provided for in this Agreement, no Member shall be entitled to interest on such Member's Capital Contribution or on any Profits retained by the Company.

VIII.6   **Investment of Capital Contributions**.   The Capital Contributions of the Members shall be invested in demand, money market or time deposits, obligations, securities, investments or other instruments constituting cash equivalents, until such time as such funds shall be used for Company purposes.  Such investments shall be made for the benefit of the Company.

VIII.7   **No Personal Liability**.   No Member shall have any personal liability for the repayment of any Capital Contributions of any Member.

ARTICLE IX
**ALLOCATIONS AND DISTRIBUTIONS**

IX.1      **Profits and Losses**.  Profits and Losses, and each item of Company income, gain, loss, deduction, credit and tax preference with respect thereto, for each Fiscal Year (or shorter period in respect of which such items are to be allocated) shall be allocated among the Members as provided in this Article VIII.

IX.2      **Profits**.  After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Profits for any Fiscal Year shall be allocated in the following order of priority:

(a)      First, to the Members and Managing Member, if any, who received any allocation of Losses under Section 9.3(c), in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to such Members pursuant to Section 9.3(c) for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Members pursuant to this Section 9.2(a) for all prior Fiscal Years;

(b)      Second, to the Members and Managing Member, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(b) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to each Member pursuant to this Section 9.2(b) for all prior Fiscal Years;

(c)      Third, to the Members and Managing Member, in proportion to (and to the extent of) the excess, if any, of (i) the cumulative Losses allocated to each Member pursuant to Section 9.3(a)(ii) hereof for all prior Fiscal Years, over (ii) the cumulative Profits allocated to such Member pursuant to this Section 9.2(c) for all prior Fiscal Years;

(d)      Fourth, the balance of the Profits remaining, if any, among the Members and Managing Member, *pro rata*, in proportion to their respective Sharing Ratios.

IX.3      **Losses**.  After giving effect to the special allocations set forth in Sections 9.4 and 9.5, Losses shall be allocated as set forth in Section 9.3(a), subject to the limitation in Section 9.3(b) below, and, if applicable, as provided in Section 9.3(c).

(a)      Losses for any Fiscal Year shall be allocated in the following order of priority:

(i)      first, to the Members in proportion to and to the extent of the excess, if any, of (A) the cumulative Profits allocated to each such Partner pursuant to Section 9.2(d) hereof for all prior Fiscal Years, over (B) the cumulative Losses allocated to such Partner pursuant to this Section 9.3(a)(i) for all prior Fiscal Years; and

(ii)      the balance, if any, among the Members in proportion to their respective Sharing Ratios.

(b)      The Losses allocated pursuant to Section 9.3(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event some, but not all, of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 9.3(a) hereof, the limitation set forth in this Section 9.3(b) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to the Members under Section 1.704-1(b)(2)(ii)(d) of the Tax Regulations.

(c)      In the event that there are any remaining Losses in excess of the limitations set forth in Section 9.3(b), such remaining Losses shall be allocated among the Members in proportion to their respective Sharing Ratios.

IX.4      **Special Allocations**.  The following special allocations shall be made in the following order:

(a)      <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(f) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partnership Minimum Gain, determined in accordance with Section 1.704-2(g) of the Tax Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Tax Regulations.  This Section 9.4(a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Tax Regulations and shall be interpreted consistently therewith.

(b)      <u>Partner Minimum Gain Chargeback</u>.  Except as otherwise provided in Section 1.704-2(i)(4) of the Tax Regulations, notwithstanding any other provision of this Article VIII, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Tax Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with

{00018425.DOCX}

Section 1.704-2(i)(4) of the Tax Regulations.  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Tax Regulations.  This Section 9.4(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Tax Regulations and shall be interpreted consistently therewith.

(c)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Tax Regulations, items of Company income and gain shall be specially allocated to the Member in an amount and manner sufficient to eliminate, to the extent required by the Tax Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Section 9.4(c) shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VIII have been tentatively made as if this Section 9.4(c) were not in this Agreement.

(d)    <u>Gross Income Allocation</u>.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amounts such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Tax Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 9.4(d) shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VIII have been made as if Section 9.4(c) and this Section 9.4(d) were not in this Agreement.

(e)    <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their Sharing Ratios.

(f)    <u>Partner Nonrecourse Deductions</u>.  Any Partner Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Tax Regulations.

(g)    <u>Mandatory Allocations Under Section 704(c) of the Code</u>.  Notwithstanding the foregoing provisions of this Section 8.4, in the event Section 704(c) of the Code or Section 704(c) of the Code principles applicable under Section 1.704-1(b)(2)(iv) of the Tax Regulations require allocations of Profits or Losses in a manner different than that set forth above, the provisions of Section 704(c) of the Code and the Tax Regulations thereunder shall control such allocations among the Members.  Any item of Company income, gain, loss and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the Company or which has been revalued for Capital Account purposes pursuant to Section 1.704-l(b)(2)(iv) of the Tax Regulations) and which is required or permitted to be allocated to such Member for income tax purposes under Section 704(c) of the Code so as to take into account the variation between the tax basis of such property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Section 704(c) of the Code using the "traditional method" described in Section 1.704-3(b) of the Tax Regulations; <u>provided</u>, <u>however</u>, that curative allocations

consisting of the special allocation of gain or loss upon the sale or other disposition of the contributed property shall be made in accordance with Section 1.704-3(c) of the Tax Regulations to the extent necessary to eliminate any disparity, to the extent possible, between the Members' book and tax Capital Accounts attributable to such property; <u>further provided</u>, <u>however</u>, that any other method allowable under applicable Tax Regulations may be used for any contribution of property as to which there is agreement between the contributing Member and the other Members.

IX.5    **Curative Allocations**.  The allocations set forth in Sections 9.4 (a) through (g) (the "Regulatory Allocations") are intended to comply with certain requirements of the Tax Regulations. It is the intent of the Managing Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 9.5.  Therefore, notwithstanding any other provision of this Article IX (other than the Regulatory Allocations), the Managing Members shall make such offsetting special allocations of Company income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Sections 9.2 and 9.3.  The Managing Members (i) shall take into account future Regulatory Allocations under Sections 9.4(a) and 9.4(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 9.4(e) and 9.4(f) and (ii) may reallocate Profits and Losses for prior open years (or items of gross income and deduction of the Company for such years) among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the current year and future years. This Section 9.5 shall control notwithstanding any reallocation or adjustment of taxable income, taxable loss, or items thereof by the Internal Revenue Service or any other taxing authority.

IX.6    **Other Allocation Rules**.

(a)    For purposes of determining the Profits, Losses, or any other item allocable to any period (including allocations to take into account any changes in any Member's Sharing Ratio during a Fiscal Year and any transfer of any interest in the Company), Profits, Losses, and any such other item shall be determined on a daily, monthly, or other basis, as determined by the Managing Members using any permissible method under Section 706 of the Code and the Tax Regulations thereunder.

(b)    The Members are aware of the income tax consequences of the allocations made by this Article IX and hereby agree to be bound by the provisions of this Article VIX in reporting their shares of Company income and loss for income tax purposes.

(c)    Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Partnership within the meaning of Section 1.752-3(a)(3) of the Tax Regulations, the Members' interests in Company Profits are in proportion to their Sharing Ratios.

(d)    To the extent permitted by Section 1.704-2(h)(3) of the Tax Regulations, the Members shall endeavor to treat distributions of Net Cash Flow as having been made from

the proceeds of a Nonrecourse Liability or a Partner Nonrecourse Debt only to the extent that such distributions would cause or increase an Adjusted Capital Account Deficit for any Partner.

(e)     Except as otherwise provided in this Article IX, an allocation of Company Profits or Losses to a Member shall be treated as an allocation to such Member of the same share of each item of income, gain, loss and deduction taken into account in computing such Profits or Losses.

(f)     For purposes of determining the character (as ordinary income or capital gain) of any Profits allocated to the Members pursuant to this Article IX, such portion of Profits that is treated as ordinary income attributable to the recapture of depreciation shall, to the extent possible, be allocated among the Members in the proportion which (i) the amount of depreciation previously allocated to each Member bears to (ii) the total of such depreciation allocated to all Members.  This section 9.6(f) shall not alter the amount of allocations among the Members pursuant to this Article IX, but merely the character of income so allocated.

(g)     Except for arrangements expressly described in this Agreement, no Member shall enter into (or permit any Person related to the Member to enter into) any arrangement with respect to any liability of the Company that would result in such Member (or a person related to such Member under Section 1.752-4(b) of the Tax Regulations) bearing the economic risk of loss (within the meaning of Section 1.752-2 of the Tax Regulations) with respect to such liability unless such arrangement has been approved by all Members.  To the extent a Member is permitted to guarantee the repayment of any Company indebtedness under this Agreement, each of the other Members shall be afforded the opportunity to guarantee such Member's *pro rata* share of such indebtedness, determined in accordance with the Members' respective Sharing Ratios.

IX.7    **Distribution of Net Cash Flow**.  (a) <u>Amounts and Timing</u>.  Net Cash Flow shall be distributed to the Members as follows:

(1)     During such time that the Capital Contributing Members have not been paid their respective Capital Contributions and Preferred Return (defined below) in full, the distributions should be made,

(i)     parri passu, Only to the Members who made a capital contribution, after a preferred return is paid in an amount equal to 8% annual interest (preferred Return)

(ii)    The return of their full Capital Contributions.

(2)     Following the return to the Members of their Capital Contributions and Preferred Return in full, the distributions should be made,

(i)     All Members based on their membership interest.

(b)     <u>Amounts Withheld</u>.  All amounts withheld pursuant to the Code and Tax Regulations or any provision of any state or local tax law with respect to any payment, distribution, or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Section 9.7 for all purposes under this Agreement.  The

Members are authorized to withhold from distributions, or with respect to allocations, to the Members and to pay over to any federal, state, or local government any amounts required to be so withheld pursuant to the Code and Tax Regulations or any provisions of any other federal, state, or local law, and shall allocate any such amounts to the Members with respect to which such amount was withheld.

(c)    Draws for Payment of Estimated Taxes.  The Company may pay to each Member a quarterly draw, not to exceed the amount reasonably necessary to provide for payment by the Members of any federal, state and local estimated taxes with respect to Profits allocated to the Members pursuant to this Article VIII, and each such draw, if any, shall be treated as a loan from the Company to each Member receiving such draw and shall be deemed repaid by reducing the amount of each subsequent distribution to the Member receiving such draw pursuant to this Section 9.7(c) by the lesser of (a) the entire amount otherwise distributable to the Member receiving such draw and (b) the entire amount of any unrepaid draws pursuant to this Section 9.7(c).  All draws hereunder shall be made to the Members pro rata based on their estimated respective shares of Profits allocated to each of them for such Fiscal Year under this Article VIX.  Any draw by any Member made pursuant to this Section 9.7(c) shall not result in any decrease in the Sharing Percentage of such Member.

ARTICLE X
**TAXES**

X.1    **Tax Matters Partner.**                 shall also be the Tax Matters Partner of the Company, designated as such on Schedule A, pursuant to Section 6231(a)(7) of the Code. Such Member shall not resign as the Tax Matters Member unless, on the effective date of such resignation, the Company has designated another Member as Tax Matters Member and such Member has given its consent in writing to its appointment as Tax Matters Member.  The Tax Matters Member shall receive no additional compensation from the Company for its services in that capacity, but all expenses incurred by the Tax Matters Member in such capacity shall be borne by the Company.  The Tax Matters Member is authorized to employ such accountants, attorneys  and agents as it, in its sole discretion, determines is necessary to or useful in the performance of its duties.  In addition, such Member shall serve in a similar capacity with respect to any similar tax related or other election provided by state or local laws.

X.2    **Mandatory Section 754 Election.**  Upon a transfer by a Member of an interest in the Company, which transfer is permitted by the terms of this Agreement, or upon the death of a Member or the distribution of any Company Property to one or more Members, the Members, upon the request of one or more of the transferees or distributees, shall cause the Company to file an election on behalf of the Company, pursuant to Section 754 of the Code, to cause the basis of the Company's property to be adjusted for federal income tax purposes in the manner prescribed in Section 734 or Section 743 of the Code, as the case may be.  The cost of preparing such election, and any additional accounting expenses of the Company occasioned by such election, shall be borne by such transferees or distributees.

ARTICLE XI
**TRANSFER OF MEMBERSHIP INTEREST**

XI.1    **Compliance with Securities Laws**.  No Unit of Membership Interest has been registered under the Securities Act of 1933, as amended, or under any applicable state securities laws.  A Member may not transfer (a transfer, for purposes of this Agreement, shall be deemed to include, but not be limited to, any sale, transfer, assignment, pledge, creation of a security interest or other disposition) all or any part of such Member's Units of Membership Interest, except upon compliance with the applicable federal and state securities laws.  The Members shall have no obligation to register any Member's Units of Membership Interest under the Securities Act of 1933, as amended, or under any applicable state securities laws, or to make any exemption therefrom available to any Member.

XI.2    **Transfer of Economic Interest**.  The right to receive allocations of Profits and Losses and to receive Distributions may not be transferred in whole or in part unless the following terms and conditions have been satisfied:

The transferor shall have:

(a) Assumed all costs incurred by the Company in connection with the transfer;

(b) furnished the Company with a written opinion of counsel, satisfactory in form and substance to counsel for the Company, that such transfer complies with applicable federal and state securities laws and the Agreement and that such transfer, for federal income tax purposes, will not cause the termination of the Company under Section 708(b) of the Code, cause the Company to be treated as an association taxable as a corporation for income tax purposes or otherwise adversely affect the Company or the Members; and

(c) Complied with such other conditions as the Members may reasonably require from time to time.

Transfers will be recognized by the Company as effective only upon the close of business on the last day of the calendar month following satisfaction of the above conditions.  Any transfer in contravention of this Article X and any transfer which if made would cause a termination of the Company for federal income tax purposes under Section 708(b) of the Code shall be void *ab initio* and ineffectual and shall not bind the Company or the other Members.

XI.3    **Transfer of Membership Interest and Admission of Substitute Member**.  Except for the right to receive allocations of Profits and Losses and to receive Distributions, a Membership Interest of any Member, except for the membership interest of the Managing Member, may not be transferred in whole or in part, and a transferee shall not have a right to become a Member unless the following terms and conditions have been satisfied:

(a)    All of the other Members shall have consented in writing to the transfer and substitution, which consent may be arbitrarily withheld by any such Member;

(b)    The transferee shall have assumed the obligations, if any, of the transferor to the Company, including the obligation to fulfill the *pro rata* portion of the transferor's then existing or subsequently arising Commitment allocable to the transferred Unit of Membership Interest or portion thereof; and

XI.4    **Status of Transferee**.  A transferee of a Unit of Membership Interest who is not a Substitute Member shall be entitled only to receive that share of Profits, Losses and Distributions, and the return of Capital Contribution, to which the transferor would otherwise be entitled with respect to the interest transferred, and shall not have the rights of a Member of the Company under the Act or this Agreement including without limitation the  right to obtain any information on account of the Company's transactions, to inspect the Company's books or to vote with the Members on, or to grant or withhold consents or approvals of, any matter.  The Company shall, however, if a transferee and transferor jointly advise the Company in writing of a transfer of the Unit of Membership Interest, furnish the transferee with pertinent tax information at the end of each Fiscal Year.

XI.5    **Death, Dissolution, Bankruptcy or Incompetency of a Member**.  Upon the death, dissolution, adjudication of bankruptcy or adjudication of incompetency of a Member, such Member's successors, executors, administrators or legal representatives shall have all the rights of a Member (except as provided by the last sentence of this Section 11.5) for the purpose of settling or managing such Member's estate, including such power as such Member possessed to substitute a successor as a transferee of such Member's interest in the Company and to join with such transferee in making the application to substitute such transferee as a Member. However, such successors, executors, administrators or legal representatives will not have the right to become a Substitute Member in the place of their predecessor in interest unless all of the other Members shall so consent as provided in Section 11.3(a) hereof.

XI.6    **Dispositions not in Compliance with this Article Void**.   Any attempted Disposition of a Unit of Membership Interest, or any part thereof, not in compliance with this Article shall be void *ab initio* and ineffectual and shall not bind the Company.

ARTICLE XII
**DISSOCIATION OF A MEMBER**

XII.1    **Dissociation**.  A Person shall cease to be a Member upon the happening of any of the following events:

> (a)    the Withdrawal of a Member;

> (b)    the bankruptcy of a Member;

> (c)    in the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's personal estate;

> (d)    in the case of a Member that is a trust or who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e)      in the case of a Member that is a separate Organization other than a corporation, the dissolution and commencement of winding up of the separate Organization;

(f)      in the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g)      in the case of a Member that is an estate, the distribution by the fiduciary of the estate's entire interest in the Company.

XII.2   **Rights of Dissociating Member**.  In the event any Member dissociates prior to the expiration of the term of this Agreement:

(a)      if the Dissociation causes a dissolution and winding up of the Company under Article XII, the Member shall be entitled to participate in the winding up of the Company to the same extent as any other Member except that, if such Dissociation results from a withdrawal of a Member in violation of this Agreement, any Distributions to which such Member would have been entitled shall be reduced by that portion of the damages, if any, sustained by the Company as a result of the Dissolution Event and winding up that is chargeable to the Capital Accounts of the other Members;

(b)      if the Dissociation does not cause a dissolution and winding up of the Company under Article XII, the Company shall pay to the Member, within six months of such Dissociation, an amount equal to the value of the Member's Membership Interest in the Company, to be paid over a period not to exceed five years together with interest at the minimum rate necessary to avoid the imputation of interest under the Code.  The value of the Member's Membership Interest shall include the amount of any Distributions to which the Member is entitled under the Agreement and the fair market value of the Member's Membership Interest as of the date of Dissociation as determined by a Certified Public Accountant utilizing generally accepted accounting procedures, reduced by any damages sustained by the Company as a result of the Member's Dissociation.

## ARTICLE XIII
## DISSOLUTION AND WINDING UP

XIII.1   **Dissolution**.  The Company shall be dissolved and its affairs wound up, upon the first to occur of any of the following events (each of which shall constitute a Dissolution Event):

(a)      the expiration of the term of the Agreement, unless the Company is continued with the consent of all of the Members;

(b)      the written consent of the Majority Members;

(c)      the Dissociation of any Member, unless at the time of such Dissociation there are at least two remaining Members and the Company is continued with the consent of all of the remaining Members within 180 days after such Dissociation;

(d)      at any time when there is but one Member, the Dissociation of such Member, or the transfer of all or part of the Membership Interest of such Member and the admission or attempted admission of the transferee of such interest as a Substitute Member.

XIII.2  **Effect of Dissolution**.  Upon dissolution, the Company shall not be terminated and shall continue until the winding up of the affairs of the Company is completed and a certificate of dissolution has been issued by the Secretary of State of New York.

XIII.3  **Distribution of Assets on Dissolution**.  Upon the winding up of the Company, the Members acting together or such Person(s) designated by the Members representing at least a majority of the Members' Sharing Ratios) shall take full account of the assets and liabilities of the Company, shall liquidate the assets (unless the Members determine that a distribution of any Company Property in-kind would be more advantageous to the Members than the sale thereof) as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds therefrom in the following order:

(a)      first, to the payment of the debts and liabilities of the Company to creditors, including Members who are creditors, to the extent permitted by law, in satisfaction of such debts and liabilities, and to the payment of necessary expenses of liquidation;

(b)      second, to the setting up of any reserves which the Members may deem necessary or appropriate for any anticipated obligations or contingencies of the Company arising out of or in connection with the operation or business of the Company.  Such reserves may be paid over by the Members to an escrow agent or trustee selected by the Members to be disbursed by such escrow agent or trustee in payment of any of the aforementioned obligations or contingencies and, if any balance remains at the expiration of such period as the Members shall deem advisable, shall be distributed by such escrow agent or trustee in the manner hereinafter provided;

(c)      then, to the Members in accordance with positive Capital Account balances taking into account all Capital Account adjustments for the Company's taxable year in which the liquidation occurs. Liquidation proceeds shall be paid within 60 days of the end of the Company's taxable year in which the liquidation occurs.  Such distributions shall be in cash or Property (which need not be distributed proportionately) or partly in both, as determined by the Members.

If at the time of liquidation the Members shall determine that an immediate sale of some or all Company Property would cause undue loss to the Members, the Members may, in order to avoid such loss, defer liquidation.

XIII.4  **Winding Up and Filing Articles of Dissolution**.  Upon the commencement of the winding up of the Company, articles of dissolution shall be delivered by the Company to the Secretary of State of New York for filing.  The articles of dissolution shall set forth the information required by the Act.  The winding up of the Company shall be completed when all debts, liabilities, and obligations of the Company have been paid and discharged or reasonably

adequate provision therefor has been made, and all of the remaining Property of the Company has been distributed to the Members.

ARTICLE XIV

**MISCELLANEOUS**

XIV.1 **Notices**.  Notices to the Company shall be sent to the Principal Office of the Company.  Notices to the Members shall be sent to their addresses set forth on Schedule A.  Any Member may require notices to be sent to a different address by giving notice to the other Members in accordance with this Section 14.1.  Any notice or other communication required or permitted hereunder shall be in writing, and shall be deemed to have been given, on the date delivered personally or sent by facsimile, given, three business days after being deposited in the custody of United States Mail by prepaid telegram or mailed first class, postage prepaid, and one business day after deposit with a courier service, to such Members at such addresses.

XIV.2 **Headings**.  All Article and section headings in the Agreement are for convenience of reference only and are not intended to qualify the meaning of any Article or section.

XIV.3 **Entire Agreement**.  This Agreement together with the schedules and appendices attached hereto constitutes the entire agreement between the parties and supersedes any prior agreement or understanding between them respecting the subject matter of this Agreement.

XIV.4 **Binding Agreement**.  The Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their successors, heirs, legatees, devisees, assigns, legal representatives, executors and administrators, except as otherwise provided herein.

XIV.5 **Saving Clause**.  If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held invalid, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.  If the operation of any provision of this Agreement would contravene the provisions of the Act, such provision shall be void and ineffectual.

XIV.6 **Counterparts**.  The Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all the parties hereto, even though all parties are not signatory to the original or the same counterpart.  Any counterpart of either the Agreement shall for all purposes be deemed a fully executed instrument.

XIV.7 **Governing Law**.  The Agreement shall be governed by and construed in accordance with the laws of the State of New York.

XIV.8 **No Membership Intended for Nontax Purposes**.  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership, either general or limited, under the New York Partnership Law.  The Members do not intend to be partners one to another, or partners as to any third party.  To the extent any Member, by word or action, represents to another person that any Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Members who incur personal liability by reason of such wrongful representation.

{00018425.DOCX}

XIV.9 **No Rights of Creditors and Third Parties under Agreement**. The Agreement is entered into among the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person. Except and only to the extent provided by applicable statute, no such creditor or any third party shall have any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

XIV.10     **General Interpretive Principles**. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)     the terms defined in this Agreement include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)     accounting terms not otherwise defined herein have the meanings given to them in the United States in accordance with generally accepted accounting principles;

(c)     references herein to "Sections", "paragraphs", and other subdivisions without reference to a document are to designated Sections, paragraphs and other subdivisions of this Agreement;

(d)     a reference to a paragraph without further reference to a Section is a reference to such paragraph as contained in the same Section in which the reference appears, and this rule shall also apply to other subdivisions;

(e)     the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the Effective Date.

Everyday Logistics LLC


By: _____
    Eliot Spitzer
      Managing Member

By: _____
    Managing Member LLC

By: _____
    New Investor LLC

By: _____

## SCHEDULE A

| Name and Address of Member | Capital Contribution | Membership Interest |
|---|---|---|
| New Investor LLC | $650,000 | 65% |
| Managing Member LLC | $0 | 10% |
| Unsecured Creditors | $0 | 25% |

# Exhibit B

| | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **REVENUE** | | | | | |
| Leisure Room Revenue | 609,435.22 | 633,812.63 | 633,813.63 | 633,814.63 | 633,815.63 |
| Group Room Revenue | 3,181,193.05 | 3,308,440.77 | 3,308,441.77 | 3,308,442.77 | 3,308,443.77 |
| **Total Room Revenue** | **3,790,628.27** | **3,942,253.40** | **3,942,255.40** | **3,942,257.40** | **3,942,259.40** |
| | | | | | |
| Outlet Food | 143,454.35 | 149,192.52 | 155,160.22 | 161,366.63 | 167,821.30 |
| Banquet Food | 2,637,696.78 | 2,743,204.65 | 2,852,932.84 | 2,967,050.15 | 3,085,732.16 |
| **Total Food** | **2,781,151.13** | **2,892,397.18** | **3,008,093.06** | **3,128,416.78** | **3,253,553.46** |
| | | | | | |
| **Banquet Service Charges** | **68,498.49** | **71,238.43** | **74,087.97** | **77,051.49** | **80,133.54** |
| | | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total Beverage** | **446,682.54** | **464,549.84** | **483,131.84** | **502,457.11** | **522,555.39** |
| | | **0.00** | **0.00** | **0.00** | **0.00** |
| **Total F&B** | **3,296,332.16** | **3,428,185.45** | **3,565,312.86** | **3,707,925.38** | **3,856,242.39** |
| | | | | | |
| Meeting Room Revenue | 422,022.17 | 438,903.06 | 456,459.18 | 474,717.55 | 493,706.25 |
| Telephone | 378.95 | 394.11 | 409.87 | 426.27 | 443.32 |
| Health Club | 280,564.80 | 291,787.39 | 303,458.89 | 315,597.24 | 328,221.13 |
| Golf | 286,578.90 | 297,990.06 | 309,909.66 | 322,306.04 | 335,198.29 |
| Activities | 34,407.25 | 35,783.54 | 37,214.88 | 38,703.48 | 40,251.62 |
| Gift Shops | 20,797.22 | 21,629.11 | 22,494.27 | 23,394.04 | 24,329.81 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| TOTAL MISC INCOME | 1,044,699.29 | 1,086,487.26 | 1,129,946.75 | 1,175,144.62 | 1,222,150.41 |
| | | | | | |
| **TOTAL REVENUE** | **8,131,659.72** | **8,456,926.11** | **8,795,203.15** | **9,147,011.28** | **9,512,891.73** |
| | | | | | |
| **EXPENSES & PROFIT** | | | | | |
| | | | | | |
| Room Expenses: | | | | | |
| Payroll | 718,541.20 | 747,282.85 | 777,174.16 | 808,261.13 | 840,591.57 |
| Operational | 199,920.91 | 207,917.75 | 216,234.46 | 224,883.83 | 233,879.19 |
| Travel / Commissions | 60,385.53 | 62,800.95 | 65,312.99 | 67,925.51 | 70,642.53 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Room Expenses** | **978,847.64** | **1,018,001.55** | **1,058,721.61** | **1,101,070.47** | **1,145,113.29** |
| **Room Departmental Profit** | **2,811,780.63** | **2,924,251.86** | **2,883,533.79** | **2,841,186.93** | **2,797,146.11** |
| | | | | | |
| Food Expenses: | | | | | |
| Payroll | 625,127.19 | 650,132.28 | 676,137.57 | 703,183.07 | 731,310.39 |
| Banquet Service | 424,142.83 | 441,108.54 | 458,752.88 | 477,103.00 | 496,187.12 |
| Cost of Food | 911,513.68 | 947,974.23 | 985,893.20 | 1,025,328.92 | 1,066,342.08 |
| Operational | 140,094.27 | 145,698.04 | 151,525.96 | 157,587.00 | 163,890.48 |
| Other/Contract | 7,054.96 | 7,337.16 | 7,630.64 | 7,935.87 | 8,253.31 |
| **Total Food Expenses** | **2,107,932.93** | **2,192,250.25** | **2,279,940.26** | **2,371,137.87** | **2,465,983.38** |
| **Food Departmental Profit** | **741,716.69** | **771,385.36** | **802,240.77** | **834,330.40** | **867,703.62** |
| | | | | | |
| Beverage Expenses: | | | | | |
| Payroll | 60,418.53 | 62,835.27 | 65,348.68 | 67,962.63 | 70,681.13 |
| Banquet Service | 18,982.92 | 19,742.24 | 20,531.90 | 21,353.20 | 22,207.33 |
| Cost of Beverage | 53,285.60 | 55,417.02 | 57,633.70 | 59,939.05 | 62,336.62 |
| Operational | 2,944.98 | 3,062.78 | 3,185.29 | 3,312.70 | 3,445.21 |
| Other/Contract | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Beverage Expenses** | **135,632.03** | **141,057.31** | **146,699.60** | **152,567.59** | **158,670.29** |
| **Beverage Departmental Profit** | **311,050.51** | **323,492.53** | **336,432.23** | **349,889.52** | **363,885.10** |
| | | | | | |
| Meeting Room Expenses: | | | | | |
| Payroll | 16,577.56 | 17,240.66 | 17,930.29 | 18,647.50 | 19,393.40 |
| Operational | 7,975.76 | 8,294.79 | 8,626.58 | 8,971.65 | 9,330.51 |
| Other | | | | | |
| **Total Meeting Room Expenses** | **24,553.32** | **25,535.45** | **26,556.87** | **27,619.15** | **28,723.91** |
| **Meeting Room Departmental Profit** | **397,468.85** | **413,367.60** | **429,902.31** | **447,098.40** | **464,982.34** |
| | | | | | |
| Telephone Expenses: | | | | | |
| Service Contract | 4,539.68 | 4,721.27 | 4,910.12 | 5,106.52 | 5,310.78 |
| Operational | 80,428.45 | 83,645.59 | 86,991.41 | 90,471.07 | 94,089.91 |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total Telephone Expenses** | **84,968.13** | **88,366.86** | **91,901.53** | **95,577.59** | **99,400.69** |
| **Telephone Departmental Profit** | **-84,589.18** | **-87,972.75** | **-91,491.66** | **-95,151.32** | **-98,957.38** |
| | | | | | |
| Health Club Expenses: | | | | | |
| Payroll | 76,436.31 | 79,493.76 | 82,673.51 | 85,980.45 | 89,419.67 |
| Contract Labor | 125,923.90 | 130,960.86 | 136,199.29 | 141,647.26 | 147,313.15 |
| Operational | 30,663.62 | 31,890.16 | 33,165.77 | 34,492.40 | 35,872.10 |
| Other | | | | | |
| **Total Health Club Expenses** | **233,023.83** | **242,344.78** | **252,038.57** | **262,120.12** | **272,604.92** |
| **Health Club Departmental Profit** | **47,540.97** | **49,442.61** | **51,420.31** | **53,477.13** | **55,616.21** |
| | | | | | |
| Golf Expenses: | | | | | |
| Payroll - Golf | 99,968.99 | 103,967.75 | 108,126.46 | 112,451.52 | 116,949.58 |
| Payroll - Grounds | 171,283.41 | 178,134.75 | 185,260.14 | 192,670.54 | 200,377.36 |
| | | | | | |
| Lease of Equipment | 86,566.51 | 90,029.17 | 93,630.34 | 97,375.55 | 101,270.57 |
| Operational | 99,958.37 | 103,956.70 | 108,114.97 | 112,439.57 | 116,937.15 |
| Other | 4,811.18 | 5,003.63 | 5,203.77 | 5,411.92 | 5,628.40 |
| **Total Golf Expenses** | **462,588.46** | **481,092.00** | **500,335.68** | **520,349.11** | **541,163.07** |
| **Golf Departmental Profit** | **-176,809.56** | **-183,101.94** | **-190,426.02** | **-198,043.06** | **-205,964.78** |
| | | | | | |
| Activities Expenses: | | | | | |
| Payroll | 46,601.98 | 48,466.06 | 50,404.70 | 52,420.89 | 54,517.73 |
| Rentals | 429.00 | 446.16 | 464.01 | 482.57 | 501.87 |
| Entertainment | 65,506.20 | 68,126.45 | 70,851.51 | 73,685.57 | 76,632.99 |
| Other | 3,438.00 | 3,575.52 | 3,718.54 | 3,867.28 | 4,021.97 |
| **Total Activities Expenses** | **115,975.18** | **120,614.19** | **125,438.75** | **130,456.30** | **135,674.56** |
| **Activities Departmental Profit** | **-81,567.93** | **-84,830.65** | **-88,223.87** | **-91,752.83** | **-95,422.94** |
| | | | | | |
| Gift Shop Expenses: | | | | | |
| Payroll | 12,197.08 | 12,684.96 | 13,192.36 | 13,720.06 | 14,268.86 |
| Cost of Supplies | 13,458.47 | 13,996.81 | 14,556.68 | 15,138.95 | 15,744.51 |
| **Total Gift Shop Expenses** | **25,655.55** | **26,681.77** | **27,749.04** | **28,859.00** | **30,013.36** |
| **Gift Shop Departmental Profit** | **-4,858.33** | **-5,052.66** | **-5,254.77** | **-5,464.96** | **-5,683.56** |
| | | | | | |
| Other Expenses: | | | | | |
| Payroll | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Operational | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Total Other Expenses | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Other Departmental Profit** | **0.00** | **0.00** | **0.00** | **0.00** | **0.00** |
| | | 0.00 | 0.00 | 0.00 | 0.00 |
| **TOTAL DEPARTMENTAL PROFIT** | **4,169,177.07** | **4,335,944.15** | **4,509,381.91** | **4,689,757.19** | **4,877,347.48** |
| | | | | | |
| Overhead Expenses: | | | | | |
| Management | 400,000.00 | 416,000.00 | 432,640.00 | 449,945.60 | 467,943.42 |
| Advertising & Sales | 357,580.17 | 371,883.38 | 386,758.71 | 402,229.06 | 418,318.22 |
| Repairs & Maintenance | 629,992.09 | 655,191.77 | 681,399.44 | 708,655.42 | 737,001.64 |
| Heat, Light, & Power | 832,672.00 | 865,978.88 | 900,618.04 | 936,642.76 | 974,108.47 |
| Benefits | 492,637.97 | 512,343.49 | 532,837.23 | 554,150.72 | 576,316.75 |
| Health | 57,204.78 | 59,492.97 | 61,872.69 | 64,347.60 | 66,921.50 |
| Mandatory | 173,859.62 | 180,814.00 | 188,046.56 | 195,568.43 | 203,391.16 |
| **Total Overhead Expenses** | **2,943,946.63** | **3,061,704.50** | **3,184,172.68** | **3,311,539.58** | **3,444,001.17** |
| | | 0.00 | 0.00 | 0.00 | 0.00 |
| **GROSS OPERATING PROFIT** | **1,225,230.44** | **1,274,239.66** | **1,325,209.24** | **1,378,217.61** | **1,433,346.32** |
| | | | | | |
| Fixed Expenses: | | | | | |
| Insurance | 185,000.00 | 192,400.00 | 200,096.00 | 208,099.84 | 216,423.83 |
| Taxes | 65,000.00 | 67,600.00 | 70,304.00 | 73,116.16 | 76,040.81 |
| Other - School Tax | 90,654.00 | 94,280.16 | 98,051.37 | 101,973.42 | 106,052.36 |
| **Total Fixed Expenses** | **340,654.00** | **354,280.16** | **368,451.37** | **383,189.42** | **398,517.00** |
| | | 0.00 | 0.00 | 0.00 | 0.00 |
| **NET OPERATING PROFIT** | **884,576.44** | **919,959.50** | **956,757.88** | **995,028.19** | **1,034,829.32** |
| | | | | | |
| Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Extraordinary Loss | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

## EXHIBIT B

## ASSETS AND LIABILITIES

Assets
Real Property.................................................................................... $ 10,000,000
Personal Property............................................................................. $        30,000

Liabilities
First Mortgage ................................................................................. $ 16,600,000
Second Mortgage ............................................................................ $   4,000,000
Third Mortgage................................................................................ $   2,500,000
Fourth Mortgage.............................................................................. $   3,000,000
Fifth Mortgage................................................................................. $   1,000,000
Sixth Mortgage................................................................................ $   2,133,500
General Unsecured Claims............................................................... $        200,000
Administration Claims...................................................................... $        75,000
Total                                                                                                    $ 29,508,500

## CHAPTER 7 LIQUIDATION ANALYSIS

Assets
Real Property and misc. personal property........................................ $ 10,000,000

Liabilities
First Mortgage ................................................................................. $ 10,000,000
Second Mortgage ............................................................................ $        -0-
Third Mortgage................................................................................ $        -0-
Fourth Mortgage.............................................................................. $        -0-
Fifth Mortgage................................................................................. $        -0-
Sixth Mortgage................................................................................ $        -0-
General Unsecured Claims............................................................... $        -0-
Administration Claims...................................................................... $        -0-
Total                                                                                                    $ 10,000,000