UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re                                                                    Chapter 11

EVERYDAY LOGISTICS LLC,                              Case No. 10-22026 (RDD)

                        Debtor.
--------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT

       THIS DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL
CREDITORS AND PARTIES IN INTEREST OF EVERYDAY LOGISTICS, LLC,
("**DEBTOR**").  THE DISCLOSURE STATEMENT CONTAINS INFORMATION THAT
MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE DEBTOR'S
PLAN OF REORGANIZATION.  ALL CREDITORS ARE URGED TO READ THIS
DISCLOSURE STATEMENT CAREFULLY.  ALL CAPITALIZED TERMS
CONTAINED IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED
HEREIN SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS
CONTAINED IN THE PLAN OF REORGANIZATION ANNEXED TO THE
DISCLOSURE STATEMENT AS EXHIBIT A.

       COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT
CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
489 Fifth Avenue
New York, New York 10017
Telephone: (212) 593-1100
Fascimile: (212) 644-0544

ATTORNEYS FOR THE DEBTOR

## INTRODUCTION

1.       The Debtor submits this Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of its Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as Exhibit "A".  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  All capitalized terms used but not defined herein shall have the meaning set forth in the Plan.

2.       This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the terms and implications of the Plan.  Every effort has been made to fully explain the various aspects of the Plan as it affects all Creditors.  To the extent a Creditor has any questions, the Debtor urges you to contact its counsel and every effort will be made to assist you.

**3.       THE DEBTOR URGES YOU TO VOTE IN FAVOR OF THE PLAN. THE DEBTOR'S GOAL IS FOR ALL CREDITOR CLASSES TO ACCEPT THE PLAN. IF ALL CREDITOR CLASSES DO NOT ACCEPT THE PLAN, THE DEBTOR INTENDS TO SEEK CRAMDOWN OF THE PLAN UNDER SECTION 1129(b) OF THE BANKRUPTCY CODE AS MAY BE NECESSARY TO EFFECT CONFIRMATION OF THE PLAN.**

4.       On _____, 2013, after notice and a hearing, the Bankruptcy

Court entered an order approving this Disclosure Statement pursuant to Section 1125 (a) of the

Bankruptcy Code  as containing information of a kind, and in sufficient detail, as far as is

reasonably practicable in light of the nature and history of the Debtor and the condition of the

Debtor's books and records, to enable Creditors whose votes are being solicited to make an

informed judgment whether to accept or reject the Plan.

5.       Creditors should read this Disclosure Statement in its entirety prior to

voting on the Plan.  No solicitation of votes may be made except pursuant to this Disclosure

Statement.

**6.       EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT,
NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR
FUTURE OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH
REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH
RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE
ACCEPTANCE OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN
THIS DISCLOSURE STATEMENT SHOULD BE REPORTED TO COUNSEL FOR
THE DEBTOR.**

**7.       THE INFORMATION CONTAINED IN THIS DISCLOSURE
STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR.  THE DEBTOR'S BOOKS**

3

**AND RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE DEBTOR'S FINANCIAL CONDITION AS SET FORTH IN THIS DISCLOSURE STATEMENT.  BASED UPON THE INFORMATION MADE AVAILABLE, DEBTOR'S COUNSEL HAS NO INFORMATION TO INDICATE THAT THE INFORMATION DISCLOSED HEREIN IS INACCURATE.  NEITHER THE DEBTOR NOR ITS COUNSEL, HOWEVER, IS ABLE TO STATE DEFINITIVELY THAT THERE IS NO INACCURACY HEREIN OR THAT FUTURE EVENTS MAY NOT RENDER THE INFORMATION CONTAINED HEREIN INACCURATE.**

8.     After reviewing this Disclosure Statement indicate your vote to accept or to reject the Plan on the enclosed ballot, and return the ballot to counsel for the Debtor so as to be received on or before _____, 2013 at 4:00 p.m.

9.     The Bankruptcy Court has entered an Order fixing _____, 2013 at 10:00 a.m., at the United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York, as the date, time and place for the hearing on confirmation of the Plan, and fixing _____, 2013 at 4:00 p.m. as the last date for the filing of any objections to confirmation of the Plan.

## GENERAL INFORMATION REGARDING THE DEBTOR AND THE PLAN

1.     On January 7, 2010, the Debtor filed a Chapter 11 petition.

2.      The Debtor's sole asset is the Hudson Valley Resort & Spa (the "Hotel")
located at 400 Granite Road, Kerhonkson, New York.  The Hotel has 323 rooms, 100,000 square
feet of common area, including lobby, convention space, restaurant, and spa, a golf course, and
employees approximately 150 workers.

3.      The Debtor purchased the Hotel from Minnewaska Company, L.L.C. in
March 2006.  The Debtor financed the purchase with a number of lenders, and subsequently
incurred additional secured debt.  Thus, as of the bankruptcy filing, the Property appeared to be
encumbered by six mortgages (the "Mortgages") totaling in excess of $22.5 million.  The first
mortgage is in favor Kennedy Funding Inc. ("Kennedy" or "Kennedy Funding") in an amount in
excess of $17 million as of June 2013.  The second mortgage is in favor of Park National
Funding LLC in the amount of approximately $4 million as the bankruptcy filing.  The third
mortgage is in favor of the seller Minnewaska Company, LLC in the amount of approximately
$2.5 million as of the bankruptcy filing.  The fourth mortgage is in favor Stone Mountain
Holdings LLC in the amount of approximately $3 million as of the bankruptcy filing.  The fifth
mortgage is in favor Yaakov Friedman in the amount of approximately $1 million, and the sixth
mortgage is in favor of CYB Trust in the amount of approximately $2.1 million, all as of the
bankruptcy fling.  The mortgagees are collectively referred to herein as the "Lenders."

4.      At the time the Debtor purchased the Hotel, Everyday had grand plans to
develop the Hotel and the Hotel's property into a special destination.  Indeed, Everyday had

contracted with golfing great Vijay Singh to develop a professional golf course surrounding the Hotel. Everyday entered into negotiations with the Marriot hotel chain to upgrade and operate the Hotel. The financial projections made at the time the Debtor acquired the Hotel estimated the value of the Hotel and its property would appreciate to a value in excess of $100 million, and the Lenders obviously believed in Everyday's long-term goals.

5.      Notwithstanding the foregoing, the economic downturn halted Everyday's opportunities to develop the Hotel and its property. Indeed, at the time that Everyday entered into its loan agreements, it was anticipated, particularly by the First Mortgagee, that Everyday would promptly repay its obligations and/or refinance a portion of the amounts owed. Thus, Everyday anticipated obtaining secondary financing in order to fully upgrade the Hotel and develop the Hotel's property thereby causing the Hotel and its property to realize their full financial potential.

6.      A basic assumption underlying Everyday's payment obligations was the expectation and belief that there would not be a global economic meltdown that would devastate the hospitality business and freeze mortgage credit availability; particularly for domestic hotel resort development. Contrary to these assumptions, beginning in the Summer and Fall of 2008, market conditions declined so severely that a worldwide freeze on the issuance of new credit in fact developed, regardless of the qualifications of the borrower. But for the existence of the credit crisis, Everyday would have obtained the refinancing it sought, which was necessary to pay the amounts due under the agreements to the Lenders.

6

7.      The Hotel nonetheless continued to operate and to provide its guests with refurbished accommodations, banquet facilities, complete spa services, indoor and outdoor heated pools, full fitness center, tennis courts, and a golf course; all at competitive rates. The Hotel specializes in group events, hosting numerous business and social occasions, including those that require observance of kosher dietary restrictions.  Naturally, given the need for certainty when booking a group event, the Debtor's bankrupt status has hurt business since it filed this case.

8.      The first mortgage is a high interest bridge loan which matured and could not be refinanced.  Ultimately, Kennedy Funding filed a foreclosure action and a receiver was appointed therein.  By agreement of the parties, the receiver order was stayed until January 7, 2010 to facilitate negotiations.  Settlement negotiations were ongoing up until the Chapter 11 filing herein.  In order to avoid the disruption of the Debtor's business that a receivership could cause, not to mention the expense of a receivership, the Debtor filed its Chapter 11 petition before the receiver took possession.

9.      The Debtor's total amount of unsecured debt, including mortgage deficiency claims is estimated to be in excess of $37 million.

10.     The Debtor's objective in the filing this Chapter 11 was to protect and preserve the Hotel, to maintain and increase income, and to restructure the existing loan to facilitate a realistic scenario for all interested parties.

11.     Since filing this case, the Debtor explored many plan alternatives.  A number of options that first appeared promising turned out to be unfeasible.

12.     Over the course of the past year, the New York State legislature has been moving to expand casino gambling and video lottery terminal gambling on a selective basis in selective locations.  The Debtor has followed these developments closely and believes that it would benefit if New York State passes laws to expand gambling in the Hudson Valley region.

13.     On the strength of that possibility, the Debtor has finally attracted an investor who was able to make an agreement with Kennedy that will be the cornerstone of the Debtor's Chapter 11 Plan.

14.     Under the Plan, the Property will be transferred to the Granit at Hudson Valley Resort LLC ("New Owner").   95% of the membership interests in the New Owner will be owned by Granit Investors LLC ("Borrower"), a new entity unrelated to the Debtor or Eliot Spitzer, the Debtor's principal.  Mr. Spitzer, however, will be the managing member of the New Owner.  In addition, AAO Management LLC, an entity owned and controlled Eliot Spitzer, will own 5% of the New Owner and will be paid an annual $200,000 management fee.

8

**DEBTOR'S PLAN OF REORGANIZATION**
**CLASSIFICATION AND TREATMENT OF CLAIMS**

**Class 1: Kennedy Funding**

15.    **Classification** -- Class 1 consists of the Secured Claim held by Kennedy

Funding, the first mortgagee.  The Class 1 Claim totals $17,676,110 as of July, 2013 plus certain

unliquidated costs and fees.

16.    **Treatment** – The mortgage lien of Kennedy Funding (and all related

obligations owed by the Debtor to Kennedy Funding) is deemed properly perfected, valid, and

enforceable on the terms and in the amount thereof (including all principal, interest, default

interest, late fees and other fees and charges) without defense or set-off.  The mortgage lien and

all related obligations shall survive confirmation and shall remain a first priority lien and charge

against the Property, regardless of any transfer of title to the Property pursuant to this Plan or

otherwise.  Upon the timely and irrevocable payment by New Owner to Kennedy Funding of all

payments and amounts due (and the timely satisfaction by New Owner of all obligations) as set

forth in the Forbearance Agreement, on the terms and conditions set forth therein, the mortgage

lien (and related obligations) shall be satisfied.  This provision shall survive any dismissal of this

bankruptcy case or its conversion to Chapter 7 and shall be binding on any trustee.  In the event

of any conflict between this provision and any other provision of this Plan or otherwise, this

provision shall prevail.  This provision may not be modified without the express written consent

of Kennedy Funding. The Class 1 Claim shall be paid pursuant to that certain Forbearance

Agreement annexed the Plan as Exhibit A.  Without limiting or modifying the more detailed

terms of the agreement, certain essential terms are summarized as follows:

(a)    Borrower: The Granit at Hudson Valley Resort, LLC, a new third party investor unrelated to the Debtor;

(b)    Maturity date: May 1, 2015;

(c)    Principal: $9,780,000

(d)    Paydown Payments: $100,000 upon Borrower's execution of agreement (already paid) and $400,000 upon Effective Date (to be held in escrow with Debtor's counsel);

(e)    Interest rate: 6.5%;

(f)    Payment rate: $25,000.00 per month for the period June 1, 2013 through May 1, 2015.

(g)    Accrued Interest:  Any interest accrued ("Monthly Accruals") which is not required to be paid currently above shall be deferred and paid on the Maturity Date;

(h)    Payment on Maturity Date: all principal, interest and other sums due shall be due and payable in full on the Maturity Date;

(i)    Options to Payment in Full on Maturity Date. Provided that no event of default shall have occurred, borrower or its designee shall have the option to repay the obligation or purchase the obligations for the following amounts ("Purchase Price"):  (i)  $10,450,000 less the Paydown Payments plus the Monthly Accruals if the tender is made on or before May 31, 2014, (ii)  $10,650,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2014 and November 30, 2014, and (iii) $10,850,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2014 and May 31, 2015.

(j)    Option to Extend Maturity Date.  Provided that no event of default shall have occurred, borrower or its designee shall have the option to extend the Maturity Date on the following terms: (i) $250,000 payment due December 1, 2014, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (ii) $250,000 payment due March 1, 2015, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (iii) commencing June 1, 2015 monthly accruals cease (iv) monthly payments of $50,000 per month commencing June 1, 2015; (iv) $200,000 Purchase Price increase commencing June 1, 2015, (v) $200,000 Purchase Price increase commencing December 1, 2015 and (vi) final maturity date May 31, 2016.

(k)     Purchase Price Adjustment:  In the event a VLT License has been obtained, the Purchase
        Price shall be increased by $1,500,000, and in the event the Class III Casino License has
        been obtained, the Purchase Price shall be increased by $3,000,000.

(l)     In certain circumstances Kennedy Funding will be entitled to record a deed-in-lieu of
        foreclosure upon a monetary default, which will be held in escrow.

17.     **Voting** –   The holder of the Class 1 Claim is impaired and is entitled to

vote to accept or reject the Plan.

## Class 2: General Unsecured Claims

18.     **Classification** -- Class 2  consists of Allowed General Unsecured Claims.

The General Unsecured Claims asserted against the Debtor presently total approximately

$29,737,000 excluding Kennedy.

19.     **Treatment** – Each Class 2 Claimant shall be entitled to a pro-rata share of

a distribution fund.  The distribution fund will be equal to 25% of net operating income earned

under the new owners.  The distribution fund will be capped at $750,000 total, over 4 years with

the following distribution dates: May 31, 2014, May 31, 2015, and May 31, 2016.  As set forth

on Exhibit B, such distributions will yield a 2.5% return to general unsecured creditors.  In the

event the Property is sold before the payment schedule is complete, the unpaid payments in their

capped amounts for the unexpired periods shall be paid in full at closing.  In addition, if the

Property is sold on or before May 31, 2016 to a buyer with a video lottery terminal license, an

additional distribution shall be made at closing in the amount of $1,500,000 which will yield a

total 7.5% return to general unsecured creditors.  If the Property is sold on or before May 31,

2016 to a buyer with a casino license, an additional distribution shall be made at closing in the

amount of $3,000,000 which will yield a total 12.6% return to general unsecured creditors.

20.    **Voting** -- Holders of the Class 2 Claims are impaired and are entitled to

vote to accept or reject the Plan.

## Class 3: Interest Holders

21.    **Classification** -- Class 3 consists of the Debtor's members.

22.    **Treatment** -- The Class 3 Interest Holder shall be entitled to no

distribution under the Plan, its Interests shall be cancelled, and the Debtor shall be dissloved,

23.    **Voting** -- The Holder of Class 3 Interests is deemed to have rejected the

Plan under 1126(g) of the Bankruptcy Code.

## ADMINISTRATIVE EXPENSES

24.     Allowed Administrative Expenses, including without limitation, Bankruptcy Fees, shall be paid in full, in cash on the later of the Effective Date, or the date such Administrative Expense becomes Allowed or as soon as practicable thereafter, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

25.     Total unpaid administration claims are projected to be approximately $135,000 .

## PRIORITY CLAIMS

26.     Allowed Priority Claims, including all Claims under Sections 507(a)(2), (3),(4),(5),(6),(7),and (8) of the Bankruptcy Code,  shall be paid in full in Cash on the Effective Date.  The Debtor estimates that the Allowed Priority Claims total approximately $1,200 on account of claims made by the State of New York and the United States Internal Revenue Service.

## MISCELLANEOUS

27.     All outstanding United States Trustee fees and any applicable interest will be paid on or before the Effective Date.   Thereafter, all such fees and any interest shall be paid as they become due.

## MEANS FOR IMPLEMENTATION OF THE PLAN

28.     <u>Plan Payments</u>  –  On the Effective Date of the Plan, the Borrower shall make the $400,000 Effective Date payment to Kennedy as required by the Forbearance Agreement annexed to the Plan as Exhibit A, and in addition shall fund payment of (a) administration claims in the estimated amount of $135,000, (b) Priority Claims in the estimated amount of $1,200, and (c) fees payable to the Office of the United States Trustee in the estimated amount of $50,000 (collectively, the "Effective Date Payments").  Post-confirmation payments will be made from cash flow as set forth on the projections annexed as Exhibit B to the Plan. Post-confirmation payments due in the event of a sale of the Property will be due at closing as set forth in the Operating Agreement annexed hereto as part of Exhibit A to the Plan.

29.     The funds to be distributed under the Plan on the Effective Date shall be held in an IOLA account maintained by Backenroth Frankel & Krinsky, LLP until the Effective

Date.  On the Effective Date, such funds will be turned over to the Debtor and the Debtor shall be

the disbursing agent under the Plan.

      30.    <u>Transfer of Title to Property</u> – On the Effective Date, the New Owner shall

acquire title to the Property free and clear of all liens, claims and encumbrances, except the

mortgage lien of Kennedy Funding.   Post Confirmation, the New Owner shall be governed by its

operating agreement, a copy of which is annexed to the Plan as Exhibit B.

      31.    <u>Good Faith Transfer</u> – In order to ensure consummation of the Plan, the

Plan requires that  the Confirmation Order contain the following findings of fact and conclusions

of law: (a) that the terms and conditions of the transfer of the Property to the New Owner are fair

and reasonable, (b) that the transfer of the Property to the New Owner is non-collusive, fair and

reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the

New Owner represents an arm's-length transaction and was negotiated in good faith between the

parties, (d) that the New Owner, as transferee of the Property, is a good faith purchaser under

Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code §

363(m), (e) the transfer of the Property to the New Owner was not controlled by an agreement

among potential purchasers, (f) that no cause of action exists against the New Owner or with

respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that

any claims under Bankruptcy Code § 363(n) or any other claims as against the New Owner are

hereby released, waived and discharged.

32.    <u>Release of Liens</u> –  Except as otherwise provided for in the Plan and in connection with the assumption and assignment of Kennedy's mortgage, on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the New Owner any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the New Owner, be deemed released, and (y) execute such documents and instruments as the Debtor or New Owner request to evidence such Claim holder's release of such property or Lien.

33.    <u>Execution of Documents</u> -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

34.    <u>Filing of Documents</u>.  Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and/or the Confirmation Order.

35.     **11 U.S.C. 1146**.  Under the Plan, pursuant to Bankruptcy Code

§ 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the

creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or

assignment of any lease or sublease or the making or delivery of any deed or other instrument of

transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without

limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the

Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting,

transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of,

or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of

indebtedness by such means, and the making, delivery or recording of any deed or other

instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with

the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a)

exemption, each recorder of deeds or similar official for any county, city or governmental unit in

which any instrument hereunder is to be recorded, any instrument of transfer of the title to the

Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the

payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax,

mortgage tax, intangible tax or similar tax, including without limitation New York State

Documentary Tax.

## LITIGATION ANALYSIS

36.    The Debtor's review of its books and records indicates that there are no material avoidance actions that are economically feasible to prosecute.  The Debtor, however, reserves the right to prosecute any such claims to ensure the most efficient and economical administration of the estate.

## OBJECTIONS TO CLAIMS/TREATMENT OF DISPUTED CLAIMS

### Objections to and Estimation of Claims and Prosecution of Disputed Claims

37.    The Debtor has not yet completed its review of the Claims asserted in this case. Under the Plan, the Debtor may object, on appropriate grounds, to the allowance of any Claim up to one hundred twenty (120) days following the Effective Date of the Plan subject to extension by Order of the Bankruptcy Court. Under the provisions of the Plan, and unless otherwise ordered by the Bankruptcy Court, the Debtor reserves the exclusive right to, and shall object to the allowance of, Claims listed in the Debtor's schedules or filed with the Bankruptcy Court with respect to which it disputes liability in whole or in part. All objections shall be litigated to Final Order. The Plan reserves the right of the Debtor to compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

38.     Under the Plan, the Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  All of the aforementioned claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

Distribution on Disputed Claims

39.     The Plan provides that no distribution shall be made with respect to a Disputed Claim until the resolution of such dispute by Final Order or by compromise, settlement, withdrawal or resolution by any other method approved by the Bankruptcy Court thereby becoming an Allowed Claim.  In terms of distribution, the Plan provides that, as soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan.

<u>Reserve for Disputed Claims</u>

40.     The Plan further provides that, if Disputed Claims exist as of the Effective Date, the Debtor shall hold for the benefit of each holder of a Disputed Claim, cash in amount equal to the distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim as of the Effective Date in an amount equal to the lesser of: (i) the amount listed in the schedules; (ii) the amount filed with the Bankruptcy Court; or (iii) the amount as estimated by the Bankruptcy Court pursuant to §502(c) of the Bankruptcy Code.

## **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

41.     At least 10 days prior to the Confirmation Hearing, the Debtor shall designate those executory contracts and unexpired leases that the Debtor shall assume and assign to the appropriate post-confirmation successor entity under the Plan.   Such designation shall be made by the filing of a notice in the docket of this case and by service by overnight delivery to the counterparties to such agreements.  All unexpired leases and executory contracts not so designated shall be deemed rejected under the Plan.

42.     In the event of a rejection of any Executory Contract which results in damage to the other party or parties to the Executory Contract, a Proof of Claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the

Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract shall

be treated as a General Unsecured Claim.


## MANAGEMENT OF THE DEBTOR


43.     Eliot Spitzer has managed the Debtor both before and during the pendency

of this case.  Post-confirmation, Mr. Spitzer will manage the Effective Date disbursement of Plan

payments.  AAO Management LLC, an entity owned and controlled by Mr. Spitzer will manage

the Property post confirmation.  Mr. Spitzer will manage the New Owner post-confirmation.

AAO Management LLC will earn $200,000 annually for its services.


## FINANCIAL PROJECTIONS AND LIQUIDATION ANALYSIS


44.     Annexed hereto as Exhibit B are projections indicating that the post-

confirmation Debtor will have sufficient cash flow to satisfy the Borrower's obligations to

Kennedy under the Plan.  Also annexed as part of Exhibit B are a balance sheet and liquidation

analysis.  In the event of a liquidation, Kennedy, as first mortgagee, holds as senior secured

position and would be entitled to virtually all of the Debtor's assets.


45.     The Debtor has obtained an appraisal, a copy of which is filed with

Bankruptcy Court as Exhibit C to this Disclosure Statement, and will be made available to any

party upon request made to the undersigned.  The Appraisal indicates that the value of the

Property is $9,100,000 as of June 21, 2013.  Kennedy's first mortgage claim is $17,676,110 as of

July 2013.  Thus, the in a liquidation and sale of the Property, the only creditor entitled to a

distribution would be Kennedy.

**TAX CONSEQUENCES**

46.     The Debtor does not believe that there will be any negative tax

consequences to the Debtor or to Creditors under the Plan.

47.     **THE DEBTOR DOES NOT PURPORT, THROUGH THIS**

**DISCLOSURE STATEMENT, TO ADVISE THE CREDITORS OR INTEREST**

**HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF**

**THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS**

**AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL**

**CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE**

**PLAN.**

**VOTING PROCEDURES AND REQUIREMENTS**

48.     A ballot to be used for voting to accept or reject the Plan is enclosed with

this Disclosure Statement.  Each creditor is entitled to execute the ballot, and return it to the

undersigned to be considered for voting purposes.  The Bankruptcy Court has directed that, in

22

order to be counted for voting purposes, ballots for the acceptance or rejection of the Plan must

be received no later than _____, 2013 at 4:00 p.m. (the "Voting Deadline") at

the following address:

> Backenroth Frankel & Krinsky, LLP
> 489 Fifth Avenue
> New York, New York  10017
> Attn:  Mark A. Frankel, Esq.

49.     Each Creditor of the Debtor whose Claim is impaired under the Plan is

entitled to vote, if either (i) its Claim has been scheduled by the Debtor, or (ii) it has filed a Proof

of Claim on or before the last date set by the Bankruptcy Court for such filings.

50.     Class 1 and Class 2 Creditors are impaired under the Plan and are eligible,

subject to the limitations set forth above, to vote to accept or reject the Plan.

51.     Any Claim as to which an objection has been filed (and such objection is

still pending) is not entitled to vote, pursuant to Section 1126(a) of the Bankruptcy Code, unless

the Bankruptcy Court temporarily allows the Claim, pursuant to Bankruptcy Rule 3018, in an

amount which it deems proper for the purpose of accepting or rejecting the Plan upon motion by

a Creditor whose Claim is subject to an objection.  Such motion must be heard and determined

by the Bankruptcy Court prior to the Voting Deadline in order for any such Creditor's vote to be

counted.

52.     A Creditor's vote may be disregarded, pursuant to Section 1126(e) of the

Bankruptcy Code,  if the Bankruptcy Court determines that the Creditor's acceptance or rejection

was not solicited or procured in good faith or in accordance with the provisions of the

Bankruptcy Code.


53.     Section 1126(c) of the Bankruptcy Code defines acceptance of a Plan by a

class of Creditors as acceptance by holders of two-thirds in dollar amount and a majority in

number of the Claims of that class which actually cast ballots for acceptance or rejection of the

Plan, i.e., acceptance takes place only if two-thirds in amount and a majority in number of the

Creditors actually voting cast their ballots in favor of acceptance.


54.     Section 1126(d) of the Bankruptcy Code defines acceptance of a Plan by a

class of Interests as acceptance by holders of two-thirds in amount of the allowed Interests of

such class held by holders of such interests.


## INJUNCTION, DISCHARGE AND PROPERTY OF THE ESTATE


55.     Discharge.  The confirmation of this Plan shall discharge the Debtor from

any Claim that accrued or arose on or before the Confirmation Date pursuant to 11 U.S.C.

§1141(d)(1).


24

56.      Vesting of Property.  Except as otherwise provided in the Plan, on the Effective Date title to all of the Debtor's assets shall pass to the Debtor or its designee free and clear of all Liens, Claims and Interests, including, without limitation, all liens and mortgages subordinate to the Class I Claimant's mortgage under the Forbearance Agreement, and in accordance with Section 1141 of the Bankruptcy Code.

## CONFIRMATION OF THE PLAN

57.      Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of the Plan.

58.      By order of the Bankruptcy Court dated  _____, 2011, the Confirmation Hearing has been scheduled for _____, 2013 at 10:00 a.m., in Judge Drain's Courtroom, United States Bankruptcy Court, 300 Quarropas Street, White Plains, New York.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned Confirmation Hearing.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court, with a copy to chambers, with proof of service and served upon the following on or before _____, 2011 at 4:00 p.m.:

Backenroth Frankel & Krinsky, LLP
489 Fifth Avenue
New York, New York  10017
Mark A. Frankel, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.


59.    At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.  The applicable requirements are as follows: (a) the Plan complies with the applicable provisions of the Bankruptcy Code, (b) the Debtor has complied with the applicable provisions of the Bankruptcy Code, (c) the Plan has been proposed in good faith and not by any means forbidden by law; (d) any payment made or promised or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable, (e) the Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider; (f) with respect to each class of

impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or

will receive or retain under the Plan on account of such Claim or interest property of a value, as

of the Effective Date of the Plan, in an amount that is not less than the amount that such holder

would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the

Bankruptcy Code, (g) each class of Claims or interests has either accepted the Plan or is not

impaired under the Plan, (h) except to the extent that the holder of a particular Claim has agreed

to a different treatment of such Claim, the Plan provides that Administrative Expenses and

priority Claims will be paid in full on the Effective Date, (i) at least one class of impaired Claims

has accepted the Plan, determined without including any acceptance of the Plan by any insider

holding a Claim of such class; and (j) Confirmation of the Plan is not likely to be followed by the

liquidation, or the need for further financial reorganization of the Debtor or any successors to the

Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.


60.     The Debtor believes that the Plan satisfies all of the statutory requirements

of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with

all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in

good faith.


61.     The Debtor contends that holders of all Claims impaired under the Plan

will receive payments under the Plan having a present value as of the Effective Date in amounts

not less than the amounts likely to be received if the Debtor were liquidated under Chapter 7 of

the Bankruptcy Code.

## CRAMDOWN

62.    In the event that any impaired class of Claims does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable."

## THE DEBTOR INTENDS TO INVOKE THE CRAMDOWN PROVISIONS OF SECTION 1129(b) AS TO ANY IMPAIRED CLASS THAT DOES NOT ACCEPT THE PLAN.

63.    A plan of reorganization does not discriminate unfairly within the meaning of the Bankruptcy Code if no class receives less than it is legally entitled to receive for its Claims or equity interests.  "Fair and equitable" has the following meanings for General Unsecured Claims:

(a)    each impaired General Unsecured Creditor  receives or retains property of a  value equal to the amount of its Allowed Claim; or

(b)    the holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

64.    In the event one or more classes rejects the Plan, the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting impaired class of Claims.

## CONCLUSION

The Debtor urges the Debtor's Creditors to vote to accept the Plan and to evidence

such acceptance by returning their ballots so that they will be received no later than

_____, 2013 at 4:00 p.m.


Dated:  New York, New York
        July 31, 2013


                                    **Everyday Logistics, LLC, by Hotel K LLC, its
                                    Managing Member**


                          By:     s/Eliot Spitzer, Managing Member



                                    **BACKENROTH FRANKEL & KRINSKY,
                                    LLP**,   **Attorneys for the Debtor**


                          By:     s/Mark Frankel_____
                                    489 Fifth Avenue
                                    New York, New York 10017
                                    (212) 593-1100

# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
In re

                                                            Chapter 11

EVERYDAY LOGISTICS LLC,                                     Case No. 10-22026

                      Debtor.
--------------------------------------------------------------x


### DEBTORS AMENDED PLAN OF REORGANIZATION


**BACKENROTH, FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, New York  10017
(212) 593-1100
Counsel to the Debtor-in-Possession

## INTRODUCTION

Everyday Logistics, LLC ("Debtor"), proposes this Plan of Reorganization for the Debtor. **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR, EACH OF THE DEBTOR'S CREDITORS, AND THE INTEREST HOLDERS (AS ALL SUCH TERMS ARE DEFINED BELOW)**.

### ARTICLE 1)

### DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1 **"Administrative Expense"** Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code.

1.2 **"Administrative Expense Claim"** A claim for payment of an Administrative Expense.

1.3 **"Allowance Date"** shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

1.4 **"Allowed Claim"** shall mean a Claim against the Debtor: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

2315551 v2

1.5    **<u>Allowed Secured Claim</u>** shall mean an Allowed Claim for which a Claimant asserts and is determined by a Final Order to hold a valid, perfected and enforceable Lien, security interest or other interest or encumbrance in property in which the Debtor has an interest not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law, or an Allowed Claim for which a Claimant asserts a setoff under Section 553 of the Bankruptcy Code and such Claim is allowed by Final Order, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property or to the extent of the amount subject to such setoff, as the case may be.

1.6    **<u>Allowed Unsecured Claim</u>** shall mean an Unsecured Claim to the extent same is allowed.

1.7    **<u>Bankruptcy Case</u>** shall mean this Chapter 11 bankruptcy case of the Debtor.

1.8    **<u>Bankruptcy Code</u>** shall mean Title 11 of the United States Code (11. U.S.C. §101 <u>et</u>. <u>seq</u>.), as in effect on the Petition Date and as amended during the Bankruptcy Case.

1.9    **<u>Bankruptcy Court</u>** shall mean the Court as defined below.

1.10    **<u>Cash</u>** shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

2315551 v2

1.11 **"Claim"** shall mean a right to payment as set forth in §101(5) of the Bankruptcy Code.

1.12 **"Claimant"** shall mean the holder of a Claim.

1.13 **"Confirmation Date"** shall mean the date of the entry of the Confirmation Order.

1.14 **"Confirmation Hearing"** shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

1.15 **"Confirmation Order"** shall mean the order of the Court confirming the Plan.

1.16 **"Court"** shall mean the United States Bankruptcy Court for the Southern District of New York.

1.17 **"Creditor"** shall mean any entity that holds a claim against the Debtor.

1.18 **"Debtor"** shall mean Everyday Logistics, LLC.

1.19 **"Disputed Claim"** shall mean the whole or any portion of any claim against the Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

2315551 v2

1.20    **"<u>Effective Date</u>"** shall mean no later than the Date upon which the Confirmation Order is a Final Order.

1.21    **"<u>Estate</u>"** shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.22    **"<u>Executory Contracts</u>"** shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

1.23    **"<u>Final Order</u>"** shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

1.24    **"<u>Interest</u>"** shall mean an existing ownership interest in Debtor.

1.25    **"<u>Interest Holder</u>"** shall mean a holder and owner of an existing Interest in Debtor.

1.26    **"<u>Investor Entity</u>"** shall mean an entity to be created to take post-confirmation ownership of the Debtor s membership Interests.

1.27    **"<u>Legal Rate</u>"** shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Confirmation Hearing.

1.28    **"<u>Lien</u>"** shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

2315551 v2

1.29    **"<u>Petition Date</u>"** shall mean January 7, 2010, the date of the filing of the Bankruptcy Case by the Debtor.

1.30    **"<u>Plan</u>"** shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

1.31    **"<u>Secured Claim</u>"** shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

1.32    **"<u>Secured Creditor</u>"** shall mean the owner or holder of a Secured Claim.

1.33    **"<u>Unsecured Claim</u>"** shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of the Debtor or the Debtor's Estate; (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim  includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code.

1.34    **"<u>Unsecured Creditor</u>"** shall mean the owner or holder of an Unsecured Claim.

## ARTICLE 2)

## CLASSIFICATION AND TREATMENT OF CLAIMS

## <u>Class 1: Kennedy Funding</u>

2.1    **Classification** -  Class 1 consists of the Secured Claim held by Kennedy Funding, the first mortgagee.

2.2    **Treatment** -  The mortgage lien of Kennedy Funding (and all related obligations owed by the Debtor to Kennedy Funding) is deemed properly perfected, valid, and enforceable on the terms and in the amount thereof (including all principal, interest, default interest, late fees and other fees and charges) without defense or set-off.  The mortgage lien and all related obligations shall survive confirmation and shall remain a first priority lien and charge against the Property, regardless of any transfer of title to the Property pursuant to this Plan or otherwise.  Upon the timely and irrevocable payment by New Owner to Kennedy Funding of all payments and amounts due (and the timely satisfaction by New Owner of all obligations) as set forth in the Forbearance Agreement, on the terms and conditions set forth therein, the mortgage lien (and related obligations) shall be satisfied.  This provision shall survive any dismissal of this bankruptcy case or its conversion to Chapter 7 and shall be binding on any trustee.  In the event of any conflict between this provision and any other provision of this Plan or otherwise, this provision shall prevail.  This provision may not be modified without the express written consent of Kennedy Funding.  The Class 1 Claim shall be paid pursuant to that certain Forbearance Agreement annexed to the Plan as Exhibit A.  Without limiting or modifying the more detailed terms of the agreement, certain essential terms are summarized as follows:

(a)    Borrower: The Granit at Hudson Valley Resort, LLC, a new third party investor unrelated to the Debtor;

(b)    Maturity date: May 1, 2015;

2315551 v2

(c)     Principal: $9,780,000

(d)     Paydown Payments: $100,000 upon Borrower's execution of agreement (already paid) and $400,000 upon Effective Date (to be held in escrow with Debtor's counsel);

(e)     Interest rate: 6.5%;

(f)     Payment rate: $25,000.00 per month for the period June 1, 2013 through May 1, 2015;

(g)     Accrued Interest:  Any interest accrued ("Monthly Accruals") which is not required to be paid currently above shall be deferred and paid on the Maturity Date;

(h)     Payment on Maturity Date: all principal, interest and other sums due shall be due and payable in full on the Maturity Date;

(i)     Options to Payment in Full on Maturity Date.  Provided that no event of default shall have occurred, borrower or its designee shall have the option to repay the obligation or purchase the obligations for the following amounts ("Purchase Price"):  (i) $10,450,000 less the Paydown Payments plus the Monthly Accruals if the tender is made on or before May 31, 2014, (ii) $10,650,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2014 and November 30, 2014, and (iii) $10,850,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2014 and May 31, 2015;

(j)     Option to Extend Maturity Date.  Provided that no event of default shall have occurred, borrower or its designee shall have the option to extend the Maturity Date on the following terms: (i) $250,000 payment due December 1, 2014, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (ii) $250,000 payment due March 1, 2015, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (iii) commencing June 1, 2015 monthly accruals cease (iv) monthly payments of $50,000 per month commencing June 1, 2015; (iv) $200,000 Purchase Price increase commencing June 1, 2015, (v) $200,000 Purchase Price increase commencing December 1, 2015 and (vi) final maturity date May 31, 2016.

(k)     Purchase Price Adjustment:  In the event a VLT License has been obtained, the Purchase Price shall be increased by $1,500,000, and in the event the Class III Casino License has been obtained, the Purchase Price shall be increased by $3,000,000.

(l)     In certain circumstances Kennedy Funding will be entitled to record a deed-in-lieu of foreclosure upon a monetary default, which will be held in escrow.

2.3     **Voting**   The holder of the Class 1 Claim is impaired and is entitled to vote

to accept or reject the Plan.

2315551 v2

## Class 2: Unsecured Claims

2.4     **Classification** - Class 2  consists of Allowed Unsecured Claims.

2.5     **Treatment**  Each Class 2 Claimant shall be entitled to a pro-rata share of a distribution fund.  The distribution fund will be equal to 25% of net operating income earned under the new owners.  The distribution fund will be capped at $750,000 total, over 4 years with the following distribution dates: May 31, 2014, May 31, 2015, and May 31, 2016.  As set forth on Exhibit B, such distributions will yield a 2.5% return to general unsecured creditors.  In the event the Property is sold before the payment schedule is complete, the unpaid payments in their capped amounts for the unexpired periods shall be paid in full at closing.  In addition, if the Property is sold on or before May 31, 2016 to a buyer with a video lottery terminal license, an additional distribution shall be made at closing in the amount of $1,500,000 which will yield a total 7.5% return to general unsecured creditors.  If the Property is sold on or before May 31, 2016 to a buyer with a casino license, an additional distribution shall be made at closing in the amount of $3,000,000 which will yield a total 12.6% return to general unsecured creditors.

2.6     **Voting**   Class 2 is impaired and is entitled to vote accept or reject the Plan.

## Class 3: Interest Holders

2.7     **Classification**  Class 3 consists of the Debtor s members.

2.8     **Treatment** -- The Class 3 Interest Holder shall be entitled to no distribution under the Plan, its Interests shall be cancelled, and the Debtor shall be dissolved

2.9    **Voting**    The Holders of Class 3 Equity Interests are deemed to have rejected the Plan, under 1126(g) of the Bankruptcy Code.

## ARTICLE 3)

## ADMINISTRATIVE EXPENSES, PRIORITY CLAIMS, AND STATUTORY FEES

3.1    Allowed Administrative Expenses shall be paid in full, in Cash on the Effective Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

3.2    Allowed Priority Claims, including all Claims under Sections 507(a)(2), (3),(4),(5),(6),(7),and (8) of the Bankruptcy Code,  shall be paid in full in Cash on the Effective Date.  The Debtor estimates that the Allowed Priority Claims total approximately $1,200 on account of claims made by the State of New York and the United States Internal Revenue Service.

3.3    All outstanding United States Trustee fees and any applicable interest will be paid on or before the Effective Date.   Thereafter, all such fees and any interest shall be paid as they become due.

2315551 v2

## ARTICLE 4)

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     On the Effective Date of the Plan, the Borrower shall make the $400,000

Effective Date payment to Kennedy as required by the Forbearance Agreement annexed to the

Plan as Exhibit A, and in addition shall fund payment of (a) administration claims in the

estimated amount of $135,000, (b) Priority Claims in the estimated amount of $1,200, and (c)

fees payable to the Office of the United States Trustee in the estimated amount of $50,000

(collectively, the "Effective Date Payments").   Post-confirmation payments will be made from

cash flow as set forth on the projections annexed hereto as exhibit B.   Post-confirmation

payments due in the event of a sale of the Property will be due at closing as set forth in the

Operating Agreement annexed hereto as part of Exhibit A.

4.2     The funds to be distributed under the Plan on the Effective Date shall be

held in an IOLA account maintained by Backenroth Frankel & Krinsky, LLP until the Effective

Date.   On the Effective Date, such funds will be turned over to the Debtor and the Debtor shall

be the disbursing agent under the Plan for those funds.

4.3     **Transfer of Title to Property**   On the Effective Date, the New Owner

shall acquire title to the Property free and clear of all liens, claims and encumbrances, except the

mortgage lien of Kennedy Funding as set forth in the Forbearance Agreement.     Post

Confirmation, the New Owner shall be governed by its operating agreement, a copy of which is

annexed to the Plan as part of Exhibit A.

2315551 v2

4.4    **Good Faith Transfer**    In order to ensure consummation of the Plan, the Plan requires that  the Confirmation Order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the transfer of the Property to the New Owner are fair and reasonable, (b) that the transfer of the Property to the New Owner is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the New Owner represents an arm's-length transaction and was negotiated in good faith between the parties, (d) that the New Owner, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the transfer of the Property to the New Owner was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the New Owner or with respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the New Owner are hereby released, waived and discharged.

4.5    **Release of Liens**    Except as otherwise provided for in the Plan and in connection with the assumption and assignment of Kennedy  s mortgage, on the Effective Date, (a) each holder of a Secured Claim, shall on the Effective Date (x) turn over and release to the New Owner any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the New Owner, be deemed released, and (y) execute such documents and instruments as the Debtor or New Owner request to evidence such Claim holder's release of such property or Lien..

2315551 v2

4.6    **Execution of Documents** -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

4.7    **Filing of Documents.**    Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and/or the Confirmation Order.

4.8    **11 U.S.C. 1146**.    Under the Plan, pursuant to Bankruptcy Code § 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent

2315551 v2

with the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a) exemption, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded, any instrument of transfer of the title to the Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage tax, intangible tax or similar tax, including without limitation New York State Documentary Tax.

4.9     **Post-confirmation Management**.  Eliot Spitzer will manage the Effective Date disbursement of Plan payments.  AAO Management LLC, an entity owned and controlled by Mr. Spitzer will manage the Property post confirmation.  Mr. Spitzer will manage the New Owner post-confirmation.  AAO Management LLC will earn $200,000 annually for its services.

4.10     **Filing of Documents.**     Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and/or the Confirmation Order.

4.11     **11 U.S.C. 1146**.     Under the Plan, pursuant to Bankruptcy Code § 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or

2315551 v2

assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with the foregoing, and the Supreme Court interpretation of the Bankruptcy Code §1146(a) exemption, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded, any instrument of transfer of the title to the Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage tax, intangible tax or similar tax, including without limitation New York State Documentary Tax.

## ARTICLE 5)

## PROVISIONS FOR THE RETENTION, ENFORCEMENT

## AND SETTLEMENT OF CLAIMS BELONGING TO THE
## DEBTOR OR THE DEBTOR'S ESTATE

5.1    All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent

transfer claim pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code are hereby preserved for the benefit of the Debtor.   Prosecution and settlement of such Claims shall be the exclusive responsibility of Debtor and all proceeds from such actions shall vest in and be the property of the Debtor.

## ARTICLE 6)

### PROVISIONS FOR THE RESOLUTION OF DISPUTED

### CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

6.1    **Objections to Claims**.  The Debtor may object, on appropriate grounds, to the allowance of any Claim up to one hundred twenty (120) days following the Effective Date of the Plan subject to extension by Order of the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court, the Debtor reserves the exclusive right to, and shall object to the allowance of, Claims listed in the Debtor's schedules or filed with the Bankruptcy Court with respect to which it disputes liability in whole or in part.  All objections shall be litigated to Final Order. The Plan reserves the right of the Debtor to compromise, settle, withdraw or resolve by any other method approved by the Bankruptcy Court, any such objections to Claims.

6.2    The Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to §502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such contingent or unliquidated Claim at any time during litigation concerning any objection to any

2315551 v2

Claim, including during the pendency of any appeal relating to any such objection.  All of the aforementioned claim objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted method.

6.3    **Distribution on Disputed Claims**.  No distribution shall be made with respect to a Disputed Claim until the resolution of such dispute by Final Order or by compromise, settlement, withdrawal or resolution by any other method approved by the Bankruptcy Court thereby becoming an Allowed Claim.  As soon as practicable after a Disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and/or distributions to which such holder is then entitled under the Plan.

6.4    **Reserve for Disputed Claims**.  If Disputed Claims exist as of the Effective Date, the Debtor shall hold for the benefit of each holder of a Disputed Claim, cash in amount equal to the distributions which would have been made to the holder of such Disputed Claim if it were an Allowed Claim as of the Effective Date in an amount equal to the lesser of: (i) the amount listed in the schedules; (ii) the amount filed with the Bankruptcy Court; or (iii) the amount as estimated by the Bankruptcy Court pursuant to §502(c) of the Bankruptcy Code.

## ARTICLE 7)

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    **Assumption**.  At least 10 days prior to the Confirmation Hearing, the Debtor shall designate those executory contracts and unexpired leases that the Debtor shall

assume and assign to the appropriate post-confirmation successor entity under the Plan.    Such

designation shall be made by the filing of a notice in the docket of this case and by service by

overnight delivery to the counterparties to such agreements.  All unexpired leases and executory

contracts not so designated shall be deemed rejected under the Plan.

7.2    **Claims Upon Rejection**.    In the event of a rejection of any Executory

Contract which results in damage to the other party or parties to the Executory Contract, a Proof

of Claim for such damages must be filed by the damaged party with the Court within sixty (60)

days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory

Contract shall be treated as a General Unsecured Claim.

7.3    **Failure to File**.  Any Claim arising from the rejection of any Executory

Contract not filed with the Court within the time period provided in the preceding paragraph

above shall be deemed discharged and shall not be entitled to participate in any distribution

under the Plan.

## ARTICLE 8)

## RETENTION OF JURISDICTION

8.1    **Retention of Jurisdiction**.    The Court shall have jurisdiction over all

matters arising under, arising in, or relating to Debtor Bankruptcy Case including, but not limited

to, proceedings:

8.1.1.  To consider any modification of the Plan under section 1127 of the

Bankruptcy Code;

2315551 v2

8.1.2.   To hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157.

8.1.3.   To hear, determine and enforce all Claims  and causes of action which may exist on behalf of the Debtor or the Debtor's estate, including, but not limited to, any right of the Debtor or the Debtor's Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

8.1.4.   To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

8.1.5.   To value assets of the Estate.

8.1.6.   To enforce the Confirmation Order, the final decree, and all injunctions therein;

8.1.7.   To enter an order concluding and terminating the Bankruptcy Case;

8.1.8.   To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

8.1.9.   To determine all questions and disputes regarding title to the assets of the Debtor and liens against such assets.

8.1.10. To re-examine Claims which may have been allowed for purposes of voting, and to determine objections which may be filed to any Claims;

2315551 v2

## ARTICLE 9)

## GENERAL PROVISIONS

9.1     **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

9.2     **Contents of Confirmation Order**.  The Confirmation Order may contain such injunctions and other orders as may be necessary to implement the Plan.

9.3     **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a creditor holding a Disputed Claim, until such Claim, or any part thereof, becomes an Allowed Claim, if ever.

9.4     **Discharge of Claims not Classified**.  Any Claim not specifically classified within this Plan shall not receive distributions under the Plan on account of such Claim, and shall be deemed discharged and forever barred.

9.5     **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

9.6     **Other Actions**.  Nothing contained herein shall prevent the Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

2315551 v2

## ARTICLE 10)

## MODIFICATIONS

10.1 **Modification of Plan.** The Debtor may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, the Debtor may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE 11)

## INJUNCTION, DISCHARGE AND PROPERTY OF THE ESTATE

11.1 **Discharge**. The confirmation of this Plan shall discharge the Debtor from any Claim that accrued or arose on or before the Confirmation Date pursuant to 11 U.S.C. §1141(d)(1).

11.2 **Vesting of Property**. Except as otherwise provided in the Plan, on the Effective Date title to all of the Debtor's assets shall pass to the Debtor or its designee free and clear of all Liens, Claims and Interests, including, without limitation, all liens and mortgages subordinate to the Class I Claimant's mortgage, in accordance with Section 1141 of the Bankruptcy Code.

## ARTICLE 12)

## CLOSING THE CASE

12.1 Upon substantial consummation, the Debtor may move for a final decree to close the Bankruptcy Case and to request such other orders as may be just.

2315551 v2

Dated:      New York, New York
            July 31, 2013

                              **Everyday Logistics, LLC, by Hotel K LLC,
                              its Managing Member**


              By:            s/Eliot Spitzer, Managing Member


                              **BACKENROTH FRANKEL & KRINSKY,
                              LLP**, **Attorneys for the Debtor**


              By:            s/Mark Frankel
                             Mark A. Frankel   489 Fifth Avenue
                             New York, New York 10017
                             (212) 593-1100

2315551 v2

# Exhibit A

## FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** (this "<u>Agreement</u>") is executed as of the 1st day of June, 2013 (the "<u>Effective Date</u>"), by and among **KENNEDY FUNDING, INC.** ("<u>Agent</u>"), a New Jersey corporation having an address at 930 Sylvan Avenue, Suite 110, Englewood Cliffs, New Jersey 07632, as agent for the lenders identified on <u>Schedule D</u> to the Note (as defined below) and incorporated herein by reference, in each case having an address care of Kennedy Funding, Inc., 930 Sylvan Avenue, Suite 110, Englewood Cliffs, New Jersey 07632 (the aforesaid Agent and lenders are hereinafter collectively referred to as "<u>Lender</u>"), **THE GRANIT AT HUDSON VALLEY RESORT LLC,** a _____ limited liability company, having an address at 400 Granite Road, Kerhonkson, New York ____ (the "<u>Borrower</u>"), and **ELIOT SPITZER** residing at _____, ("<u>Spitzer</u>").

## BACKGROUND

A.    Lender previously made a loan to Everyday Logistics LLC ("Original Borrower") in the original principal amount of **NINE MILLION SEVEN HUNDRED EIGHTY THOUSAND ($9,780,000) DOLLARS** ("<u>Loan</u>"), which is evidenced by a Promissory Note, dated as of March 8, 2006, in the original principal amount of the Loan made payable to Lender ("<u>Note</u>").

B.    Lender is the holder of a Mortgage and Security Agreement, dated March 8, 2006 (the "<u>Mortgage</u>"), recorded in the Ulster County Clerk's Office in Book _____, Pages ____ on _____, encumbering certain real property and improvements commonly known as 400 Granite Road, Kerhonkson, New York _____ as more particularly described in _____ Title Report No. _____, as security for the Loan such real property and improvements being shown on the survey prepared by D.W. Hannig L.S., P.C. and attached hereto as Schedule A (the "<u>Property</u>").

C.    In addition to the Mortgage, the Loan is also secured by, among other things, that certain Loan and Security Agreement, dated March 8, 2006 (the "<u>Loan Agreement</u>") and that certain Guaranty, dated March 8, 2006 (the "<u>Guaranty</u>"), pursuant to which Spitzer irrevocably and unconditionally guaranteed to Lender payment and performance of the Loan.

D.    Following various defaults of its obligations under the Loan, Original Borrower filed for Chapter 11 protection in the United States Bankruptcy Court, Southern District of New York, Proceeding No. 10-22026 (the "Bankruptcy Proceeding").

E.    The Borrower and the Original Borrower will be seeking approval in the Bankruptcy Proceeding for a plan (the "Bankruptcy Plan").  Wherever in this Agreement approval of the Bankruptcy Plan is addressed, approval shall mean a final, non-appealable order approving the Bankruptcy Plan in the Bankruptcy Proceeding.

F.     Pursuant to the Bankruptcy Plan, Lender has agreed that Borrower may assume the Loan, which Borrower hereby acknowledges and agrees is due and payable to Lender by reason of the Events of Default described herein and Borrower and Guarantor have requested that Lender forbear from exercising certain of its rights and remedies pursuant to the Loan Documents to allow Borrower an opportunity to satisfy, in full, its payment obligations to Lender under the Loan Documents, and Lender is willing to so forbear on the terms and conditions hereinafter stated.

**NOW, THEREFORE**, the parties agree as follows:

1.     <u>Incorporation of the Recitals</u>.  All of the recitals set forth above are made a part of this Agreement and incorporated herein as if set at length in the text of this Agreement.

2.     <u>Definitions</u>.

(a)     "<u>Borrower</u>" shall mean The Granit at Hudson Valley Resort LLC**,** a _____ limited liability company.

(b)     "<u>Debtors</u>" shall mean the Borrower and the Guarantor collectively.

(c)     "<u>Deed Release Event of Default</u>" shall mean the failure to make any payment as and when due under Section 4(e)(ii) hereof; the failure to make any payment of local real property taxes on the Property after ninety (90) days has elapsed from the due date of such taxes and Lender has delivered a notice of default, in which case Borrower shall have an additional twenty (20) days in which to make payment of said taxes plus interest and penalties thereon, but said ninety (90) and twenty (20) day periods shall terminate immediately upon commencement of a foreclosure action by the appropriate governmental authority, or the failure to maintain the liability or property insurance for the Property required by the Loan Documents; unless Borrower fails to pay to Lender, within thirty (30) days after receipt of notice that Lender made payment to renew, reinstate or replace any such insurance policy, such payment to be in the amount of Lender's payments to renew, reinstate or replace plus 10% thereof.

(d)     "<u>Guarantor</u>" shall mean Eliot Spitzer.

(e)     "<u>Indebtedness</u>" shall mean (i) the Loan Amount plus (ii) all other amounts owed by Borrower and/or Guarantor to Lender in connection with the Loan Documents, the sum of which is the amount of [$17,676,109.52].

(f)     "<u>Lien</u>" shall mean any mortgage, pledge, assignment, hypothecation, security interest, encumbrance, lien, charge or deposit arrangement or other arrangement having the practical effect of the foregoing.

(g)    "<u>Loan</u>" shall mean that certain loan in the original principal amount of $9,780,000 made by Lender to Borrower.

(h)    "<u>Loan Amount</u>" shall mean $9,780,000, but shall be reduced to $9,280,000 upon the receipt by Lender of the Paydown Payments.

(i)    "<u>Loan Documents</u>" shall mean the Note, Guaranty, Mortgage, and Loan Agreement as amended to date, this Forbearance Agreement and all instruments, documents, mortgages and agreements executed in connection therewith or related thereto, and amendments, modifications, or supplements thereto, collectively.

(j)    "<u>Proceeds</u>" shall mean all "proceeds" as such term is defined in Section 9-306(1) of the Uniform Commercial Code as in effect in the State of New Jersey on the date hereof ("<u>UCC</u>").

(k)    All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Loan Documents.

3.    <u>Ratification of Existing Obligations</u>.  Borrower and Guarantor hereby ratify and confirm in all respects the obligations as evidenced by or otherwise arising under the Loan Documents including all of the terms, representations and undertakings set forth therein, in each case, as modified by this Agreement.  In the event of any inconsistency, this Agreement shall control.

4.    <u>Acknowledgement of the Indebtedness, Payments</u>.

(a)    <u>Confirmation of Indebtedness</u>.  Borrower hereby acknowledges and confirms it is indebted to Lender, without defense, setoff, claim or counterclaim under the Loan Documents, in the aggregate principal amount of $9,780,000, together with all accrued and unpaid interest thereon in the amount of $8,751,870.00 less a credit of $909,100 in respect of payments made subsequent to the commencement of the Bankruptcy Proceeding, plus all fees, costs and expenses (including attorneys' fees in the amount of $53,339.52) incurred to date, which amounts are absolutely and unconditionally owing without defense, setoff, claim, counterclaim or deduction of any nature.  Borrower acknowledges that the entire outstanding Indebtedness owed to Lender as of the date hereof is Seventeen Million Six Hundred Seventy-Three Thousand One Hundred Nine and 52/100 ($17,676,109.52) DOLLARS.

(b)    <u>Acknowledgment and Agreement of Payments</u>.  Borrower expressly acknowledges that all payments made to Lender or its counsel prior to the date hereof by Borrower, Original Borrower, or any other party, are fully earned and non-refundable. Prior to the execution and delivery hereof, the Borrower has tendered $500,000 to Backenroth & Frankel as escrow agent ("the <u>Escrow Agent</u>").  Lender acknowledges that $100,000 of said deposit has been paid to it prior to execution and delivery hereof, which

Borrower acknowledges is fully earned and non-refundable.  Upon approval of the Bankruptcy Plan in the Bankruptcy Proceeding the Escrow Agent shall pay to the Lender the balance in the amount of $400,000; provided that if the Bankruptcy Plan has not been approved by the following dates, then the respective amounts shall be paid on such dates: August 31, 2013, the amount of $50,000; September 30, 2013, the amount of $100,000; October 30, 2013, the amount of $100,000; November 31, 2013, the amount of $100,000; and December 30, 2013, the amount of $50,000.  If the Bankruptcy Plan is approved prior to any such dates, the remaining balance of the $400,000 shall be paid on the date of such approval.  Such $500,000 in payments are earned as of the date hereof and non-refundable, and shall be referred to herein as the "Paydown Payments" when actually received by Lender and shall reduce the principal amount of the Loan.

(c)    Certain Covenants.  Borrower covenants that it shall, promptly following the Effective Date (i) use good faith to obtain a VLT License at its sole cost and expense, (ii) use good faith to obtain a Class III Casino License at its sole cost and expense, and (iii) cooperate fully with Lender in listing the Loan for sale with one or more brokers, and on such terms as approved by Lender in its discretion in accordance with the terms hereof.

(d)    Payment of Expenses.  Debtors acknowledge and agree they are liable for all reasonable fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with the documentation, preparation, interpretation and negotiation of this Agreement and any amendment, modification or supplement to this Agreement, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of the Lender's rights and remedies hereunder and under the Loan Documents.  All such fees, costs and expenses are referred to herein as the "Expenses".

(e)    Interest Rate; Payments.

(i)    As of the Effective Date, interest shall accrue on the Loan Amount at a rate per annum equal to 6.5 %; provided, however, (A) if Borrower or Guarantor makes any attempt to repudiate in writing any of their obligations, including those obligations set forth herein; (B) if any federal or state bankruptcy, insolvency, or similar proceeding is initiated by or against Borrower or any Guarantor and not dismissed within sixty (60) days after the initiation thereof; or (C) upon an Event of Default under this Agreement (other than an Existing Default), then interest shall accrue retroactively on the outstanding principal balance of the Loan at the Default Rate from the Effective Date, until the date Lender receives repayment in full of the Loan and all other Indebtedness due and payable to Lender;

(ii)    Borrower shall pay to Lender as follows:

(A)     (1)  payments of $25,000 per month shall be made on the first day of each month, commencing on June 1, 2013 through May 1, 2015 (provided that in the event this Agreement is fully executed after June 1, 2013 all payments due prior to such execution shall be due retroactively and be paid upon such execution) and the balance in the amount of $25,267 shall be accrued monthly (the "Monthly Accruals");

(2)  payments of $50,267.00 per month shall be made on the first day of each month, commencing on June 1, 2015 through May 1, 2016;

(B)     (1)  the amount of $250,000 shall be paid to Lender on or before December 1, 2014 unless the Loan has been repaid in full prior to such date;

(2)  the amount of $250,000 shall be paid to Lender on or before March 1, 2015 unless the Loan has been repaid in full prior to such date.

(C)     the entire Indebtedness and all accrued and unpaid interest shall be paid on May 31, 2016 (the "Maturity Date"); and

(D)     upon payment in full of the Indebtedness or payment of the Purchase Price, Lender shall issue a satisfaction or assignment of the Loan, at no additional cost, subject to the right of Lender to maintain the lien of record for one year after such payment in order to secure only the payment described in Section 4(e)(iv) below )the "Maintained Lien").

(iii)     in the event that there has been no further default under the Loan and the Borrower tenders repayment in full of the Indebtedness, then the Borrower may repay or acquire the Indebtedness at the following amounts (the "Purchase Price") as set forth below:

(A)     $10,450,000 less the Paydown Payments plus the Monthly Accruals if the tender is made on or before May 31, 2014.

(B)     $10,650,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2014 and November 30, 2014. and

(C)     $10,850,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2014 and May 31, 2015.

(D)     $11,050,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2015 and November 30, 2015.

(E)     $11,250,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2015 and May 31, 2016.

(iv)    In the event the VLT License has been obtained for the Property, the Purchase Price shall be increased by $1,500,000.  In the event the Class III Casino License has been obtained for the Property, the Purchase Price shall be increased by $3,000,000.  If neither the VLT License or the Class III Casino License has been obtained at the time the Purchase Price has otherwise been tendered, the Lender shall subordinate the Maintained Lien to the mortgage lien of the lender providing the refinancing proceeds.  If there is no possibility at such time for either such license to be granted, as evidenced by an affidavit of Eliot Spitzer, Lender shall release the Maintained Lien.  At any time after payment of the Purchase Price if Borrower pays to Lender an additional $500,000, Lender shall release the Maintained Lien.

(f)    Additional Terms.

(i)    All interest accrued but not required to be paid monthly pursuant to Section 4 (e) (i), (ii), or (iii) above shall be paid on the Maturity Date. All dates for payments required under the Loan are deemed to be of the essence. If any payment pursuant to Section 4 (e) (i), (ii) or (iii) is not made when due, the Loan shall be deemed to be irrevocably in default if such payment is not cured within 10 days of the date due by payment of the unpaid amount plus a late fee of 10% of the unpaid amount. No payment made pursuant to Section 4(e)(ii)(A) shall be applicable to the Purchase Price.  No payment made pursuant to Section 4 (e)(ii)(B) shall be applicable to the Purchase Price, unless the Loan is repaid in full prior to June 1, 2015 in which event the payments made pursuant to Section 4(e)(ii) Borrower shall reduce the Purchase Price.  In the event there is an uncured default under the Loan on or before May 31, 2016, the entire amount of $17,676,190.52 together with all accrued and unpaid interest, costs, and expenses shall be due and payable immediately

(ii)    All payments due to Lender shall be paid in immediately good funds by wire transfer to such account as Lender directs Borrower in writing.

5.    Borrower's Obligations.

(a)    Appointment of Independent Director.  As a condition to the effectiveness of this Agreement, Borrower shall deliver to Lender a written amendment to Borrower's constituent organizational documents in form and substance satisfactory to Lender providing for the appointment of an independent third-party manager whose affirmative vote shall be required prior to Borrower seeking any relief pursuant to the United States Bankruptcy Code or any state debtor-relief law or regulation.  The independent director shall be selected by Borrower and shall be subject to the approval of Lender.  The appointment of such independent director or directors shall occur prior to the execution of this Agreement by Borrower.

(b)    Payment of Expenses.  On or before the Effective Date, Borrower agrees to pay Lender the amount of _____ **and ___/100**

**($_____.00) DOLLARS** for payment of certain Expenses incurred by the Lender in connection with the documentation, preparation, interpretation and negotiation of this Agreement and the consummation and administration of the transactions contemplated hereunder.

       (c)   <u>Liens</u>.  On or before the Effective Date, Borrower shall deliver evidence reasonably satisfactory to Lender that Borrower has paid and discharged any and all claims of lien recorded against the Mortgaged Property (other than the Mortgage and Liens of record against the Mortgaged Property as of the Closing Date which were acceptable to Lender on the Closing Date) or effect the release thereof by recording or delivering to Lender a surety bond in sufficient form and amount or provide Lender with other evidence, which Lender deems, in its sole discretion, to be in an amount and form sufficient and from a surety satisfactory for payment of such claims of lien, for the full and continuous protection of Lender from the effect of such liens.

       (d)   <u>Updated Title Report and Endorsement to Lender's Title Policy</u>.  On or before the Effective Date, Borrower shall deliver to Lender a title report with respect to the Mortgaged Property from a title insurance company reasonably satisfactory to Lender evidencing that the Mortgage continues to constitute a first priority Lien on the Mortgaged Property and that no Lien exists against the Mortgaged Property other than those Liens of record against the Mortgaged Property as of the Closing Date which were acceptable to Lender on the Closing Date.

       (e)   <u>Deed in Lieu of Foreclosure</u>.  Upon the execution and delivery of this Agreement:

       (i)   Borrower shall duly execute a Deed in Lieu of Foreclosure in the form attached hereto as **Exhibit A** and made a part hereof for the Mortgaged Property ("<u>Deed in Lieu</u>"), together with all necessary forms sufficient to transfer fee title to the Mortgaged Property to Lender or Lender's assignee.  The Deed in Lieu shall be delivered to and held in escrow by Lender's counsel, Sills Cummis & Gross PC, in accordance with the terms and conditions of that certain Escrow Agreement executed and entered into simultaneously herewith.

       (ii)   Borrower acknowledges and agrees that upon a Deed Release Event of Default pursuant to this Agreement (other than the Existing Defaults), Lender has the absolute right, but not the obligation, to release from escrow and record the Deed in Lieu, upon 20 days advance written notice to Borrower if the Deed Release Event of Default has not been cured, and to take any and all necessary measures to acquire title to the Mortgaged Property and to extinguish Borrower's interest in the Mortgaged Property. Without limiting any rights or powers granted to Lender by this Agreement and/or the Loan Documents, Borrower hereby appoints Lender the attorney-in-fact of Borrower, which appointment as attorney-in-fact is irrevocable and coupled with an interest, for the purpose of carrying out the provisions of this Agreement and the Deed in Lieu and taking

any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof including, without limitation, to execute, in connection with the conveyance of the Mortgaged Property to Lender pursuant to the Deed in Lieu, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Mortgaged Property.  Borrower shall pay any and all transfer and/or recording taxes or fees associated with the filing of the Deed in Lieu and/or the transfer of title to the Mortgaged Property to Lender.  Borrower shall cooperate fully with Lender, now and at all times in the future, to effect a prompt, complete and lawful conveyance and transfer to Lender or its designee of the Mortgaged Property pursuant to and as contemplated by the provisions of this Agreement and the Deed in Lieu, and promptly take all actions reasonably required by Lender to effect any such conveyance and transfer, including (without limitation) supplying information regarding the Mortgaged Property, completing and executing such further documentation as Lender may reasonably consider necessary or appropriate promptly to effect any such conveyance and transfer.  The authorization and power of attorney granted to Lender pursuant to this paragraph shall be deemed coupled with an interest and shall be irrevocable.

(iii)    If Lender elects, in its sole discretion, to record the Deed in Lieu upon a Deed Release Event of Default, Borrower acknowledges and agrees the Deed in Lieu is intended to be and constitute an absolute conveyance of title to the Mortgaged Property and is not intended to be a mortgage, trust, conveyance or security of any kind. Borrower further agrees and acknowledges that the Mortgage shall not merge into the fee interest conveyed by the Deed in Lieu, but that the Mortgage shall survive and remain as a good and valid mortgage, separate and apart from any other interest of Lender in the Mortgaged Property.  **IT IS FURTHER AGREED AND ACKNOWLEDGED THAT THE TRANSFER CONTEMPLATED BY THE DEED IN LIEU SHALL NOT CONSTITUTE A FULL OR PARTIAL SATISFACTION, WAIVER OR RELEASE OF THE INDEBTEDNESS EVIDENCED BY ANY INSTRUMENT SECURED BY OR MADE IN CONJUNCTION WITH THE MORTGAGE**.

(iv)    Notwithstanding the foregoing, provided that the Deed in Lieu has not been previously released from escrow in accordance with this Agreement and the Escrow Agreement, upon Lender's receipt of payment in full of the Indebtedness as set forth in this Agreement, then Lender shall promptly authorize the release of the Deed in Lieu from escrow and the delivery of same to the possession of Borrower or Borrower's attorney on behalf of Borrower.

(v)    Borrower and Lender shall duly execute a Consent Judgment of Foreclosure in the form attached hereto as Exhibit B in the case entitled Kennedy Funding, Inc. v. Everyday Logistics, LLC presently pending in Ulster County in  [New York State Supreme Court], No. ___.  The Consent Judgment of Foreclosure shall be held in escrow by Lender's counsel, and released from escrow, on the same terms and conditions as set forth with respect to the Deed in Lieu.

(vi)    The remedies of Lender described in this Section 5€shall be referred to as the "Deed Release Remedies".

(f)    **Borrower Documents**.  The following documents of Borrower, which shall be satisfactory to Lender in its sole discretion, shall be delivered to Lender upon execution of this Agreement:

(i)    **Amendment to the Limited Liability Company Operating Agreement and Articles of Organization**.  Certified copy of (A) the First Amendment to the Limited Liability Company Operating Agreement of the Borrower, and (B) the First Amendment to the Articles of Organization of Borrower, pursuant to which an independent third-party manager has been appointed whose affirmative vote shall be required prior to Borrower seeking any relief pursuant to the United States Bankruptcy Code or any state debtor-relief law or regulation, provided that this condition may be satisfied after execution of this Agreement, but prior to approval of the Bankruptcy Plan.

(ii)    **Consents**.  Written consents of (A) All of the members and managers of the Borrower authorizing the execution of this Agreement and the execution and delivery of all documents required pursuant hereto, and (B) all other parties deem necessary by Lender.

6.    **Additional Covenants and Agreements**.  The Debtors, jointly and severally, further covenant and agree with the Lender that:

(a)    Each Debtor shall comply with all terms, covenants and provisions contained in the Loan Documents as applicable and as modified by this Agreement; and

(b)    Each Debtor shall at any time or from time to time execute and deliver such further and additional instruments and documents, and take such further action as Lender may reasonably request, in each case to further the purposes of this Agreement and the Loan Documents.

(c)    The United States Bankruptcy Court shall retain jurisdiction with respect to the Loan and the obligations of the Original Borrower and the Debtors thereunder and under the Bankruptcy Plan. In the event of any dispute under this Forbearance Agreement, the parties shall submit to the jurisdiction of the United States Bankruptcy Court, unless another forum is chosen by Lender in its sole and absolute discretion.

7.    **Reservation of Rights**.  By agreeing to forbear from the exercise of those rights and remedies granted to Lender under the Loan Documents, Lender does not waive any of its rights or remedies with respect to the Existing Defaults.  All rights and remedies of the Lender with respect to the Existing Defaults are hereby preserved pending fulfillment of the Borrower's obligations under this Agreement and under the

Loan Documents.  The granting of the forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of the Lender's rights and remedies or constitute a course of conduct or dealing on behalf of the Lender.  Upon an Event of Default, Lender shall have the right to exercise one or more of its rights and remedies hereunder or pursuant to the Loan Documents or at law or in equity.  Lender's agreements contained herein are limited to the express terms of this Agreement, and except as expressly set forth herein, shall not impair any right or remedy of Lender, or any of Borrower's obligations to Lender, as applicable, or Lender's right to enforce full and strict performance of all of the terms of the Loan Documents.

       8.    <u>Representations and Warranties</u>.  The Debtors, jointly and severally, represent and warrant to the Lender that:

       (a)    All warranties and representations made by the Original Borrower and Guarantor under the Loan Documents are hereby incorporated by reference and remain true and correct as of the Effective Date (except for those warranties and representations that are made as of a specific date which shall be true and correct as of such date and except that Original Borrower is operating pursuant to the Bankruptcy Proceeding).

       (b)    The execution and delivery by the Debtors of this Agreement and the performance by them of the transactions herein contemplated:

       (i)    are and will be within their respective powers;

       (ii)    have been authorized by all necessary organizational action; and

       (iii)    are not and will not be in contravention of any order of any court or other agency of government, of law or any other indenture, agreement or undertaking to which they are a party or by which their property is bound, or be in conflict with, result in a breach of, or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or undertaking or result in the imposition of any lien, charge or encumbrance of any nature on any of the properties of any Debtors.

       (c)    This Agreement is the valid and binding agreement of the Borrower and Guarantors, and is enforceable against each of them in accordance with its respective terms.

       (d)    No Event of Default, other than the Existing Defaults, has occurred under the Loan Documents.

9.      Default.

(a)      In addition to each of the Events of Default, other than the Existing Defaults, set forth in the Loan Documents, the (i) failure of any Debtor to comply with his or its representations, warranties, covenants or other undertakings under this Agreement, and (ii) occurrence or institution of any action or proceeding which may materially adversely affect the Borrower's ability to perform under this Agreement (as determined by Lender in its sole discretion exercised in good faith), but excluding the inability to obtain approval of the Bankruptcy Plan by _____, 2013 if approval of assignment of this Agreement to Original Borrower is approved in the Bankruptcy Proceeding by such date, shall be an Event of Default under this Agreement and the Loan Documents,  provided that Lender shall give notice and opportunity to cure any Event of Default other than a Deed Release Event of Default for a period of at least 60 days, and if default cannot be cured in 60 days, such reasonable additional time if Borrower is diligently pursuing a cure. Absent a Deed Release Event of Default, Lender's remedies shall not include termination of this Agreement, nor Lender's Deed Release Remedies.

(b)      Intentionally Deleted.

(c)      Any default, other than the Existing Defaults, by the Debtors under any of the Loan Documents, shall be considered an Event of Default hereunder and an Event of Default under all of the Loan Documents, and upon the occurrence of such an Event of Default, Lender shall have such rights remedies it is otherwise entitled to except as limited in Section 9 (a) above.

10.      Non-Waiver.  No omission or delay by the Lender in exercising any right or power under this Agreement, the Loan Documents or any related agreement will impair such right or power or be construed to be a waiver of any default or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and no waiver will be valid unless in writing and signed by the Lender and then only to the extent specified.  Lender's rights and remedies are cumulative and concurrent and may be pursued singly, successively or together.  No waiver of any event of default shall be construed to be a waiver of or acquiescence in or consent to any preceding or subsequent event of default.

11.      Release.  As further consideration for the Lender's agreement to grant the accommodations set forth herein, the Debtors hereby waive and release and forever discharge the Lender and its officers, directors, attorneys, agents, employees, affiliates, subsidiaries, successors and assigns from any liability, damage, claim, loss or expense of any kind that any of the Debtors may now or hereafter have against the Lender or any such other person arising out of or relating to events, actions or inactions occurring through and including the Effective Date with respect to the Indebtedness, this Agreement, the Note, or the other Loan Documents.

12.    <u>Waivers</u>.

(a)    The Debtors will not, directly or indirectly, do any act or fail to do any act, which would impair or affect the Lender's security interest in any collateral or other security interests, nor will the Debtors, upon any default or Event of Default under this Agreement or the other Loan Documents, contest the Lender's right to obtain judgment against any Debtor or to foreclose upon any collateral or interests pledged to the Lender, nor will any Debtor move to vacate or enjoin such judgment or foreclosure.

(b)    The Debtors waive and renounce all rights which are waivable under Article 9 of the UCC, whether such rights are waivable before or after default, including, without limitation, those rights with respect to compulsory disposition of collateral (UCC §§9-610, 9-615 and 9-620), any right of redemption under UCC §9-623, and any right to notice relating to disposition of collateral under UCC §9-611.

(c)    The Debtors specifically agree that, for valuable consideration which Debtors acknowledge having been received herein, the Lender shall be entitled at all times to relief from the automatic stay under Section 362 of the Bankruptcy Code, any stay or other form of creditor restraint imposed under Section 105 or any other section of the Bankruptcy Code or any other stay or creditor restraint imposed under any other proceeding, any of which would adversely impact the rights and remedies that are available to the Lender under this Agreement, the other Loan Documents or applicable law.  The Debtors, to the fullest extent permitted by law, irrevocably and unconditionally consent to such relief and hereby irrevocably and unconditionally waive their rights to object to the foregoing relief.  In the event the Borrower files any bankruptcy or insolvency proceeding, the Borrower hereby consents and agrees that this Agreement shall be deemed to be a stipulation between Lender and Borrower that an order providing that Borrower shall not be entitled to use cash collateral (to the extent a claim is raised by the Debtors that any cash or other collateral actually constitute cash collateral which the Lender does not concede) in any manner shall be entered by the bankruptcy or other court, and the Borrower shall not oppose the entry of such an order by any bankruptcy or other court.

(d)    Borrower hereby represents and warrants that it has no present intention to currently or in the future file a voluntary petition for bankruptcy under any chapter of the Bankruptcy Code, or any other proceeding to liquidate, reorganize or rehabilitate under any state or other federal law or under any law of any foreign jurisdiction (collectively, an "<u>Insolvency Proceeding</u>").

(e)    In the event of a subsequent Insolvency Proceeding by, against or involving Borrower, Borrower shall not contest any claim or assertion by Lender that the Loan is binding between the parties, and that valuable consideration has been received by Borrower for same.

(f)    If, for any reason, Borrower becomes a debtor in a case under any chapter of the Bankruptcy Code, then Borrower hereby agree as follows:

(i)    Borrower acknowledges and agrees that, for the duration that the automatic stay may remain in effect in any such bankruptcy case, the minimum that would constitute "adequate protection" for the interests of Lender must, at a minimum, include each of the following:  (a) a cure of any and all prepetition monetary defaults under the Loan Documents within sixty (60) days from the commencement of the case; (b) the timely performance of all monetary obligations under the Loan Documents arising from and after the commencement of the case; and (c) the debtor in such case shall file, within ninety (90) days of the commencement of the case, a plan of reorganization which provides for treatment of Lender which is acceptable to Lender, or which leaves the interests of Lender unimpaired.  Under no circumstances shall Borrower seek any extension of such 90-day deadline pursuant to section 362(d)(3) of the Bankruptcy Code or any other statutory provision or equitable principle.  Failure to provide adequate protection on such terms shall constitute a separate and distinct cause for the termination of the automatic stay in any such bankruptcy case.

(ii)    Borrower shall not seek to modify, impair or limit the rights and remedies of Lender under sections 506(c) or 552(b) of the Bankruptcy Code or otherwise, and shall not seek to obtain credit or incur debt to be secured by a senior or equal lien on the Mortgaged Property, or any other property which constitutes collateral of the Lender under the Loan Documents pursuant to section 364(d) or otherwise.

(iii)    Notwithstanding the provisions of this Paragraph 12(f) to the contrary, Borrower and Guarantors acknowledge and agree that Lender shall in no way whatsoever be deemed to have waived any right to relief from the automatic stay under Section 362 of the Bankruptcy Code, any stay or other form of creditor restraint imposed under Section 105 or any other section of the Bankruptcy Code or any other stay or creditor restraint imposed under any other proceeding pursuant to Paragraph 12(c) hereof. Nothing in this Paragraph 12 shall be deemed in any way to limit or restrict any of Lender's rights to seek in the Bankruptcy Court any relief that Lender, in its sole discretion, may deem appropriate.

(iv)    Borrower acknowledges and confirms that the Mortgaged Property constitutes "single asset real estate" as such term is used in Section 362(d)(3) of the Bankruptcy Code.

(v)    Lender shall be deemed in the proceeding, to the extent it is determined that Section 552(a) of the Bankruptcy Code applies to limit Lender's interest under the Note, the other Loan Documents or this Agreement, to have a continuing post-bankruptcy interest in all leases or lettings or agreements for the use of the Mortgaged Property entered into after the filing of the petition or the order for relief, whichever is later.  Borrower agrees that if an order is in effect permitting it to use cash collateral,

Borrower shall (1) maintain at all times an adequate and appropriate amount and coverage of insurance covering its assets in amounts not less than that required under the Loan Documents, naming Lender as an additional insured and loss payee, as its interest may appear, and (2) during the entire course of the proceeding, pay adequate protection payments each month on the principal outstanding under the Note at the rate set forth in the Note.

          (vi)    During the pendency of the case, if any of the rights granted hereunder or under the Loan Documents are challenged adversely to Lender as not being security interests or liens, they shall be deemed to be security interests, perfected and fully enforceable without the necessity of the filing of any additional documents or commencement of proceedings otherwise required under non-bankruptcy law for the perfection or enforcement of security interests, with such perfection and enforcement being binding upon Borrower and any subsequent appointed trustee, either in Chapter 11 or under any other Chapter of the Bankruptcy Code, and upon other creditors of Borrower who have or who may hereafter extend secured or unsecured credit to Borrower.

          (vii)    Borrower agrees that if Borrower becomes a debtor under the Bankruptcy Code, the debtor's right to hire professionals under Section 327 of the Bankruptcy Code shall be subject to the following limitations (1) no professional hired by the debtor or the estate shall make application for professional compensation in excess of $300 per hour and said fee shall be deemed under Sections 327, 328, 329 and 330 of the Bankruptcy Code to be reasonable compensation which is equal to the cost of comparable services other than in a case under title 11, and (2) Borrower shall not use any revenues, rents, income or other payments which may now or hereafter be received, or become due or owing under leases of the Mortgaged Property, or any other amount due on account of the use of the Mortgaged Property, or any cash collateral for payment of professional fees or expenses.

          (viii)    Borrower hereby acknowledges and agrees that (1) Borrower will not contest any proof of claim filed by Lender, (2) Borrower will not reclassify the debt owed to Lender or treat such debt as impaired under 11 U.S.C. Section 1124, (3) a reorganization under applicable bankruptcy laws will not be feasible and it hereby waives its rights to contest or allege that there is a reasonable likelihood of an effective reorganization, and (4) from the date of filing and thereafter, Borrower shall be deemed to have no equity in the Mortgaged Property.  Borrower acknowledges that the representations made by it in this Paragraph 12 are a material inducement to Lender to enter into this Agreement.

          (g)    The Debtors will not present any defense and/or take any actions to delay the Lender's recording of the Deed in Lieu.  The Debtors hereby waive any and all right to challenge and/or object to the Lender's right to record the Deed in Lieu to the fullest extent of the law.  If Lender elects, in its sole discretion, to commence an action

against the Debtors, the Debtors acknowledge and agree that: (i) the Debtors have no claim or cause of action against the Lender arising from or in connection with the Loan Documents or otherwise; (ii) the Debtors have no offset or defense against any of their obligations to Lender, including the indebtedness owed to Lender pursuant to the Loan Documents; and (iii) Lender has properly performed and satisfied in a timely manner any obligations to Borrower.

13.    <u>General Conditions</u>.

(a)    <u>No Third-Party Benefits.</u>  This Agreement is made for the sole benefit of Borrower and Lender, their successors and assigns and no other person or persons shall have any rights or remedies under or by reason of this Agreement.

(b)    <u>Entire Agreement</u>.  The Note and the other Loan Documents are each hereby reaffirmed and ratified and constitute the entire understanding among the parties regarding the Loan.  The Loan Documents supersede all oral negotiations and prior writings concerning the subject matter of the Loan Documents.  If there is any conflict between the terms, conditions and provisions of this Agreement and those of any other agreement or instrument, including any of the Loan Documents, the terms, conditions and provisions of this Agreement shall prevail.  This Agreement may not be modified, amended or terminated except by a written agreement signed by each of the parties hereto.

(c)    <u>Notices</u>.  Any notice, request, direction or demand given or made under this Agreement shall be in writing, shall be sent to the parties at their respective addresses set forth below and shall be delivered personally, by Federal Express or other reputable overnight national courier service, by electronic facsimile transmission, or by certified U.S. Mail, return receipt requested, and shall be deemed given upon the earlier to occur of (i) actual receipt, (ii) the second business day after being deposited in the U.S. mail, (iii) the next business day after being deposited in Federal Express or another reputable overnight courier or (iv) the date sent, if sent by electronic facsimile transmission:

If to Lender:        Kennedy Funding, Inc.

_____

_____

Attention: _____

Facsimile No. _____

With a copy to:      Sills Cummis & Gross PC
One Rockefeller Plaza
New York, New York 10020
Attention:  Michael R. Leighton, Esq.
Facsimile No.:  (212) 643-6500

If to Borrower:          _____

                         _____

                         _____


With a copy to:      Yaron Kornblum, Esq.
                     926 RXR Plaza
                     Uniondale, New York 11556

And a copy to:       Daniel Cohen
                     c/o Law Offices of Allen Lebovitz, P.C.
                     266 Broadway, Suite 304
                     Brooklyn, New York 11211
                     Email: DCohen@LawALPC.com

(d)     Each party to this Agreement may designate a different address within the 48 contiguous United States of America as its address for receipt of notices hereunder, by notice given to all other parties not less than ten (10) days prior to the date such change of address is to become effective.

(e)     <u>Documentation</u>.  In addition to the instruments and documents mentioned or referred to herein, Borrower shall, at its own cost and expense, supply Lender with such other instruments, documents, information and data as may, in Lender's opinion, be reasonably necessary for the purposes hereof, all of which shall be in form and content acceptable to Lender.

(f)     <u>Survival</u>.  The representations, warranties and covenants herein shall survive and shall remain in force and effect until the Loan is paid in full.

(g)     <u>Relationship to Loan Documents</u>.  All terms and conditions of the Loan Documents shall be and remain in full force and effect until the Debt and all other amounts secured by the Loan Documents payable by Borrower to Lender hereunder shall have been paid in full.  Any reference to any of the Loan Documents from and after the Effective Date shall mean the Loan Documents as amended and modified by this Agreement.  In the event of any inconsistency between the provisions of this Agreement and the Loan Documents, the provisions of this Agreement shall control.

(h)     <u>Further Assurance</u>.  Borrower agrees to execute such documents and take such other action as requested by Lender to effectuate the purposes of this Agreement.

(i)    Course of Dealing; Waivers.  No failure or delay by the Lender or its shareholders, directors, officers, employees or agents in the exercise of any right under this Agreement shall operate as a waiver thereof, and any single or partial exercise of any such right shall not preclude any later exercise of any such right.  The Lender's failure at any time to require strict performance by the Borrower of any provision of this Agreement shall not thereafter affect any right under this Agreement of the Lender to demand strict compliance and performance.  Any suspension or waiver of a right under this Agreement must be in writing signed by an officer or principal of the Lender.

(j)    Severability.  If any provision of this Agreement or the documents executed in connection herewith conflicts with applicable law, such provision shall be deemed severed from this Agreement or the documents executed in connection herewith, as the case may be, and the balance thereof shall remain in full force and effect.

(k)    Headings.  The headings used herein are for the convenience of the parties only and shall not be used to interpret the terms of this Agreement.

(l)    Attorneys' Fees.  If any action or proceeding at law or in equity, or an arbitration proceeding (collectively an "action"), shall be brought under this Agreement for or on account of any breach of or to enforce or interpret any of the terms, covenants, or conditions of this Agreement, Lender shall be entitled to recover from the Debtors all reasonable attorneys' fees and costs and expenses incurred in connection with the prosecution or defense of such action or the settlement of such controversy.

(m)    Waiver of Jury Trial.  LENDER AND DEBTORS EACH ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE LENDING RELATIONSHIP ESTABLISHED HEREBY WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE,  DEBTORS AND LENDER EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING ACTIONS SOUNDING IN TORT) TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT RELATING HERETO OR ARISING FROM THE TRANSACTION CONTEMPLATED HEREUNDER OR THE LENDING RELATIONSHIP ESTABLISHED HEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE AND NOT BY A JURY.

(n)    Choice of Law/Venue.  THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW JERSEY AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY AND ALL CLAIMS OR CAUSES OF ACTION

ARISING OUT OF THIS AGREEMENT SHALL BE PROSECUTED EXCLUSIVELY IN THE SUPREME COURT OF THE STATE OF NEW JERSEY, BERGEN COUNTY.

(o)     Advice of Counsel.  The Debtors acknowledge that they have consulted with independent legal counsel concerning this Agreement and the Debtors knowingly and voluntarily hereby waive the rights described therein or affected thereby. It is the intent of the parties hereto that no part of this Agreement is to be construed against any party because of the identity of the drafter.

(p)     Assignment.  This Agreement may not be assigned, pledged or otherwise transferred, directly or indirectly, by any Borrower or any Guarantors without the prior written consent of Lender, provided that in the event the Bankruptcy Plan is not approved by _____, 2013, the Borrower may assign this Agreement to Original Borrower upon 15 days advance written notice to Lender.  Lender hereby confirms its Knowledge that Original Borrower is operating in the Bankruptcy Proceeding and could possibly continue to do so after assignment of this Agreement, but Lender does not waive any default under this Agreement or the Loan Documents except as expressly provided herein.  Lender may assign, pledge or otherwise transfer this Agreement without the consent of any Borrower or any Guarantors.  Notwithstanding the foregoing, internal transfers in the Borrower shall be permitted so long as AAO Management LLC retains 5% of the equity in Borrower and Eliot Spitzer retains day-to-day and all other control of the Borrower.

(q)     Counterparts.  This Agreement may be executed in one or more counterparts by some or all of the parties hereto, and (i) each such counterpart shall be considered an original, and all of which together shall constitute a single Agreement, (ii) the exchange of executed copies of this Agreement by facsimile or Portable Document Format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties for all purposes, and (iii) signatures of the parties transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have executed this Forbearance Agreement the day and year first above written.

WITNESS:

                              **LENDER**:

                              **KENNEDY FUNDING, INC.**, as Agent

_____   By:_____

Print Name:                       Name:

                                     Title:

WITNESS:                       **BORROWER:**

                              **GRANIT OWNER:**

                              The Granit at Hudson Valley Resort LLC,

                              By: AAO Management LLC

_____   By:_____

Name:                          Name: Eliot Spitzer

                                 Title: Managing Member

WITNESS:                       **GUARANTOR:**

_____   _____

Name:                          **ELIOT SPITZER**, an individual

# Exhibit B

**DRAFT 7-18-13**
**OPERATING AGREEMENT**

**OF**

**THE GRANIT AT HUDSON VALLEY RESORT LLC**

**A NEW YORK LIMITED LIABILITY COMPANY**

This Operating Agreement of The Granit at Hudson Valley Resort LLC, a limited liability company organized pursuant to the New York Limited Liability Company Law (the "Company"), is entered into and is effective as of the effective date, by and among the Company and the persons and entities executing this Agreement as Members.

**ARTICLE I**

**DEFINITIONS**

The terms and conditions used in this Agreement have the meanings set forth in Section 102 of the Act, or as set forth below (unless otherwise expressly provided here).

1.1.  "Act" means the New York Limited Liability Company Law, and all amendments.

1.2.  "Additional Member" means a Member other than an initial member or a substitute member who has acquired a Membership Interest in the Company.

1.3.  "Agreement" means this Operating Agreement, as originally executed and as it may be amended from time to time.

1.4.  "Articles of Organization" means the Articles of Organization of the Company filed or to be filed with the New York Secretary of State for the purpose of forming the Company, pursuant to Section 203 of the Act, as amended.

1.5.  "Assignee" means the transferee of a Membership Interest who has not been admitted as a substituted member.

1.6.  "Bankrupt Member" means a Member who (a) has become the subject for an order for relief under the United States Bankruptcy Code and similar state law, or (b) has initiated, either in an original Proceeding or by way of answer, a federal or state action for liquidation arrangements, composition, readjustment of debts, or similar relief.

1.7.  "Capital Account" as of any date means the Capital Contribution to the Company by a Member, adjusted as of that date pursuant of this Agreement.

1.8. "Capital Contribution" means any Member's contribution to the capital of the Company in cash, property, services rendered or a promissory note or other binding obligation to contribute cash or property or to render services. "Initial Capital Contribution" means the initial contribution to the capital of the Company pursuant to this Agreement.

1.9. "Code" means the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any superseding federal revenue statute.

1.10. "Company" refers to The Granit at Hudson Valley Resort LLC, and any successor limited liability company.

1.11. "Company Property" means any Property owned by the Company.

1.12. "Deficit Capital Account" means with respect to any Member, the deficit balance, if any, in that Member's Capital Account as of the end of the taxable year.

1.13. "Distributable Cash" means all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company:  (i) all principal and interest payments on the Company's indebtedness and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including management fees; and (iii) Reserves.

1.14. "Disposition" ("Dispose") means any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.15. "Disassociation" means any action that causes a Person or Entity to cease to be a Member as described in Article XII hereof.

1.16. "Dissolution Event" means an event results in the dissolution of the Company under Article XIII unless the Members agree to the contrary.

1.17. "Distribution" means any cash and other property paid by the Company to a Member in its capacity as a Member.

1.18. "Economic Interest" means a Member's or Economic Interest Owner's share of one or more of the Company's net profits, net losses and distributions of the Company's assets pursuant to this Agreement and the Act, but it does not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

1.19. "Economic Interest Owner" means the owner of an Economic Interest who is not a Member.

2

1.20.  "Entity" means any domestic or foreign general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association, or other business organization.

1.21.  "Fiscal Year" means the fiscal year of the Company, which will be the year determined by the Manager.

1.22.  "Majority Interest" means one or more interests of Members which, taken together, exceed fifty (50%) percent of the aggregate of all Membership Interests.

1.23.  "Manager" means AAO Resort Management LLC or any other Person or Entity that succeeds it in that capacity.  References to the Manager in the singular or as it, or other like references will also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

1.24.  "Member" means each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may subsequently become Members in accordance with Article XI.  To the extent a Manager has acquired a Membership Interest in the Company, it will have all the rights of a Member with respect to that Membership Interest, and the term "Member" as used here includes a Manager to the extent it has purchased the Membership Interest in the Company.  If a Person or Entity is a Member immediately prior to the purchase or other acquisition of an Economic Interest, such Person or Entity will have all the rights of a Member with respect to the purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.  The term includes initial Members, substituted Members and additional Members.

1.25.  "Membership Interest" means a Member's entire interest in the Company, including Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement or as required by the Act.

1.26.  "Net Losses" means the losses and deductions of the Company, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the Company's tax return filed for federal income tax purposes.

1.27.  "Net Profits" means the Company's income and gains, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the Company's tax return filed for federal income tax purposes.

1.28.  "Person" means any natural person.  In addition, the term means the heirs, executors, administrators, legal representatives, successors and permitted assigns of that "Person" where the context so permits.

1.29.  "Proceeding" means any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator or governmental agency may enter a judgment, order, decree or other determination that, if not appealed and reversed, would be binding on the Company, a Member or other Person or Entity subject to the jurisdiction of that court, arbitrator or governmental agency.

1.30.  "Property" means any property, real or personal, tangible or intangible, including money and any legal or equitable interest in property, but excluding services and promises to perform future services.

1.31.  "Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during that period to reserves that must be maintained in an amount deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

1.32.  "Selling Member" means any Member or Economic Interest Owner who desires to or does sell, assign, pledge, hypothecate or otherwise transfers for a consideration all or any portion of the Member's Membership Interest or Economic Interest.

1.33.  "Transferring Member" means any Member or Economic Interest Owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise) all or any part of its Membership Interest or Economic Interest.

1.34.  "Taxing Jurisdiction" means any state, local or foreign government that collects tax, interest or penalties, however designated, and any Member's share of the income or gain attributable to the Company.

1.35.  "Treasury Regulations" means all proposed, temporary and final regulations promulgated under the Code as from time to time in effect.

## ARTICLE II

## ORGANIZATION

2.1.  Formation.  The Company was organized as a New York Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State in accordance with and pursuant to the Act.

2.2.  <u>Name</u>.  The name of the Company is The Granit at Hudson Valley Resort LLC, and all business of the Company will be conducted under that name or any other name determined by the Manager, but in any case, only to the extent permitted by applicable law.

2.3.  <u>Effective Date</u>.  This Agreement is effective on the date of its execution.

2.4.  <u>Principal Place of Business</u>.  The Company's principal place of business within the State of New York will be 400 Granite Road, Kerhonkson, New York 12446. The Company may establish any other places of business as the Manager deems advisable.

2.5.  <u>Term</u>.  The Company's term is perpetual from the date of filing of the Articles of Organization with the Secretary of State, unless the Company is dissolved and its affairs wound up in accordance with this Agreement.

## ARTICLE III

### BUSINESS OF COMPANY

3.1.  <u>Nature of Business</u>.  The Company's purpose and business is to engage in any lawful business, to take such actions that will at any time appear conducive to or expedient for the protection or benefit of the Company and its assets, to exercise all other powers necessary to or reasonably connected with the Company's business that may be legally exercised by limited liability companies under the Act, and to engage in all activities necessary, customary, or convenient, or incident to any of the foregoing.

## ARTICLE IV

### MEMBERS

4.1.  <u>Names and Addresses</u>.  The names, addresses and Membership Interest Percentages of the initial Members are set forth in Schedule A to this Agreement.

4.2.  <u>Additional Members</u>.  In the event that a Person or Entity is subsequently admitted as an Additional Member in accordance with Article XI, that Person's or Entity's name, address and Membership Interest Percentages shall be added to Schedule A.

4.3.  <u>Membership Certificates</u>.  The Company will not issue Membership Certificates.

## ARTICLE V

### MEMBER RIGHTS AND DUTIES

5

5.1.  Management Rights.  No Member, except the Manager if he is a Member, shall have any right to manage the affairs of the Company.

5.2.  Voting.  Except for nonwaivable provisions of the Act and as provided for in this Agreement, the Members shall not have any right to vote on any matter regarding the Company.

5.3.  Limitation of Liability.  Members are not liable for any debts, obligations or liabilities of the Company or each other, whether arising in tort, contract or otherwise, solely by reason of being a Member.  Each Member, however, remains personally liable for payment of its Capital Contribution as set forth in Section 502 of the Act or as otherwise provided in this Agreement.

5.4.  Indemnification.  The Company will indemnify the Members, the Manager, and their agents for all costs, losses, liabilities and damages paid or accrued by any Member, the Manager or any of their agents in connection with the Company's business, to the fullest extent permitted under the laws of New York.

5.5.  Priority and Return of Capital.  Except as expressly provided in Section 8.6 or Article XIII, no Member has priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, Net Losses or a Distribution; provided, however, that this Section does not apply to loans or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

5.6.  Liability to the Company.  A Member who rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or subsequently provided by the Act or this Agreement.

5.7.  Financial Adjustments.  No Members admitted after the date of this Agreement are entitled to any retroactive allocations of losses, income or expense deductions incurred by the Company.  The Manager may, at the Manager's discretion, at the time a Member is admitted, close the Company's books and records (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to that Member for that portion of the Fiscal Year in which that Member was admitted in accordance with the Code.

5.8.  Representations and Warranties.  Each Member, and in the case of an organization, the Person(s) or Entity executing the Agreement on the organization's behalf, represents and warrants to the Company and each other Member and the Manager that:  (a) if that Member is an organization, it is duly organized, validly existing, and in good standing under the law of its state of organization, and has full organizational power to execute and agree to the Agreement to perform its obligations under the Agreement; (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without intent to distribute the interest; and (c) the Member acknowledges that the interests have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the

Member without appropriate registration or the availability of an exemption from those requirements.

5.9. <u>Partition</u>.  Each Member waives any right they may have to institute or maintain an action with respect to the sale of Company Property.

5.10. <u>Conflicts of Interest</u>.

(a)     A Member is entitled to enter into transactions that may be considered competitive with, or into a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members may enter into transactions that are similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members must account to the Company and hold as trustee for it any property, profit or benefit derived by the Member, without the consent of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)     A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest.  A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a non-Member, subject to other applicable law.  No transaction with the Company will be voidable solely because a Member has a direct or indirect interest in the transaction if either (i) the transaction is fair to the Company, or (ii) disinterested Members, knowing the material facts of the transaction and the Member's interest, authorize, approve or ratify the transaction.

## ARTICLE VI

## MANAGER RIGHTS AND DUTIES

6.1. <u>Management</u>.  The Company's business and affairs will be managed exclusively by the Manager.  The Manager will direct, manage and control the Company's business.  Except for situations in which Member approval is expressly required by this Agreement or by nonwaivable provisions of the Act, the Manager has full authority and discretion to manage and control the Company's business, affairs and properties, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business. The Manager will be paid a management fee of $200,000.00 per annum payable quarterly in arrears.

6.2. <u>Number and Tenure</u>.  Except as provided below, the Company will have one Manager, AAO Resort Management LLC or its successor.  The Manager shall hold office until it shall resign, it is dissolved, or it is the subject of an order of relief under the United States Bankruptcy Code or has initiated, either in an original Proceeding or by

7

way of answer, a federal or state action for liquidation arrangements, composition, readjustment of debts, or similar relief ("Termination Events"). Upon the occurrence of a Termination Event, a successor manager designated by the current Manager shall become the Manager. If the current Manager has not designated a successor manager, the Members holding a Majority Interest shall appoint a successor manager. For as long as the Company is indebted Kennedy Funding, Inc., Kennedy Funding, Inc. shall have the right to appoint an independent manager ("Independent Manager") who shall have no authority or power except that its consent shall be required in order for the Company to seek relief under the United States Bankruptcy Code or any state debtor relief law or regulation. For as long as the company is indebted to Kennedy Funding, Inc., neither the Manager nor the Members may amend the provisions for the Independent Manager.

6.3. <u>Powers</u>. Except as set forth in this Agreement, the Manager shall have full power and authority, on the Company's behalf to take any lawful action that the Manager considers necessary, convenience or advisable in connection with any Company business, including, but not limited to, the following:

(a)     Purchase, lease or otherwise acquire from, or sell, lease or otherwise dispose of, to any Person or Entity any Company Property.

(b)     Open bank accounts and otherwise invest the Company's funds.

(c)     Borrow money for the Company from banks or other lending institutions and on terms as the Manager deems appropriate, and in connection with this power, to hypothecate, encumber or grant security interests in the Company's assets to secure repayment of the borrowed sums. No debt may be contracted nor liability incurred by or on behalf of the Company except by the Manager or by agents or employees of the Company expressly authorized to contract such debt or incur liability by the Manager.

(d)     Purchase insurance on the Company's business and assets.

(e)     Commence lawsuits and other Proceedings.

(f)     Enter into any agreement, instrument or other writing.

(g)     Retain accountants, attorneys or other agents.

(h)     If consented to by the Independent Manager or if the consent of the Independent Manager is no longer required, to make a filing under the United States Bankruptcy Code or any state debtor relief law or regulation.

6.4. <u>Binding Authority</u>. Unless authorized to do so by the Manager, no attorney-in-fact, employee or other agent of the Company has any power or authority to bind the Company in any way, to pledge its credit or to render it pecuniarily liable for any purpose. No Member has any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in

accordance with the previous sentence.

6.5.  <u>Duty of Care</u>.  Each of the Manager and the Independent Manager must perform its duties as a manager in good faith, in a manner it reasonably believes to be in the best interest of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Manager and the Independent Manager who so performs the duties as a manager does not have any liability by reason of being or having been a manager of the Company.  The Manager and the Independent Manager do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company operations.  Each of the Manager and the Independent Manager will not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage was the result of fraud, bad faith, gross negligence or willful misconduct of the Manager or the Independent Manager, as the case may be.

6.6.  <u>No Exclusive Duty to Company</u>.  The Manager and the Independent Manager are not required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member has any right pursuant to this Agreement to share or participate in the other business interests or activities of the Manager or the Independent Manager or in the income or proceeds derived from them.  The Manager and the Independent Manager incur no liability to the Company or any Member as a result of engaging in any other business interests or activities.

6.7.  <u>Indemnification</u>.  The Company must indemnify and hold harmless the Manager and the Independent Manager from and against all claims and demands to the fullest extent permitted under the laws of New York.

6.8.  <u>Resignation</u>.  The Manager or the Independent Manager may resign at any time by giving written notice to the Company.  The resignation of any manager takes effect on receipt of notice by the Company or at any later time specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation is not necessary to make it effective.  The resignation of a manager who is also a Member does not affect the manager's rights as a Member and does not constitute a withdrawal of the Member.

6.9.  <u>Removal</u>.  The Manager may be removed by the Members holding a Majority Interest (i) if the Manager breaches a material term of this Agreement and same is not cured within thirty (30) days after receipt of notice of breach or if the breach cannot be cured within thirty (30) days, the Manager commences to cure with thirty (30) days and diligently pursues the cure or (ii) the Manager engages in fraud or willful misconduct or acts in bad faith.  Upon removal of the Manager, his successor as designated by him shall be the Manager and if the Manager has not designated a successor, the Members holding a Majority Interest shall appoint a successor manager.  The Independent Manager may be removed by Kennedy Funding, Inc., and by the

9

Manager if the Independent Manager has engaged in fraud or willful misconduct or acted in bad faith. The removal of a manager who is also a Member will not affect the manager's rights as a Member and will not constitute a withdrawal of the Member.

6.10. <u>Vacancies</u>. Except as otherwise provided in this Agreement, any vacancy in the Manager position shall be filled by the Entity or Person designated by the former Manager. If the former Manager has not designated a successor, the vacancy shall be filled by the Members holding a Majority Interest. A vacancy in the position of the Independent Manager shall only be filled by Kennedy Funding, Inc.

6.11. <u>Written Consent of the Managers</u>. Any action required or permitted to be taken by the Manager or the Independent Manager or the Manager and the Independent Manager may be taken without a meeting if all the managers whose consent is required consent in writing to the adoption of a resolution authorizing the action.

6.12. <u>Meeting by Teleconference</u>. The Manager and the Independent Manager may participate in a meeting of such managers by means of a conference telephone or similar equipment which allows all managers participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at such a meeting.

6.13. <u>Appointment of Officers</u>. The Manager may appoint the officers of the Company ("Officers"). The Officers shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager. Each Officer shall hold office until a successor has been appointed by the Manager and qualified. Any number of offices may be held by the same individual.

6.14. <u>Indemnification</u>. The Company shall indemnify and hold harmless any Officers from and against all claims and demands to the fullest extent permitted under the laws of New York.

## ARTICLE VII

### CONTRIBUTIONS AND CAPITAL CONTRIBUTIONS

7.1. <u>Capital Contributions</u>. Each Members capital contributions are set forth in the Company's records.

7.2. <u>Capital Accounts</u>. A Capital Account will be established and maintained for each Member and each Assignee. Each Member's Capital Account will be increased by the value of each Capital Contribution made by the Member, allocations to the Member of the Net Profits and any other allocations to the Member of income pursuant to the Code. Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, allocations to the Member of Net Losses, and other allocations to the Member pursuant to the Code.

7.3.  <u>Transfers</u>.  On a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring its Membership Interests will become the Capital Account of the Person or Entity to which or whom the Membership Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

7.4.  <u>Modifications</u>.  The manner in which Capital Accounts are to be maintained pursuant to this Article VII is intended to comply with the requirements of Section 704(b) of the Code.  If, in the opinion of the Manager, the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which Capital Accounts are maintained will be so modified; provided, however, that any change in the manner of maintaining Capital Accounts will not materially alter the economic agreement between or among the Members.

7.5.  <u>Deficit Capital Account</u>.  Except as otherwise required in the Act or this Agreement, no Member has any liability to restore all or any portion of a deficit balance in a Capital Account.

7.6.  <u>Withdrawal or Reduction of Capital Contributions</u>.  Except as set forth in Article X, no Member may withdraw from the Company until the dissolution and winding up of the Company.  A Member will not receive from the Company any portion of its Capital Contribution until all indebtedness and liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of the Manager, sufficient to pay them.  A Member, irrespective of the nature of the Capital Contribution of that Member, has only the right to demand and receive cash in return for the Capital Contribution.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.1.  <u>Allocations of Profits and Losses</u>.  Except as provided by Sections 8.2, 8.3 and 8.4, the Profits and Losses of the Company shall be allocated all to Granit Investors LLC until its Capital Contributions have been paid in full and then the Members shall receive distributions on a pro rata basis based on their Membership Interest Percentages. For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in accordance with their respective shares of Profits and Losses (taking into account the special allocations set forth in Sections 8.2 through 8.4), subject to the rules of Section 704(c)(1)(A) of the Code and the Treasury Regulations promulgated thereunder.

8.2.  <u>Minimum Gain Chargeback Allocations</u>.  Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Article VIII, if there is a net decrease in Company minimum gain as defined in the

Treasury Regulations ("Company Minimum Gain") during any Company Fiscal Year, each Member shall be specifically allocated items of Company income and gain for such year (and, if necessary, for subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, to the extent required and in the manner provided by Section 1.704-2(g) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 8.2 is intended to comply with the minimum gain chargeback provision of Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

8.3.   Qualified Income Offset.  Except as provided in Section 8.2, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which create or increase an adjusted capital account deficit as defined in the Treasury Regulations ("Adjusted Capital Account Deficit"), items of Company income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible; provided that an allocation pursuant to this Section 8.3 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all allocations provided for in this Article VIII have been tentatively made as if this Section 8.3 were not in this Agreement.  This Section 8.3 is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

8.4.   Curative Allocations.  The allocations set forth in Sections 8.2 and 8.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company Distributions.  Accordingly, the Members are hereby authorized to divide other allocations of Profits, Losses and other items among the Members as may be necessary so as to prevent the Regulatory Allocations from distorting the manner in which Company Distributions will be divided among the Members.  In general, the Members anticipate that this will be accomplished by specially allocating items of income, gain, loss and deduction among the Members so that the net amount of the Regulatory Allocations and such special allocations to such Member is zero.  However, the Members shall have discretion to accomplish this result in any reasonable manner.

8.5.   Allocations and Distributions of Distributable Cash and Property.  Except as provided in Sections 8.2, 8.3, and 8.4 Distributions of the Distributable Cash during any Fiscal Year shall be allocated and distributed as provided in Sections 8.1 and 8.6 and in Article XIII hereof (relating to the dissolution of the Company).

8.6.   Distribution Rules.

(i)   Distributions may be made in cash or in kind.  Distributions shall be made to Granit Investors LLC until its Capital Contributions have been paid in full and then the

12

Members shall receive Distributions on a pro rata basis based on their Membership Interest Percentages.  Except as specifically set forth herein, the Manager shall not be obligated to make any Distributions hereunder at any time prior to the dissolution of the Company in accordance with Article XIII hereof.  All Distributions pursuant to Section 8.6 hereof shall be made at such times and in such amounts as shall be determined by the Manager; provided, however, that the Manager shall cause the Company to distribute to the Members, if available, an amount of Distributable Cash as shall be sufficient to enable the Members to fund their federal, state and local income tax liabilities (using the highest Federal, state and local income tax rates applicable to any of the Members) attributable to their respective distributive shares of the taxable income of the Company. Each Member shall simultaneously receive the same income tax distribution.

(ii)    All amounts withheld pursuant to the Code or any provision of any state or local law with respect to any payment, Distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article VIII for all purposes of this Agreement.  The Manager is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law and shall allocate such amounts to those Members with respect to which such amounts were withheld.

8.7.    <u>Distributions in Kind</u>.  A Member, regardless of his Capital Contribution, has no right to demand and receive any Distribution from the Company in any form other than cash.  A Member may not be compelled to accept a Distribution of any asset in kind from the Company to the extent that the percentage of the asset distributed to him exceeds a percentage of that asset that is equal to the percentage in which he shares in Distributions from the Company.

8.8.    <u>Limitations on Distributions</u>.

(i)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to a Member to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests and liabilities for which recourse of creditors is limited to specified property of the Company, exceed the fair market value of the assets of the Company, except that the fair market value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of such property exceeds such liability.  A Member who receives a Distribution in violation of this Section, and who knew at the time of Distribution that the Distribution violated this Section, shall be liable to the Company for the amount of the Distribution as provided for under the Act or this Agreement.

(ii)    This Section 8.8 shall not affect any obligation or liability of a Member under this Agreement or other applicable law for the amount of a Distribution.  Unless otherwise agreed, however, a Member who receives a wrongful Distribution from the

13

Company shall have no liability under this Agreement or other applicable law for the amount of the Distribution after the expiration of three (3) years from the date of the Distribution.

8.9.    Offset.  The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member.

8.10.    Limitation Upon Distributions.  No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.

8.11.    Interest on and Return of Capital Contributions.  No Member shall be entitled to interest on his Capital Contribution or to a return of his Capital Contribution, except as specifically set forth in this Agreement.

8.12.    Accounting Period.  The accounting period of the Company shall be determined by the Manager.

8.13.    Payments.

a.    The Company shall make payments to creditors from its revenue in the following order:

1.    First, to pay general creditors of the Company; and

2.    Then, to pay the unsecured creditors of Everyday Logistics LLC ("Unsecured Creditors") as set forth in (b).

b.    1.    The Unsecured Creditors shall be entitled to receive twenty five (25%) percent of the balance of amounts remaining after the payments in subsection (a)(1), (2) and (3) above until they are paid $750,000.00 and upon payment of the $750,000.00 they shall not be entitled to any further payment.

2.    If the Company receives a VLT License, the Unsecured Creditors shall receive a one-time payment of $1,500,000.00 reduced by all prior payments by the Company to them.

3.    If the Company receives a Class 3 Casino License, the Unsecured Creditors shall receive a one-time payment of $3,000,000.00 reduced by all prior payments by the Company to them.

## ARTICLE IX

## BOOKS, REPORTS AND TAXES

9.1.    <u>Books and Records</u>.  The Company shall keep or cause to be kept full and true books of account and such additional records required to be maintained pursuant to Section 1103 of the Act.  Such books of account shall at all times be maintained at the principal office of the Company and shall be open to the inspection, examination and copying of the Member, at reasonable intervals, upon at least five (5) days' prior written notice and at reasonable hours of the business day for any purpose reasonably related to a Member's interests.  The Company may require the Member to sign a confidentiality agreement prior to permitting an inspection to protect the Company's confidential information.

9.2.    <u>Annual Statements</u>.  Members will receive annual financial statements within ninety days after the end of each Fiscal Year.  Such financial statements will include a balance sheet, a statement of profit and loss and such other information as the Manager shall decide. Information returns required by the Internal Revenue Service will be provided to Members in accordance with Internal Revenue Service reporting requirements.

9.3.    <u>Accounts of Company</u>.  All funds of the Company are to be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager.  Withdrawals from any such bank account or accounts shall be made upon such signature or signatures as the Manager may designate.

9.4.    <u>Tax Returns</u>.  The Manager must cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Copies of such returns or pertinent information from them, will be furnished to the Members within a reasonable time after the end of the Fiscal Year.  Each Member must furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.5.    <u>Tax Elections</u>.  Company will make the following elections on the appropriate tax returns:

(a)    To adopt a Fiscal Year;

(b)    To adopt a method of accounting and keep the Company's books and records on the income tax method;

(c)    If a Distribution as described in Section 734 of the Code occurs, or if a transfer of a Membership Interest described in Section 743 of the Code occurs, on the written request of any Member, to elect to adjust the basis of the property of the Company pursuant to Section 754 of the Code;

(d)    Any other election that the Manager deems appropriate and in the best interests of the Members.  Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no

15

provisions of this Agreement will be interpreted to authorize any such election.

9.6.  <u>Tax Matters Partners</u>.  The Manager shall be the "tax matters partner" of the Company pursuant to Section 6231 (a)(7) of the Code.  The Manager shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.

# ARTICLE X

## DISPOSITION OF INTERESTS

10.1.  <u>General</u>.  Except as otherwise specifically provided in this Agreement, no Member has the right to:

(a)    Sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "Sell") all or any part of its Membership Interest.

(b)    Transfer for no consideration, whether or not by operation of law, (a "Transfer") all or any part of its Membership Interest or Economic Interest.

10.2.  <u>Transfer of Membership Interest</u>.  A Transferring Member may Transfer all or any portion of its Membership Interest (without regard to Sections 10.3(a), 10.3(b) and 10.3(c)), provided that the transferee or other successor-in-interest complies with Section 10.4, and subject to Section 10.6.

10.3.  <u>Sale of Membership Interest</u>.

(a)    If a Selling Member desires to Sell all or any portion of its Membership Interest to another Person or Entity, the Selling Member must obtain from such purchaser a bona fide written offer to purchase the interest, stating the terms and conditions on which the purchase is to be made.  The Selling Member must give written notice to the remaining Members of its intention to transfer the interest, with a copy of the bona fide written offer to purchase the interest.

(b)    Each of the remaining Members, on a basis pro rata to their Membership Interests or on a basis pro rata to the Membership Interests of those remaining Members exercising their right of first refusal, has the right to exercise a right of first refusal to purchase all (but not less than all) of the interest proposed to be sold by the Selling Member on the same terms and conditions as stated in the bona fide written offer to purchase by giving notice to the Selling Member of their intention to do so within thirty (30) days after receiving written notice from the Selling Member.  The failure of the remaining Members to so notify the Selling Member of their desire to exercise this right of first refusal with respect to all of the interest desired to be sold within thirty (30) days results in the termination of the right of first refusal, and the Selling Member is entitled to consummate the sale of its interest in the Company, or the portion of its interest, if any, with respect to which the right of first refusal has not been exercised, to the third party

16

purchaser.

(c)    In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to Sell on the same terms and conditions as are stated in the bona fide written offer to purchase, the remaining Members have the right to designate the time, date and place of closing, provided that the date of closing will be the later of the date set forth for closing in the bona fide offer or within ninety (90) days after receipt of written notification from the Selling Member of the third party offer to purchase.

10.4.  Conditions of Transfer.  In the event of either the purchase of the Selling Member's interest in the Company by a third party purchaser or a Transfer without consideration of an interest in the Company, and as a condition to recognizing one or more of the effectiveness and binding nature of any such Sale or Transfer and (subject to Section 10.6 below) substitution of a new Member as against the Company or otherwise, the Manager may require the Selling Member or transferring Member and/or the proposed purchaser, transferee or successor-in-interest to execute, acknowledge and deliver to the remaining Members, the instruments of transfer, assignment and assumption and other certificates, representations and documents, and to perform all other acts which the Manager deems necessary or desirable to:

(a)    Constitute the purchaser, transferee or successor-in-interest as a Member;

(b)    Confirm that the Person or Entity desiring to acquire an interest or interests in the Company, or to be admitted as a Member, has agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement, as amended (whether such Person or Entity is to be admitted as a new Member or will merely be an Economic Interest Owner);

(c)    Preserve the Company after the completion of the sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(d)    maintain the status of the Company as a partnership for federal and state tax purposes; and

(e)    Assure compliance with any applicable state and federal laws, including securities laws and regulations.

10.5.  Effective Date.  Any sale or Transfer of a Membership Interest is deemed effective as of the last day of the calendar month in which the transferee or successor interest complies with the provisions of Section 10.4.  The Selling Member or transferring Member agrees, on request of the Manager, to execute certificates or other documents and perform other acts as reasonably requested by the Manager from time to

time in connection with the sale, transfer, assignment or substitution.  The Selling Member or transferring Member indemnifies the Company and the remaining Members against any and all loss, damage or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article X.

10.6.  Purchaser/Transferee Not Member in Absence of Consent of the Manager. Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, Section 10.3), if the Manager does not approve the transferee who is not a Member immediately prior to the sale or transfer as a Member, then the proposed purchaser or Transferee has no right to participate in the management of the business and affairs of the Company and shall not be a Member.  The purchaser or transferee will be merely an Economic Interest Owner.

## ARTICLE XI

## ADMISSION OF ADDITIONAL
## MEMBERS AND ASSIGNEES

11.1.  Admission of New Members or Assignees.  From the date of the formation of the Company, any Person or Entity acceptable to the Manager may become a Member in the Company, subject to the terms and conditions of this Agreement, either by the Company's issuance of Membership Interests for such consideration that the Manager has approved, or as an Assignee of a Member's Membership Interest or a portion of it.

11.2.  No Retroactive Allocations.  No new Members are entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at his option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated under it.

## ARTICLE XII

## DISSOCIATION OF MEMBER

12.1.  Dissociation.  A Person or Entity ceases to be a Member and becomes an Economic Interest Owner on the happening of any of the following events:

(a)      The withdrawal of a Member with the consent of the Manager;

(b)      a Member becoming a Bankrupt Member;

(c)      In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member

18

incompetent to manage the Member's person estate;

     (d)    In the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

     (e)    In the case of a Member that is a separate organization other than a corporation, the dissolution and commencement of winding up of the separate organization;

     (f)    In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

     (g)    In the case of a Member which is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

     12.2.  <u>Rights of Dissociating Member</u>.  In the event any Member disassociates prior to the expiration of a stated term of existence as set forth in the Articles of Organization, or in Section 2.6 above the dissociated Member shall be an Economic Interest Owner for all purposes.  If the dissociation is a consensual withdrawal pursuant to Section 12(a), then the Disposition of the Member's Membership Interest is to be provided in the terms of the consent to withdraw.

## ARTICLE XIII

## DISSOLUTION AND WINDING UP

     13.1.  <u>Dissolution</u>.  The Company is dissolved and its affairs must be wound up upon the first to occur of the following Dissolution Events:

     (a)    The vote or written consent of all Members;

     (b)    The Manager decides in his sole discretion that the Company should be dissolved.

     (c)    The date a Court dissolves the Company under Section 702 of the Act.

     13.2.  <u>Winding Up</u>.  On dissolution of the Company, the Manager may, in the name of and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Company's business, dispose of and convey the Company's Property, discharge the Company's liabilities, and distribute to the Members and Economic Interest Holders any remaining assets of the Company, all without affecting the liability of Members and Economic Interest Owners.  On winding up of the Company, the assets are to be distributed as follows:

19

(a)       To existing creditors, including Kennedy Funding, Inc. (if a creditor), the unsecured creditors of Everyday Logistics LLC (if creditors) and any Member or Economic Interest Owner who is a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves, other than liabilities for distributions to Members or Economic Interest Owners under Section 507 or 508 of the Act;

(b)       To Members and Economic Interest Owners in satisfaction of liabilities for Distributions under Section 507 or 508 of the Act; and

(c)       To Members and Economic Interest Owners as follows:  first, for the return of Granit Investors LLC's Capital Contributions, to the extent not previously returned; second, to the return of AAO Resort Management LLC's, other Members' and other Economic Interest Holders' Capital Contributions, to the extent not previously returned; and third, to the Members and Economic Interest Holders on a pro rata basis based on their Membership and Economic Interests.

13.3.   Articles of Dissolution.  Within ninety (90) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, the Manager must file articles of dissolution with the New York Secretary of State pursuant to the Act.

13.4.   Deficit Capital Account.  On a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member has no obligation to make any Capital Contribution, and the negative balance of any Capital Account will not be considered a debt owed by the Member to the Company or to any other Person or Entity for any purpose.

13.5.   Nonrecourse to Other Members.  Except as provided by applicable law or as expressly provided in this Agreement, on dissolution, each Member will receive a return of his, her or its Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return any Capital Contribution of any Member, the Member will have no recourse against any other Member.

13.6.   Termination.  On completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company is deemed terminated.

## ARTICLE XIV

## INJUNCTIONS; SPECIFIC PERFORMANCE

14.1.    The attempted sale, assignment, hypothecation, transfer, pledge, encumbrance, gift or other Disposition of any Membership Interests or any interest therein by any Member in violation of this Agreement shall be void, and during the period of any such violation of this Agreement, no such Membership Interests shall be entitled to vote or to the payment of Distributions.    This prohibition on voting and Distributions shall be in addition to and not in lieu of any other remedies, legal or equitable, to enforce the terms of this Agreement.    No transfer of ownership of the Membership Interests shall be recorded on the books of the Company except for such transfers which are effected in compliance with all of the terms and conditions hereof and the provisions of the applicable laws of the State of New York.

14.2.    The parties recognize that the Company is a closely-held company and that irreparable harm will result from the breach of any of the provisions set forth in this Agreement and that money damages will be inadequate to fully remedy such injury. Accordingly, the parties agree that (a) in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the injured party or parties shall be entitled to an injunction restraining such breach or threatened breach or compelling the performance of obligations which, if not performed, constitute or would constitute such a breach, (b) in the event of a breach of an obligation to sell or to purchase created hereby, the injured party or parties shall be entitled to specific performance of the obligation so breached, and (c) the party against whom any such equitable action or Proceeding is brought hereby waives the claim or defense therein that such party or such legal representative has an adequate remedy at law and such party shall not urge in any such equitable action or Proceeding the claim or defense that such remedy at law exists.    The party seeking equitable or injunctive relief shall not be required to furnish a bond or other undertaking in connection with the application for such relief.

## ARTICLE XV

## GENERAL PROVISIONS

15.1.    Notices.    Any notice, demand or other communication required or permitted to be given pursuant to this Agreement is sufficiently given for all purposes if it is in writing and (a) delivered personally to the party, or (b) sent by messenger, or by overnight courier, or by registered or certified mail, postage prepaid, addressed to the Member, Manager or the Company at his or its address set forth in this Agreement, or such address as the Member, Manager or Company gives notice of.    Except as otherwise provided in this Agreement, any notice is deemed given, on delivery or refusal of delivery, except if sent by registered or certified mail, then five business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

15.2    Entire Agreement.    This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and

representation previously made, by the Members with respect to them, whether or not relied or acted on. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or not relied or acted on, and no usage of trade, whether or not relied or acted on, amends this Agreement or impairs or otherwise affects any Member's obligations pursuant to this Agreement or any rights and remedies of a Member pursuant to this Agreement.

15.3.  <u>Amendment</u>.  No amendment to this Agreement is effective unless made in a writing duly executed by all Members and specifically referring to each provision of this Agreement being amended.

15.4.  <u>No Partnership Intended for Nontax Purposes</u>.  The Members have formed the Company under the Act, and expressly do not intend to form a partnership under either the New York Partnership Law or the New York Revised Limited Partnership Act. The Members do not intend to be partners to one another, or partners as to any third party. To the extent any Member, by work or action, represents to another Person or Entity that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation is liable to any other Member who incurs personal liability by reason of such wrongful representation.

15.5.  <u>Rights of Creditors and Third Parties Under Agreement</u>.  The Agreement is entered into between the Company and the Members for the exclusive benefit of the Company, its Members, and their successors and permitted assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person or Entity. Except and only to the extent provided by applicable statute, no such creditor or third party has any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise.

15.6.  <u>Execution of Additional Instruments</u>.  Each Member agrees to execute other and further statements of interests and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.7.  <u>Construction</u>.  Whenever the singular number is used in this Agreement, and when required by the context, the same includes the plural and vice versa, and the masculine gender includes the feminine and neuter genders and vice versa.

15.8.  <u>Headings</u>.  The headings in this Agreement are for convenience only and are not to be used to interpret or construe any provision of this Agreement.

15.9.  <u>Waiver</u>.  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement constitutes a waiver of such right or remedy. No waiver by a Member of any right or remedy under this Agreement is effective unless made in a writing duly executed by the Member waiving such right or remedy and specifically referring to each such right or remedy being waived.

15.10.  <u>Severability</u>.  Whenever possible, each provision of this Agreement is to be interpreted to be effective and valid under applicable law.  However, if any provision of this Agreement is prohibited by or invalid under such law, it is deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it is prohibited or invalid only to the extent of such prohibition or invalidity without the remainder of the Agreement or any other provision being prohibited or invalid.

15.11.  <u>Binding</u>.  This Agreement is binding on and inures to the benefit of all Members, and each of the successors and permitted assignees of the Members as provided for herein.

15.12.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which is deemed an original and all of which constitutes one and the same instrument.

15.13.  <u>Governing Law</u>.  This Agreement is governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to principles of conflict of laws.

IN WITNESS WHEREOF, the undersigned have signed this Agreement below conclusively evidence their agreement to the terms and conditions of this Agreement by so signing this Agreement.

THE GRANIT AT HUDSON VALLEY RESORT LLC

By: AAO Resort Management LLC
    (Manager and Member)


By: _____
    Eliot Spitzer, Manager


AAO RESORT MANAGEMENT LLC


By: _____
    Eliot Spitzer, Manager


GRANIT INVESTORS LLC


By: _____
    Name:

23

Title:

**SCHEDULE A**

**INITIAL MEMBERS**

| Name | Address | Membership<br>Interest Percentages |
|------|---------|-----------------------------------|
| AAO Resort Management LLC | 400 Granite Road<br>Kerhonkson, NY 12446 | 5% |
| Granit Investors LLC | _____<br>_____ | 95% |

2817043 v1

# Exhibit B

## EXHIBIT B

## ASSETS AND LIABILITIES

Assets
Real Property...................................................................................... $ 10,000,000
Personal Property............................................................................... $       30,000

Liabilities
First Mortgage .................................................................................... $ 16,600,000
Second Mortgage ............................................................................... $   4,000,000
Third Mortgage................................................................................... $   2,500,000
Fourth Mortgage................................................................................. $   3,000,000
Fifth Mortgage.................................................................................... $   1,000,000
Sixth Mortgage................................................................................... $   2,133,500
General Unsecured Claims................................................................. $      200,000
Administration Claims........................................................................ $       75,000
Total                                                                                                  $ 29,508,500

## CHAPTER 7 LIQUIDATION ANALYSIS

Assets
Real Property and misc. personal property........................................ $ 10,000,000

Liabilities
First Mortgage .................................................................................... $ 10,000,000
Second Mortgage ............................................................................... $        -0-
Third Mortgage................................................................................... $        -0-
Fourth Mortgage................................................................................. $        -0-
Fifth Mortgage.................................................................................... $        -0-
Sixth Mortgage................................................................................... $        -0-
General Unsecured Claims................................................................. $        -0-
Administration Claims........................................................................ $        -0-
Total                                                                                                  $  10,000,000

*The Grand at Hudson Valley Resort*
*Four-Year Projection*

| | 2013 / 2014 | 2014 / 2015 | 2015 / 2016 | 2016 / 2017 | |
|---|---|---|---|---|---|
| **REVENUE** | | | | | |
| Leisure Room Revenue | 1,659,165 | 1,725,532 | 1,794,553 | 1,866,335 | |
| Group Room Revenue | 2,940,778 | 3,058,409 | 3,180,745 | 3,307,975 | |
| **Total Room Revenue** | **4,599,943** | **4,783,941** | **4,975,298** | **5,174,310** | |
| | | | | | |
| Outlet Food | 155,160 | 161,366 | 167,821 | 174,534 | |
| Banquet Food | 2,852,933 | 2,967,050 | 3,085,732 | 3,209,162 | |
| **Total Food** | **3,008,093** | **3,128,417** | **3,253,553** | **3,383,696** | |
| | | | | | |
| Banquet Service Charges | 74,088 | 77,052 | 80,134 | 83,339 | |
| | | | | | |
| Total Beverage | 483,132 | 502,457 | 522,556 | 543,458 | |
| | | | | | |
| **Total F&B** | **3,565,313** | **3,707,926** | **3,856,243** | **4,010,492** | |
| | | | | | |
| Meeting Room Revenue | 456,459 | 474,717 | 493,706 | 513,454 | |
| Telephone | 410 | 426 | 443 | 461 | |
| Health Club | 303,459 | 315,597 | 328,221 | 341,350 | |
| Golf | 309,910 | 322,306 | 335,199 | 348,607 | |
| Activities | 37,215 | 38,704 | 40,252 | 41,862 | |
| Gift Shops | 22,494 | 23,394 | 24,330 | 25,303 | |
| Other | 0 | 0 | 0 | 0 | |
| Total Misc. Income | **1,129,947** | **1,175,145** | **1,222,151** | **1,271,037** | |
| | | | | | |
| **TOTAL REVENUE** | **$9,295,203** | **$9,667,011** | **$10,053,692** | **$10,455,839** | |
| | | | | | |
| **EXPENSES & PROFIT** | | | | | |
| | | | | | |
| Room Expenses: | | | | | |
| Payroll | 777,174 | 800,489 | 824,504 | 849,239 | |
| Operational | 216,234 | 222,721 | 229,403 | 236,285 | |
| Travel / Commissions | 65,313 | 67,272 | 69,291 | 71,369 | |
| Other | 0 | 0 | 0 | 0 | |
| **Total Room Expenses** | **1,058,721** | **1,090,483** | **1,123,197** | **1,156,893** | |
| **Room Departmental Profit** | **3,541,222** | **3,693,458** | **3,852,101** | **4,017,417** | |
| | | | | | |
| Food Expenses: | | | | | |
| Payroll | 676,138 | 696,422 | 717,315 | 738,834 | |
| Banquet Service | 458,753 | 472,516 | 486,691 | 501,292 | |
| Cost of Food | 985,893 | 1,015,470 | 1,045,934 | 1,077,312 | |
| Operational | 151,526 | 156,072 | 160,754 | 165,577 | |
| Other/Contract | 7,631 | 7,860 | 8,096 | 8,339 | |
| **Total Food Expenses** | **2,279,941** | **2,348,339** | **2,418,789** | **2,491,353** | |
| **Food Departmental Profit** | **802,240** | **857,129** | **914,898** | **975,681** | |
| | | | | | |
| Beverage Expenses: | | | | | |
| Payroll | 65,349 | 67,309 | 69,329 | 71,409 | |
| Banquet Service | 20,532 | 21,148 | 21,782 | 22,436 | |
| Cost of Beverage | 57,634 | 59,363 | 61,144 | 62,978 | |
| Operational | 3,185 | 3,281 | 3,379 | 3,480 | |
| Other/Contract | 0 | 0 | 0 | 0 | |
| **Total Beverage Expenses** | **146,700** | **151,101** | **155,634** | **160,303** | |
| **Beverage Departmental Profit** | **336,432** | **351,356** | **366,922** | **383,155** | |
| | | | | | |
| Meeting Room Expenses: | | | | | |
| Payroll | 17,930 | 18,468 | 19,022 | 19,593 | |
| Operational | 8,627 | 8,886 | 9,152 | 9,427 | |
| Other | 0 | 0 | 0 | 0 | |
| **Total Meeting Room Expenses** | **26,557** | **27,354** | **28,174** | **29,020** | |
| **Meeting Room Departmental Profit** | **429,902** | **447,364** | **465,532** | **484,435** | |
| | | | | | |
| Telephone Expenses: | | | | | |
| Service Contract | 4,910 | 5,057 | 5,209 | 5,365 | |
| Operational | 86,991 | 89,601 | 92,289 | 95,057 | |
| Other | 0 | 0 | 0 | 0 | |
| Total Telephone Expenses | **91,901** | **94,658** | **97,498** | **100,423** | |
| **Telephone Departmental Profit** | **(91,491)** | **(94,232)** | **(97,054)** | **(99,962)** | |
| | | | | | |
| Health Club Expenses: | | | | | |
| Payroll | 82,674 | 85,154 | 87,709 | 90,340 | |
| Contract Labor | 136,199 | 140,285 | 144,494 | 148,828 | |
| Operational | 33,166 | 34,161 | 35,186 | 36,241 | |
| Other | 0 | 0 | 0 | 0 | |
| **Total Health Club Expenses** | **252,039** | **259,600** | **267,388** | **275,410** | |
| **Health Club Departmental Profit** | **51,420** | **55,997** | **60,833** | **65,940** | |
| | | | | | |
| Golf Expenses: | | | | | |
| Payroll - Golf | 108,126 | 111,370 | 114,711 | 118,152 | |
| Payroll - Grounds | 185,260 | 190,818 | 196,542 | 202,439 | |
| Lease of Equipment | 93,630 | 96,439 | 99,332 | 102,312 | |
| Operational | 108,115 | 111,358 | 114,699 | 118,140 | |
| Other | 5,204 | 5,360 | 5,521 | 5,687 | |
| **Total Golf Expenses** | **500,335** | **515,345** | **530,805** | **546,730** | |
| **Golf Departmental Profit** | **(190,425)** | **(193,039)** | **(195,607)** | **(198,123)** | |
| | | | | | |
| Activities Expenses: | | | | | |
| Payroll | 50,405 | 51,917 | 53,475 | 55,079 | |
| Rentals | 464 | 478 | 492 | 507 | |
| Entertainment | 70,852 | 72,978 | 75,167 | 77,422 | |
| Other | 3,719 | 3,831 | 3,945 | 4,064 | |
| **Total Activities Expenses** | **125,440** | **129,203** | **133,079** | **137,072** | |
| **Activities Departmental Profit** | **(88,225)** | **(90,500)** | **(92,828)** | **(95,210)** | |
| | | | | | |
| Gift Shop Expenses: | | | | | |
| Payroll | 13,192 | 13,588 | 13,995 | 14,415 | |
| Cost of Supplies | 14,557 | 14,994 | 15,444 | 15,907 | |
| **Total Gift Shop Expenses** | **27,749** | **28,581** | **29,439** | **30,322** | |
| **Gift Shop Departmental Profit** | **(5,255)** | **(5,188)** | **(5,109)** | **(5,019)** | |
| | | | | | |
| Other Expenses: | | | | | |
| Payroll | 0 | 0 | 0 | 0 | |
| Operational | 0 | 0 | 0 | 0 | |
| Total Other Expenses | 0 | 0 | 0 | 0 | |
| **Other Departmental Profit** | **0** | **0** | **0** | **0** | |
| | | | | | |
| **TOTAL DEPARTMENTAL PROFIT** | **$4,785,820** | **$5,022,347** | **$5,269,687** | **$5,528,315** | |
| | | | | | |
| Overhead Expenses: | | | | | |
| Management | 282,219 | 290,686 | 299,406 | 308,388 | |
| Advertising & Sales | 386,759 | 398,362 | 410,313 | 422,622 | |
| Repairs & Maintenance | 681,399 | 701,841 | 722,896 | 744,583 | |
| Heat, Light, & Power | 900,618 | 927,637 | 955,466 | 984,130 | |
| Benefits | 532,837 | 548,822 | 565,287 | 582,245 | |
| Health | 61,873 | 63,729 | 65,641 | 67,610 | |
| Mandatory | 188,047 | 193,688 | 199,499 | 205,484 | |
| **Total Overhead Expenses** | **3,033,752** | **3,124,765** | **3,218,507** | **3,315,063** | |
| | | | | | |
| **GROSS OPERATING PROFIT** | **$1,752,068** | **$1,897,582** | **$2,051,180** | **$2,213,252** | |
| | | | | | |
| Fixed Expenses: | | | | | |
| Insurances | 200,096 | 206,099 | 212,282 | 218,650 | |
| Taxes | 70,304 | 72,413 | 74,586 | 76,823 | |
| Other - School Tax | 98,051 | 100,993 | 104,022 | 107,143 | |
| **Total Fixed Expenses** | **368,451** | **379,505** | **390,890** | **402,616** | |
| | | | | | |
| **Debt Service** | **300,000** | **800,000** | **600,000** | **600,000** | |
| | | | | | |
| **NET OPERATING PROFIT** | **$1,083,617** | **$718,078** | **$1,060,290** | **$1,210,636** | |
| | | | | | |
| Return of Investment - Grand Investors LLC | 1,000,000 | 0 | 0 | 0 | **Distribution Recap** |
| | | | | | |
| **NET OPERATING PROFIT AFTER RETURN OF INVESTMENT** | **$83,617** | **$718,078** | **$1,060,290** | **$1,210,636** | **$3,072,620** |
| | | | | | |
| **Grand Investors LLC - 70%** | 58,532 | 502,654 | 742,203 | 847,445 | 2,168,989 | |
| **General Unsecured Creditors - 25% **** | 20,904 | 179,519 | 265,072 | 284,504 | 750,000 ** |
| **AAO Management LLC - 5%** | 4,181 | 35,904 | 53,014 | 60,532 | 153,631 | |
| | | | | | |
| | $83,617 | $718,078 | $1,060,290 | $1,210,636 | $3,072,620 | |
| | | | | | |
| **** Capped at $750,000** | | | | | |

Exhibit C

**RESTRICTED USE APPRAISAL REPORT**

OF

**HUDSON VALLEY RESORT**
**400 GRANITE ROAD**
**TOWN OF ROCHESTER, NEW YORK 12446**

Hilco File #13AL76

**DATE OF VALUE**

June 21, 2013

**PREPARED FOR**

Mr. Eliot Spitzer
**Everyday Logistics LLC**
400 Granite Road
Kerhonkson, NY 12446

**PREPARED BY**

**Hilco Real Estate Appraisal, LLC**
668 Columbia Turnpike
East Greenbush, New York 12061

# Hilco Real Estate Appraisal, LLC

July 8, 2013

Mr. Eliot Spitzer
**Everyday Logistics LLC**
400 Granite Road
Kerhonkson, NY 12446

RE:    Hudson Valley Resort
       400 Granite Road
       Town of Rochester, New York 12446
       Hilco File #: 13AL41

Dear Mr. Spitzer:

In fulfillment of your request, we have prepared a Restricted Use Appraisal Report of the fee simple interest of the above-referenced real property. The purpose of this appraisal is to estimate the market values of the subject property as of June 21, 2013. The function of the appraisal is to estimate market value for the purposes of bankruptcy proceedings.

The subject property is a 331-room full-service resort hotel and golf course that includes banquet rooms, meeting rooms, theater, performance space, health spa and two restaurants. It is situated on a 386-acre parcel on Granite Road in the Town of Rochester, New York. In addition to this parcel, the subject includes three additional adjacent parcels containing 165.3, 18.58 and 1.05 acres. Thus, the total acreage for the subject is 570.93 acres. The 18.58-acre parcel contains a single family home which is currently used by the owners for VIP guests on an as needed basis. The other two parcels represent vacant land. The hotel improvements were originally constructed in the 1950s, with the most recent renovation occurring in 2001. The single family home was constructed in 1970.

The subject is owned by Everyday Logistics, LLC. The resort site is accessed via the northern side of Granite Road, also known as County Route 27, within the Town of Rochester. The Town of Rochester identifies the subject's tax parcels as Section 76.4, Block 1, Lot 56.1 (hotel parcel), Section 76.3, Block 1, Lot 11.12 (165.3-acre vacant land parcel), Section 76.4 Block 1, Lot 39.1 (house parcel), and Section 76.4, Block 1, Lot 38 (1.05-acre vacant land parcel). The site is serviced by a private water and sewer system, and three of the four parcels are situated within the Rural Conservation (R-5) Zoning District. The 1.05 acre vacant parcel is situated within the Low Density Residential (R-2) Zoning District. The property is more fully described, legally and physically, within the following report.

Based on the analysis contained in the following report, the market value conclusion for the subject is as follows:

Mr. Eliot Spitzer
May 31, 2013
Page 2

| GOING CONCERN - MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion (Rounded)** |
| Going Concern - Market Value As Is | Fee Simple | June 21, 2013 | $9,100,000 |
| Source: Hilco Real Estate Appraisal | | | |

Assuming competent and normal marketing conditions, it is our opinion that the subject property could be sold "as is" within approximately 18 months at the above-indicated values.

The valuation of a hotel/inn property is typically that of the "going concern." Going concern is defined to include the real property plus the contributory value of the furniture, fixtures and equipment (FF&E) and business interest. FIRREA rules require that appraisals contain a discussion of these elements of value and their individual allocation in the total value of the property. For purposes of this appraisal the total market value of the subject property has been allocated as follows:

|  | June 21, 2013 |
|---|---|
| Real Property Value: | $8,100,000 |
| Personal Property (FF&E): | $1,000,000 |
| Business Value: | $0 |
| Going Concern Value (As Is): | $9,100,000 |

To develop the opinion of value, we performed a Restricted Use Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(c) of the Uniform Standards of Professional Appraisal Practice for a Restricted Use Appraisal Report. As such, it presents an abbreviated discussion of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of values.

Our opinion of value was formed based on our experience in the field of real property valuation, as well as the research and analysis set forth in this appraisal. Our concluded opinion of value is subject to the Assumptions, Limiting Conditions and Certification in this appraisal report.

It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if we can be of further service, please do not hesitate to contact us.

Respectfully Submitted,

**Hilco Real Estate Appraisal**
By:

Chris L. Harland, MAI                          Jay Buhr
Managing Director – Northeast Region          Appraiser
New York Certification No. 46000026600

**Hilco** Real Estate Appraisal, LLC
668 Columbia Turnpike • East Greenbush, NY 12061 • 518.472.0380 • fax: 518.472.0388

## CERTIFICATION OF THE APPRAISERS

We certify that to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and have no personal interest or bias with respect to the parties involved. We have no direct or indirect interest in the property, financially or otherwise.

4. Our compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of a stipulated result, or the occurrence of a subsequent event, such as the approval of a loan. The appraisal assignment was not based on a requested minimum valuation, a specific valuation or the approval of a loan.

5. Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation and the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute. In addition, this report conforms to the requirements of the Financial Institution Reform, Recovery, and Enforcement Act (FIRREA).

6. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

7. Chris L. Harland, MAI has completed the requirements of the continuing education program of the Appraisal Institute.

8. Jay Buhr has made a personal inspection of the property that is the subject of this report.

9. Chris L. Harland, MAI and Jay Buhr have extensive experience in the appraisal/review of similar property types.

10. Chris L. Harland, MAI is certified in the state where the subject is located.

11. The appraisers signing this report have not conducted appraisal services on the subject in the three years prior to the valuation date.

Chris L. Harland, MAI
Managing Director – Northeast Region
New York Certification No. 46000026600

Jay Buhr
Appraiser

Hilco Real Estate Appraisal, LLC

*Subject Photographs*

## SUBJECT PHOTOGRAPHS



**GRANITE ROAD FACING NORTH**



**GRANITE ROAD FACING SOUTH**



**MAIN BUILDING EXTERIOR**



**BENTLEYS AND 2000 ROOMS**



**3000 ROOMS**



**4000 AND ECONOMY ROOMS**

*Page iii*                                                    ***Subject Photographs***



**LOBBY**



**BANQUET ROOM**




**CONFERENCE ROOM**

**GIFT SHOP**




**SPA HOT TUB**



**INDOOR POOL**

Hilco Real Estate Appraisal, LLC

*Page iv*                                                          ***Subject Photographs***



**FITNESS ROOM**



**MANHATTAN THEATER**



**BENTLEYS RESTAURANT**



**THE VIEW RESTAURANT**



**TYPICAL MAIN BUILDING ROOM**



**TYPICAL MAIN BUILDING SUITE**

Hilco Real Estate Appraisal, LLC

*Page v*

*__Subject Photographs__*



**OUTDOOR POOL**



**TENNIS COURTS**



**GOLF COURSE**



**SINGLE FAMILY HOME PARCEL**



**SMALL VACANT PARCEL**



**LARGE VACANT PARCEL**

Hilco Real Estate Appraisal, LLC

*Table of Contents*

# TABLE OF CONTENTS

CERTIFICATION OF THE APPRAISERS .................................................................i

SUBJECT PHOTOGRAPHS ...............................................................................ii

TABLE OF CONTENTS ....................................................................................vi

IDENTIFICATION OF THE SUBJECT PROPERTY ..................................................1

OWNERSHIP HISTORY ...................................................................................1

DATE OF INSPECTION AND VALUATION ...........................................................2

DEFINITION OF MARKET VALUE ......................................................................2

PROPERTY RIGHTS APPRAISED .......................................................................2

DEFINITION OF FEE SIMPLE ESTATE................................................................3

SCOPE OF WORK ..........................................................................................3

HIGHEST AND BEST USE ................................................................................3

VALUATION .................................................................................................4

CONCLUSION ...............................................................................................19

REAL PROPERTY VALUE ALLOCATION ..............................................................21

ASSUMPTIONS & LIMITING CONDITIONS..........................................................25

ADDENDA.....................................................................................................29

    A.  Aerial Map, Tax Map, & Flood Map
    B.  Zoning
    C.  Smith Travel Research Reports
    D.  Subject's Historical Income & Expenses
    E.  Discounted Cash Flow Analysis Summary
    F.  NYS General Real Estate Appraiser's License & Qualifications

*Restricted Use Appraisal Report*

## IDENTIFICATION OF THE SUBJECT PROPERTY

The subject property is a 331-room full-service resort hotel and golf course that includes banquet rooms, meeting rooms, theater, performance space, health spa and two restaurants. It is situated on a 386-acre parcel along the northern side of Granite Road in the Town of Rochester, New York. In addition to this parcel, the subject includes three additional adjacent parcels containing 165.3, 18.58 and 1.05 acres. The 18.58-acre parcel contains a single family home constructed in 1970. The subject hotel improvements were first constructed in the 1950s and added onto since then. The last major renovation was completed in 2001.

The hotel and two other parcels have visibility from and direct access to Granite Road. The 165.3-acre parcel has direct access to Berme Road. Granite Road is a two-lane, northeast-southwest roadway also known as County Route 27 that connects with US Route 44/State Route 55 to the southwest and connects with Main Street in the hamlet of Accord to the northeast. Berme Road is a two-lane east-west roadway connecting US Route 44/State Route 55 in the west with Granite Road in the east. The Town of Rochester identifies the subject's tax parcels as Section 76.4, Block 1, Lot 56.1 (hotel parcel), Section 76.3, Block 1, Lot 11.12 (165.3-acre vacant parcel), Section 76.4, Block 1, Lot 39.1 (single family home parcel), and Section 76.4, Block 1, Lot 38 (1.05-acre vacant parcel). The site is serviced by a private water and sewer system and three of the four parcels are situated within the Rural Conservation (R-5) Zoning District. The 1.05 acre vacant parcel is situated within the Low Density Residential (R-2) Zoning District. It appears that the hotel parcel, the single family home parcel and the 165.3-acre vacant parcel are legally conforming uses. Due to its 1.05-acre size, the smaller vacant parcel could represent a legally non-conforming use, as the R-2 district requires a 2-acre minimum lot size. However, technically, since it's not being used, this is not an issue.

The hotel parcel is improved with a multi-building resort hotel containing 331 rooms. The single family parcel is improved with a 2,896 square foot contemporary single family home. The hotel site is also improved with an 18-hole golf course, four tennis courts, an outdoor swimming pool, 400+ parking spaces, exterior lighting, paved drives and landscaping.

The improvements are considered to be in average overall condition. The main building contains the lobby, reservation desk, banquet rooms, conference rooms, theater, performance space, and two restaurants, along with 141 guest rooms (including three guest suites). There are also 57 guest rooms in the "economy" building, 67 guest rooms in the "2000" building (including three smaller rooms that were converted from storage space that are used only on an as-needed basis), 38 guest rooms in the "3000" building, and 28 guest rooms in the "4000" building. The spa and small golf pro shop are located on the bottom floor of the "3000" building, and the indoor pool is located under the "4000" building. All of the buildings are connected via indoor hallways. The hotel contains multiple staircases and three elevators and is fully sprinklered with a wet system.

The hotel contains a total of 331 rooms, including three suites, 325 standard guest rooms and three smaller rooms used on a contingency basis.

## OWNERSHIP HISTORY

The four parcels are owned by Everyday Logistics LLC. The current owners purchased the property on March 8, 2006 for $18,500,000 from Minnewaska Company LLC. The subject property is not currently listed for sale. In 2009 or 2010, the hotel business went into bankruptcy protection and is in the process of presenting a plan to emerge from bankruptcy.

*Page 2*                                           ***Restricted Use Appraisal Report***

Our "as is" value of $9,100,000 is significantly below the previous sale price due to the effects of the recession as well as the stigma associated with the bankruptcy.

## DATE OF INSPECTION AND VALUATION

Jay Buhr performed an interior and exterior inspection of the subject property on June 21, 2013, which is the "as is" date of valuation.  The purpose of this appraisal is to estimate the market value of the subject property in "as is" condition under market conditions prevailing as of June 21, 2013.  This appraisal has been prepared in order to assist in bankruptcy proceedings.

## DEFINITION OF MARKET VALUE

Market value is defined as follows:

> Market value is one of the central concepts of the appraisal practice.  Market value is differentiated from other types of value in that it is created by the collective patterns of the market.  Market value means the most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.  Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

> 1. Buyer and seller are typically motivated;
> 2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
> 3. A reasonable time is allowed for exposure in the open market;
> 4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
> 5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. [1]

## INTENDED USE OF REPORT

The intended use of this appraisal is to provide information necessary for bankruptcy proceedings.  The intended user is Mr. Eliot Spitzer.

## PROPERTY RIGHTS APPRAISED

The property rights appraised represent the fee simple estate.

---

[1] This definition is from regulations published by federal regulatory agencies pursuant to Title XI of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA) of 1989 between July 5, 1990, and August 24, 1990, by the Federal Reserve System (FRS).  National Credit Union Administration (NCUA), Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS), and the Office of Comptroller of the Currency (OCC). This definition is compatible with the definition of market value contained in *The Dictionary of Real Estate Appraisal*, Fifth Edition, and the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of The Appraisal Foundation, 2010 edition.  This definition is also referenced in regulation jointly published by the OCC, OTS, FRS, and FDIC on June 7, 1994, and in the Interagency Appraisal and Evaluation Guidelines, dated October 27, 1994.

## DEFINITION OF FEE SIMPLE ESTATE

The fee simple estate, as used in this report and presented within *The Appraisal of Real Estate, Thirteenth Edition* (Appraisal Institute, 2010), is defined as follows:

*"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."*

## SCOPE OF WORK

To develop the opinion of value, we performed a Restricted Use Appraisal Report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(c) of the Uniform Standards of Professional Appraisal Practice for a Restricted Use Appraisal Report. As such, it presents an abbreviated discussion of the data, reasoning, and analyses that were used in the appraisal process to develop the appraiser's opinion of value.

The appraisal development and reporting process for this assignment consisted of the following:

1. Identified and inspected both the interior and exterior of the subject property, as well as its surrounding environs; identified and considered those characteristics that may have a legal, economic or physical impact on the subject;
2. Investigated the micro and/or macro market environments with respect to physical and economic factors relevant to the valuation process; interviewed regional and local market participants; reviewed available published data and other various resources;
3. Conducted regional and/or local research with respect to applicable tax data, zoning requirements, flood zone status, demographics, and other information that could affect the value of the subject property;
4. Conducted market inquiries into recent sales of similar vacant land properties.
5. Conducted market inquiries into average daily room rates and average occupancy rates for similar facilities to estimate an appropriate potential gross income for the subject. Deducted appropriate operating expenses to estimate the stabilized net operating income for the subject. Converted net operating income into value through a discounting process.
6. Provided a breakdown of the going concern value by estimating the contributory value of furniture, fixtures and equipment and business interest.
7. Prepared the *Sales Comparison Approach (Excess Land Only) and Income Capitalization Approach*.
8. Correlated and reconciled the results into a reasonable and defensible value conclusion, as defined herein; and
9. Estimated a reasonable exposure time and marketing time associated with the value estimate presented.

Although the previous procedure was conducted, the depth and discussion contained in this report is specific to the needs of the client and for the intended use stated herein. A significant difference between this Restricted Use Appraisal Report and the Self-Contained Appraisal Report is the level of detail in the presentation of information. This report contains minimal presentation of information while a Self-Contained Appraisal Report contains a comprehensive level of detail in the presentation.

## HIGHEST AND BEST USE

As Vacant – Residential Development

As Improved – Continued use as a resort hotel with golf course

## VALUATION

### Sales Comparison Approach

Using the Sales Comparison Approach, the appraiser produces a value indication by comparing the subject property to similar properties referred to as comparable sales. After consideration of various elements of comparison, adjustments are applied to the sale prices of these properties for differences between the subject and the comparable sales. This approach is considered to be most useful when many similar properties have recently sold and there are similar properties currently for sale in the subject market area.

Proper application of this approach requires that a degree of comparability of each sale to the subject be considered, that differences in physical, functional and economic characteristics be noted, and that adjustments for these differences be made. Also, only market-oriented (arm's length) transactions should be considered in the analysis.

Analysis of Comparable Vacant Land Sales

As indicated previously, the four subject parcels together contain 570.93 acres, with the resort hotel and golf course improvements located on a parcel with 386 acres.

To determine the amount of excess land to appraise, we first determined the amount of acreage necessary for the golf course. Typically, golf courses require 100 to 150 acres. As the subject golf course represents an 18-hole course, we allocated 150 acres for it. For the resort hotel portion of the subject, we allocated 100 acres. Based on our allocation, there are 320.93 acres of excess vacant land associated with the subject. We have included data summaries for each of the selected comparable land sales in the chart below. In comparing the subject to the four comparable sales, a number of factors were considered, including conditions of sale, market conditions, location, parcel size, frontage, topography, utilities, and zoning.

| SUMMARY OF COMPARABLE VACANT LAND SALES | | | | | | |
|---|---|---|---|---|---|---|
| No. | Property Location | Sale Date | Zoning | Size (Acres) | Sale Price | Price/Acre |
| 1 | 123 Creamery Road Stanford, NY | 03/13 | AR5 Residential | 164.60 | $1,700,000 | $10,328 |
| 2 | Swartekill Road Esopus, NY | 12/12 | R40 Residential | 216.70 | $985,820 | $4,549 |
| 3 | 216 Foordemoor Road Wawarsing, NY | 03/12 | RU Rural | 233.36 | $1,200,000 | $5,142 |
| 4 | Railroad Avenue Ulster, NY | 09/11 | R-30 Residential | 118.20 | $400,000 | $3,384 |
| 5 | Silver Hollow Road Hunter, NY | 04/11 | Residential | 371.30 | $1,059,132 | $2,852 |
| 6 | Cooper Street Town of Rochester, NY | 07/10 | CF Core Farm | 56.30 | $60,000 | $1,066 |
| Compiled by Hilco Real Estate Appraisal | | | | | | |

Based on our analysis of these six sales and comparing each of them with the subject, we believe an appropriate value per acre for the subject is approximately $5,000. Our value conclusion of the excess land is shown in the table below.

| SALES COMPARISON APPROACH VALUE CONCLUSION | |
|---|---|
| | **June 21, 2013** |
| Number of Acres | 320.93 |
| Value per Acre | $5,000 |
| Indicated Value | $1,604,650 |
| **Rounded Value (As Is)** | **$1,600,000** |
| Compiled by Hilco Real Estate Appraisal | |

### *Income Capitalization Approach*

The Income Capitalization Approach (Income Approach) is the procedure that converts anticipated economic benefits to be derived from ownership of the property into a present value estimate. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. In the case of income-producing properties, the higher the net earnings, the higher the value, all other factors remaining constant.

Capitalization is the process of converting income expectancy into present value. If a plausible relationship between income and value can be established, it is possible to estimate value when only income is known. Selecting the proper capitalization method and rate(s) are among the most important steps in the Income Capitalization Approach. The two common valuation techniques associated with the Income Capitalization Approach are direct capitalization and the discounted cash flow (DCF) analysis. The DCF methodology is considered the most applicable technique for the valuation of the subject property, as it is currently not at a stabilized occupancy.

### REVENUE

In order to project revenue for hotels, an average occupancy rate and average daily rate must be determined. To project these figures for the subject, we have utilized the subject's historical occupancy data, its income data from 2009 through 2012 (plus year to date 2013), hotel income and expense comparables from the Catskill region, the Smith Travel Research (STR) 2012 Host Report for Resort Hotels, and the Smith Travel Research Destination Report, which provides occupancy and average daily rate data for hotels within the subject's competitive market. The STR Destination Report includes statistics for April and May 2013. Data from the subject's historical income and expenses, along with the STR data, is included in the Addenda. In addition to room revenue, there are a number of other revenue sources, including food and beverage, spa, gift shop, activities, golf and other income sources. In the past the subject has received telephone revenue (both in-room and pay phone). However, over the past four years, this revenue source has decreased substantially, and there is no telephone revenue for 2013 to date. Therefore, in our DCF analysis, we are estimating no telephone revenue.

### Occupancy

From 2009 through 2012, occupancy rates have declined from 56.24% in 2009 to 43.92% in 2012. Occupancy for 2013 (through May) is 30.99% but does not take into consideration the busier summer season. The STR Destination Report for the Newburgh/Kingston region shows occupancy through May of 2013 at 50.4%. This report includes all types of hotel properties, not just resort properties. The STR 2012 Host report shows an occupancy level of 67.8% for

resort hotels nationally.  Finally, only one of the area's competing resort properties (Pinegrove Ranch and Family Resort in Kerhonkson) provided us with occupancy data.  That resort's most recent occupancy level is 55%.  The subject's drop in occupancy levels since 2009 can be attributed somewhat to the overall recession but also to the effects of the bankruptcy.  As the general manager indicated, the vast majority (almost 90%) of business at the property is from groups.  Many groups have been hesitant to book with the subject, as they are unsure whether the resort will be open at the time of their event.

| OCCUPANCY RATES | |
|---|---|
| Year | Subject Property |
| 2009 | 56.2% |
| 2010 | 51.1% |
| 2011 | 52.1% |
| 2012 | 43.9% |
| Source: Hudson Valley Resort | |

For the purposes of the DCF analysis, we project occupancy to gradually improve over the 10-year time horizon, from 45% to 55%, the latter figure being what we believe to be a stabilized level of occupancy.

**Average Daily Rate (ADR)**

Based on reported room revenue and occupancy levels from 2009 through 2012 (and through May of 2013), the subject's ADR has also gradually decreased for the same reasons indicated previously for occupancy rates.  In 2009, the ADR was $45.30, while the ADR in 2012 was $41.41 (and $30.71 through May 2013).  This compares to an ADR in the Newburgh/Kingston area through May 2013 of $105.78 from the STR Destination Report.  The STR 2012 Host Report shows an ADR of $182.17 for resorts nationwide.  From our survey of area resort properties in the Catskills, we found an ADR of $355 at the Pinegrove Ranch and Family Resort in Kerhonkson and $500 at the Mohonk Mountain House in nearby New Paltz.  Both of these rates, however, include three daily meals.  The historical ADR data at the subject do not include meals.  Clearly, the subject's ADR is significantly lower than any of the market data provided, even before the start of the recession.

For the purposes of the DCF analysis, we project an initial ADR of $49.00 for Year 1, increasing by 3.0 percent annually throughout the 10-year period.  This rate is reasonable, considering the overall ADR of the comparable market data and significant upside potential at the subject.

| AVERAGE DAILY RATES (ADR) | |
|---|---|
| Year | Subject Property |
| 2009 | $45.30 |
| 2010 | $45.60 |
| 2011[)] | $42.65 |
| 2012 | $41.41 |
| Source: Hudson Valley Resort | |

*Page 7*                                                          *Restricted Use Appraisal Report*

## Room Revenue

The subject's room revenue from 2009 through 2012 is presented in the table below, along with our first year's DCF estimate of room revenue, which is based on our projected occupancy and ADR.    Future years' room revenue is also based on each year's occupancy and ADR assumptions.

| ROOM REVENUE | |
|---|---|
| Year | Subject Property |
| 2009 | $3,078,223 |
| 2010 | $2,813,622 |
| 2011 | $2,684,742 |
| 2012 | $2,197,666 |
| 2014* | $2,663,971 |

Source: Hudson Valley Resort
*Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014

## Food and Beverage Revenue

The subject's food and beverage revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of food and beverage revenue.  We estimated the first year's DCF food and beverage revenue using a figure of $9,000 per room, based on the historical data.  For future years, it is estimated that food and beverage revenue will increase by 3.0 percent annually.

| FOOD AND BEVERAGE REVENUE | | |
|---|---|---|
| Year | Total | Per Room |
| 2009 | $3,404,210 | $10,285 |
| 2010 | $3,615,690 | $10,924 |
| 2011 | $3,524,691 | $10,649 |
| 2012 | $2,840,969 | $8,583 |
| 2014* | $2,979,000 | $9,000 |

Source: Hudson Valley Resort
*Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014

## Spa Revenue

The subject's spa revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of spa revenue.  We estimated the first year's DCF spa revenue based on the historical data.  For future years, it is estimated that spa revenue will increase by 3.0 percent annually.

*Page 8*                                                      *Restricted Use Appraisal Report*

| SPA REVENUE | |
|---|---|
| Year | Subject Property |
| 2009 | $144,811 |
| 2010 | $153,277 |
| 2011 | $99,117 |
| 2012 | $46,352 |
| 2014* | $65,000 |
| Source:  Hudson Valley Resort | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## Gift Shop Revenue

The subject's gift shop revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of gift shop revenue.  We estimated the first year's DCF gift shop revenue based on the historical data.  For future years, it is estimated that gift shop revenue will increase by 3.0 percent annually.

| GIFT SHOP REVENUE | |
|---|---|
| Year | Subject Property |
| 2009 | $35,898 |
| 2010 | $33,397 |
| 2011 | $31,725 |
| 2012 | $23,890 |
| 2014* | $28,000 |
| Source:  Hudson Valley Resort | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## Activities Revenue

The subject's activities revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of activities revenue.  We estimated the first year's DCF activities revenue based on the historical data.  For future years, it is estimated that activities revenue will increase by 3.0 percent annually.

*Page 9*                                          *Restricted Use Appraisal Report*

| ACTIVITIES REVENUE | |
| --- | --- |
| Year | Subject Property |
| 2009 | $132,133 |
| 2010 | $97,141 |
| 2011 | $61,189 |
| 2012 | $22,313 |
| 2014* | $40,000 |
| Source:  Hudson Valley Resort *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## Golf Revenue

The subject's golf revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of golf revenue.  We estimated the first year's DCF golf revenue based on the historical data.  For future years, it is estimated that golf revenue will increase by 3.0 percent annually.

| GOLF REVENUE | |
| --- | --- |
| Year | Subject Property |
| 2009 | $264,523 |
| 2010 | $264,317 |
| 2011 | $176,984 |
| 2012 | $171,588 |
| 2014* | $200,000 |
| Source:  Hudson Valley Resort *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## Other Revenue

The subject's other revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of other revenue.  Over the past two years, this revenue source has increased significantly, mainly due to the subject owners leasing out large blocks of rooms during the Passover celebration.  We estimated the first year's DCF other revenue based on the historical data and assuming that this Passover lease revenue will decrease somewhat.  For future years, it is estimated that other revenue will decrease by 3.0 percent annually as the Passover lease revenue becomes less important to the subject's revenue.

*Page 10*                                     *Restricted Use Appraisal Report*

| OTHER REVENUE | |
| --- | --- |
| Year | Subject Property |
| 2009 | $242,953 |
| 2010 | $137,288 |
| 2011 | $376,538 |
| 2012 | $396,446 |
| 2014* | $335,000 |
| Source: Hudson Valley Resort *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## Total Revenue

The subject's total revenue from 2009 through 2012 is presented in the table below, along with our first year's estimate of total revenue.

| TOTAL REVENUE | |
| --- | --- |
| Year | Subject Property |
| 2009 | $7,309,318 |
| 2010 | $7,176,271 |
| 2011 | $6,962,865 |
| 2012 | $5,704,415 |
| 2014* | $6,310,971 |
| Source: Hudson Valley Resort *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | |

## DEPARTMENTAL EXPENSES

The departmental expenses are typically calculated as a percentage of each department's revenue. We calculated these expenses using this method and based our estimates of first year expenses using the subject's historical expenses as well as data from the 2012 STR Host Report. For all years of the 10-year analysis period, we kept the projected percentage of departmental revenue constant for all expense categories, with the exception of insurance and real estate taxes. For those two expense categories, we projected a first year expense and increased it by 3.0 percent annually throughout the 10-year period.

## Rooms Expense

The following table presents the subject's rooms expenses from 2009 through 2012, along with our first year's estimate for the DCF. Rooms expenses consist of all payroll, benefits, and supplies associated with rooms. This includes all laundry expenses. The 2012 STR Host Report shows that rooms expenses were 27.8% of room revenue for resort facilities nationwide and 29.2% of all full-service hotels in the Middle Atlantic states. We based our DCF rooms expense estimate of 29% of room revenue with slightly more weight given to the STR data. In addition, the subject property was able to obtain this level of expenses within the past four years.

*Restricted Use Appraisal Report*

| ROOMS EXPENSES | | |
|---|---|---|
| Year | Total | % of Room Revenue |
| 2009 | $912,134 | 29.6% |
| 2010 | $952,421 | 33.9% |
| 2011 | $944,940 | 35.2% |
| 2012 | $848,111 | 38.6% |
| 2014* | $772,552 | 29.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Food and Beverage Expense

The following table presents the subject's food and beverage expenses from 2009 through 2012, along with our first year's estimate for the DCF. Food and beverage expenses consist of all payroll, benefits, and supplies associated with the restaurants and bars. The 2012 STR Host Report shows that rooms expenses were 74.6% of food and beverage revenue for resort facilities nationwide and 86.5% of all full-service hotels in the Middle Atlantic states. We based our DCF food and beverage expense estimate of 60% of food and beverage revenue with most weight given to the subject's historical expenses.

| FOOD AND BEVERAGE EXPENSES | | |
|---|---|---|
| Year | Total | % of Food & Beverage Revenue |
| 2009 | $2,086,632 | 61.3% |
| 2010 | $1,851,956 | 51.2% |
| 2011 | $1,844,966 | 52.3% |
| 2012 | $1,467,048 | 51.6% |
| 2014* | $1,787,400 | 60.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Spa Expense

The following table presents the subject's spa expenses from 2009 through 2012, along with our first year's estimate for the DCF. Spa expenses consist of all payroll, benefits, and supplies associated with the spa. As the data in the table indicate, this expense category represents a net loss to the hotel property. However, spas similar to the subject are typically considered a standard amenity at resort properties similar to the subject and are offered to attract guests to the property. Therefore, we assume that the subject will continue to offer this amenity in the future. We based our DCF spa expense estimate of 125% of spa revenue with most weight given to the subject's historical expenses. We have no comparable expenses for this expense category.

Page 12                                              *Restricted Use Appraisal Report*

| SPA EXPENSES | | |
|---|---|---|
| Year | Total | % of Spa Revenue |
| 2009 | $148,535 | 102.6% |
| 2010 | $157,518 | 102.8% |
| 2011 | $143,292 | 144.6% |
| 2012 | $90,881 | 196.1% |
| 2014* | $81,250 | 125.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Gift Shop Expense**

The following table presents the subject's gift shop expenses from 2009 through 2012, along with our first year's estimate for the DCF. Gift shop expenses consist of all payroll, benefits, and supplies associated with the gift shop. As the data in the table indicate, this expense category represents a net loss to the hotel property. However, gift shops like the subject are typically considered a standard amenity at resort properties similar to the subject and are offered as a customer service. Therefore, we assume that the subject will continue to offer this amenity in the future. We based our DCF gift shop expense estimate of 115% of gift shop revenue with most weight given to the subject's historical expenses.

| GIFT SHOP EXPENSES | | |
|---|---|---|
| Year | Total | % of Gift Shop Revenue |
| 2009 | $42,545 | 118.5% |
| 2010 | $38,695 | 115.9% |
| 2011 | $45,184 | 142.4% |
| 2012 | $38,930 | 163.0% |
| 2014* | $32,200 | 115.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Activities Expense**

The following table presents the subject's activities expenses from 2009 through 2012, along with our first year's estimate for the DCF. Activities expenses consist of all payroll, benefits, and supplies associated with the subject's activities program. As the data in the table indicate, this expense category has sometimes represented a net loss to the hotel property. However, an activities program is typically considered a standard amenity at resort properties similar to the subject. Therefore, we assume that the subject will continue to offer this amenity in the future. We based our DCF activities expense estimate of 75% of activities revenue with most weight given to the subject's historical expenses.

*Page 13*                                                    *__Restricted Use Appraisal Report__*

| ACTIVITIES EXPENSES | | |
|---|---|---|
| Year | Total | % of Activities Revenue |
| 2009 | $72,489 | 54.9% |
| 2010 | $110,419 | 113.7% |
| 2011 | $46,218 | 75.5% |
| 2012 | $44,723 | 200.4% |
| 2014* | $30,000 | 75.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Golf Expense**

The following table presents the subject's golf expenses from 2009 through 2012, along with our first year's estimate for the DCF. Golf expenses consist of all payroll, benefits, and supplies associated with the subject's 18-hole golf course. As the data in the table indicate, this expense category represents a net loss to the hotel property. However, golf courses are often included as amenities at other area resorts and are a major draw of customers to these types of resorts. Therefore, we assume that the subject will continue to offer this amenity in the future. We based our DCF activities expense estimate of 150% of golf revenue with most weight given to the subject's historical expenses.

| GOLF EXPENSES | | |
|---|---|---|
| Year | Total | % of Golf Revenue |
| 2009 | $358,379 | 135.5% |
| 2010 | $347,774 | 131.6% |
| 2011 | $319,763 | 180.7% |
| 2012 | $321,121 | 187.1% |
| 2014* | $300,000 | 150.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Other Expense**

The following table presents the subject's other expenses from 2009 through 2012, along with our first year's estimate for the DCF. Other expenses consist mainly of expenses associated with the subject's telecommunications equipment, wind and storm damage, and other general property items. We based our DCF other expense estimate of 50% of other revenue with most weight given to the subject's historical expenses.

***Restricted Use Appraisal Report***

| OTHER EXPENSES | | |
|---|---|---|
| Year | Total | % of Other Revenue |
| 2009 | $569,128 | 234.3% |
| 2010 | $64,782 | 47.2% |
| 2011 | $218,358 | 58.0% |
| 2012 | $82,737 | 20.9% |
| 2014* | $167,500 | 50.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## UNDISTRIBUTED OPERATING EXPENSES

Undistributed Operating Expenses are those expenses that are incurred by a hotel property but are not attributed to a particular department revenue category. They include the following eight categories and are typically calculated as a percentage of total revenue. For the purposes of our DCF, we have calculated all of these expense categories as a percentage of total revenue for the entire 10-year period (with the exception of the insurance and real estate tax expense categories).

### Administrative Expense

The following table presents the subject's administrative expenses from 2009 through 2012, along with our first year's estimate for the DCF. Administrative expenses consist mainly of expenses associated with administrative staff salaries and benefits, credit card and check processing, travel and entertainment, and a variety of other miscellaneous items. The 2012 STR Host Report shows that administrative expenses were 8.6% of total revenue for resort facilities nationwide and 8.4% of all full-service hotels in the Middle Atlantic states. We based our DCF administrative expense estimate of 4.8% of total revenue with most weight given to the subject's historical expenses.

| ADMINISTRATIVE EXPENSES | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | $324,359 | 4.4% |
| 2010 | $347,933 | 4.8% |
| 2011 | $323,692 | 4.6% |
| 2012 | $342,152 | 6.0% |
| 2014* | $302,927 | 4.8% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

### Advertising & Sales Expense

The following table presents the subject's advertising and sales expenses from 2009 through 2012, along with our first year's estimate for the DCF. Advertising and sales expenses consist mainly of expenses associated with dues and memberships, all types of advertising and various other promotion-related items. The 2012 STR Host Report shows that marketing expenses were 6.6% of total revenue for resort facilities nationwide and 6.0% of all full-service hotels in

the Middle Atlantic states.  We based our DCF advertising and sales expense estimate of 6.5% of total revenue with most weight given to the STR expenses and assuming that a more robust advertising and sales program will be needed to increase occupancy and ADR into the future.

| ADVERTISING AND SALES EXPENSES | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | $483,696 | 6.6% |
| 2010 | $447,826 | 6.2% |
| 2011 | $341,115 | 4.9% |
| 2012 | $273,446 | 4.8% |
| 2014* | $410,213 | 6.5% |
| Source:  Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Repairs and Maintenance Expense**

The following table presents the subject's repairs and maintenance expenses from 2009 through 2012, along with our first year's estimate for the DCF.  Repairs and maintenance expenses consist of all expenses associated with ongoing repairs of the property (as opposed to major capital expenditures) as well as maintenance expenses like snow plowing and landscaping.  The 2012 STR Host Report shows that repairs and maintenance expenses were 5.1% of total revenue for resort facilities nationwide and 4.6% of all full-service hotels in the Middle Atlantic states.  We based our DCF repairs and maintenance expense estimate of 9.0% of total revenue with most weight given to the subject's historical expenses.  Based on the historical data, it appears unlikely that the subject could significantly lower its repairs and maintenance expenses enough to fall within the range of the STR comparables.

| REPAIRS AND MAINTENANCE EXPENSES | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | $715,057 | 9.8% |
| 2010 | $664,779 | 9.3% |
| 2011 | $657,451 | 9.4% |
| 2012 | $643,053 | 11.3% |
| 2014* | $567,987 | 9.0% |
| Source:  Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

**Utilities Expense**

The following table presents the subject's utilities expenses from 2009 through 2012, along with our first year's estimate for the DCF.  Utilities expenses consist of all costs for electric, gas and oil fuel power.  The 2012 STR Host Report shows that utilities expenses were 4.4% of total revenue for resort facilities nationwide and 3.9% of all full-service hotels in the Middle Atlantic states.  We based our DCF utilities expense estimate of 10.0% of total revenue with most weight given to the subject's historical expenses.  As utilities expenses are unlikely to change significantly, it is more prudent to rely on the subject's historical data rather than the STR comparable data.

*__Restricted Use Appraisal Report__*

| UTILITIES EXPENSES | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | $784,946 | 10.7% |
| 2010 | $861,769 | 12.0% |
| 2011 | $918,843 | 13.2% |
| 2012 | $674,433 | 11.8% |
| 2014* | $631,097 | 10.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Management Expense

The subject has been owner-managed since its purchase in 2006. Therefore, there have been no management expenses associated with the property. However, for the purposes of our analysis, we have estimated a management fee expense of 2.9% of total revenue. The 2012 STR Host Report shows that management fee expenses were 2.7% of total revenue for resort facilities nationwide and 3.1% of all full-service hotels in the Middle Atlantic states.

## Insurance Expense

The following table presents the subject's insurance expenses from 2009 through 2012, along with our first year's estimate for the DCF. Insurance expenses consist of all costs for the subject's property insurance. The 2012 STR Host Report shows that insurance expenses were 1.5% of total revenue for resort facilities nationwide and 0.8% of all full-service hotels in the Middle Atlantic states. We based our first year DCF insurance expense estimate of 3.0% of total revenue with more weight given to the subject's historical expenses. After the first year, we have increased this expense by 3.0 percent annually. It is more prudent to rely on the subject's own historical data for insurance expenses.

| INSURANCE EXPENSES | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | $188,250 | 2.6% |
| 2010 | $222,648 | 3.1% |
| 2011 | $210,722 | 3.0% |
| 2012 | $192,698 | 3.4% |
| 2014* | $189,329 | 3.0% |
| Source: Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Real Estate Tax Expense

The following table presents the subject's real estate tax expenses from 2009 through 2012, along with our first year's estimate for the DCF. The 2012 STR Host Report shows that real estate tax expenses were 2.7% of total revenue for resort facilities nationwide and 4.6% of all full-service hotels in the Middle Atlantic states. We based our first year real estate tax expense estimate of $137,337 by using the subject's current tax liabilities. These were calculated using the subject's existing assessed value and multiplying it by the local municipalities' (county, town and school) tax rates. After the first year, we have increased this expense by 2.0 percent

*Page 17*                                                   *Restricted Use Appraisal Report*

annually.   As with insurance, real estate tax expenses are typically calculated using actual historical data rather than comparable data.

| REAL ESTATE TAX EXPENSES | | |
| --- | --- | --- |
| Year | Total | % of Total Revenue |
| 2009 | $129,206 | 1.8% |
| 2010 | $128,681 | 1.8% |
| 2011 | $133,940 | 1.9% |
| 2012 | $137,578 | 2.4% |
| 2014* | $137,337 | 2.2% |
| Source:  Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Reserves for Replacement

As with the case of the subject, this expense is typically not considered by owner users.   It represents funds set aside for short-lived items such as roof repairs, parking lot resurfacing, furniture replacement, equipment replacement, and, in the case of the subject, golf course improvements.   The 2012 STR Host Report shows that management fee expenses were 2.2% of total revenue for resort facilities nationwide and 2.1% of all full-service hotels in the Middle Atlantic states.   For the purposes of our analysis, we have estimated a reserve expense of 2.5% of total revenue.

## Total Expenses

The subject's total expenses from 2009 through 2012 is presented in the table below, along with our first year's estimate of total expenses.

| TOTAL EXPENSES | | |
| --- | --- | --- |
| Year | Total | % of Total Revenue |
| 2009 | $7,351,969 | 100.6% |
| 2010 | $7,086,707 | 98.8% |
| 2011 | $6,841,310 | 98.3% |
| 2012 | $5,821,611 | 102.1% |
| 2014* | $5,750,584 | 91.1% |
| Source:  Hudson Valley Resort | | |
| *Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014 | | |

## Net Operating Income

The subject's net operating income (total revenue minus total expenses) from 2009 through 2012 is presented in the table below, along with our first year's estimate of net operating income.

*Page 18*                                                    *Restricted Use Appraisal Report*

| NET OPERATING INCOME | | |
|---|---|---|
| Year | Total | % of Total Revenue |
| 2009 | -$42,651 | -0.6% |
| 2010 | $89,565 | 1.2% |
| 2011 | $121,554 | 1.7% |
| 2012 | -$117,196 | -2.1% |
| 2014* | $560,387 | 8.9% |

Source: Hudson Valley Resort
*Estimate of Hilco Real Estate Appraisal, LLC for year ending June 2014

## DISCOUNTED CASH FLOW ANALYSIS

The following table summarizes our assumptions for our discounted cash flow analysis. The discount and terminal capitalization rates were determined by referring to several different sources including the PricewaterhouseCoopers 1st Quarter 2013 biannual survey for the National Full Service Lodging Segment.

| SUMMARY OF DISCOUNTED CASH FLOW ASSUMPTIONS | |
|---|---|
| **General Assumptions** | |
| Start Date | July 1, 2013 |
| Term of Analysis | 10 Years |
| Basis | Fiscal |
| Software | Excel |
| **Growth Rate Assumptions** | |
| Income Growth | 3.0% |
| Expense Growth | Based on percentage of department or total revenue |
| Inflation (CPI) | 3.0% |
| Real Estate Tax Growth | 2.0% |
| **Market Rates – Year 1** | |
| Average Daily Rate – Year 1 | $49.00 |
| Average Occupancy – Year 1 | 45% |
| **Financial Assumptions** | |
| Discount Rate | 12.00% |
| Terminal Capitalization Rate | 10.00% |
| Cost of Sale | 2.00% |
| Capital Expenses (Deferred Maintenance) | $0 |

Our Discounted Cash Flow Analysis is provided in the Addenda of this report. Our value via the Income Capitalization report is $7,500,000.

Hilco Real Estate Appraisal, LLC

## CONCLUSION

| SUMMARY OF VALUE CONCLUSION | |
|---|---|
| | June 21, 2013 |
| Cost Approach | Not Applicable |
| Sales Comparison Approach | $1,600,000 |
| Income Capitalization Approach | $7,500,000 |
| Compiled by: Hilco Real Estate Appraisal | |

The Cost Approach is predicated on the principle that an investor would pay no more for an existing property than it would cost to acquire land and construct a building with similar utility. This approach is not considered to be relevant for the appraisal of the subject since market participants are not buying, selling, investing or lending with reliance placed upon the Cost Approach for properties similar to the subject. As such, this approach has been excluded from this analysis.

The Sales Comparison Approach is predicated on the principle that an investor would pay no more for an existing property than for a comparable property with similar utility. The applicability of this approach is contingent on the reliability and comparability of available data. The Sales Comparison Approach is considered a relevant approach for the subject's excess land. For the subject's resort property, the Sales Comparison Approach is not applicable due to the distressed nature of the property and the lack of comparable sales of this type.

The Income Capitalization Approach is considered a persuasive method for valuing the subject's resort property. This approach is predicated on the principle of anticipated economic benefits and best reflects the investment characteristics of the subject. Investors typically purchase resort hotel properties, such as the subject, based on this approach. Thus, this approach most closely parallels the anticipated analysis that would be employed by the most typical purchaser of the subject property.

## RECONCILIATION

Given the investment nature of the subject's property use, the Income Capitalization Approach has most weight in estimating the subject's resort market value, while the Sales Comparison Approach has most weight in estimating the subject's excess land market value. Based on the above discussion, the overall value for the subject property is concluded as follows:

| GOING CONCERN MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Property Segment | Interest Appraised | Dates of Value | Value Conclusion (Rounded) |
| Resort | Fee Simple Going Concern | June 21, 2013 | $7,500,000 |
| Excess Land | Fee Simple Going Concern | June 21, 2013 | $1,600,000 |
| Total | Fee Simple Going Concern | June 21, 2013 | $9,100,000 |
| Source: Hilco Real Estate Appraisal | | | |

Our opinion of values was formed based on our experience in the field of real property valuation, as well as the research and analysis summarized in this report. Our concluded

*Page 20*                                          *__Restricted Use Appraisal Report__*

opinion of values is subject to the Assumptions, Limiting Conditions and Certification in this appraisal report.

## UPSIDE POTENTIAL OF LEAVING BANKRUPTCY AND CASINO OPERATION

As noted previously, the subject hotel business entered bankruptcy in 2009 or 2010 and is in the process of presenting a plan to emerge from bankruptcy. As a result of the bankruptcy status, business at the hotel has been negatively affected. As about 90% of the hotel's business is from groups, the hotel has often had difficulty attracting group business. Groups are hesitant to book with the subject resort, as they are not certain that the resort will be operating by the time of their event.

Assuming that the property will emerge from bankruptcy, this cloud of uncertainty will be lifted from the property and encourage groups to book their events at the subject property with confidence. Thus, the emergence of the subject property from bankruptcy presents the subject property with significant upside potential. This upside potential is dependent on a wide variety of factors, including future market conditions, the overall competitive landscape and future management of the hotel property.

Another factor indicating upside potential for the subject property relates to the possibility of casino gambling being legalized in New York State. Earlier this month, the New York State Legislature agreed for the second time in two sessions (as required by the state constitution) to allow a statewide referendum allowing casino gambling in the state. The referendum is scheduled for November 2013 and would allow up to two casinos in the Catskills region.

The subject owners have indicated that they would like to submit a proposal to the proposed future state gaming commission to operate one of these two casinos at the subject property. If a casino at the subject property were approved, there would clearly be upside potential to the cash flow and value. In a recent (April 11, 2013) article in Hotel News Now, Michael Register, VP of development for Trust Hospitality, commented on the value of a casino operation to a hotel property. Referring to the new 4-star Hemingway casino-hotel that he will be managing in Gulfport, Mississippi, he indicated that "I think the hotel would be successful without the casino, but the casino and gaming component put it into a different league."

The upside potential of a casino would mean much more revenue for the hotel resort property, although the revenue would be highly dependent on gaming and not as much on room or other resort revenue. As Suzanne Mellen, MAI, President of HVS Gaming Services indicated in the Hotel News Now article, hotels in most casinos outside of Las Vegas are considered an amenity, only worth as much as the gaming operation attached to it. Room revenues at most casinos are expected to remain minimal, as the casino operator either comps or significantly discounts rooms for gaming customers.

Due to the lack of clarity regarding whether casino gambling will be allowed in the state and, even if allowed, whether the subject property would be chosen to be one of the two Catskill resorts to have gambling on site, the degree of upside potential at the subject is difficult to quantify. Regardless, improving market conditions and emergence from bankruptcy should positively influence the subject in upcoming years.

# REAL PROPERTY VALUE ALLOCATION

## OVERVIEW

In certain types of real estate, there is value attributable to specialized personal property, marketing, and/or management skills necessary to operate the real estate as it was designed. Examples of these types of properties include hotels, motels, congregate care facilities, nursing homes, hospitals and golf clubs. In all of these properties, the personal property, marketing, and/or management skills are integral to the operation of the real property for its designed use. These properties are generally marketed and sold inclusive of these items, and therefore the value is reflective of a going concern.

Buyers and sellers generally do not make a distinction among the various components. Knowledgeable hotel brokers support this assertion. The brokers generally feel that the personal property and business interest would be largely reflected in the internal financial projections and rates of return utilized by buyers.

As a segregated estimate, the real property value is a requirement under current appraisal guidelines and ad valorem tax law, and the contributory value of the personal property and business interest must be deducted from the previously concluded going concern value. We have relied on generally accepted appraisal guidelines to perform this task. Our value allocation estimates for the personal property and business interest are discussed in the following sections. After estimating these allocations, they have been deducted from the going concern value to provide an estimate of value for the real property component of the subject.

## PERSONAL PROPERTY

Lodging facilities' personal property consists of furnishings, fixtures and equipment (FF&E). According to the *Dictionary of Real Estate Appraisal, 5th Edition*, page 249, FF&E is "tangible personal property plus trade fixtures and leasehold improvements." On page 68, equipment is defined as "fixed assets other than real estate, e.g., office equipment, automotive equipment; as distinguished from fixtures, which are assets that are physically or legally attached to the real estate." On page 159 of the *Dictionary of Real Estate Appraisal*, real estate is defined as "an identified parcel or tract of land, including improvement, if any."

These assets are difficult to isolate from the value of an operating hotel/motel property. Personal property is an integral part of a transient lodging facility. Without furniture, fixtures, and equipment, a hotel could not operate its facilities and rent its guest rooms, and thus would not be able to generate any income attributable to real property. Personal property and real property are uniquely combined in a hotel or motel. Unlike an office or other commercial building, a hotel would have to close its doors without furniture, fixtures and equipment. Lodging facilities are generally sold with their furniture, fixtures, and equipment in place, although lenders may be restricted from financing the purchase of personal property.

The following is a list of FF&E replacement cost estimates per guest room provided by other hotel managers/franchisees in upstate New York:

*Restricted Use Appraisal Report*

| LODGING FACILITY* | FF&E PER GUESTROOM |
|---|---|
| Desmond – Colonie, NY | $5,953 |
| Holiday Inn – Colonie, NY | $4,025 |
| Days Inn Hotel - Port Jervis, NY | $2,500 |

*Verbal confirmation was provided by the property management for each of these hotels that we have previously appraised.

It should be noted that the Desmond and Holiday Inn are full-service hotels, similar to the subject, and the Days Inn, is a limited-service hotel. Based on the above and the nature of the subject, we have concluded at $6,000 per guest room for FF&E.

Discussions with various hotel managers indicated that the economic life of hotel FF&E generally ranges from five years to ten years depending on the item. Therefore, we are utilizing an overall (average) economic life of eight years. For the subject, we are utilizing an effective age of four years. The depreciated FF&E for the subject is calculated as follows:

Total FF&E: $6,000 x 331 Rooms = $1,986,000

Physical Depreciation: 4 Year Effective Age/8 Year Economic Life = 50.0%

Total Depreciation = $1,986,000 x 0.50 = $993,000

Value of the FF&E: $1,986,000 - $993,000 = $993,000 ($1,000,000 rounded)

## BUSINESS INTEREST

The estimate of value for the business interest component of the going concern value is considerably more subjective than the personal property value estimate. This is due to the intangible nature of the business interest.

Under the current theory, the primary method of valuing the business interest in a property is to capitalize the management and/or franchise fees in excess of what is required for the physical operation of the property.

In order to value the business interest aspects of a hotel/motel, the components of this value must be identified. These components consist of:

1. Organization, coordination and marketing
2. Working capital
3. Inventories
4. Liquor License (if lounge is present)
5. Initiation fees, royalties, reservation fees
6. Goodwill

### *Capitalization of Excess Management & Ownership Fees Method*

The various fees directly attributed to ownership and management of a lodging property are broken down into the following categories:

*Restricted Use Appraisal Report*

### Management Fees

- - Base Management Fee
- - Incentive Management Fees
- - Owner System-Reimbursable Expenses

### Franchise Fees

- - Initiation Fee
- - Royalty Fee
- - Reservation Fee
    Base and per occupied room
- - Marketing Fee

Of all the fees listed above, only a portion can be directly related to the business value of a going concern property.   All real estate requires management, and good appraisals acknowledge that need with the management expense (typically 2.0-6.0 percent of gross income).  The business value component of a going concern above and beyond the real estate can be estimated by capitalizing the management fees in excess of those that contribute directly to the operational performance.  In a hotel, these costs would be all of the fees listed below with some exceptions.

Fees capitalized for business value are:

-Base management fee if it <u>exceeds</u> the industry standard of 2.0 to 6.0 percent.  The portion which reflects industry standard is typical of all real estate and reflected in purchase prices and yield and capitalization rates.  If the management fee is higher than industry standards, it represents surplus management fee or exceptional management contribution and business value.

-The incentive management fee should be considered only if it is being received or has the potential to be achieved by the management company.  The management contract should be analyzed for the conditions of the incentive fee and if the fee is being attained or accrued under the required circumstances, it should be capitalized as part of the business value.  If it is subordinate to debt service and unlikely to be achieved due to the weakness of the market and/or operations, it should be ignored.

-Owner system reimbursable expenses are the corporate charge backs for travel and services provided by the management company's corporate staff for the subject property.

-The entire package of franchise fees represents quantifiable operational expenses to achieve profit.  With the exception of the initiation fee, which is amortized with the pre-opening expenses, the combined amount of these fees should be capitalized as part of business value.

*Restricted Use Appraisal Report*

As noted previously, the subject property is owner-occupied and has been so since the 2006 purchase. It includes a full service hotel resort, golf course and other improvements. It is our opinion that the subject property does not have abnormally high excess earnings that could be capitalized in order to estimate business value. We assume this going forward with our DCF analysis under the assumption that a management company could run the hotel. Therefore, we estimate that there is no business value associated with the subject property.

**CONCLUSION**

The components of going concern value, real property, personal property and business value are rarely quantified individually. Typically a purchaser of a going concern property relies on the Income Capitalization Approach, which addresses the components in a unified model. The real property value allocation for the subject property has been derived by subtracting the estimated value of the personal property and business interest from the market value of the going concern. These calculations are as follows:

| ALLOCATION OF VALUES | |
| --- | --- |
| Fee Simple Going Concern Value | $9,100,000 |
| Business Value | $0 |
| FF&E Value | ($1,000,000) |
| Indicated Real Estate Value | $8,100,000 |
| Source: Hilco Real Estate Appraisal, LLC | |

## ASSUMPTIONS & LIMITING CONDITIONS

1. Unless otherwise specifically noted in the body of the report, it is assumed that title to the property or properties appraised is clear and marketable and that there are no recorded or unrecorded matters or exceptions to total that would adversely affect marketability or value. Hilco Real Estate Appraisal is not aware of any title defects nor has it been advised of any unless such is specifically noted in the report. Hilco Real Estate Appraisal, however, has not examined title and makes no representations relative to the condition thereof. Documents dealing with liens, encumbrances, easements, deed restrictions, clouds and other conditions that may affect the quality of title have not been reviewed. Insurance against financial loss resulting in claims that may arise out of defects in the subject property's title should be sought from a qualified title company that issues or insures title to real property.

2. It is assumed that improvements have been constructed or will be constructed according to approved architectural plans and specifications and in conformance with recommendations contained in or based upon any soils report(s).

   Unless otherwise specifically noted in the body of this report, it is assumed: that any existing improvements on the property or properties being appraised are structurally sound, seismically safe and code conforming; that all building systems (mechanical/electrical, HVAC, elevator, plumbing, etc.) are, or will be upon completion, in good working order with no major deferred maintenance or repair required; that the roof and exterior are in good condition and free from intrusion by the elements; that the property or properties have been engineered in such a manner that it or they will withstand any known elements such as windstorm, hurricane, tornado, flooding, earthquake, or similar natural occurrences; and, that the improvements, as currently constituted, conform to all applicable local, state, and federal building codes and ordinances. Hilco Real Estate Appraisal professionals are not engineers and are not competent to judge matters of an engineering nature. Hilco Real Estate Appraisal has not retained independent structural, mechanical, electrical, or civil engineers in connection with this appraisal and, therefore, makes no representations relative to the condition of improvements. Unless otherwise specifically noted in the body of the report: no problems were brought to the attention of Hilco Real Estate Appraisal by ownership or management; Hilco Real Estate Appraisal inspected less than 100% of the entire interior and exterior portions of the improvements; and Hilco Real Estate Appraisal was not furnished any engineering studies by the owners or by the party requesting this appraisal. If questions in these areas are critical to the decision process of the reader, the advice of competent engineering consultants should be obtained and relied upon. It is specifically assumed that any knowledgeable and prudent purchaser would, as a precondition to closing a sale, obtain a satisfactory engineering report relative to the structural integrity of the property and the integrity of building systems. Structural problems and/or building system problems may not be visually detectable. If engineering consultants retained should report negative factors of a material nature, or if such are later discovered, relative to the condition of improvements, such information could have a substantial negative impact on the conclusions reported in this appraisal. Accordingly, if negative findings are reported by engineering consultants, Hilco Real Estate Appraisal reserves the right to amend the appraisal conclusions reported herein.

3. Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property was not observed by the appraisers. Hilco Real Estate Appraisal has no knowledge of the existence of such materials on or in the property. Hilco Real Estate Appraisal, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea formaldehyde foam insulation, contaminated groundwater or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

   We have inspected, as thoroughly as possible by observation, the land; however, it was impossible to personally inspect conditions beneath the soil. Therefore, no representation is made as to these matters unless specifically considered in the appraisal.

4. All furnishings, equipment and business operations, except as specifically stated and typically considered as part of real property, have been disregarded with only real property being considered in the report unless otherwise stated. Any existing or proposed improvements, on or off-site, as well as any alterations or repairs considered, are assumed to be completed in a workmanlike manner according to standard practices based upon the information submitted to Hilco Real Estate Appraisal. This report may be subject to amendment upon re-inspection of the subject property subsequent to repairs, modifications, alterations and completed new

*Assumptions and Limiting Conditions*

    construction. Any estimate of Market Value is as of the date indicated; based upon the information, conditions and projected levels of operation.

5. It is assumed that all factual data furnished by the client, property owner, owner's representative, or persons designated by the client or owner to supply said data are accurate and correct unless otherwise specifically noted in the appraisal report. Unless otherwise specifically noted in the appraisal report, Hilco Real Estate Appraisal has no reason to believe that any of the data furnished contain any material error. Information and data referred to in this paragraph include, without being limited to, numerical street addresses, lot and block numbers, Assessor's Parcel Numbers, land dimensions, square footage area of the land, dimensions of the improvements, gross building areas, net rentable areas, usable areas, unit count, room count, rent schedules, income data, historical operating expenses, budgets, and related data. Any material error in any of the above data could have a substantial impact on the conclusions reported. Thus, Hilco Real Estate Appraisal reserves the right to amend conclusions reported if made aware of any such error. Accordingly, the client-addressee should carefully review all assumptions, data, relevant calculations, and conclusions within 30 days after the date of delivery of this report and should immediately notify Hilco Real Estate Appraisal of any questions or errors.

6. The date of value to which any of the conclusions and opinions expressed in this report apply is set forth in the Letter of Transmittal. Furthermore, the dollar amount of any value opinion herein rendered is based upon the purchasing power of the American Dollar on that date. This appraisal is based on market conditions existing as of the date of this appraisal. Under the terms of the engagement, we will have no obligation to revise this report to reflect events or conditions that occur subsequent to the date of the appraisal. However, Hilco Real Estate Appraisal will be available to discuss the necessity for revision resulting from changes in economic or market factors affecting the subject.

7. Hilco Real Estate Appraisal assumes no private deed restrictions that would limit the use of the subject property in any way.

8. Unless otherwise noted in the body of the report, it is assumed that there are no mineral deposit or subsurface rights of value involved in this appraisal, whether they be gas, liquid, or solid. Nor are the rights associated with extraction or exploration of such elements considered unless otherwise stated in this appraisal report. Unless otherwise stated it is also assumed that there are no air or development rights of value that may be transferred.

9. Hilco Real Estate Appraisal is not aware of any contemplated public initiatives, governmental development controls, or rent controls that would significantly affect the value of subject.

10. The estimate of Market Value, which may be defined within the body of this report, is subject to change with market fluctuations over time. Market value is highly related to exposure, time promotion effort, terms, motivation, and conclusions surrounding the offering. The value estimate(s) consider the productivity and relative attractiveness of the property, both physically and economically, on the open market.

11. Any cash flows included in the analysis are forecasts of estimated future operating characteristics are predicated on the information and assumptions contained within the report. Any projections of income, expenses and economic conditions utilized in this report are not predictions of the future. Rather, they are estimates of current market expectations of future income and expenses. The achievement of the financial projections will be affected by fluctuating economic conditions and is dependent upon other future occurrences that cannot be assured. Actual results may vary from the projections considered herein. Hilco Real Estate Appraisal does not warrant these forecasts will occur. Projections may be affected by circumstances beyond the current realm of knowledge or control of Hilco Real Estate Appraisal.

12. Unless specifically set forth in the body of the report, nothing contained herein shall be construed to represent any direct or indirect recommendation of Hilco Real Estate Appraisal to buy, sell, or hold the properties at the value stated. Such decisions involve substantial investment strategy questions and must be specifically addressed in consultation form.

13. Also, unless otherwise noted in the body of this report, it is assumed that no changes in the present zoning ordinances or regulations governing use, density, or shape are being considered. The property is appraised assuming that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, nor national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimates contained in this report is based, unless otherwise stated.

14. This study may not be duplicated in whole or in part without the specific written consent of Hilco Real Estate Appraisal nor may this report or copies hereof be transmitted to third parties without said consent, which consent Hilco Real Estate Appraisal reserves the right to deny. Exempt from this restriction is duplication for the

internal use of the client-addressee and/or transmission to attorneys, accountants, or advisors of the client-addressee. Also exempt from this restriction is transmission of the report to any court, governmental authority, or regulatory agency having jurisdiction over the party/parties for whom this appraisal was prepared, provided that this report and/or its contents shall not be published, in whole or in part, in any public document without the express written consent of Hilco Real Estate Appraisal which consent Hilco Real Estate Appraisal reserves the right to deny. Finally, this report shall not be advertised to the public or otherwise used to induce a third party to purchase the property or to make a "sale" or "offer for sale" of any "security", as such terms are defined and used in the Securities Act of 1933, as amended. Any third party, not covered by the exemptions herein, who may possess this report, is advised that they should rely on their own independently secured advice for any decision in connection with this property. Hilco Real Estate Appraisal shall have no accountability or responsibility to any such third party.

15. Any value estimate provided in the report applies to the entire property, and any pro ration or division of the title into fractional interests will invalidate the value estimate, unless such pro ration or division of interests has been set forth in the report.

16. The distribution of the total valuation in this report between land and improvements applies only under the existing program of utilization. Component values for land and/or buildings are not intended to be used in conjunction with any other property or appraisal and are invalid if so used.

17. No opinion is intended to be expressed on matters that may require legal expertise or specialized investigation or knowledge beyond that customarily employed by real estate appraisers. Values and opinions expressed presume that environmental and other governmental restrictions/conditions by applicable agencies have been met, including but not limited to seismic hazards, flight patterns, decibel levels/noise envelopes, fire hazards, hillside ordinances, density, allowable uses, building codes, permits, licenses, etc. No survey, engineering study or architectural analysis has been made known to Hilco Real Estate Appraisal unless otherwise stated within the body of this report. If the Consultant has not been supplied with a termite inspection, survey or occupancy permit, no responsibility or representation is assumed or made for any costs associated with obtaining same or for any deficiencies discovered before or after they are obtained. No representation or warranty is made concerning obtaining these items. Hilco Real Estate Appraisal assumes no responsibility for any costs or consequences arising due to the need, or the lack of need, for flood hazard insurance. An agent for the Federal Flood Insurance Program should be contacted to determine the actual need for Flood Hazard Insurance.

18. Acceptance and/or use of this report constitutes full acceptance of the Contingent and Limiting Conditions and special assumptions set forth in this report. It is the responsibility of the Client, or client's designees, to read in full, comprehend and thus become aware of the aforementioned contingencies and limiting conditions. Neither the Appraiser nor Hilco Real Estate Appraisal assumes responsibility for any situation arising out of the Client's failure to become familiar with and understand the same. The Client is advised to retain experts in areas that fall outside the scope of the real estate appraisal/consulting profession if so desired.

19. Hilco Real Estate Appraisal assumes that the subject property analyzed herein will be under prudent and competent management and ownership; neither inefficient nor super-efficient.

20. It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined and considered in the appraisal report.

21. No survey of the boundaries of the property was undertaken. All areas and dimensions furnished are presumed to be correct. It is further assumed that no encroachments to the realty exist.

22. The *Americans with Disabilities Act* (ADA) became effective January 26, 1992. Notwithstanding any discussion of possible readily achievable barrier removal construction items in this report, Hilco Real Estate Appraisal has not made a specific compliance survey and analysis of this property to determine whether it is in conformance with the various detailed requirements of the ADA. It is possible that a compliance survey of the property together with a detailed analysis of the requirements of the ADA could reveal that the property is not in compliance with one or more of the requirements of the ADA. If so, this fact could have a negative effect on the value estimated herein. Since Hilco Real Estate Appraisal has no specific information relating to this issue, nor is Hilco Real Estate Appraisal qualified to make such an assessment, the effect of any possible non-compliance with the requirements of the ADA was not considered in estimating the value of the subject property.

23. Client shall not indemnify Appraiser or hold Appraiser harmless unless and only to the extent that the Client misrepresents, distorts, or provides incomplete or inaccurate appraisal results to others, which acts of the Client proximately result in damage to Appraiser. The Client shall indemnify and hold Appraiser harmless from any claims, expenses, judgments or other items or costs arising as a result of the Client's failure or the failure of any

*Page 28*                                    <u>**Assumptions and Limiting Conditions**</u>

of the Client's agents to provide a complete copy of the appraisal report to any third party.  In the event of any litigation between the parties, the prevailing party to such litigation shall be entitled to recover from the other reasonable attorney fees and costs.

## ADDENDA

**A.  Aerial Map, Tax Map, & Flood Map**
**B.  Zoning**
**C.  Smith Travel Research Reports**
**D.  Subject's Historical & Projected Income and Expense Statements**
**E.  Discounted Cash Flow Analysis Summary**
**F.  NYS General Real Estate Appraiser's License & Qualifications**

*Page 30*

**Addendum A**

**Aerial Map, Tax Map, Site Map, Flood Map & Floor Plans**

*Page 31*

## AERIAL MAP



*Page 32*

## TAX MAP



*Page 33*

## FLOOD MAP



*Page 34*

**Addendum B**

**Zoning**

*Page 35*

**Addenda**

## Town of Rochester Zoning Law • Schedule of District Regulations

| District Intent | Principal Permitted Uses | Special Uses | Accessory Uses | Development Standards | |
|---|---|---|---|---|---|
| | | | | Residential | Nonresidential |
| **R-1** Neighborhood Residential District: This district is intended to recognize and preserve the integrity of predominantly residential low intensity areas of the Town together with personal and related services, and to protect them from intrusion of inappropriate uses. | Agriculture (animal)* Agriculture (non-animal) Bed and breakfast* Cemetery Day care centers* Pro houses, duplex and similar public buildings* One-family dwelling Place of worship* Public park and playgrounds* Two-family dwelling (new) *Requires site plan review by Planning Board | Gift, antique and craft shops Home occupation - Class II Low-impact animal-based service establishments Manufactured homes Multi-family dwellings Office (<1,600 square feet) Restaurant, tavern, private beverages Two-family dwelling (conversion) | Farm stands Home occupations - Class I Other customary accessory uses Parking areas Private gardens Eggs Yard uses | **Minimums:** Lot area (without SWS): < 0.5 acre Lot area (with SWS): 2 ½ 40 sq. ft Lot width (feet) Lot depth (feet) Lot frontage (feet) Front yard (feet) Side yard (feet) Rear yard (feet) **Maximums:** Lot coverage Building height (feet) Building stories Density (without SWS) Density (with SWS) | < 0.5 acre 2 ½ 40 sq. ft 100 100 50 40 25 25 45% 35 2.5 1.00 2.00 | < 0.5 acre 2 ½ 40 sq. ft 100 100 60 40 25 25 40% 35 2.5 N/A N/A |
| | | | | *Note: SWS = central sewer and central water* | |

## Town of Rochester Zoning Law • Schedule of District Regulations

| District Intent | Principal Permitted Uses | Special Uses | Accessory Uses | Development Standards | |
|---|---|---|---|---|---|
| | | | | Residential | Nonresidential |
| **R-2** Low Density Residential District: This district is intended to recognize and preserve the integrity of low intensity (low density rural residential) areas of the Town and to protect them from intrusion of incompatible uses. | Agriculture (animal)* Agriculture (non-animal) Bed and breakfast* Cemetery Day care centers* Pro houses, duplex and similar public buildings* Home occupations - Class II* One-family dwelling Place of worship* Public park and playgrounds* Kennels, temporary portable uses less than 90 days* Two-family dwelling (new) *Requires site plan review by Planning Board | Golf course or driving range Nonprofit club or recreation use Manufactured housing park Nursery or greenhouse Veterinarian services facilities Two-family dwelling (conversion) | Agriculture/nursery housing* Farm stands Home occupations - Class I Other customary accessory uses Parking areas Private gardens Signs Stables (private) Yard uses | *Requires site plan review by Planning Board | **Minimums:** Lot area Lot width (feet) Lot depth (feet) Lot frontage (feet) Front yard (feet) Side yard (feet) Rear yard (feet) **Maximums:** Lot coverage Building height (feet) Building stories | 2.0 acre 200 160 50 35 40 40 50% 35 2.5 | 2.0 acre 200 160 50 35 40 40 50% 35 2.5 |

Hilco Real Estate Appraisal, LLC

*Page 36*

## Addenda

### Town of Rochester Zoning Law - Schedule of District Regulations

| District Intent | Principal Permitted Uses | Special Uses | Accessory Uses | Development Standards — Residential | Nonresidential |
|---|---|---|---|---|---|
| **R-6 Rural Conservation District** The district is intended to conserve large open spaces of the Town that are distant to develop while allowing for both very low density residential development and those compatible uses that, while they may require large acreages, also typically also provide large open spaces. | Agriculture (animal)<br>Agriculture (land animal)<br>Bed and breakfast*<br>Cemetery*<br>Daycare centers*<br>Firehouses, libraries and other public buildings*<br>Home occupation - Class I*<br>Hunting and fishing clubs<br>One-family dwellings<br>Places of worship*<br>Public parks and playgrounds*<br>Sawmills, temporary portable units less than 90 days<br>Stables (commercial)*<br>Two-family dwellings (new)*<br><br>*Requires site plan review by Planning Board | Agricultural processing facilities<br>Agricultural retail sales<br>Agricultural tourism enterprises<br>Camping resort or RV park<br>Commercial recreation uses<br>Commercial permits<br>Education & conference center<br>Golf courses or driving range<br>Health care institutions<br>Home occupation - Class II<br>Museums, galleries and performance centers<br>Nonprofit club or organization use<br>Nursery or greenhouse<br>Private recreational facilities<br>Resort hotel, camp, ranch or lodge<br>Seasonal logging jobs<br>Telecommunications facilities<br>Two-family (existing conversion)<br>Warehouse and storage facilities | Farm stands<br>Home occupations - Class I<br>Major structures with an DEC jurisdiction*<br>Other commercial/accessory uses<br>Parking areas<br>Private garages<br>Spas<br>Stables/paddocks<br>Trails/walks<br><br>*Requires site plan review by Planning Board | **Minimums**<br>Lot area: 5.0 acres<br>Lot width (front): 200<br>Lot width (rear): 200<br>Lot front: 60<br>Front yard (feet): 80<br>Side yard (feet): 50<br>Rear yard (feet): 50<br><br>**Maximums**<br>Lot coverage: 10%<br>Building height (feet): 35<br>Building stories: 2.5 | 5.0 acres<br>300<br>300<br>60<br>80<br>75<br>75<br><br>20%<br>40<br>2.5<br><br>Note: Performance standards of §140-20 may apply. |

### Town of Rochester Zoning Law - Schedule of District Regulations

| District Intent | Principal Permitted Uses | Special Uses | Accessory Uses | Development Standards — Residential | Nonresidential |
|---|---|---|---|---|---|
| **H Hamlet District** This district is intended to create designated neighborhood shopping context complemented by higher density residential development that can access those shopping areas as pedestrians or within short commute. | Agricultural retail sales<br>Agriculture (animal)<br>Bed and breakfast*<br>Cemetery*<br>Daycare centers*<br>Firehouses, libraries and other public buildings*<br>Gift, antique or craft shops*<br>Home occupation - Class I*<br>Laundromat and service establishments*<br>Offices*<br>One-family dwellings<br>Places of worship*<br>Public parks and playgrounds*<br>Restaurants and taverns*<br>Telecommunications facilities<br>Two-family dwellings (new)*<br><br>*Requires site plan review by Planning Board | Agricultural retail sales<br>Agricultural tourism enterprises<br>Convenience market (with no self-fuel gas)<br>Health care institutions<br>Home occupation - Class II<br>Light manufacturing<br>Mixed-use activities<br>Multi-family dwellings<br>Museums, galleries and conference centers<br>Nonprofit club or recreation use<br>Nursery or greenhouse<br>Parking (commercial)<br>Restaurant and service establishments (non-auto)<br>Telecommunications facilities<br>Two-family dwellings (conversion) | Farm stands<br>Home occupations - Class I<br>Other commercial/accessory uses<br>Parking areas<br>Private garages<br>Spas<br>Sidewalks | **Minimums**<br>Lot area (without SW): 1.0 acre<br>Lot area (with SW): 13,000 sq.ft.<br>Lot width (feet): 25<br>Lot front: 60<br>Front yard (feet): 10<br>Side yard (feet): 5<br>Rear yard (feet): 5<br><br>**Maximums**<br>Lot coverage: 50%<br>Building height (feet): 35<br>Building stories: 2.5 | 1.0 acre<br>12,000 sq.ft.<br>75<br>75<br>50<br>10<br>15<br><br>50%<br>35<br>2.5<br><br>Note: SW - central sewer and central water<br><br>Note: Performance standards of §140-20 may apply. |

Hilco Real Estate Appraisal, LLC

**Addendum C**

**Smith Travel Research Reports**

## __Addenda__

# April 2013



|  | Current Month - April 2013 vs April 2012 | | | | | Percent Change from April 2013 | | | | | Year to Date - April 2013 vs April 2012 | | | | | Percent Change from YTD 2012 | | | | | Participation | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Occ % | | ADR | | RevPAR | | Occ | ADR | RevPAR | Room Rev | Room Sold | Occ % | | ADR | | RevPAR | | Occ | ADR | RevPAR | Room Rev | Room Avail | Room Sold | Census Props | Sample Props | Census Rooms | Sample Rooms |
|  | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 | | | | | | 2013 | 2012 | 2013 | 2012 | 2013 | 2012 | | | | | | | | | | |
| United States | 63.8 | 63.1 | 110.92 | 108.06 | 70.24 | 68.21 | 0.5 | 2.5 | 2.8 | 5.7 | 2.3 | 60.2 | 57.9 | 109.73 | 104.22 | 66.07 | 60.37 | 4.4 | 4.9 | 8.0 | 11.2 | 2.1 | 8.0 | 50061 | 30067 | 4906547 | 3492009 |
| New York | 71.3 | 71.2 | 169.16 | 194.24 | 142.03 | 138.21 | 0.3 | -2.5 | -2.8 | -5.7 | 2.8 | 66.4 | 64.0 | 177.92 | 169.64 | 118.19 | 108.45 | 3.8 | 4.9 | 8.9 | 9.0 | 2.7 | 6.6 | 1026 | 262727 | 152610 |
| New York, NY | 85.1 | 85.6 | 259.52 | 255.97 | 221.72 | 217.21 | -0.5 | 2.0 | 4.3 | -3.5 | -3.0 | 78.9 | 76.3 | 223.29 | 214.35 | 176.28 | 163.78 | 3.4 | 3.1 | 11.8 | 3.0 | 7.2 | 674 | 3551 | 104828 | 80304 |
| Long Island | 70.9 | 63.1 | 126.25 | 118.62 | 89.55 | 73.20 | 12.4 | 8.8 | 24.0 | 13.9 | 25.0 | 72.4 | 67.8 | 120.64 | 115.09 | 91.67 | 69.40 | 25.3 | 10.1 | 58.2 | 4.0 | 0.2 | 901 | 71 | 55191 | 8481 |
| Syracuse, NY | 62.5 | 66.0 | 69.52 | 69.20 | 52.82 | 57.82 | -3.7 | 10.3 | -3.7 | -10.3 | 9.3 | 53.4 | 55.0 | 92.40 | 87.87 | 49.45 | 44.63 | 2.8 | 5.4 | 9.8 | 1.1 | 4.0 | 102 | 71 | 9912 | 8407 |
| Albany/Schenectady, NY | 69.5 | 67.7 | 101.47 | 92.98 | 60.49 | 57.59 | -2.1 | 5.3 | 3.9 | -2.0 | 1.5 | 53.5 | 54.7 | 99.06 | 86.10 | 53.33 | 45.36 | -2.8 | 1.9 | -0.7 | -4.0 | -2.5 | 137 | 85 | 11774 | 9476 |
| Buffalo, NY | 62.1 | 61.7 | 87.00 | 87.09 | 54.40 | 50.73 | -0.7 | 0.3 | 1.2 | -0.3 | -2.0 | 53.3 | 53.6 | 87.16 | 85.10 | 46.42 | 45.56 | -1.1 | 8.7 | -0.3 | -1 | 1.3 | 140 | 89 | 13001 | 10392 |
| Rochester, NY | 63.9 | 63.9 | 91.21 | 89.51 | 45.21 | 49.30 | -4.0 | 2.1 | 6.5 | 10.8 | 4.1 | 47.5 | 47.4 | 89.67 | 89.82 | 42.75 | 42.14 | 0.3 | 1.5 | 4.0 | 2.8 | 3.1 | 122 | 74 | 10327 | 8408 |
| Rockland/Westchester | 69.2 | 66.4 | 147.91 | 142.24 | 102.37 | 94.46 | 3.8 | 2.5 | 7.8 | 7.5 | 3.7 | 63.4 | 68.7 | 140.87 | 155.54 | 89.18 | 80.97 | 6.1 | 3.9 | 10.2 | -2.1 | 6.0 | 63 | 40 | 6150 | 8941 |
| Niagara Falls, NY | 58.7 | 69.6 | 89.05 | 78.60 | 49.59 | 48.41 | -3.1 | 0.2 | -2.9 | -2.1 | 0.8 | 47.1 | 46.7 | 77.80 | 78.53 | 39.12 | 36.72 | 0.6 | -0.8 | 0.0 | 0.7 | 1.5 | 54 | 20 | 4026 | 3100 |
| New York/Syracuse | 48.0 | 48.5 | 89.71 | 87.43 | 43.51 | 43.66 | -1.3 | 3.2 | 1.2 | -2.3 | -2.3 | 43.0 | 45.7 | 85.49 | 85.84 | 38.76 | 34.57 | -5.6 | -0.5 | 0.7 | 8.3 | -0.6 | 163 | 79 | 8524 | 3820 |
| Nassau/Kingston | 54.9 | 46.7 | 101.69 | 97.47 | 55.65 | 45.48 | 10.5 | 4.5 | 15.5 | 9.9 | 10.5 | 42.0 | 48.1 | 101.20 | 98.02 | 43.43 | 43.31 | 3.4 | 6.5 | 70.0 | -0.9 | 6.5 | 63 | 28 | 2631 | 3753 |
| Binghamton, NY | 56.0 | 57.7 | 91.01 | 89.23 | 44.67 | 50.88 | -4.6 | -7.5 | -13.8 | -11.8 | -8.0 | 47.5 | 56.9 | 79.45 | 85.05 | 37.80 | 43.20 | -6.6 | -21.9 | -19.7 | -19.1 | 29 | 20 | 2808 | 2081 |
| Upstate New York | 42.5 | 47.6 | 89.85 | 90.58 | 38.35 | 42.48 | -11.0 | -1.5 | -8.7 | -4.9 | -9.5 | 43.2 | 45.2 | 89.06 | 85.22 | 42.45 | 43.00 | -5.3 | 4.4 | -1.4 | 2.9 | -2.7 | 249 | 92 | 14992 | 8710 |
| Broad/Elmira | 40.1 | 51.6 | 133.12 | 107.62 | 53.48 | 56.75 | -12.1 | -7.4 | -7.4 | -4.6 | -8.6 | 43.2 | 43.5 | 68.03 | 69.82 | 45.29 | 51.32 | 18.6 | 2.7 | -15.0 | -2.4 | -14.4 | 82 | 43 | 5178 | 2718 |
| New York West Area | 51.0 | 54.1 | 90.16 | 91.10 | 49.01 | 49.93 | -5.8 | -1.1 | -6.8 | -0.3 | 7.9 | 47.3 | 53.9 | 93.51 | 93.98 | 44.84 | 45.57 | -3.7 | -0.7 | -5.0 | 9.0 | 5.3 | 45 | 19 | 2766 | 1517 |

Hilco Real Estate Appraisal, LLC

*Page 39*

*Addenda*

Currency: USD - US Dollar

Tab 2 - Multi-Segment
New York State Hierarchy 2 Tier by
For the month of May 2013

Hilco Real Estate Appraisal, LLC

*Page 40*

# FULL-SERVICE HIGHLIGHTS

*Note: For a variety of reasons, some operators submitting data for the study do not include detailed information on Fixed Charges. Therefore, we have presented the operating results to the point following the deduction of "Selected Fixed Charges," which includes Property Taxes, Insurance and Reserve for Capital Replacement. That point is called "Amount Available for Debt Service and Other Fixed Charges." It is called "Net Operating Income (NOI)" by appraisers and "Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA)" by financial analysts.*

- Profile of the sample: 2,574 full-service hotels, comprised of 745,439 guestrooms, submitted responses for the 2012 HOST Study (reporting 2011 data).

- The sample properties had an average guestroom count of 290 rooms, and they recorded an occupancy rate of 68.5% and an average daily rate of $153.81.

- Full-service hotels in the HOST Study generated $240.08 in total revenue per occupied room night in 2011 (up from $236.13 in 2010). Full-service, chain-affiliated hotels checked in at $230.83 per occupied room night, while independent properties reported $327.39 per occupied room night.

- Total departmental (rooms, food and beverage, telecommunications, and other operated departments and rentals) expenses for full-service hotels in the survey came to $135.44 per occupied room night.

- Gross Operating Profit (GOP) for the participating full-service properties was 31.5%, compared with 29.9% in 2010. GOP in 2011 was approximately $18,633 per available room and $75.54 per occupied room night.

- Geographic regions with the highest GOP per occupied room night from participating full-service hotels included: Middle Atlantic ($94.32); New England ($80.22); Pacific ($79.56); South Atlantic ($77.06); and West South Central ($73.70).

- Based on size, participating hotels with more than 500 rooms produced the highest GOP per available room at $23,228. Performances from other size groupings included: 300 rooms to 500 rooms ($19,013); 150 rooms to 300 rooms ($16,272); and Under 150 rooms ($11,849).

- Full-service Resort properties, with an average size of 398 rooms, produced an ADR of $182.17. Following closely were Urban hotels, which had an average size of 402 rooms and reported an ADR of $176.85.

*Page 41*

| FULL-SERVICE Summary | Total U.S. | | | Chain-Affiliated | | | Independent | | |
|---|---|---|---|---|---|---|---|---|---|
| Occupancy (of Sample) | 68.5% | | | 69.4% | | | 61.1% | | |
| Average Size of Property (Rooms) | 290 | | | 297 | | | 240 | | |
| Average Daily Rate | $153.81 | | | $151.19 | | | $178.55 | | |
| | Ratio to Sales | Per Available Room | Per Occupied Room Night | Ratio to Sales | Per Available Room | Per Occupied Room Night | Ratio to Sales | Per Available Room | Per Occupied Room Night |
| **REVENUE** | | | | | | | | | |
| Rooms | 64.0% | $37,939 | $153.81 | 65.5% | $37,832 | $151.19 | 54.5% | $39,316 | $178.55 |
| Food | 18.8 | 11,126 | 45.11 | 18.5 | 10,672 | 42.65 | 20.9 | 15,036 | 68.28 |
| Beverage | 5.4 | 3,194 | 12.91 | 4.9 | 2,843 | 11.36 | 8.4 | 6,061 | 27.53 |
| Other Food & Beverage | 4.8 | 2,821 | 11.44 | 4.9 | 2,806 | 11.21 | 4.1 | 2,985 | 13.56 |
| Telecommunications | 0.5 | 278 | 1.13 | 0.5 | 292 | 1.17 | 0.2 | 169 | 0.77 |
| Other Operated Departments | 4.4 | 2,610 | 10.58 | 3.8 | 2,155 | 8.65 | 8.8 | 6,332 | 28.75 |
| Rentals & Other Income | 1.9 | 1,122 | 4.55 | 1.8 | 1,017 | 4.07 | 2.8 | 2,010 | 9.13 |
| Cancellation Fee | 0.2 | 137 | 0.55 | 0.2 | 132 | 0.53 | 0.2 | 179 | 0.81 |
| Total Revenue | 100.0% | $59,217 | $240.08 | 100.0% | $57,760 | $230.83 | 100.0% | $72,087 | $327.39 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | 27.5% | $10,431 | $42.29 | 27.3% | $10,324 | $41.26 | 29.1% | $11,430 | $52.00 |
| Food & Beverage | 76.5 | 12,935 | 52.44 | 76.4 | 12,308 | 49.19 | 78.0 | 18,302 | 83.12 |
| Telecommunications | 152.6 | 425 | 1.72 | 147.5 | 431 | 1.72 | 225.4 | 381 | 1.73 |
| Other Operated Depts & Rentals | 3.4 | 2,018 | 8.19 | 2.9 | 1,683 | 6.72 | 6.7 | 4,820 | 21.94 |
| Total Departmental Expenses | 43.6% | $25,809 | $104.64 | 42.8% | $24,746 | $98.89 | 48.5% | $34,963 | $158.79 |
| Total Departmental Profit | 56.4% | $33,408 | $135.44 | 57.2% | $33,014 | $131.94 | 51.5% | $37,124 | $168.60 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative & General | 8.8% | $5,214 | $21.14 | 8.6% | $4,977 | $19.89 | 10.0% | $7,240 | $32.88 |
| Marketing | 7.1 | 4,205 | 17.05 | 7.3 | 4,191 | 16.75 | 6.1 | 4,374 | 19.87 |
| Utility Costs | 4.2 | 2,487 | 10.08 | 4.2 | 2,432 | 9.72 | 4.1 | 2,974 | 13.51 |
| Property Operations & Maintenance | 4.8 | 2,869 | 11.63 | 4.8 | 2,764 | 11.05 | 5.2 | 3,780 | 17.17 |
| Total Undistributed Operating Expenses | 24.9% | $14,775 | $59.90 | 24.9% | $14,364 | $57.41 | 25.9% | $18,369 | $83.43 |
| GROSS OPERATING PROFIT | 31.5% | $18,633 | $75.54 | 32.3% | $18,650 | $74.53 | 26.0% | $18,755 | $85.17 |
| Franchise Fees (Royalty) | 1.0 | 575 | 2.33 | 1.1 | 640 | 2.56 | 0.1 | 43 | 0.19 |
| Management Fees | 3.0% | 1,805 | 7.32 | 3.2% | 1,825 | 7.29 | 2.3% | 1,655 | 7.52 |
| INCOME BEFORE FIXED CHARGES | 27.5% | $16,253 | $65.89 | 28.0% | $16,185 | $64.68 | 23.7% | $17,058 | $77.46 |
| Selected Fixed Charges | | | | | | | | | |
| Property Taxes | 3.4% | $1,999 | $8.10 | 3.5% | $1,998 | $7.99 | 2.8% | $2,031 | $9.22 |
| Insurance | 1.1 | 656 | 2.66 | 1.1 | 616 | 2.46 | 1.4 | 1,000 | 4.54 |
| Reserve for Capital Replacement | 2.2 | 1,280 | 5.19 | 2.3 | 1,310 | 5.24 | 1.5 | 1,048 | 4.76 |
| AMOUNT AVAILABLE FOR DEBT SERVICE & OTHER FIXED CHARGES* | 20.8% | $12,318 | $49.94 | 21.1% | $12,261 | $48.99 | 18.0% | $12,979 | $58.94 |
| **PAYROLL & RELATED EXPENSES**** | | | | | | | | | |
| Rooms | 17.0% | $6,846 | $24.07 | 16.4% | $6,500 | $22.43 | 21.8% | $7,494 | $34.72 |
| Food & Beverage | 45.2 | 6,369 | 25.54 | 44.9 | 5,761 | 23.24 | 47.0 | 10,457 | 48.75 |
| Telecommunications | 275.9 | 443 | 1.75 | 241.2 | 454 | 1.77 | 495.4 | 374 | 1.58 |
| Other Operated Departments | 2.9 | 2,696 | 12.11 | 2.1 | 2,190 | 9.27 | 5.3 | 4,281 | 21.55 |
| Administrative & General | 4.9 | 2,519 | 10.63 | 4.8 | 2,315 | 9.44 | 5.0 | 3,882 | 18.56 |
| Marketing | 3.0 | 1,516 | 6.39 | 2.9 | 1,406 | 5.75 | 3.5 | 2,205 | 10.68 |
| Property Operations & Maintenance | 2.6 | 1,337 | 5.70 | 2.4 | 1,202 | 4.91 | 3.7 | 2,261 | 11.10 |
| Total Payroll & Related Expenses | 33.5% | $18,529 | $77.53 | 32.1% | $16,374 | $68.73 | 42.8% | $28,972 | $136.63 |

\* Other Fixed Charges include Depreciation and Amortization, Interest, Rent and Equipment Leases.
\*\* Included in above expenses. Only shown here for additional detail. Each line is calculated independently, representing only the total cost noted "Payroll & Related Expenses" data for the specific department.
Expense ratios to sales for rooms, F&B and telecommunications departmental expenses are based on the respective departmental revenues. All other expenses ratios are based on total revenue. Individual Ratio to Sale "Departmental Expenses" will not equal "Total Departmental Expenses" as Other Operational Depts & Rentals' are calculated on total revenue. Totals may not add due to rounding.

HOST STUDY    STR    23

*Page 42*

| FULL-SERVICE Ratios to Sales | New England | Middle Atlantic | South Atlantic | East North Central | East South Central | West North Central | West South Central | Mountain | Pacific |
|---|---|---|---|---|---|---|---|---|---|
| **Geographic Region** | | | | | | | | | |
| Occupancy (of Sample) | 68.8% | 72.7% | 68.2% | 65.9% | 62.6% | 69.5% | 65.4% | 68.8% | 78.2% |
| Average Size of Property (Rooms) | 256 | 300 | 290 | 287 | 208 | 263 | 298 | 266 | 331 |
| Average Daily Rate | $165.89 | $207.94 | $145.65 | $133.91 | $113.54 | $114.65 | $193.42 | $134.96 | $171.65 |
| **REVENUE** | | | | | | | | | |
| Rooms | 65.3% | 70.4% | 61.9% | 64.4% | 65.3% | 64.6% | 64.0% | 57.6% | 64.2% |
| Food | 18.8 | 16.0 | 19.9 | 19.6 | 18.7 | 18.6 | 19.3 | 21.2 | 18.1 |
| Beverage | 6.2 | 5.2 | 5.8 | 6.0 | 4.1 | 5.0 | 4.9 | 6.0 | 5.4 |
| Other Food & Beverage | 5.4 | 4.3 | 4.7 | 5.5 | 5.7 | 5.9 | 5.3 | 5.5 | 4.1 |
| Telecommunications | 0.4 | 0.5 | 0.5 | 0.5 | 0.3 | 0.4 | 0.6 | 0.4 | 0.5 |
| Other Operated Departments | 3.5 | 2.1 | 5.0 | 3.2 | 4.3 | 2.4 | 4.3 | 6.9 | 5.2 |
| Rentals & Other Income | 1.4 | 1.4 | 1.9 | 1.6 | 1.3 | 2.7 | 1.6 | 2.0 | 2.4 |
| Cancellation Fee | 0.2 | 0.1 | 0.3 | 0.2 | 0.2 | 0.5 | 0.3 | 0.3 | 0.2 |
| Total Revenue | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | 27.3% | 29.2% | 25.6% | 28.7% | 25.9% | 25.7% | 24.2% | 27.7% | 29.2% |
| Food & Beverage | 75.8 | 83.5 | 70.7 | 72.4 | 72.7 | 70.0 | 67.4 | 72.3 | 81.8 |
| Telecommunications | 181.8 | 159.5 | 148.4 | 135.3 | 241.4 | 163.3 | 138.8 | 169.4 | 152.8 |
| Other Operated Depts & Rentals | 2.4 | 1.7 | 3.5 | 2.6 | 3.9 | 3.2 | 3.3 | 6.1 | 4.0 |
| Total Departmental Expenses | 43.1% | 45.2% | 41.7% | 43.5% | 42.4% | 41.7% | 39.3% | 46.3% | 46.0% |
| Total Departmental Profit | 56.9% | 54.8% | 58.3% | 56.5% | 57.6% | 58.3% | 60.7% | 53.7% | 54.0% |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative & General | 8.9% | 8.4% | 9.1% | 8.6% | 9.8% | 9.1% | 8.7% | 9.5% | 8.6% |
| Marketing | 7.0 | 6.0 | 7.3 | 7.5 | 7.2 | 7.5 | 7.7 | 8.1 | 6.8 |
| Utility Costs | 4.7 | 3.9 | 4.3 | 3.9 | 5.7 | 4.8 | 4.2 | 4.2 | 4.1 |
| Property Operations & Maintenance | 4.5 | 4.5 | 4.8 | 5.2 | 5.5 | 4.9 | 4.8 | 5.0 | 4.8 |
| Total Undistributed Operating Expenses | 25.9% | 22.9% | 25.5% | 25.3% | 28.0% | 26.3% | 25.4% | 26.8% | 24.3% |
| **GROSS OPERATING PROFIT** | 31.6% | 31.9% | 32.8% | 31.2% | 29.6% | 32.0% | 35.3% | 26.9% | 29.7% |
| Franchise Fees (Royalty) | 1.0 | 0.8 | 0.9 | 1.3 | 2.0 | 1.8 | 1.2 | 1.1 | 0.7 |
| Management Fees | 2.9% | 3.1% | 3.2% | 3.1% | 3.0% | 2.9% | 3.2% | 3.2% | 2.8% |
| **INCOME BEFORE FIXED CHARGES** | 27.7% | 28.1% | 28.6% | 26.8% | 24.7% | 27.4% | 30.9% | 22.7% | 26.3% |
| **Selected Fixed Charges** | | | | | | | | | |
| Property Taxes | 4.2% | 4.6% | 3.1% | 4.0% | 1.9% | 4.6% | 3.3% | 3.2% | 2.8% |
| Insurance | 0.7 | 0.8 | 1.3 | 0.7 | 0.9 | 0.8 | 1.0 | 0.7 | 1.5 |
| Reserve for Capital Replacement | 2.0 | 2.1 | 2.4 | 2.7 | 2.3 | 1.8 | 1.6 | 1.9 | 2.2 |
| AMOUNT AVAILABLE FOR DEBT SERVICE & OTHER FIXED CHARGES* | 20.8% | 20.6% | 21.8% | 19.4% | 19.6% | 20.2% | 25.0% | 16.9% | 19.8% |
| **PAYROLL & RELATED EXPENSES**\*\* | | | | | | | | | |
| Rooms | 17.3% | 18.0% | 16.0% | 17.3% | 19.1% | 16.4% | 14.9% | 17.4% | 18.5% |
| Food & Beverage | 44.9 | 50.7 | 42.8 | 41.1 | 49.1 | 40.6 | 42.9 | 42.6 | 50.9 |
| Telecommunications | 474.6 | 295.9 | 252.7 | 209.1 | 547.3 | 401.8 | 292.2 | 255.9 | 282.5 |
| Other Operated Departments | 1.8 | 2.0 | 2.5 | 2.1 | 8.7 | 1.8 | 2.1 | 4.5 | 2.9 |
| Administrative & General | 5.1 | 4.8 | 4.9 | 4.8 | 5.8 | 4.9 | 4.9 | 5.3 | 4.8 |
| Marketing | 3.1 | 2.8 | 2.9 | 2.9 | 2.7 | 3.0 | 3.1 | 3.8 | 2.8 |
| Property Operations & Maintenance | 2.4 | 2.5 | 2.4 | 2.6 | 4.1 | 2.5 | 2.5 | 2.7 | 2.6 |
| Total Payroll & Related Expenses | 34.5% | 34.8% | 31.7% | 32.5% | 37.6% | 31.7% | 30.9% | 35.4% | 35.6% |

\* Other Fixed Charges include Depreciation and Amortization, Interest, Rent and Equipment Leases.
\*\* Included in above expense. Only shown here for additional detail. Each line is calculated independently, representing only the totals that contributed Payroll & Related Expenses to the specific department.

Departmental expenses for rooms, F&B and telecommunications departmental expenses are based on their respective departmental revenues. All other expenses are based on total revenue. Individual ratio to Sales "Departmental Expenses" will not equal "Total Departmental Expenses" as "Other Operated Depts & Rentals" are calculated on total revenue. Totals may not add due to rounding.

24    STR.    HOST STUDY

Hilco Real Estate Appraisal, LLC

*Page 43*

| | Location | | | | | | Price Category | | | | Size | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Airport | Interstate | Resort | Small Metro/Town | Luxury | Upscale | Mid-Price | Economy*** | Under 150 Rooms | 150 to 300 Rooms | 300 to 500 Rooms | Over 500 Rooms |
| | 71.1% | 65.8% | 72.7% | 60.0% | 67.8% | 55.8% | 69.3% | 67.9% | 68.2% | 65.4% | 65.5% | 67.0% | 68.6% | 71.0% |
| | 402 | 214 | 276 | 146 | 398 | 151 | 374 | 252 | 236 | 232 | 121 | 217 | 377 | 825 |
| | $179.85 | $125.87 | $113.75 | $110.17 | $182.17 | $130.01 | $180.23 | $148.93 | $113.35 | $91.69 | $118.90 | $145.01 | $157.59 | $170.70 |
| | | | | | | | | | | | | | | |
| | 66.8% | 66.4% | 69.6% | 59.8% | 56.1% | 57.9% | 60.2% | 66.8% | 73.7% | 71.4% | 74.0% | 66.6% | 62.5% | 61.5% |
| | 18.1 | 17.9 | 17.0 | 19.5 | 21.2 | 21.5 | 20.9 | 17.0 | 14.0 | 15.6 | 12.6 | 16.6 | 19.4 | 21.1 |
| | 5.2 | 4.6 | 3.8 | 6.0 | 7.0 | 5.6 | 5.3 | 4.6 | 3.4 | 3.9 | 4.7 | 5.4 | 5.4 | 5.5 |
| | 4.5 | 6.0 | 5.6 | 4.4 | 3.8 | 4.3 | 4.9 | 4.7 | 4.2 | 4.6 | 2.8 | 4.6 | 5.3 | 4.9 |
| | 0.6 | 0.4 | 0.6 | 0.1 | 0.4 | 0.2 | 0.5 | 0.4 | 0.3 | 0.2 | 0.1 | 0.3 | 0.5 | 0.6 |
| | 2.9 | 3.0 | 2.2 | 9.4 | 8.6 | 9.2 | 5.1 | 4.3 | 2.3 | 1.9 | 4.4 | 4.5 | 5.2 | 3.8 |
| | 1.8 | 1.5 | 1.3 | 1.8 | 2.6 | 1.1 | 1.9 | 1.9 | 1.9 | 2.2 | 1.3 | 1.8 | 1.6 | 2.3 |
| | 0.2 | 0.2 | 0.1 | 0.0 | 0.3 | 0.2 | 0.3 | 0.2 | 0.1 | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 |
| | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| | | | | | | | | | | | | | | |
| | 27.9% | 26.2% | 29.2% | 25.9% | 27.9% | 28.3% | 25.8% | 27.2% | 29.8% | 32.0% | 26.3% | 26.5% | 27.3% | 29.7% |
| | 78.4 | 72.6 | 70.4 | 77.1 | 74.6 | 76.7 | 73.6 | 77.7 | 81.5 | 80.8 | 82.8 | 77.6 | 75 | 73.7 |
| | 135.1 | 169.1 | 157.3 | 531.0 | 167.2 | 278.2 | 134.4 | 166.6 | 215.4 | 308.8 | 392.4 | 182.4 | 105.0 | 122.0 |
| | 2.2 | 2.7 | 1.3 | 8.6 | 6.4 | 7.2 | 3.9 | 3.3 | 1.8 | 1.3 | 3.9 | 3.8 | 3.9 | 2.6 |
| | 43.4% | 41.4% | 40.3% | 47.4% | 46.6% | 48.2% | 44.4% | 42.7% | 42.0% | 44.5% | 40.6% | 42.7% | 44.3% | 44.3% |
| | 56.6% | 58.6% | 59.7% | 52.6% | 53.4% | 51.8% | 55.6% | 57.3% | 58.0% | 55.5% | 59.4% | 57.3% | 55.7% | 55.7% |
| | | | | | | | | | | | | | | |
| | 9.5% | 9.3% | 9.4% | 9.6% | 8.9% | 9.7% | 8.6% | 8.7% | 9.4% | 10.9% | 10.4% | 9.5% | 8.9% | 7.9% |
| | 6.9 | 7.8 | 7.7 | 7.4 | 6.6 | 7.2 | 7.0 | 7.3 | 7.3 | 7.6 | 7.3 | 7.4 | 7.4 | 6.6 |
| | 3.8 | 4.6 | 4.2 | 5.3 | 4.4 | 5.7 | 3.7 | 4.4 | 5.4 | 5.4 | 4.8 | 4.4 | 4.2 | 4.0 |
| | 4.5 | 5.1 | 4.9 | 5.5 | 5.1 | 5.8 | 4.6 | 5.5 | 5.6 | 6.5 | 5.5 | 4.9 | 4.9 | 4.6 |
| | 23.6% | 26.8% | 26.2% | 27.9% | 24.8% | 28.4% | 23.9% | 25.2% | 27.8% | 31.5% | 27.9% | 26.4% | 25.3% | 23.0% |
| | 33.0% | 31.8% | 33.5% | 24.7% | 28.6% | 23.4% | 31.7% | 30.1% | 30.2% | 24.0% | 31.5% | 30.9% | 30.4% | 32.7% |
| | 0.7 | 1.9 | 1.5 | 1.8 | 0.3 | 1.3 | 0.6 | 1.3 | 1.7 | 1.6 | 1.4 | 1.6 | 1.0 | 0.2 |
| | 3.1% | 3.1% | 3.4% | 3.1% | 2.7% | 3.0% | 3.0% | 3.2% | 3.0% | 2.8% | 3.5% | 3.0% | 3.0% | 3.0% |
| | 29.2% | 26.9% | 28.6% | 19.9% | 25.6% | 19.1% | 28.1% | 27.6% | 25.5% | 19.7% | 26.6% | 26.2% | 26.3% | 29.5% |
| | | | | | | | | | | | | | | |
| | 3.9% | 3.3% | 3.3% | 2.8% | 2.7% | 2.4% | 3.4% | 3.2% | 3.7% | 3.7% | 3.4% | 3.3% | 3.2% | 3.6% |
| | 0.9 | 1.0 | 1.1 | 0.9 | 1.5 | 1.2 | 1.1 | 1.1 | 1.3 | 1.5 | 1.1 | 1.0 | 1.0 | 1.2 |
| | 2.1 | 2.2 | 2.6 | 0.9 | 2.2 | 2.1 | 2.3 | 2.0 | 2.2 | 1.7 | 2.3 | 1.9 | 2.3 | 2.2 |
| | 22.3% | 20.4% | 21.6% | 15.5% | 19.2% | 13.4% | 21.3% | 21.3% | 18.3% | 12.8% | 19.8% | 20.0% | 19.6% | 22.8% |
| | | | | | | | | | | | | | | |
| | 18.7% | 16.5% | 16.8% | 17.7% | 17.8% | 21.1% | 15.9% | 16.5% | 18.3% | 21.7% | 17.8% | 16.4% | 16.9% | 17.7% |
| | 49.1 | 43.3 | 42.8 | 45.1 | 44.1 | 47.3 | 43.6 | 45.7 | 45.9 | 48.8 | 45.3 | 44.7 | 45.1 | 47.0 |
| | 247.2 | 235.0 | 220.7 | 804.4 | 377.3 | 529.0 | 242.7 | 323.3 | 313.6 | 312.5 | 404.7 | 360.0 | 238.3 | 187.0 |
| | 1.4 | 2.5 | 1.1 | 8.0 | 4.1 | 8.3 | 2.6 | 3.8 | 2.3 | 1.8 | 5.8 | 3.9 | 2.3 | 1.7 |
| | 4.7 | 5.0 | 4.9 | 5.0 | 4.8 | 6.0 | 4.6 | 4.9 | 5.3 | 5.7 | 5.3 | 4.9 | 4.8 | 4.2 |
| | 2.9 | 3.1 | 2.7 | 2.9 | 2.8 | 3.0 | 2.8 | 2.8 | 3.2 | 3.4 | 2.5 | 3.3 | 3.1 | 2.5 |
| | 2.6 | 2.4 | 2.3 | 3.2 | 2.9 | 4.1 | 2.4 | 2.6 | 2.7 | 3.3 | 2.5 | 2.5 | 2.7 | 2.7 |
| | 34.0% | 31.7% | 31.1% | 34.8% | 36.6% | 40.9% | 33.6% | 32.9% | 33.6% | 38.6% | 31.8% | 32.8% | 35.6% | 36.1% |

*** Full Service Budget and Economy properties are grouped together.

HOST STUDY   STR.   25

Hilco Real Estate Appraisal, LLC

*Page 44*

| FULL-SERVICE Amounts Per Available Room | Geographic Region | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | New England | Middle Atlantic | South Atlantic | East North Central | East South Central | West North Central | West South Central | Mountain | Pacific |
| Occupancy (of Sample) | 68.8% | 72.7% | 68.2% | 65.9% | 62.6% | 63.5% | 65.4% | 69.8% | 73.2% |
| Average Size of Property (Rooms) | 256 | 300 | 290 | 287 | 209 | 263 | 298 | 256 | 331 |
| Average Daily Rate | $165.59 | $207.94 | $145.65 | $133.91 | $113.54 | $114.65 | $138.42 | $134.96 | $171.65 |
| **REVENUE** | | | | | | | | | |
| Rooms | $40,511 | $54,816 | $35,927 | $31,689 | $25,994 | $26,311 | $31,067 | $31,367 | $45,218 |
| Food | 11,063 | 12,433 | 11,599 | 9,650 | 7,374 | 7,597 | 9,373 | 11,025 | 12,779 |
| Beverage | 3,217 | 4,068 | 3,240 | 2,453 | 1,615 | 2,024 | 2,359 | 3,290 | 3,834 |
| Other Food & Beverage | 3,360 | 3,360 | 2,758 | 2,681 | 2,282 | 2,401 | 2,581 | 2,998 | 2,887 |
| Telecommunications | 227 | 367 | 275 | 256 | 135 | 171 | 248 | 212 | 338 |
| Other Operated Departments | 2,144 | 1,635 | 2,907 | 1,557 | 1,692 | 996 | 2,072 | 3,761 | 3,579 |
| Rentals & Other Income | 878 | 1,073 | 1,120 | 783 | 530 | 1,112 | 760 | 1,009 | 1,651 |
| Cancellation Fee | 97 | 114 | 148 | 96 | 70 | 202 | 135 | 181 | 144 |
| **Total Revenue** | $62,097 | $77,886 | $58,009 | $49,147 | $39,363 | $40,814 | $48,614 | $54,482 | $70,630 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | $11,053 | $16,032 | $9,281 | $9,033 | $6,649 | $7,023 | $7,531 | $9,697 | $13,228 |
| Food & Beverage | 13,831 | 17,189 | 12,463 | 10,701 | 8,181 | 8,413 | 9,640 | 12,815 | 15,942 |
| Telecommunications | 412 | 614 | 406 | 349 | 279 | 279 | 344 | 358 | 617 |
| Other Operated Depts & Rentals | 1,477 | 1,346 | 2,055 | 1,214 | 1,558 | 1,234 | 1,675 | 3,313 | 2,905 |
| **Total Departmental Expenses** | $26,773 | $35,181 | $24,217 | $21,357 | $16,667 | $16,999 | $19,089 | $25,233 | $32,492 |
| **Total Departmental Profit** | $35,324 | $42,705 | $33,792 | $27,790 | $22,696 | $23,815 | $29,515 | $29,249 | $38,138 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative & General | $5,580 | $6,527 | $5,262 | $4,245 | $3,762 | $3,734 | $4,241 | $5,163 | $6,038 |
| Marketing | 4,377 | 4,680 | 4,389 | 3,694 | 2,832 | 3,048 | 3,725 | 4,434 | 4,798 |
| Utility Costs | 2,905 | 3,049 | 2,482 | 1,926 | 2,252 | 1,932 | 2,059 | 2,264 | 2,879 |
| Property Operations & Maintenance | 2,881 | 3,582 | 2,794 | 2,579 | 2,163 | 2,007 | 2,316 | 2,719 | 3,417 |
| **Total Undistributed Operating Expenses** | $15,693 | $17,838 | $14,787 | $12,484 | $11,009 | $10,736 | $12,341 | $14,580 | $17,127 |
| **GROSS OPERATING PROFIT** | $19,631 | $24,967 | $19,005 | $15,956 | $11,677 | $13,079 | $17,174 | $14,669 | $21,001 |
| Franchise Fees (Royalty) | $642 | $595 | $547 | $524 | $804 | $731 | $579 | $557 | $500 |
| Management Fees | $1,817 | $2,428 | $1,856 | $1,647 | $1,164 | $1,181 | $1,578 | $1,748 | $1,944 |
| **INCOME BEFORE FIXED CHARGES** | $17,172 | $21,854 | $16,600 | $13,185 | $9,709 | $11,167 | $15,017 | $12,344 | $18,557 |
| **Selected Fixed Charges** | | | | | | | | | |
| Property Taxes | $2,580 | $3,551 | $1,783 | $1,936 | $754 | $1,879 | $1,609 | $1,729 | $1,954 |
| Insurance | 412 | 686 | 770 | 333 | 345 | 333 | 608 | 995 | 1,038 |
| Reserve for Capital Replacement | $1,228 | $1,609 | $1,407 | $1,308 | $990 | $732 | $780 | $1,048 | $1,520 |
| **AMOUNT AVAILABLE FOR DEBT SERVICE & OTHER FIXED CHARGES*** | $12,952 | $16,109 | $12,640 | $9,558 | $7,720 | $8,223 | $12,140 | $9,172 | $14,045 |
| **PAYROLL & RELATED EXPENSES*** | | | | | | | | | |
| Rooms | $6,335 | $8,821 | $5,218 | $4,785 | $4,081 | $4,120 | $4,167 | $5,246 | $7,661 |
| Food & Beverage | 7,281 | 8,811 | 5,867 | 4,700 | 3,919 | 3,960 | 4,420 | 6,423 | 9,093 |
| Telecommunications | 479 | 729 | 393 | 344 | 300 | 300 | 288 | 368 | 642 |
| Other Operated Departments | 1,638 | 2,162 | 2,657 | 1,654 | 3,451 | 975 | 1,687 | 3,943 | 3,585 |
| Administrative & General | 2,801 | 3,004 | 2,442 | 1,908 | 1,996 | 1,831 | 2,022 | 2,674 | 3,149 |
| Marketing | 1,735 | 1,631 | 1,444 | 1,234 | 920 | 1,175 | 1,314 | 1,775 | 1,659 |
| Property Operations & Maintenance | 1,322 | 1,838 | 1,282 | 1,132 | 1,334 | 939 | 1,004 | 1,334 | 1,742 |
| **Total Payroll & Related Expenses** | $20,109 | $24,574 | $16,918 | $13,962 | $13,155 | $12,388 | $13,452 | $19,154 | $25,426 |

\* Other Fixed Charges include Depreciation and Amortization, Interest, Rent and Equipment Leases.
\*\* Included in above expenses. Only shown here for additional detail. Each line is calculated independently, representing only the hotels that contributed Payroll & Related Expenses data for the specific department. Expense ratios transfer for rooms, F&B and telecommunications departmental expenses are based on the respective departmental revenues. All other expenses are based on total revenue. Individual Ratios to Sales "Departmental Expenses" will not equal Total Departmental Expenses" as "Other Operational Depts & Rentals" are calculated on total revenue. Totals may not add due to rounding.

 **STR.** HOST STUDY

Hilco Real Estate Appraisal, LLC

*Page 45*

| | Location | | | | | | Price Category | | | | Size | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Airport | Interstate | Resort | Small Metro/Town | Luxury | Upscale | Mid-Price | Economy*** | Under 150 Rooms | 150 to 300 Rooms | 300 to 500 Rooms | Over 500 Rooms |
| | 71.1% | 65.8% | 72.7% | 60.0% | 67.8% | 55.8% | 69.3% | 67.9% | 68.2% | 65.4% | 65.5% | 67.0% | 68.6% | 71.0% |
| | 402 | 214 | 276 | 146 | 398 | 151 | 374 | 252 | 236 | 282 | 121 | 217 | 377 | 825 |
| | $176.85 | $125.67 | $113.75 | $110.17 | $182.17 | $130.01 | $180.28 | $148.96 | $113.35 | $91.69 | $118.90 | $146.01 | $157.59 | $170.70 |
| | $45,284 | $29,736 | $29,787 | $24,157 | $44,734 | $26,222 | $45,223 | $36,229 | $27,843 | $21,652 | $27,815 | $34,978 | $39,113 | $43,729 |
| | 12,313 | 7,999 | 7,291 | 8,098 | 16,879 | 9,747 | 15,674 | 9,229 | 5,233 | 4,729 | 4,754 | 8,729 | 12,147 | 14,929 |
| | 3,507 | 2,036 | 1,819 | 2,450 | 5,609 | 2,557 | 4,709 | 2,481 | 1,296 | 1,188 | 1,750 | 2,822 | 3,390 | 3,869 |
| | 3,078 | 2,694 | 2,344 | 1,807 | 3,031 | 1,957 | 3,995 | 2,597 | 1,587 | 1,361 | 1,070 | 2,423 | 3,295 | 3,450 |
| | 360 | 188 | 240 | 42 | 295 | 83 | 395 | 228 | 131 | 73 | 51 | 182 | 302 | 439 |
| | 1,955 | 1,336 | 945 | 3,881 | 6,832 | 4,194 | 3,802 | 2,305 | 870 | 561 | 1,051 | 2,325 | 3,226 | 2,857 |
| | 1,236 | 686 | 609 | 737 | 2,110 | 498 | 1,893 | 1,057 | 724 | 680 | 494 | 925 | 1,021 | 1,645 |
| | 150 | 97 | 62 | 20 | 240 | 89 | 202 | 122 | 37 | 30 | 34 | 108 | 139 | 207 |
| | $67,918 | $44,774 | $42,857 | $41,182 | $79,780 | $45,347 | $75,098 | $54,234 | $37,761 | $30,254 | $37,623 | $52,588 | $62,645 | $71,096 |
| | $12,643 | $7,770 | $8,300 | $6,279 | $12,437 | $7,423 | $12,124 | $9,835 | $9,296 | $8,919 | $7,325 | $9,271 | $10,691 | $12,535 |
| | 14,821 | 9,245 | 7,928 | 9,491 | 19,049 | 10,942 | 17,717 | 11,037 | 6,645 | 5,902 | 6,933 | 10,865 | 14,124 | 16,483 |
| | 517 | 317 | 377 | 223 | 493 | 292 | 531 | 398 | 282 | 221 | 199 | 332 | 501 | 635 |
| | 1,466 | 1,204 | 571 | 3,517 | 5,158 | 3,239 | 2,933 | 1,810 | 653 | 403 | 1,475 | 1,950 | 2,443 | 1,905 |
| | $29,447 | $18,545 | $17,266 | $19,510 | $37,137 | $21,876 | $33,305 | $23,146 | $15,876 | $13,450 | $15,867 | $22,418 | $27,764 | $31,441 |
| | $38,466 | $26,229 | $25,591 | $21,672 | $42,593 | $23,471 | $41,788 | $31,088 | $21,885 | $16,804 | $22,362 | $30,120 | $34,881 | $39,595 |
| | $5,742 | $4,190 | $4,021 | $3,971 | $6,865 | $4,283 | $6,468 | $4,745 | $3,563 | $3,237 | $3,905 | $5,048 | $5,546 | $4,657 |
| | 4,854 | 3,483 | 3,305 | 3,045 | 5,296 | 3,278 | 5,222 | 2,765 | 2,307 | | 2,750 | 3,904 | 4,510 | 4,703 |
| | 2,560 | 2,044 | 1,790 | 2,200 | 3,542 | 2,591 | 2,814 | 2,381 | 2,043 | 1,949 | 1,807 | 2,302 | 2,620 | 2,807 |
| | 3,055 | 2,278 | 2,108 | 2,259 | 4,089 | 2,540 | 3,464 | 2,621 | 2,123 | 1,979 | 2,051 | 2,592 | 3,093 | 3,200 |
| | $16,021 | $11,985 | $11,225 | $11,475 | $19,783 | $12,692 | $17,968 | $13,694 | $10,489 | $9,532 | $10,513 | $13,848 | $15,868 | $16,367 |
| | $22,445 | $14,244 | $14,366 | $10,197 | $22,890 | $10,579 | $23,820 | $17,394 | $11,396 | $7,272 | $11,849 | $16,272 | $19,013 | $23,228 |
| | $480 | $842 | $640 | $727 | $299 | $570 | $471 | $657 | $642 | $472 | $584 | $954 | $552 | $165 |
| | $2,132 | $1,375 | $1,455 | $1,263 | $2,190 | $1,353 | $2,285 | $1,714 | $1,129 | $833 | $1,222 | $1,561 | $1,892 | $2,152 |
| | $19,833 | $12,027 | $12,271 | $8,207 | $20,371 | $8,656 | $21,064 | $14,983 | $9,625 | $5,962 | $9,998 | $13,757 | $16,469 | $20,921 |
| | $2,654 | $1,465 | $1,430 | $1,074 | $2,421 | $1,069 | $2,543 | $1,717 | $1,403 | $1,110 | $1,286 | $1,720 | $2,082 | $2,519 |
| | 628 | 445 | 474 | 351 | 1,236 | 538 | 908 | 562 | 473 | 452 | 417 | 539 | 658 | 882 |
| | $1,425 | $981 | $1,096 | $381 | $1,733 | $946 | $1,902 | $1,073 | $833 | $518 | $870 | $1,017 | $1,422 | $1,568 |
| | $15,126 | $9,135 | $9,272 | $6,401 | $15,282 | $6,103 | $15,041 | $11,511 | $6,811 | $3,882 | $7,420 | $10,481 | $12,357 | $16,971 |
| | $7,893 | $4,657 | $4,690 | $3,941 | $7,734 | $4,862 | $7,617 | $5,313 | $4,449 | $4,423 | $5,007 | $5,565 | $6,567 | $7,569 |
| | 8,702 | 4,501 | 3,500 | 4,404 | 10,762 | 5,405 | 10,618 | 5,147 | 2,842 | 3,452 | 4,026 | 6,012 | 8,597 | 9,861 |
| | 519 | 370 | 318 | 432 | 451 | 383 | 511 | 388 | 323 | 290 | 534 | 438 | 412 | 484 |
| | 1,388 | 2,630 | 480 | 4,945 | 4,721 | 4,300 | 3,119 | 2,882 | 919 | 475 | 5,210 | 3,040 | 2,101 | 1,374 |
| | 3,036 | 2,055 | 1,819 | 1,922 | 3,707 | 2,283 | 3,571 | 2,265 | 1,530 | 1,655 | 2,208 | 2,507 | 2,662 | 2,707 |
| | 1,701 | 1,325 | 1,024 | 1,153 | 2,100 | 1,254 | 2,083 | 1,352 | 1,220 | 989 | 1,078 | 1,630 | 1,765 | 1,600 |
| | 1,802 | 989 | 875 | 1,130 | 2,298 | 1,531 | 1,872 | 1,201 | 876 | 932 | 1,078 | 1,237 | 1,521 | 1,830 |
| | $28,652 | $19,968 | $11,979 | $19,788 | $30,021 | $16,668 | $27,627 | $16,094 | $10,904 | $11,496 | $14,166 | $17,760 | $22,565 | $24,926 |

*** Full Service Budget and Economy properties are grouped together

Hilco Real Estate Appraisal, LLC

*Page 46*

| FULL-SERVICE Amounts Per Occupied Room | Geographic Region | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | New England | Middle Atlantic | South Atlantic | East North Central | East South Central | West North Central | West South Central | Mountain | Pacific |
| Occupancy (of Sample) | 68.8% | 72.7% | 68.2% | 65.9% | 62.6% | 63.5% | 65.4% | 63.8% | 79.2% |
| Average Size of Property (Rooms) | 256 | 300 | 290 | 287 | 203 | 263 | 238 | 256 | 331 |
| Average Daily Rate | $165.59 | $207.94 | $145.65 | $133.91 | $113.54 | $114.65 | $133.42 | $184.96 | $171.65 |
| **REVENUE** | | | | | | | | | |
| Rooms | $165.60 | $207.94 | $145.65 | $133.91 | $113.54 | $114.65 | $133.42 | $184.95 | $171.65 |
| Food | 47.67 | 47.17 | 46.78 | 40.80 | 32.59 | 33.10 | 40.23 | 49.56 | 48.40 |
| Beverage | 13.15 | 15.43 | 13.54 | 10.37 | 7.13 | 8.82 | 10.12 | 14.15 | 14.52 |
| Other Food & Beverage | 13.73 | 12.75 | 11.18 | 11.33 | 10.00 | 10.48 | 11.08 | 12.89 | 10.86 |
| Telecommunications | 0.93 | 1.47 | 1.11 | 1.09 | 0.81 | 0.74 | 1.05 | 0.91 | 1.28 |
| Other Operated Departments | 8.76 | 6.20 | 11.79 | 6.58 | 7.48 | 4.34 | 8.89 | 16.26 | 13.94 |
| Rentals & Other Income | 3.59 | 4.07 | 4.54 | 3.31 | 2.34 | 4.84 | 3.26 | 4.76 | 6.29 |
| Cancellation Fee | 0.29 | 0.43 | 0.60 | 0.41 | 0.31 | 0.88 | 0.58 | 0.78 | 0.55 |
| Total Revenue | $253.82 | $295.46 | $235.17 | $207.80 | $173.90 | $177.83 | $208.64 | $284.27 | $267.49 |
| **DEPARTMENTAL EXPENSES** | | | | | | | | | |
| Rooms | $45.18 | $30.82 | $37.62 | $38.45 | $29.38 | $30.61 | $32.32 | $37.25 | $50.10 |
| Food & Beverage | 55.54 | 65.21 | 50.53 | 45.25 | 36.15 | 36.66 | 41.41 | 55.36 | 60.38 |
| Telecommunications | 1.69 | 2.33 | 1.65 | 1.43 | 1.29 | 1.22 | 1.48 | 1.54 | 1.96 |
| Other Operated Depts & Rentals | 6.04 | 5.11 | 8.37 | 5.14 | 6.89 | 6.60 | 6.76 | 14.25 | 10.63 |
| Total Departmental Expenses | $109.45 | $133.47 | $98.17 | $90.32 | $73.65 | $74.09 | $81.97 | $108.50 | $123.07 |
| Total Departmental Profit | $144.37 | $161.99 | $137.00 | $117.48 | $100.25 | $103.74 | $126.67 | $126.77 | $144.42 |
| **UNDISTRIBUTED OPERATING EXPENSES** | | | | | | | | | |
| Administrative & General | $22.60 | $24.75 | $21.33 | $17.95 | $16.62 | $16.27 | $18.20 | $22.20 | $22.87 |
| Marketing | 17.89 | 17.75 | 17.22 | 15.69 | 12.52 | 13.26 | 15.99 | 19.07 | 18.15 |
| Utility Costs | 11.88 | 11.57 | 10.06 | 8.14 | 9.35 | 8.51 | 8.84 | 9.74 | 10.90 |
| Property Operations & Maintenance | 11.78 | 13.59 | 11.33 | 10.91 | 9.55 | 8.75 | 9.94 | 11.69 | 12.94 |
| Total Undistributed Operating Expenses | $64.15 | $67.67 | $59.94 | $52.58 | $48.65 | $46.79 | $52.97 | $62.70 | $64.86 |
| **GROSS OPERATING PROFIT** | $80.22 | $94.32 | $77.06 | $64.90 | $51.60 | $56.95 | $73.70 | $63.07 | $79.56 |
| Franchise Fees (Royalty) | $2.63 | $2.22 | $2.22 | $2.64 | $3.55 | $3.18 | $2.48 | $2.48 | $1.00 |
| Management Fees | $7.43 | $9.21 | $7.53 | $6.54 | $5.14 | $5.14 | $6.77 | $7.52 | $7.36 |
| **INCOME BEFORE FIXED CHARGES** | $70.16 | $82.89 | $67.31 | $55.72 | $42.91 | $48.63 | $64.45 | $53.07 | $70.30 |
| Selected Fixed Charges | | | | | | | | | |
| Property Taxes | $10.55 | $13.47 | $7.23 | $8.40 | $3.33 | $8.19 | $5.91 | $7.43 | $7.40 |
| Insurance | 1.69 | 2.22 | 3.12 | 1.41 | 1.53 | 1.45 | 2.18 | 1.70 | 3.93 |
| Reserve for Capital Replacement | $5.02 | $5.10 | $5.70 | $5.58 | $3.93 | $3.19 | $3.26 | $4.50 | $5.76 |
| **AMOUNT AVAILABLE FOR DEBT SERVICE & OTHER FIXED CHARGES*** | $52.90 | $61.10 | $51.26 | $40.38 | $34.12 | $35.80 | $52.10 | $39.44 | $53.21 |
| **PAYROLL & RELATED EXPENSES**** | | | | | | | | | |
| Rooms | $26.52 | $33.07 | $21.37 | $20.42 | $19.23 | $17.82 | $18.18 | $24.05 | $30.86 |
| Food & Beverage | 31.22 | 33.93 | 23.30 | 20.28 | 19.59 | 17.51 | 19.45 | 29.80 | 35.25 |
| Telecommunications | 1.91 | 2.60 | 1.55 | 1.43 | 1.33 | 1.26 | 1.20 | 1.67 | 2.08 |
| Other Operated Departments | 7.57 | 9.97 | 11.48 | 7.74 | 20.46 | 4.40 | 7.45 | 19.57 | 15.02 |
| Administrative & General | 12.03 | 11.94 | 10.11 | 8.26 | 9.75 | 8.07 | 8.79 | 12.59 | 12.65 |
| Marketing | 7.55 | 6.66 | 6.02 | 5.31 | 3.99 | 5.17 | 5.73 | 8.10 | 7.46 |
| Property Operations & Maintenance | 5.77 | 6.52 | 5.15 | 4.88 | 7.45 | 4.04 | 4.43 | 6.29 | 6.97 |
| Total Payroll & Related Expenses | $66.14 | $55.59 | $69.68 | $60.15 | $65.88 | $53.67 | $58.90 | $89.07 | $101.28 |

\* Other Fixed Charges include Depreciation and Amortization, Interest, Rent and Equipment Leases.
\*\* Included in above expenses. Only shown here for additional detail. Each line is calculated independently, representing only the hotels that contributed Payroll & Related Expenses' data for the specific department.
Expense ratios to sales for rooms, F&B and telecommunications departments' expenses are based on their respective departmental revenues. All other expenses are based on total revenue. Individual ratio to Sales 'Departmental Expenses' will not equal Total Departmental Expenses' as 'Other Operated Depts & Rentals' are calculated on total revenue. Totals may not add due to rounding.

28 STR.  HOST STUDY

Hilco Real Estate Appraisal, LLC

*Page 47*

| | Location | | | | | | Price Category | | | | Size | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Urban | Suburban | Airport | Interstate | Resort | Small Metro/Town | Luxury | Upscale | Mid-Price | Economy*** | Under 150 Rooms | 150 to 300 Rooms | 300 to 600 Rooms | Over 600 Rooms |
| | 71.1% | 65.8% | 72.7% | 60.0% | 67.8% | 55.8% | 69.8% | 67.9% | 68.2% | 65.4% | 65.5% | 67.0% | 68.6% | 71.0% |
| | 402 | 214 | 276 | 146 | 398 | 161 | 374 | 252 | 286 | 282 | 121 | 217 | 377 | 825 |
| | $176.85 | $125.87 | $113.75 | $110.17 | $182.17 | $130.01 | $160.23 | $148.93 | $113.35 | $91.69 | $118.90 | $145.01 | $157.59 | $170.20 |
| | | | | | | | | | | | | | | |
| | $175.95 | $125.87 | $113.75 | $110.17 | $182.17 | $130.01 | $160.23 | $148.93 | $113.35 | $91.69 | $118.90 | $145.01 | $157.59 | $170.69 |
| | 48.08 | 33.86 | 27.84 | 26.60 | 86.74 | 49.33 | 62.47 | 37.93 | 21.51 | 20.05 | 20.32 | 36.19 | 48.94 | 68.55 |
| | 13.70 | 8.63 | 6.18 | 11.20 | 22.84 | 12.68 | 18.77 | 10.21 | 5.24 | 5.04 | 7.48 | 11.70 | 13.69 | 15.22 |
| | 12.02 | 11.40 | 8.95 | 8.23 | 12.34 | 9.70 | 14.73 | 10.54 | 6.46 | 5.93 | 4.57 | 10.08 | 13.28 | 13.47 |
| | 1.48 | 0.79 | 0.92 | 0.19 | 1.20 | 0.41 | 1.57 | 0.93 | 0.53 | 0.31 | 0.22 | 0.75 | 1.22 | 1.71 |
| | 7.68 | 5.65 | 3.61 | 17.67 | 27.82 | 20.73 | 15.15 | 9.48 | 3.54 | 2.38 | 7.10 | 9.81 | 13.01 | 10.41 |
| | 4.83 | 2.90 | 2.17 | 3.35 | 8.59 | 2.47 | 5.55 | 4.34 | 2.95 | 2.60 | 2.11 | 3.88 | 4.11 | 6.43 |
| | 0.59 | 0.41 | 0.24 | 0.09 | 0.93 | 0.44 | 0.80 | 0.50 | 0.15 | 0.13 | 0.15 | 0.48 | 0.55 | 0.81 |
| | $265.23 | $189.51 | $163.66 | $187.50 | $324.68 | $224.83 | $299.27 | $222.89 | $163.73 | $128.30 | $160.85 | $217.61 | $252.40 | $277.29 |
| | | | | | | | | | | | | | | |
| | $49.37 | $32.93 | $32.04 | $28.69 | $50.65 | $36.60 | $48.32 | $40.51 | $33.77 | $29.34 | $31.31 | $38.44 | $43.07 | $48.93 |
| | 57.63 | 39.13 | 30.28 | 43.21 | 77.57 | 64.25 | 70.61 | 45.55 | 27.05 | 25.08 | 26.79 | 45.01 | 55.91 | 64.28 |
| | 2.02 | 1.34 | 1.44 | 1.02 | 2.01 | 1.15 | 2.12 | 1.61 | 1.15 | 0.94 | 0.85 | 1.37 | 2.02 | 2.09 |
| | 5.72 | 5.09 | 2.18 | 16.01 | 21.00 | 16.25 | 11.69 | 7.48 | 2.66 | 1.73 | 5.31 | 8.13 | 9.85 | 7.44 |
| | $114.99 | $78.49 | $65.94 | $88.83 | $151.23 | $108.46 | $132.74 | $95.11 | $64.63 | $57.04 | $65.26 | $92.95 | $111.86 | $122.74 |
| | $160.24 | $111.02 | $97.72 | $98.67 | $175.45 | $116.37 | $166.53 | $127.78 | $89.10 | $71.26 | $95.59 | $124.86 | $140.54 | $154.55 |
| | | | | | | | | | | | | | | |
| | $22.43 | $17.69 | $16.36 | $18.06 | $27.95 | $21.73 | $25.78 | $19.50 | $14.50 | $13.93 | $16.59 | $20.91 | $22.34 | $21.65 |
| | 18.21 | 14.74 | 12.62 | 13.67 | 21.57 | 16.25 | 20.81 | 16.22 | 11.21 | 9.78 | 11.76 | 16.18 | 18.56 | 18.35 |
| | 10.00 | 8.65 | 6.94 | 10.02 | 14.42 | 12.86 | 11.21 | 9.78 | 8.34 | 8.27 | 7.72 | 9.57 | 10.55 | 10.95 |
| | 11.93 | 9.64 | 8.05 | 10.28 | 16.53 | 13.09 | 13.81 | 10.77 | 8.64 | 8.39 | 8.77 | 10.74 | 12.46 | 12.72 |
| | $62.57 | $50.72 | $42.07 | $52.25 | $80.48 | $63.93 | $71.61 | $56.27 | $42.69 | $40.42 | $44.84 | $57.40 | $63.93 | $63.69 |
| | $87.67 | $60.90 | $54.85 | $46.42 | $92.97 | $52.44 | $94.92 | $71.51 | $46.41 | $30.84 | $50.65 | $67.46 | $76.61 | $90.66 |
| | $1.88 | $3.56 | $2.44 | $3.31 | $1.10 | $2.83 | $1.88 | $2.67 | $2.61 | $2.00 | $2.28 | $3.95 | $2.82 | $0.00 |
| | $9.33 | $5.82 | $5.56 | $5.75 | $8.92 | $5.71 | $9.03 | $7.01 | $4.60 | $3.55 | $5.65 | $6.47 | $7.52 | $8.40 |
| | $77.46 | $50.92 | $46.85 | $37.36 | $82.95 | $42.90 | $84.01 | $61.60 | $39.20 | $25.29 | $42.72 | $57.03 | $66.37 | $81.66 |
| | | | | | | | | | | | | | | |
| | $10.37 | $6.20 | $5.46 | $4.99 | $9.84 | $5.30 | $10.13 | $7.05 | $5.71 | $4.71 | $5.50 | $7.13 | $8.18 | $9.18 |
| | 2.45 | 1.88 | 1.81 | 1.60 | 5.03 | 2.67 | 3.22 | 2.39 | 1.95 | 1.92 | 1.78 | 2.23 | 2.65 | 3.36 |
| | $5.56 | $4.15 | $4.18 | $1.73 | $7.05 | $4.69 | $5.74 | $4.41 | $3.39 | $2.20 | $3.72 | $4.22 | $5.73 | $5.13 |
| | $59.03 | $38.69 | $35.40 | $29.14 | $62.22 | $30.24 | $63.92 | $47.74 | $28.15 | $18.46 | $31.72 | $43.45 | $49.81 | $52.34 |
| | | | | | | | | | | | | | | |
| | $29.38 | $19.71 | $17.96 | $18.65 | $32.95 | $25.25 | $30.23 | $22.63 | $18.63 | $18.94 | $21.90 | $23.11 | $26.35 | $28.87 |
| | 33.61 | 19.03 | 13.43 | 22.34 | 46.37 | 29.90 | 42.46 | 22.71 | 12.45 | 15.09 | 18.01 | 25.15 | 34.14 | 38.95 |
| | 1.95 | 1.49 | 1.18 | 2.09 | 1.92 | 2.12 | 2.00 | 1.55 | 1.22 | 1.08 | 2.11 | 1.74 | 1.64 | 1.87 |
| | 5.39 | 11.21 | 1.85 | 27.45 | 21.15 | 25.28 | 12.99 | 14.49 | 4.90 | 2.40 | 24.73 | 13.57 | 9.19 | 5.75 |
| | 11.79 | 8.80 | 6.98 | 9.47 | 16.26 | 13.45 | 14.35 | 10.05 | 7.12 | 7.20 | 9.91 | 10.58 | 11.75 | 10.72 |
| | 7.04 | 5.70 | 3.94 | 5.62 | 9.19 | 6.72 | 8.37 | 6.07 | 4.48 | 4.41 | 4.76 | 6.00 | 7.30 | 6.51 |
| | 6.21 | 4.28 | 3.39 | 5.83 | 9.86 | 8.99 | 7.55 | 5.40 | 3.86 | 4.34 | 5.01 | 5.26 | 6.68 | 7.20 |
| | $91.20 | $59.39 | $46.02 | $68.90 | $190.02 | $92.69 | $110.71 | $70.93 | $47.04 | $50.13 | $83.29 | $74.53 | $92.06 | $97.81 |

*** Full Service Budget and Economy properties are grouped together.

HOST STUDY   STR.   29

*Page 48*

**Addendum D**

**Subject's Historical Income and Expenses**

*Addenda*

10:55 AM
07/21/13 -
Cash Basis

**The Lexington at The Hudson Valley Resort**
**Profit & Loss**
**January 2009 through May 2013**

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| **410000 · Transient Room Revenue** | | | | | | |
| 410110 · Ind - Rack Rate | 2,550.00 | 28,999.12 | 6,147.51 | 3,193.00 | 0.00 | 40,789.63 |
| 410115 · Ind - Corp | 203,446.63 | 304,770.95 | 215,752.23 | 159,059.42 | 38,647.31 | 921,676.54 |
| 410117 · Ind Rtail Packages | 0.00 | 0.00 | -11,455.70 | 13,055.40 | 0.00 | 1,538.70 |
| 410120 · Ind Govt | 0.00 | 0.00 | -169.91 | 0.00 | 0.00 | -159.91 |
| 410125 · Ind Consortium | 133.00 | 0.00 | 0.00 | 0.00 | 0.00 | 133.00 |
| 410135 · Ind Discount | 87,741.75 | 142,528.10 | 70,000.84 | 35,070.09 | 0.00 | 341,644.78 |
| 410140 · Ind Golf Package | 2,495.00 | 4,031.00 | 3,700.00 | 1,200.00 | 318.00 | 12,632.55 |
| 410140 · Ind Spa Package | 1,024.00 | 0.00 | 0.00 | 0.00 | 422.55 | 1,034.00 |
| **Total 410000 · Transient Room Revenue** | 297,315.38 | 485,844.17 | 284,093.97 | 252,432.91 | 39,408.95 | 1,359,205.29 |
| **410001 · Group Room Revenue** | | | | | | |
| 410150 · Group Association | 159,676.46 | 55.40 | 512,453.40 | 537,841.27 | 118,957.93 | 1,359,031.52 |
| 410155 · Group Corporate | 0.00 | 1,017.00 | 12,716.44 | 1,032.00 | 41.09 | 20,703.55 |
| 410165 · Group Incentive | 1,159.00 | 129.00 | 0.00 | 443.30 | 0.00 | 1,889.16 |
| 410160 · Group Government | 1,201.82 | 289.50 | 0.00 | 0.00 | 0.00 | 8,041.32 |
| 410170 · Group Tour & Travel | 4,693,972.17 | 4,650,177.54 | 66,421.00 | 1,664,382.60 | 464,845.35 | 14,772,205.56 |
| 410200 · Group Room Revenue - Other | -2,119,727.18 | -2,258,424.65 | 3,054,118.99 | -278,915.51 | -162,769.52 | -4,460,173.37 |
| **Total 410001 · Group Room Revenue** | 2,741,082.33 | 2,393,244.59 | 2,356,350.34 | 1,924,053.66 | 421,062.82 | 9,777,823.74 |
| **410002 · Miscellaneous Room Revenue** | | | | | | |
| 410175 · GTD No Show | 13,593.12 | 8,545.21 | 6,834.68 | 6,846.68 | 1,043.70 | 35,300.39 |
| 410177 · Cancellation Fee | 4,526.50 | 4,199.53 | 14,381.45 | 5,238.17 | 3,500.69 | 32,307.95 |
| 410180 · Rollaway | 14,291.40 | 10,957.88 | 9,747.29 | 12,180.40 | 4,900.00 | 51,177.27 |
| 410185 · Refrigerator | 1,260.00 | 1,755.00 | 3,008.55 | 3,765.00 | 660.00 | 10,454.55 |
| 410190 · Crib Charge | 830.00 | 945.00 | 1,006.00 | 310.00 | 400.00 | 3,454.60 |
| 410195 · Pet Fees | 3,100.00 | 4,600.00 | 4,500.00 | 4,920.60 | 1,352.00 | 18,468.60 |
| 410196 · Microwave | 0.00 | 62.27 | 274.40 | 431.00 | 12.40 | 789.67 |
| 410197 · Key Charge | 1,303.00 | 2,650.00 | 474.50 | -10,914.14 | 2,233.00 | -2,537.64 |
| **Total 410002 · Miscellaneous Room Revenue** | 39,220.32 | 34,532.23 | 40,267.97 | 20,578.51 | 14,357.70 | 148,563.49 |
| **420000 · Food Revenue** | | | | | | |
| 420200 · Bentley's - Breakfast | 0.00 | 828.50 | 0.00 | 0.00 | 0.00 | 828.50 |
| 420205 · Bentley's - Lunch | 0.00 | 0.00 | 159.00 | 0.00 | 0.00 | 159.00 |
| 420210 · The View - Breakfast | 6,624.35 | 6,236.98 | 2,338.59 | 1,574.79 | 87.00 | 16,861.61 |
| 420215 · The View - Lunch | 4,261.51 | 63,414.14 | 4,258.34 | 35.15 | 0.00 | 76,009.14 |
| 420220 · The View - Dinner | 11,025.66 | 48,414.79 | 23,459.45 | 10,529.32 | 1,529.78 | 95,419.00 |
| 420230 · Tiki Hut | 0.00 | 0.00 | 555.50 | 65.75 | 0.00 | 622.25 |
| 420250 · Cafe | 15,520.32 | 37,253.08 | 38,149.47 | 31,036.62 | 10,377.82 | 132,419.31 |
| 420200 · Food Revenue - Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total 420000 · Food Revenue** | 38,377.84 | 181,155.84 | 63,050.05 | 43,642.63 | 12,046.60 | 342,209.56 |

*Page 50*

**Addenda**

10:35 AM
06/21/13
Cash Basis

**The Lexington at The Hudson Valley Resort**
**Profit & Loss**
**January 2009 through May 2013**

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 420201 · Banquet Food Revenue | 0.00 | 0.00 | 43,777.67 | 5,720.00 | 5,404.00 | 54,557.87 |
| 420210 · Banquet Package | 157,091.93 | 49,737.25 | 6,676.51 | 3,646.02 | 184.55 | 216,726.07 |
| 420240 · Bot Breakfast | 20,797.51 | 4,619.63 | 4,761.50 | 1,220.75 | 697.85 | 38,703.55 |
| 420250 · Bot Lunch | 225,628.74 | 55,815.54 | 15,300.10 | 11,536.28 | 21,709.91 | 309,200.97 |
| 420255 · Bot Dinner | 423,096.25 | 452,414.59 | 1,003,560.17 | 1,227,545.48 | 276,307.00 | 2,141,283.49 |
| 420260 · Bot Reception | 311,511.64 | 82,959.77 | 62,016.00 | 0.00 | 4,445.00 | 140,969.41 |
| 420265 · Banquet COD | 37,297.52 | 49,844.67 | 41,270.92 | 30,523.11 | 1,769.88 | 169,769.64 |
| 420251 · BQT Brunch | 0.00 | 4,569.71 | 1,996.00 | 0.00 | 0.00 | 6,197.71 |
| 420000 · Banquet Food Revenue - Other | 750,932.52 | 1,424,637.15 | 351,160.63 | | 1,591.80 | 2,605,492.22 |
| **Total 420001 · Banquet Food Revenue** | 1,718,310.21 | 1,623,956.62 | 1,560,251.12 | 1,279,729.64 | 200,544.35 | 6,072,735.97 |
| 420002 · Banquet Miscellaneous Revenue | | | | | | |
| 420265 · Bot Public Room Rental | 823,354.84 | 1,275,171.90 | 1,503,436.05 | 1,200,239.20 | 295,116.79 | 5,094,333.78 |
| 420270 · Bot Miscellaneous Income | 70,713.51 | 61,105.43 | 46,606.35 | 18,401.52 | 29,040.29 | 224,287.10 |
| 420275 · Bot Audio Visual Rentals | 23,816.60 | 2,603.86 | 4,903.19 | 4,050.00 | 3,124.20 | 38,545.16 |
| 420280 · Bot Service Charge | 433,375.55 | 277,522.84 | 230,561.15 | 191,722.00 | 41,609.91 | 1,174,473.15 |
| 420290 · Waiter Supervision | 11,259.20 | -5,678.58 | -18,555.15 | -2,190.00 | 1,859.00 | -5,522.53 |
| **Total 420002 · Banquet Miscellaneous Revenue** | 1,362,542.10 | 1,610,624.25 | 1,761,653.51 | 1,472,331.62 | 356,751.19 | 6,526,102.67 |
| 430000 · Bar Revenue | | | | | | |
| 430050 · Lobby Bar | 91,922.52 | 0.00 | 89,284.03 | 53,748.85 | 11,116.00 | 255,052.41 |
| 430053 · Sentry's Bar | 0.00 | 0.00 | 10.00 | 0.00 | 0.00 | 100.00 |
| 430358 · The Vine · Bar | 2,655.18 | 0.00 | 2,835.00 | 16,936.52 | 2,703.67 | 25,711.37 |
| 430310 · Empire Lounge | 47,633.24 | 0.00 | 15,433.75 | 19,788.60 | 16,753.30 | 103,658.89 |
| 430359 · Banquet Beverage | 149,818.60 | 0.00 | 6,973.25 | 14,350.42 | | 109,051.96 |
| 430000 · Bar Revenue - Other | -5,141.00 | 0.00 | -9,044.85 | 0.00 | -1,622.50 | -15,109.98 |
| **Total 430000 · Bar Revenue** | 285,913.64 | 0.00 | 113,591.43 | 105,254.49 | 35,991.35 | 536,769.75 |
| 430320 · Bartender Fees | 69.00 | 0.00 | 134.00 | -400.00 | 0.00 | 594.00 |
| 440000 · Telephone Revenue | | | | | | |
| 440415 · Local Call Revenue | 871.31 | 2.91 | 58.00 | 62.37 | 0.00 | 1,240.79 |
| 440420 · Long Distance Revenue | 4,939.96 | 2,094.55 | 63.01 | 243.21 | 0.00 | 7,343.20 |
| 440000 · Telephone Revenue - Other | 124.16 | | 0.00 | -814.27 | 0.00 | -900.11 |
| **Total 440000 · Telephone Revenue** | 5,905.43 | 2,314.27 | 121.01 | -500.83 | 0.00 | 7,652.85 |
| 442000 · Activities Revenue | | | | | | |
| 442120 · Music and Entertainment | 78,653.00 | 78,165.66 | 33,245.00 | 7,501.00 | 4,949.20 | 209,914.65 |
| 442315 · Cabana / Cushion Rental | 0.00 | 0.00 | 130.00 | 0.00 | 0.00 | 130.00 |
| 442400 · Resort Fee | 53,729.54 | 19,075.58 | 27,037.65 | 8,382.25 | 1,545.59 | 109,773.82 |
| 442307 · Water Fun Park | 0.00 | 0.00 | 742.00 | 0.00 | 0.00 | 0.00 |
| 442409 · Mini Golf | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| 442413 · Kids Klub | 340.00 | -100.00 | 0.00 | 200.00 | 110.16 | 0.00 |
| 442415 · Pool | 0.00 | 0.00 | 0.00 | 6,229.49 | -450.00 | 550.16 |
| **Total 442000 · Activities Revenue** | 132,732.54 | 97,141.24 | 61,168.85 | 22,312.85 | 6,100.95 | 318,509.24 |

Hilco Real Estate Appraisal, LLC

Page 2

**Addenda**

10:55 AM
06/24/13
Cash Basis

## The Lexington at The Hudson Valley Resort
## Profit & Loss
### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 446000 · Spa Revenue | | | | | | |
| 442415 · Spa Memberships | 37,829.00 | 35,637.85 | 20,409.00 | 3,079.93 | 251.59 | 96,495.43 |
| 442417 · Spa Massages and Services | 63,935.47 | 84,623.25 | 53,787.75 | 33,411.43 | 13,293.75 | 275,668.65 |
| 442419 · Spa Access Fees | 23,884.00 | 33,002.75 | 24,402.50 | 3,534.40 | 516.00 | 85,421.65 |
| 442421 · Classes Fees | 0.00 | 0.00 | 350.00 | 0.00 | 0.00 | 560.00 |
| 442423 · Beverage Income | 0.00 | 0.00 | 0.00 | 36.56 | 29.48 | 336.43 |
| 442500 · Spa Revenue - Other | 0.00 | 33.00 | 83.00 | 36.56 | 0.00 | 121.00 |
| **Total 442500 · Spa Revenue** | 144,811.47 | 153,276.85 | 56,111.25 | 46,351.65 | 14,246.73 | 437,804.16 |
| 444000 · Golf Revenue | | | | | | |
| 444421 · Golf Memberships | 9,050.00 | 7,932.50 | 8,750.00 | 6,456.00 | 3,530.00 | 28,142.00 |
| 444423 · Live Green Fees | 195,151.11 | 142,778.87 | 106,697.00 | 94,694.88 | 9,083.00 | 548,545.86 |
| 444425 · Golf Cart Rental | 53,712.45 | 113,716.83 | 90,555.00 | 63,725.00 | 4,599.50 | 296,790.97 |
| 444427 · Range Fees | 15.60 | -10.85 | 2.00 | 0.00 | 417.00 | -423.14 |
| 444429 · Golf Lessons | 0.00 | 0.00 | 0.00 | 0.00 | 75.00 | 75.00 |
| 444431 · Beverage Cart Income | 49.00 | 0.00 | 0.00 | 0.00 | 0.00 | 49.00 |
| 444433 · Beverage Cart Income | 3,702.73 | 0.00 | 1,555.00 | -1,291.10 | 209.00 | 6,591.83 |
| 444437 · Merchandise Sales | 791.57 | 18.00 | -206.12 | 2.16 | 524.32 | 1,345.36 |
| 444447 · Snack Bar | 0.00 | 214.43 | 0.00 | 3,325.93 | 783.79 | 4,003.72 |
| **Total 444000 · Golf Revenue** | 264,822.89 | 264,217.33 | 176,854.88 | 171,589.07 | 19,920.61 | 636,312.38 |
| 446000 · Gift Shop Revenue | | | | | | |
| 446050 · Green Mt. Coffee | 33,255.87 | 31,672.31 | 0.00 | 3,591.75 | 594.67 | 3,591.42 |
| 446450 · GS Taxable Sales | 2,347.79 | 1,553.19 | 30,254.64 | 220,257.90 | 9,593.65 | 125,433.00 |
| 446437 · GS Non-Taxable Sales | 0.00 | 139.59 | 1,250.67 | 510.33 | 230.15 | 6,139.98 |
| 446500 · Gift Shop Revenue - Other | 0.00 | 0.00 | 169.83 | 0.00 | 0.00 | 396.33 |
| **Total 446000 · Gift Shop Revenue** | 35,656.45 | 33,356.00 | 31,725.14 | 23,689.94 | 10,938.50 | 135,846.64 |
| 448000 · Other Revenue | | | | | | |
| 446441 · Commissions & Leases | 7,506.25 | 123,327.24 | 235,929.06 | 376,031.00 | 289,600.00 | 1,046,435.55 |
| 446443 · Line of Credit | 680.00 | 53,226.17 | -24,241.79 | 5,300.50 | 41,575.71 | 78,453.59 |
| 446453 · Vending Machine Revenue | 2,893.29 | 1,910.27 | 1,631.79 | 1,155.40 | 459.60 | 7,461.85 |
| 446483 · Game Room Commissions | 2,023.55 | 1,922.50 | 1,214.25 | 795.25 | 656.25 | 7,332.89 |
| 446565 · Miss Earned | 0.00 | 0.00 | 3.67 | 33.79 | 39.55 | 39.55 |
| 448500 · Other Revenue - Other | 229,722.02 | 4,026.29 | 42,627.52 | 39,840.42 | 20,027.33 | 371,891.85 |
| **Total 448000 · Other Revenue** | 243,522.01 | 159,151.47 | 348,295.49 | 421,747.86 | 21,240.02 | 21,240.02 |
| **Total Income** | 7,209,317.62 | 7,178,221.22 | 6,932,954.62 | 5,704,414.92 | 1,520,066.54 | 1,532,873.32 |
| Expense | | | | | | |
| 530000 · Cost of Food | 734,516.99 | 752,371.62 | 604,169.00 | 645,907.41 | 103,707.12 | 28,710,835.19 |
| 530025 · Cost of Beverage | 12,650.93 | 0.00 | 45,503.33 | 34,650.04 | 22,930.16 | 3,040,672.25 |
| 530250 · Cost of Cigars | 180.82 | 0.00 | 0.00 | 0.00 | 0.00 | 117,733.00 |
| 545423 · Pro Shop - Cost of Sales | 16,272.51 | 15,047.79 | 19,203.20 | 14,215.34 | 1,500.00 | 170.82 |
| 545423 · Cost of Taxable Merchandise | 0.00 | 0.00 | 0.00 | 561.65 | 7,725.64 | 1,506.00 |
| 545440 · Cost of Non-Taxable Merchandise | | | | | | 74,532.48 |
| | | | | | | 991.85 |

Hilco Real Estate Appraisal, LLC

Page 3

**Addenda**

9:55 AM
08/21/13
Cash Basis

## The Lexington at The Hudson Valley Resort
### Profit & Loss
#### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| **610010 · Rooms Department Staff** | | | | | | |
| 611000 · Reservations | 1,550.19 | 00,103.33 | 72,433.47 | 65,317.32 | 5,505.95 | 225,000.25 |
| 611200 · Bell Staff | 27,668.75 | 18,255.17 | 18,528.16 | 13,051.52 | 4,955.48 | 62,150.48 |
| 611300 · Housekeeping Staff | 205,611.15 | 224,916.25 | 228,821.50 | 192,135.87 | 72,388.00 | 930,770.89 |
| 611500 · Public Area Cleaning | 53,333.84 | 105,741.29 | 123,919.35 | 59,447.99 | 37,443.90 | 453,099.14 |
| 610009 · Rooms Department Staff - Other | 247,423.11 | 161,582.65 | 166,844.48 | 49,774.87 | 60,510.78 | 766,042.68 |
| **Total 610010 · Rooms Department Staff** | 593,009.64 | 592,506.73 | 609,503.44 | 519,734.04 | 181,803.11 | 2,434,541.16 |
| **610011 · Rooms Department Benefits** | | | | | | |
| 610910 · FICA/Medicare-Rooms Division | 47,216.70 | 47,607.68 | 47,631.28 | 40,705.54 | 14,227.21 | 155,606.71 |
| 610916 · SUTA/FUTA/Disability-Rooms Div | 26,251.31 | 39,502.62 | 39,105.66 | 34,970.85 | 17,250.46 | 153,035.10 |
| 610925 · Worker's Compensation-Rms Div | 29,054.90 | 20,626.16 | 21,367.12 | 25,763.16 | 7,905.61 | 79,261.83 |
| 610930 · Group Insurance-Rooms Division | 1,909.78 | 1,768.45 | 0.00 | 0.00 | 0.00 | 3,693.23 |
| 610940 · 401K-Rooms Division | 7,501.02 | 0.00 | 0.00 | 0.00 | 0.00 | 7,501.92 |
| 610960 · Holiday Pay-Rooms Division | 1,845.38 | 0.00 | 0.00 | 0.00 | 0.00 | 1,845.38 |
| **Total 610011 · Rooms Department Benefits** | 105,356.69 | 107,431.2? | 103,164.20 | 101,502.59 | 39,655.65 | 438,150.72 |
| 610910 · Contract Labor-Rooms Division | 2,547.30 | 0.00 | 2,954.50 | 0.00 | 55.00 | 5,163.88 |
| **622000 · Food Department Staff** | | | | | | |
| 622000 · Chef and Food Prep - Banquets | 250,434.50 | 221,533.25 | 205,103.34 | 178,692.16 | 55,579.26 | 910,807.97 |
| 622100 · Stewards - Banquets | 79,544.97 | 60,694.60 | 65,424.74 | 49,832.40 | 10,022.52 | 265,119.53 |
| 622200 · Wait Staff-Banquets | 188,920.14 | 176,227.61 | 138,665.69 | 101,844.90 | 22,355.39 | 619,451.13 |
| 622300 · Banquet Houseman | 93,078.90 | 93,939.06 | 93,636.60 | 76,316.76 | 23,150.29 | 384,379.18 |
| 622500 · Wait Staff - The View & Cafe | 19,433.05 | 57,722.33 | 27,742.71 | 11,251.26 | 2,000.53 | 100,949.91 |
| 622000 · Food Department Staff - Other | 0.00 | 0.00 | 6,254.46 | 8,220.83 | 310.00 | 15,477.29 |
| **Total 622000 · Food Department Staff** | 623,057.69 | 609,656.76 | 531,022.04 | 423,607.33 | 115,779.99 | 2,305,150.01 |
| **622001 · Food Department Benefits** | | | | | | |
| 620910 · FICA/Medicare-Food Dept | 56,555.18 | 60,316.94 | 50,733.69 | 42,271.62 | 11,192.44 | 233,007.27 |
| 620915 · SUTA/FUTA/Disability-Food Dept | 55,951.76 | 35,582.53 | 39,031.33 | 35,300.63 | 14,109.42 | 162,475.57 |
| 620925 · Worker's Compensation-Food Dept | 21,033.66 | 18,509.55 | 16,174.70 | 19,884.62 | 3,816.50 | 79,251.83 |
| 622900 · Group Insurance-Food Dept | 7,581.08 | 6,202.42 | 0.00 | 0.00 | 0.00 | 13,354.49 |
| 622960 · Holiday Pay-Food Dept | 1,510.40 | 0.00 | 0.00 | 0.00 | 0.00 | 1,510.30 |
| 622950 · Bonus & Incentive-Food Dept | 752.50 | 0.00 | 0.00 | 0.00 | 0.00 | 752.50 |
| **Total 622001 · Food Department Benefits** | 133,607.26 | 124,582.44 | 104,939.52 | 96,735.32 | 29,167.16 | 493,321.82 |
| 632035 · Banquet Service Charge | 355,333.30 | 247,051.79 | 217,057.19 | 165,522.00 | 34,593.81 | 1,021,959.18 |
| 632040 · Contract Labor-Food Dept | 5,107.55 | 2,502.28 | 17,503.76 | -8,215.55 | 16,211.06 | 38,582.92 |
| 635000 · Beverage Staff | 53,041.68 | 625.58 | 23,765.04 | 29,397.16 | 9,243.49 | 135,033.83 |
| **635001 · Beverage Benefits** | | | | | | |
| 630910 · FICA/Medicare-Bev Dept | 6,640.57 | 63.84 | 3,459.51 | 2,919.20 | 1,008.06 | 14,091.38 |
| 630915 · SUTA/FUTA/Disability-Bev Dept | 3,701.98 | 64.54 | 2,572.27 | 2,822.31 | 1,373.87 | 10,534.97 |
| 630925 · Worker's Compensation-Bev Dept | 1,361.68 | 2.26 | 1,025.62 | 1,278.50 | 162.50 | 3,641.21 |
| 635060 · 401K-Bev Dept | 3,167.63 | 0.00 | 0.00 | 0.00 | 0.00 | 3,167.63 |
| 635060 · Holiday Pay-Bev Dept | 84.00 | 0.00 | 0.00 | 0.00 | 0.00 | 84.00 |
| **Total 635001 · Beverage Benefits** | 14,955.32 | 134.76 | 7,087.50 | 7,020.47 | 2,544.49 | 31,723.54 |
| 630910 · Contract Labor-Bev Dept | | 0.00 | | 328.00 | 327.99 | 1,280.11 |
| 635000 · Activities | 14,497.13 | 11,851.72 | 14,660.55 | 18,255.75 | 2,160.00 | 67,500.25 |

Page 4

Hilco Real Estate Appraisal, LLC

10:55 AM
06/21/13
Cash Basis

## The Lexington at The Hudson Valley Resort
### Profit & Loss
### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 642031 · Aerobics Benefits | | | | | | |
| 642910 · FICA/Medicare-Activities | 1,034.40 | 1,370.55 | 1,123.70 | 1,340.23 | 155.70 | 5,077.66 |
| 642915 · SUTA/FUTA/Disability-Activities | 1,183.29 | 1,677.03 | 1,524.85 | 1,565.43 | 226.53 | 6,178.84 |
| 642925 · Worker's Compensation-Activitie | 251.91 | 616.23 | 626.00 | 681.47 | 101.65 | 2,477.33 |
| **Total 642001 · Activities Benefits** | **2,524.20** | **3,663.80** | **3,274.12** | **3,787.13** | **493.99** | **13,733.83** |
| 642910 · Concert Labor-Activities | 20.00 | 84.00 | 693.00 | 627.25 | | 1,227.25 |
| 642910 · Salaries&Wages | 68,591.56 | 66,150.13 | 77,721.23 | 46,197.94 | 7,505.96 | 266,200.61 |
| 643001 · Spa Benefits | | | | | | |
| 642910 · FICA/Medicare-Spa | 4,597.05 | 5,645.10 | 5,763.30 | 3,602.68 | 850.47 | 20,858.60 |
| 643915 · SUTA/FUTA/Disability-Spa | 3,113.12 | 4,502.59 | 6,034.05 | 3,353.64 | 799.71 | 19,371.11 |
| 643925 · Worker's Compensation-Spa | 1,409.92 | 1,234.12 | 1,317.43 | 1,340.21 | 178.22 | 5,530.60 |
| 643930 · Group Insurance-Spa | 1,838.23 | 785.59 | 0.03 | 0.00 | 0.00 | 2,426.41 |
| 643960 · Holiday Pay-Spa | 200.00 | 0.03 | | 0.00 | 0.00 | 200.00 |
| **Total 643001 · Spa Benefits** | **11,349.62** | **11,508.15** | **13,174.24** | **8,597.53** | **1,556.40** | **46,504.38** |
| 643970 · Contract Labor-Spa | 0.00 | 0.00 | 100.00 | 400.00 | 0.00 | 500.00 |
| 644020 · Gift Staff | | | | | | |
| 645 · Golf Shop Staff | 52,952.23 | 59,051.36 | 54,886.04 | 41,656.25 | 8,729.99 | 227,484.87 |
| 644000 · Golf Staff - Other | 152,815.92 | 152,935.56 | 140,065.78 | 153,014.32 | 42,101.09 | 640,934.07 |
| **Total 644001 · Golf Staff** | **215,768.15** | **211,972.32** | **194,952.82** | **194,678.57** | **50,822.08** | **853,419.94** |
| 644001 · Golf Benefits | | | | | | |
| 644910 · FICA/Medicare-Golf | 16,137.15 | 15,159.00 | 14,904.55 | 15,016.93 | 3,874.10 | 60,853.14 |
| 644915 · SUTA/FUTA/Disability-Golf | 7,330.60 | 8,139.19 | 8,951.24 | 8,912.95 | 4,422.01 | 32,814.18 |
| 644925 · Worker's Compensation-Golf | 4,825.80 | 3,674.67 | 3,555.60 | 5,135.45 | 1,279.55 | 19,714.50 |
| 644930 · Group Insurance-Golf | 2,303.80 | 1,518.23 | 0.00 | 0.00 | 0.00 | 0.00 |
| 644960 · Holiday Pay-Golf | 900.88 | 0.00 | 0.00 | 0.00 | 0.00 | 633.66 |
| 644965 · Bonus & Incentive-Golf | 0.00 | 0.00 | 0.00 | 0.00 | 369.60 | 369.60 |
| **Total 644001 · Golf Benefits** | **31,617.22** | **29,493.89** | **27,661.40** | **29,003.46** | **9,942.26** | **127,571.23** |
| 644070 · Contract Labor-Golf | | 1,020.00 | 0.00 | 0.00 | 2,311.50 | 3,331.50 |
| 646000 · Gift Shop | 20,779.17 | 20,940.32 | 21,632.14 | 16,006.59 | 1,532.52 | 68,220.34 |
| 646001 · Gift Shop Benefits | | | | | | |
| 646910 · FICA/Medicare-Gift Shop | 1,500.01 | 1,533.06 | 1,673.89 | 1,314.08 | 425.57 | 6,541.64 |
| 646915 · SUTA/FUTA/Disability-Gift Shop | 1,002.31 | 1,297.59 | 1,569.00 | 1,425.75 | 585.13 | 5,693.17 |
| 646925 · Worker's Compensation-Gift Shop | 769.42 | 939.56 | 759.94 | 906.84 | 242.22 | 3,415.37 |
| **Total 646001 · Gift Shop Benefits** | **3,437.74** | **3,455.62** | **4,000.93** | **3,720.67** | **1,253.72** | **15,916.06** |
| 650000 · Administration Staff | 110,655.16 | 102,463.75 | 105,645.55 | 159,208.57 | 48,521.24 | 527,013.63 |
| 650001 · Administration Benefits | | | | | | |
| 650910 · FICA/Medicare-A&G | 8,420.50 | 7,594.33 | 7,924.55 | 10,409.44 | 3,515.13 | 37,927.09 |
| 650915 · SUTA/FUTA/Disability-A&G | 3,315.61 | 3,038.22 | 3,593.73 | 7,356.38 | 3,733.66 | 21,490.80 |
| 650925 · Worker's Compensation-A&G | 2,350.64 | -98.63 | 529.04 | 893.90 | 230.25 | 4,500.31 |
| 650930 · Group Insurance-A&G | 1,022.73 | 0.00 | 0.00 | 0.00 | 0.00 | 1,022.73 |
| 650960 · Holiday Pay-A&G | 0.00 | 0.00 | 0.00 | 0.00 | 93.92 | 93.92 |
| 650955 · Bonus & Incentive-A&G | 0.00 | 146.15 | 0.00 | 0.00 | 0.00 | 146.15 |
| **Total 650001 · Administration Benefits** | **16,209.09** | **11,723.44** | **12,047.32** | **18,493.32** | **7,484.94** | **66,017.11** |

## Addenda

*Page 54*

10:55 AM
05/21/13
Cash Basis

**The Lexington at The Hudson Valley Resort**
**Profit & Loss**
**January 2009 through May 2013**

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 650070 · Contract Labor-A&G | 1,897.00 | 0.00 | 230.69 | 150.00 | 0.00 | 2,337.00 |
| 650-1 · Payroll Expenses | 0.00 | 0.00 | 0.00 | 931.75 | 0.00 | 931.75 |
| 650070 · Contract Labor-Security | 628.50 | 2,618.00 | 0.00 | 0.00 | 0.00 | 3,246.50 |
| 660000 · Advertising and Sales Staff | 269,507.53 | 324,622.15 | 222,327.21 | 131,948.69 | 49,107.97 | 997,104.16 |
| 660001 · Advertising and Sales Benefits | | | | | | |
| 660310 · FICA/Medicare-Sales | 20,509.97 | 22,229.28 | 19,450.94 | 10,043.50 | 3,630.37 | 79,701.06 |
| 660315 · SUTA/FUTA/Disability-Sales | 4,952.27 | 5,254.13 | 3,925.43 | 3,703.92 | 2,653.53 | 21,030.28 |
| 660325 · Worker's Compensation-Sales | 1,206.69 | 1,358.31 | 1,094.82 | 777.23 | 318.11 | 4,756.56 |
| 660350 · Group Insurance-Sales | 2,291.99 | 2,591.31 | 0.00 | 0.00 | 0.00 | 9,709.97 |
| 660916 · Commission | 21,208.95 | 33,546.99 | 23,472.00 | 17,455.53 | 5,500.00 | 107,709.20 |
| 660960 · Holiday Pay-Sales | 2,655.17 | 0.00 | 0.00 | 0.00 | 0.00 | 2,005.77 |
| 660965 · Bonus & Incentive-Sales | 150.00 | 0.00 | 0.00 | 0.00 | 0.00 | 150.00 |
| **Total 660001 · Advertising and Sales Benefits** | 53,333.04 | 69,728.07 | 52,673.19 | 33,519.88 | 13,343.81 | 225,551.14 |
| 660870 · Contract Labor-Sales | 0.00 | 200.00 | 0.00 | 22,519.68 | 0.00 | 22,000.00 |
| 670000 · Repair & Maintenance Staff | 252,750.31 | 233,024.69 | 221,553.08 | 200,646.21 | 70,912.35 | 984,872.65 |
| 670001 · Repair & Maintenance Benefits | | | | | | |
| 670310 · FICA/Medicare-Eng | 19,326.16 | 17,419.63 | 19,875.40 | 15,231.12 | 5,415.93 | 77,264.70 |
| 670315 · SUTA/FUTA/Disability-Eng | 6,442.85 | 7,858.14 | 11,624.13 | 10,286.71 | 5,497.74 | 41,830.16 |
| 670320 · Worker's Compensation-Eng | 8,656.47 | 8,134.52 | 7,776.50 | 10,459.90 | 3,552.14 | 38,536.56 |
| 670330 · Group Insurance-Eng | 3,640.99 | 1,776.39 | 0.00 | 0.00 | 0.00 | 5,417.38 |
| 670950 · Vacation Pay-Eng | 0.00 | 0.00 | 610.83 | 0.00 | 0.00 | 610.63 |
| 670960 · Holiday Pay-Eng | 2,154.69 | 0.00 | 0.00 | 0.00 | 0.00 | 2,154.69 |
| **Total 670001 · Repair & Maintenance Benefits** | 40,107.23 | 35,187.63 | 39,909.52 | 35,989.65 | 14,469.81 | 165,509.44 |
| 670870 · Contract Labor-Eng | 3,659.14 | 2,242.50 | 1,653.63 | 8,440.00 | 2,140.00 | 16,105.27 |
| 691000 · Laundry Staff | 63,694.83 | 69,467.12 | 60,051.20 | 57,517.11 | 22,554.05 | 264,454.41 |
| 691001 · Laundry Benefits | | | | | | |
| 691910 · FICA/Medicare | 4,920.33 | 4,591.58 | 6,940.84 | 4,412.62 | 1,726.18 | 21,951.55 |
| 691915 · SUTA/FUTA/Disability | 3,875.50 | 4,774.97 | 5,369.57 | 5,201.57 | 2,419.20 | 21,757.97 |
| 691920 · Worker's Comp | 2,932.21 | 2,658.65 | 2,123.21 | 2,594.18 | 980.21 | 9,954.65 |
| **Total 691001 · Laundry Benefits** | 11,696.04 | 11,334.20 | 12,849.14 | 12,209.37 | 5,125.85 | 53,654.40 |
| 710000 · Rooms Department Other Expense | | | | | | |
| 710002 · China & Glassware | 0.00 | 458.43 | 0.00 | 0.00 | 0.00 | 458.43 |
| 710002 · Cleaning Supplies | 59,502.21 | 49,837.63 | 42,472.25 | 61,065.84 | 19,518.64 | 231,147.20 |
| 710004 · Laundry-Rooms Div | 518.27 | 189.87 | 1,549.33 | 167.25 | 483.79 | 2,917.61 |
| 710009 · Equipment-Rooms Div | 3,597.49 | 9,999.19 | 12,533.65 | 12,757.25 | 0.00 | 45,703.35 |
| 710011 · Linen | 27,470.51 | 39,982.80 | 29,382.95 | 35,215.50 | 20,652.07 | 161,406.25 |
| 710012 · Guest Supplies/Rooms | 22,907.61 | 30,278.76 | 25,958.87 | 14,448.53 | 4,901.18 | 98,341.22 |
| 710014 · Vacation Pay & Expense-Rooms Div | 75.00 | 0.00 | 0.00 | 161.05 | 0.00 | 235.05 |
| 710015 · Health & Office Supplies-Rms | 8,130.36 | 5,013.11 | 5,498.81 | 5,602.32 | 2,431.74 | 24,709.38 |
| 710017 · Postage-Rooms Div | 0.00 | 0.00 | 0.00 | 370.09 | 11.60 | 470.52 |
| 710018 · Towel & Entertainment-Rooms Div | 217.50 | 162.82 | 1,888.28 | 3,635.30 | 82.50 | 5,139.95 |
| 710019 · Uniforms-Rooms Div | 79.95 | 713.53 | 1,253.23 | 1,543.79 | 65.01 | 3,364.52 |
| 710102 · Travel Agent Commission | 2,174.47 | 23,521.22 | 2,940.31 | 2,284.23 | 1,050.37 | 31,819.57 |
| 710000 · Rooms Department Other Expense - Other | 0.00 | 423.00 | 0.00 | 0.00 | 0.00 | 423.00 |
| **Total 710000 · Rooms Department Other Expense** | 116,723.25 | 160,020.14 | 127,405.16 | 139,076.46 | 63,507.07 | 607,161.48 |

Hilco Real Estate Appraisal, LLC

Page 6

*Page 55*

**Addenda**

10:55 AM
06/21/13
Cash Basis

**The Lexington at The Hudson Valley Resort**
**Profit & Loss**
**January 2009 through May 2013**

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 719100 · Laundry Other Expense | | | | | | |
| 791125 · Laundry Supplies | 27,559.75 | 24,614.50 | 22,483.13 | 20,955.67 | 8,455.11 | 103,018.24 |
| 719100 · Laundry Other Expense - Other | 0.00 | 2,054.43 | 0.00 | 0.00 | 0.00 | 2,054.43 |
| **Total 719100 · Laundry Other Expense** | 27,508.75 | 26,679.01 | 22,483.13 | 20,059.61 | 8,455.11 | 105,082.67 |
| | | | | | | |
| 720001 · Food Department Other Expense | 10,195.33 | 2,497.26 | 3,083.97 | 66.47 | 0.00 | 16,833.05 |
| 720002 · China & Glassware-Food Dept | 16,122.71 | 19,500.26 | 10,697.70 | 9,169.59 | 1,155.45 | 55,841.71 |
| 720003 · Cleaning Supplies/Food | 8,224.14 | 1,652.21 | 6,205.18 | 5,752.08 | 629.55 | 23,283.66 |
| 720004 · Fuel & Ice | 475.51 | 1,171.65 | 2,939.90 | 2,972.54 | 104.11 | 6,531.16 |
| 720005 · Decorations-Food Dept | 20,591.03 | 7,578.55 | 8,332.65 | 14,178.56 | 2,603.98 | 54,305.82 |
| 720006 · Equipment-Food Dept | 8,462.27 | 1,568.66 | 4,334.63 | 88.97 | 0.00 | 16,554.99 |
| 720011 · Linen | 24,379.79 | 18,522.77 | 7,675.26 | 7,528.60 | 3,877.20 | 59,983.64 |
| 720011 · Equipment Rental-Food Dept | 1,726.55 | 7,259.49 | 6,521.33 | 729.75 | 0.00 | 16,303.19 |
| 720012 · Guest Supplies-Food Dept | 264.12 | 4,727.64 | 451.35 | 850.10 | 0.00 | 5,303.04 |
| 720014 · Miscellaneous Expenses | 939.18 | 1,331.49 | 295.83 | 1,144.54 | 0.00 | 3,712.09 |
| 720015 · Printing & Office Supplies-Food | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 1.00 |
| 720017 · Telephone & Postage-Food Dept | 5,100.00 | 317.19 | -434.44 | 0.00 | 44.20 | 5,155.95 |
| 720018 · Travel & Entertainment-Food Dep | 1,956.71 | 3,525.82 | 1,588.76 | 210.61 | 0.00 | 8,857.70 |
| 720019 · Uniforms-Food Dept | 0.00 | 0.00 | 0.00 | 1,316.59 | 0.00 | 0.00 |
| 720323 · Freight | 12.00 | 0.00 | 0.00 | 0.00 | 0.00 | 10.00 |
| 720321 · Rubbish Services | 6,850.97 | 15,224.40 | 33.17 | 590.00 | 6,324.00 | 32,351.47 |
| 720325 · Cost Of A/V | 1,285.66 | 1,744.80 | 0.00 | 2,616.39 | 0.00 | 6,185.22 |
| 720329 · Paper Supplies/Food | 27,489.92 | 16,523.64 | 21,181.65 | 23,497.96 | 4,720.12 | 89,702.64 |
| 720000 · Food Department Other Expense - Other | 0.00 | 0.00 | 153.59 | 0.00 | 0.00 | 159.59 |
| **Total 720000 · Food Department Other Expense** | 134,948.14 | 108,634.71 | 60,350.56 | 70,151.68 | 10,659.11 | 412,074.40 |
| | | | | | | |
| 720010 · Cafeteria Other Expense | | | | | | |
| 720810 · Employee Meals In Cafeteria | 1,495.40 | 0.00 | 0.00 | 0.00 | 0.00 | 1,495.40 |
| 78111 · Meals In Restaurants | 33.48 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total 728300 · Cafeteria Other Expense** | 1,528.88 | 0.00 | 0.00 | 0.00 | 0.00 | 1,528.83 |
| | | | | | | |
| 730000 · Beverage Department Other Expen | 3,107.49 | 1,531.44 | 926.55 | 1,556.65 | 616.00 | 6,438.43 |
| 730007 · China and Glassware | 0.00 | 0.00 | 0.00 | 0.00 | 0.58 | 508.60 |
| 730007 · Decorations-Bev Dept | 421.43 | 0.00 | 0.00 | 65.00 | 0.00 | 491.43 |
| 730009 · Equipment-Bev Dept | 0.00 | 143.10 | 38.76 | 0.00 | 0.00 | 181.65 |
| 730011 · Guest Supplies-Bev Dept | 0.00 | 0.00 | 0.00 | 182.40 | 0.00 | 102.40 |
| 730016 · Travel & Entertainment-Bev Dept | 0.00 | 0.00 | 0.00 | 139.55 | 0.00 | 130.65 |
| 730019 · Uniforms-Bev Dept | -1,607.26 | 0.00 | 0.00 | 0.00 | 0.00 | 1,107.45 |
| 730021 · Food Supplies | 1,210.76 | 120.10 | 22.89 | 13.59 | 0.00 | 1,341.64 |
| 730025 · Licenses-Bev Dept | 0.00 | 0.00 | 0.00 | 0.00 | 1,832.00 | 1,832.00 |
| 730029 · Beverage Department Other Expen - Other | 0.00 | 0.00 | 0.00 | 0.00 | 713.12 | 711.12 |
| **Total 730000 · Beverage Department Other Expen** | 7,037.04 | 1,794.64 | 988.59 | 1,802.00 | 3,743.01 | 14,995.37 |

Page 7

Hilco Real Estate Appraisal, LLC

*Page 56*

**Addenda**

10:55 AM
06/21/13
Cash Basis

## The Loxington at The Hudson Valley Resort
## Profit & Loss
### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 740009 · PBX Other Expense | | | | | | |
| 740009 · Equipment-Phone Dept | 135.00 | 158.85 | 0.00 | 0.00 | 0.00 | 293.85 |
| 740024 · Phone Repairs & Maintenance | 2,970.83 | 0.00 | 75.00 | 0.00 | 0.00 | 3,045.83 |
| 740029 · Phone-Service & Equipment | 61,194.53 | 69,787.48 | 60,015.56 | 54,300.97 | 21,820.98 | 268,319.44 |
| 740009 · PBX Other Expense - Other | 4,644.08 | 0.00 | 0.00 | 0.00 | 0.00 | 4,644.08 |
| **Total 740009 · PBX Other Expense** | 68,945.04 | 69,946.31 | 60,091.50 | 54,300.97 | 21,820.98 | 266,194.80 |
| 742009 · Activities Other Expense | | | | | | |
| 742001 · Decorations | 0.00 | 657.52 | 333.78 | 0.00 | 0.00 | 1,011.30 |
| 742001 · Equipment-Activities | 3,350.50 | 59,422.65 | 7,733.39 | 4.20.85 | 1,300.54 | 67,408.70 |
| 742010 · Guest Supplies-Activities | 4,600.00 | 425.18 | 65.32 | 0.00 | 4,500.00 | 9,070.42 |
| 742010 · Printing & Office Supplies-Act | 0.00 | 1,561.75 | 0.00 | 6.47 | 0.00 | 1,598.22 |
| 742014 · Travel & Entertainment-Act | 1,300.00 | 2,620.00 | 129.60 | 0.00 | 0.00 | 4,355.60 |
| 742019 · Uniforms-Activities | 0.00 | 0.00 | 692.67 | 0.00 | 0.00 | 692.67 |
| 742139 · Music and Entertainment | 45,941.27 | 22,831.76 | 18,858.10 | 17,735.00 | 2,235.00 | 117,541.13 |
| **Total 742009 · Activities Other Expense** | 55,352.17 | 80,705.78 | 27,882.66 | 21,943.32 | 8,145.54 | 202,093.07 |
| 743009 · Spa Other Expense | | | | | | |
| 743001 · Cash Over/Short-Spa | 150.99 | 0.00 | 0.00 | 0.00 | 0.00 | 150.99 |
| 743003 · Cleaning Supplies-Spa | 2,930.09 | 1,022.09 | 2,206.12 | 559.14 | 174.08 | 8,091.02 |
| 743005 · Spa Massage Therapist | 51,221.60 | 53,147.90 | 34,645.26 | 23,521.04 | 63,984.00 | 168,982.79 |
| 743006 · Copy/ Cost-Spa | 0.00 | 0.00 | 102.00 | 0.00 | 0.00 | 102.00 |
| 743020 · Equipment-Spa | 1,143.13 | 282.66 | 820.50 | 212.92 | 0.00 | 2,415.41 |
| 743212 · Guest Supplies-Spa | 256.58 | 186.96 | 1,077.41 | 286.42 | 0.00 | 1,793.37 |
| 743215 · Printing & Office Supplies-Spa | 347.50 | 208.51 | 308.70 | 106.15 | 0.00 | 1,060.99 |
| 743218 · Travel & Entertainment-Spa | 0.00 | 1,999.60 | 0.00 | 0.00 | 0.00 | 1,999.60 |
| 743219 · Uniforms-Spa | 103.94 | 317.94 | 391.92 | 0.00 | 0.00 | 813.20 |
| 743326 · Chemicals/Pool Supplies | 5,242.51 | 12,481.74 | 4,906.90 | 5,828.31 | 1,119.00 | 29,578.36 |
| 743329 · Spa Supplies | 325.21 | 5,103.72 | 0.00 | 0.00 | 0.00 | 5,428.93 |
| 743331 · Spa Rec Supplies | 3,630.83 | 2,756.81 | 2,815.67 | 1,331.06 | 442.64 | 10,393.01 |
| 743334 · Spa Service & Robes | 3,804.35 | 2,329.83 | 4,231.99 | 3,944.61 | 0.00 | 14,307.88 |
| 743009 · Spa Other Expense - Other | 0.00 | 355.43 | 0.00 | 0.00 | 0.00 | 355.43 |
| **Total 743009 · Spa Other Expense** | 69,634.69 | 78,703.59 | 51,935.64 | 35,434.65 | 8,660.62 | 244,539.33 |
| 742009 · Golf Other Expense | | | | | | |
| 742003 · Cleaning Supplies-Golf | 518.27 | 167.43 | 91.53 | 0.00 | 110.54 | 887.77 |
| 742006 · Computer-Golf | 522.66 | 0.00 | 0.00 | 0.00 | 0.00 | 522.66 |
| 742008 · Dues & Subscriptions-Golf | 450.00 | 171.00 | 200.00 | 0.00 | 0.00 | 891.00 |
| 742010 · Equipment-Golf | 4,501.84 | 103.76 | 380.92 | 15,333.33 | 1,745.70 | 21,944.55 |
| 742010 · Equipment Lease-Golf | -40,511.82 | 42,529.48 | 34,585.92 | 23,535.25 | 12,554.00 | 172,362.55 |
| 742011 · Equipment Rental-Golf | 3,636.35 | 856.60 | 720.00 | 4,337.21 | 0.00 | 9,038.17 |
| 742013 · Guest Supplies-Golf | 0.00 | 0.00 | 0.00 | -24.00 | 0.00 | -24.00 |
| 742014 · Miscellaneous Expense-Golf | -11.59 | 0.00 | -20.00 | 0.00 | 0.00 | -31.59 |
| 742017 · Telephone & Postage-Golf | 0.00 | 0.00 | 45.61 | 0.00 | 0.00 | 45.61 |
| 742019 · Uniforms-Golf | 847.15 | 0.00 | 2,604.43 | 3,077.07 | 0.00 | 7,328.88 |
| 744310 · Cost of Golf Carts | 172.84 | 3,501.28 | 1,672.18 | 306.33 | 0.00 | 5,652.63 |
| 744715 · Cost of Scorecard/Pencils | 0.00 | 720.00 | 0.00 | 606.00 | 0.00 | 1,665.00 |
| 744716 · Operating Supplies | 3,469.38 | 1,630.07 | 14,709.01 | 3,232.37 | 1,591.82 | 25,211.69 |
| 744902 · Equipment & Small Tools | 1,318.55 | 25.85 | 419.14 | 135.21 | 575.00 | 2,473.76 |

*Page 8*

Hilco Real Estate Appraisal, LLC

**Addenda**

10:55 AM
06/21/13
Cash Basis

**The Lexington at The Hudson Valley Resort**
**Profit & Loss**
**January 2009 through May 2013**

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 744905 · Bait/Trap Sand | 0.09 | 33.23 | 0.00 | 0.00 | 0.00 | 2,995.11 |
| 744906 · Fertilizer | 25,350.84 | 21,512.48 | 13,721.94 | 0.00 | 2,961.86 | 60,566.58 |
| 744908 · Herbicide | 0.00 | 0.00 | 0.00 | 0.00 | 381.32 | 542.59 |
| 744909 · Pesticide | 424.65 | 0.00 | -0.053.45 | 1,932.50 | 542.50 | -7,408.30 |
| 744910 · Top Dressing | 0.00 | 2,960.43 | 0.00 | 4,100.00 | 0.00 | 7,824.43 |
| 744911 · Gasoline | 17,734.03 | 18,927.66 | 23,785.91 | 19,790.41 | 804.00 | 81,329.53 |
| 744915 · Repairs - Drainage | 0.00 | 720.00 | 0.00 | 0.00 | 0.00 | 720.00 |
| 744917 · Repairs - Machinery & Equip | 11,258.17 | 9,495.35 | 8,063.95 | 9,459.84 | 8,351.32 | 40,595.85 |
| 744918 · Repairs - Irrigation | 0.00 | 73.64 | 1,586.09 | 6.40 | 0.00 | 2,033.41 |
| 744919 · Repairs - Plants & Flowers-Golf | 0.00 | 0.00 | 0.00 | 1,155.17 | 2,709.74 | 1,165.17 |
| 744921 · Seed | 0.00 | 1,819.90 | 2,299.56 | 1,475.25 | 1,256.88 | 5,903.35 |
| 744900 · Golf 9er Expense - Other | 0.00 | 0.00 | 66.50 | 0.00 | 0.00 | 3,324.75 |
| **Total 744900 · Grnd/9er Expense** | 110,923.87 | 105,245.28 | 97,349.70 | 97,173.63 | 32,233.37 | 442,883.41 |
| | | | | | | |
| 746000 · Gift Shop/Other Expense | | | | | | |
| 746005 · Sale/Reg Supplies-Gift Shop | 15.41 | 19.43 | 32.29 | 0.00 | 0.00 | 67.13 |
| 746015 · Print/ls & Office Supplies-GS | 24.16 | 92.28 | 0.00 | 0.00 | 7.52 | 190.08 |
| 746017 · Freight & Postage-Gift Shop | 9.00 | 0.00 | 0.00 | 6.40 | | 15.40 |
| 746018 · Travel & Entertainment-Gift Shp | 0.00 | 0.00 | 0.00 | 0.00 | 34.10 | 34.10 |
| **Total 746900 · Gift Shop Other Expense** | 48.59 | 111.71 | 32.29 | 6.40 | 34.10 | 307.61 |
| | | | | | | |
| 748000 · Other Othr Expense | | | | | | |
| 748441 · LOAN | 0.00 | 27,655.82 | 87,971.55 | 54,017.23 | -15,759.91 | 153,914.69 |
| 748443 · Misc Cost of Sales | 18,349.91 | 0.00 | 0.00 | 0.00 | 0.00 | 18,349.90 |
| 748900 · Othr/Other Expense - Other | 0.00 | 0.00 | 25,000.00 | 0.00 | 0.00 | 25,000.00 |
| **Total 748900 · Othr Other Expense** | 18,349.90 | 27,655.82 | 112,971.55 | 54,017.23 | -15,759.91 | 197,264.49 |
| | | | | | | |
| 750000 · Admin/Maison Other Expense | | | | | | |
| 750004 · Comp Exp A&G | 1,507.84 | 28,242.23 | 32,255.11 | 4,340.12 | 3,618.08 | 79,524.54 |
| 750008 · Dues & Subscriptions | 144.60 | 70.00 | 1,010.00 | 3,400.00 | 0.00 | 5,375.00 |
| 750009 · Equipment-A&G | 954.57 | 30.00 | 2,560.00 | 0.00 | 0.00 | 3,653.57 |
| 750010 · Equipment Lease | 4,952.27 | 6,400.67 | 5,558.14 | 4,909.37 | 3,657.19 | 28,607.84 |
| 750014 · Miscellaneous Expense/A&G | 44,447.22 | 25,493.55 | 18,339.30 | 34,915.41 | 4,699.67 | 129,162.31 |
| 750016 · Printing & Office Supplies/A&G | 5,550.63 | 6,004.00 | 5,205.90 | 6,670.73 | 3,252.32 | 28,643.18 |
| 750017 · Staff Training | 1,342.07 | 1,690.00 | 0.00 | 0.00 | 465.90 | 1,944.27 |
| 750017 · Postage/Telephone A&G | 7,144.24 | 5,561.24 | 2,294.60 | 2,936.51 | 879.83 | 18,037.87 |
| 750018 · Travel & Entertainment-A&G | 12,042.52 | 23,660.60 | 30,315.54 | 30,336.11 | 22,213.31 | 121,587.67 |
| 750018 · Uniforms-A&G | 162.93 | 570.37 | 912.33 | 0.00 | 0.00 | 1,375.08 |
| 750040 · Bad Debt Provision | 0.00 | 0.00 | 0.00 | 4,352.74 | 34,582.00 | 38,934.74 |
| 750060 · Bank Charges | 2,934.24 | 8,444.52 | 1,000.00 | 3,559.30 | 1,111.21 | 23,872.87 |
| 750280 · Data Processing | 45.00 | 0.00 | 7,423.40 | 0.00 | 0.00 | 369.00 |
| 750290 · Donations | 916.49 | 2,500.60 | 284.00 | 300.00 | 70.09 | 4,566.49 |
| 750295 · Emp/Free Relations & Costs | 2,929.32 | 6,411.14 | 1,243.95 | 2,517.20 | 1,422.17 | 8,419.78 |
| 750120 · Loss/Damage Claims | 2,724.30 | 19,022.80 | 2,499.49 | 1,659.67 | 1,659.80 | 22,199.42 |
| 750125 · Credit Card/Check Processing | 64,725.40 | 48,371.15 | 60,159.41 | 33,005.32 | 6,929.12 | 240,899.40 |
| 750850 · Payroll Check Processing | 57,990.91 | 17,239.04 | 19,107.05 | 24,023.32 | 9,189.42 | 10,385.40 |
| 750829 · Licenses & Permits | 2,970.00 | 17,071.00 | 4,485.00 | 3,656.00 | 695.00 | 28,261.00 |

**Addenda**

Page 58

10:55 AM
05/21/13
Cash Basis

## The Lexington at The Hudson Valley Resort
### Profit & Loss
### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 750012 · Interest / penalty | 1,391.42 | 15,405.17 | 0.00 | 0.00 | 0.00 | 16,799.64 |
| 750000 · Administration Other Expense - Other | | | 1,673.44 | 0.00 | 0.00 | 1,673.44 |
| **Total 750000 · Administration Other Expense** | 194,760.40 | 231,128.75 | 234,599.19 | 163,487.60 | 52,804.27 | 876,810.40 |
| 750020 · Professional & Legal Fees | 0.00 | 167,200.60 | 16,831.75 | 1,060.00 | 15,030.00 | 200,141.75 |
| 750021 · Management Fees | 322,466.97 | 272,100.00 | 222,455.00 | 220,103.00 | 51,075.00 | 1,088,239.97 |
| 750022 · Partnership Fees | 0.00 | 172,269.78 | 191,000.00 | 191,250.00 | 76,000.00 | 630,519.78 |
| 750023 · Investment Fees | 0.00 | 150,023.60 | 239,350.00 | 168,313.46 | -283.46 | 557,455.00 |
| 750024 · Home Office Expenses | 73,655.51 | 55,259.08 | 0.00 | 3,500.00 | 3,830.15 | 136,492.04 |
| 750025 · Investor Loan | 105,604.40 | 0.00 | 200.00 | 0.00 | 1,000.00 | 106,804.40 |
| 750026 · Consultant Fees | 24,650.00 | 27,500.00 | 20,750.00 | 26,375.00 | 10,450.00 | 109,725.00 |
| 750010 · Interest / penalty | 9,334.88 | 6,339.42 | 2,400.00 | 0.00 | 0.00 | 17,954.30 |
| 760000 · Sales Other Expense | | | | | | |
| 760008 · Dues, Membership & Publications | 93,082.25 | 27,211.37 | 9,673.00 | 36,151.92 | 079.82 | 166,608.46 |
| 760001 · Agency Fees | 0.00 | 0.00 | 0.00 | 129.25 | 0.00 | 129.26 |
| 760012 · Agency Production | 144.00 | 0.00 | 2,449.60 | 129.25 | 0.00 | 2,564.26 |
| 760010 · Directory Advertising | 2,205.93 | 2,017.68 | 3,453.25 | 4,851.50 | 6,150.00 | 18,768.56 |
| 760015 · Printing & Office Supplies/Sale | 12,830.34 | 1,525.63 | 584.03 | 637.12 | 620.99 | 25,501.16 |
| 760017 · Postage/Telephone-Sales | 1,618.81 | 1,281.40 | 2,104.36 | 165.71 | 22.75 | 5,233.12 |
| 760018 · Travel & Entertainment Sales | 656.83 | 2,360.18 | 5,729.06 | 2,005.08 | 2,058.12 | 17,159.47 |
| 760048 · Outdoor/Billboards | 18,777.84 | 17,700.00 | 4,189.60 | 7,200.00 | 3,800.00 | 52,637.44 |
| 760049 · Trade Shows | 0,151.63 | 7,417.68 | 4,092.51 | 362.67 | 0.00 | 21,924.69 |
| 760019 · Brochures & Post Cards | 2,337.80 | 2,555.94 | 3,043.24 | 0.00 | 0.00 | 8,557.98 |
| 760115 · Magazine Advertising | 6,942.00 | 8,545.00 | 5,143.25 | 9,353.00 | 2,527.24 | 32,930.49 |
| 760118 · Newspaper Advertising | 1,388.47 | 416.00 | 619.00 | 21,669.00 | 5,954.93 | 30,047.35 |
| 760116 · Internet Advertising | 3,552.45 | 4,134.44 | 3,112.33 | 10,742.79 | 3,258.43 | 25,400.34 |
| 760202 · Direct Mail Advertising | 525.00 | 1,464.00 | 747.37 | 735.20 | 0.00 | 3,462.57 |
| 760182 · In-House Production | 2,206.16 | 15,452.70 | 12,405.21 | 6,425.20 | 332.45 | 36,733.81 |
| 760782 · In-House Production | 66.40 | 2,012.97 | 285.54 | 1,904.02 | 1,831.07 | 6,800.00 |
| 760295 · Public Relations | 278.72 | 5,151.47 | 2,894.63 | 5,293.05 | 172.20 | 13,790.09 |
| 760000 · Sales Other Expense - Other | 574.33 | | | 800.00 | 2,491.19 | 3,865.52 |
| **Total 760000 · Sales Other Expense** | 155,355.43 | 108,078.42 | 63,815.30 | 108,076.72 | 29,849.24 | 465,075.11 |
| 770000 · Maintenance Other Expense | | | | | | |
| 770004 · Computers | 6,442.44 | 5,936.03 | 7,537.90 | 5,572.93 | 380.13 | 25,849.43 |
| 770009 · Equipment | 2,534.16 | 2,426.52 | 1,291.04 | 3,497.72 | 326.62 | 10,170.06 |
| 770009 · Equipment Rental | 4,851.07 | 1,150.63 | 384.25 | 0.00 | 0.00 | 6,590.90 |
| 770015 · Printing & Office Supplies | 0.00 | 182.21 | 0.00 | 623.31 | 0.00 | 182.21 |
| 770016 · Travel & Entertainment | 150.15 | 31.00 | 153.66 | 3,218.64 | 35.00 | 993.12 |
| 770019 · Uniforms | 769 | 1,535.59 | | 3,470.92 | 1,419.57 | 19,373.62 |
| 770009 · Building - Exterior | 6,664.34 | 8,272.85 | 9,712.97 | 10,434.06 | 2,477.66 | 37,562.85 |
| 770076 · Building - Interior | 15,375.76 | 15,432.78 | 31,404.21 | 5,414.63 | 3,330.75 | 71,555.03 |
| 770082 · Alarms | 5,465.28 | 7,204.06 | 5,916.92 | 4,854.30 | 1,448.45 | 24,833.00 |
| 770191 · Cable Television Rooms | 15,320.09 | 16,759.73 | 16,558.30 | 15,004.14 | 6,199.94 | 71,242.20 |
| 770182 · Cable / Internet | 1,259.35 | 2,020.76 | 2,013.98 | 1,921.50 | 0.80 | 8,021.39 |
| 770182 · Information Systems | 0.00 | 0.00 | 0.00 | 1,628.00 | 0.00 | 1,628.00 |
| 770191 · Air Cond & Refrigeration | 58,642.24 | 32,115.10 | 49,550.37 | 28,351.98 | 14.00 | 168,673.69 |
| 770190 · Electric Bulbs | 6,533.33 | 4,321.59 | 7,045.11 | 3,420.22 | 0.00 | 22,913.67 |
| 770261 · Elevators | 35,769.42 | 37,050.21 | 31,794.21 | 30,396.08 | 8,445.26 | 134,456.18 |

Hilco Real Estate Appraisal, LLC

*Page 59*

**Addenda**

10:55 AM
06/21/13
Cash Basis

### The Lexington at The Hudson Valley Resort
### Profit & Loss
### January 2009 through May 2013

| | Jan - Dec 09 | Jan - Dec 10 | Jan - Dec 11 | Jan - Dec 12 | Jan - May 13 | TOTAL |
|---|---|---|---|---|---|---|
| 770302 · Electrical & Mechanical | 12,751.33 | 13,085.84 | 12,101.61 | 6,987.63 | 9,375.40 | 56,501.61 |
| 770303 · Engineering Supplies | 22,354.47 | 17,178.96 | 27,252.35 | 24,034.59 | 7,942.47 | 108,782.93 |
| 770323 · Floor Covering | 3,350.31 | 12,385.22 | 1,719.12 | 2,328.39 | 0.00 | 16,823.64 |
| 770325 · Furniture & Fixtures | 20,635.81 | 26,354.99 | 27,555.63 | 4,147.61 | 0.00 | 76,882.24 |
| 770326 · Grounds & Landscaping | 12,000.18 | 3,203.59 | 4,334.24 | 35,590.34 | 3,750.72 | 59,552.07 |
| 770328 · Kitchen Equipment | 9,732.65 | 21,824.34 | 8,404.88 | 14,023.23 | 558.97 | 54,625.99 |
| 770329 · Laundry Equipment | 1,857.69 | 4,220.78 | 8,442.07 | 18,752.71 | 1,219.77 | 34,449.02 |
| 770415 · Locks & Keys | 3,805.37 | 20,107.02 | 1,958.38 | 9,795.90 | 1,157.17 | 46,453.92 |
| 770420 · Maintenance Contracts | 20,321.79 | 2,970.03 | 129.00 | 27,242.84 | 0.00 | 51,172.66 |
| 770711 · Painting & Decorating | 2,266.37 | 5,520.49 | 4,708.97 | 6,132.83 | 1,116.14 | 19,830.81 |
| 770711 · Plumbing & Heating | 48,524.44 | 25,034.90 | 33,149.99 | 29,873.22 | 22,348.70 | 156,601.28 |
| 770712 · Snow Removal | 0.00 | 1,169.29 | 94.67 | 0.00 | 735.25 | 1,990.51 |
| 770714 · Swimming Pool /Spa Maintenance | 9,997.20 | 8,540.84 | 8,941.70 | 7,300.26 | 2,633.78 | 33,253.70 |
| 770715 · Pest Control | 25,490.95 | 18,982.64 | 23,403.92 | 25,858.22 | 9,183.27 | 102,668.00 |
| 770716 · Tools | 1,304.24 | 922.10 | 1,254.17 | 2,018.71 | 884.91 | 6,402.73 |
| 770717 · Water / Waste Water Plants | 14,216.00 | 19,605.16 | 16,010.88 | 12,794.90 | 13,454.68 | 75,456.90 |
| 770800 · Waste Removal | 47,418.84 | 48,192.70 | 49,968.99 | 47,407.69 | 16,002.17 | 208,705.09 |
| 770000 · Maintenance Other Expense - Other | 560.05 | 0.00 | 6.50 | 1,003.12 | 85.73 | 2,633.32 |
| **Total 770000 · Maintenance Other Expense** | **418,470.65** | **394,222.94** | **394,310.83** | **393,960.47** | **112,706.35** | **1,714,781.24** |
| 775000 · Utility | | | | | | |
| 775850 · Electric Power | 449,609.47 | 455,300.25 | 430,601.42 | 365,551.73 | 162,713.87 | 1,668,060.74 |
| 775860 · Gas - LP | 277,035.06 | 319,630.02 | 344,702.47 | 81,010.11 | 45,281.55 | 1,509,048.52 |
| 775870 · Oil | 59,303.08 | 85,558.93 | 143,338.32 | 227,871.03 | 130,785.16 | 67,856.52 |
| **Total 775000 · Utility** | **784,945.61** | **861,169.20** | **918,843.11** | **674,432.87** | **343,289.59** | **3,593,271.78** |
| 780012 · Property Insurance | 188,250.08 | 222,640.31 | 210,722.32 | 192,608.20 | 87,427.50 | 901,746.41 |
| 780102 · Property Taxes | 129,205.80 | 128,681.26 | 130,940.37 | 137,577.50 | 42,350.22 | 571,755.31 |
| 780104 · Property Expenses | | | | | | |
| 788102 · WIND DAMAGE | 0.00 | 0.00 | 0.00 | 1,075.49 | 0.00 | 1,075.49 |
| 788103 · Feasibility Loan | 317.40 | 0.00 | 0.00 | 0.00 | 0.00 | 317.46 |
| 788104 · Storm Damage | 0.00 | 0.00 | 0.00 | 8,169.29 | 0.00 | 8,183.29 |
| 788100 · Property Expenses - Other | 3,836.00 | 3,836.00 | 45,294.25 | 19,102.00 | 0.00 | 549,733.13 |
| **Total 788100 · Property Expenses** | **491,824.34** | **3,836.00** | **45,294.25** | **28,346.78** | **0.00** | **555,301.37** |
| **Total Expense** | **7,251,958.85** | **7,085,706.67** | **6,841,310.38** | **5,821,010.72** | **1,697,552.00** | **28,090,148.51** |
| **Net Income** | **-42,651.03** | **83,564.55** | **121,554.44** | **-117,166.50** | **-336,385.48** | **-285,513.32** |

*$ 51,272.16*

Hilco Real Estate Appraisal, LLC

Page 11

*Page 60*

**Addendum E**

**Discounted Cash Flow Analysis Summary**

Page 61

Addenda

## HUDSON VALLEY RESORT
### 400 GRANITE ROAD
### KERHONKSON, NEW YORK

**DCF ANALYSIS OF THE FEE SIMPLE INTEREST POSITION - AS IS**

| For the Years Ending | Year 1 Jun-14 | Year 2 Jun-15 | Year 3 Jun-16 | Year 4 Jun-17 | Year 5 Jun-18 | Year 6 Jun-19 | Year 7 Jun-20 | Year 8 Jun-21 | Year 9 Jun-22 | Year 10 Jun-23 | Reversion Jun-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | | | | | |
| Room Revenue | $2,663,971 | $2,926,816 | $3,140,230 | $3,234,436 | $3,464,728 | $3,568,670 | $3,887,792 | $4,004,425 | $4,124,558 | $4,248,295 | $4,375,744 |
| Food & Beverage | $2,979,000 | $3,068,370 | $3,160,421 | $3,255,234 | $3,352,891 | $3,453,477 | $3,557,082 | $3,663,794 | $3,773,708 | $3,886,919 | $4,003,527 |
| Telephone | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Health/Spa | $65,000 | $66,950 | $68,959 | $71,027 | $73,158 | $75,353 | $77,613 | $79,942 | $82,340 | $84,810 | $87,355 |
| Gift Shop | $28,000 | $28,840 | $29,705 | $30,596 | $31,514 | $32,460 | $33,433 | $34,436 | $35,470 | $36,534 | $37,630 |
| Activities | $40,000 | $41,200 | $42,436 | $43,709 | $45,020 | $46,371 | $47,762 | $49,195 | $50,670 | $52,191 | $53,757 |
| Golf | $200,000 | $206,000 | $212,180 | $218,545 | $225,102 | $231,855 | $238,810 | $245,975 | $253,354 | $260,955 | $268,783 |
| Other Revenue | $335,000 | $324,950 | $315,202 | $305,745 | $296,573 | $287,676 | $279,046 | $270,674 | $262,554 | $254,677 | $247,037 |
| **Total Revenue** | $6,310,971 | $6,663,126 | $6,906,134 | $7,159,254 | $7,488,987 | $7,695,662 | $8,121,538 | $8,346,442 | $8,592,655 | $8,824,381 | $9,073,832 |
| **Department Expenses** | | | | | | | | | | | |
| Room Expense | $772,552 | $848,777 | $910,667 | $937,987 | $1,004,771 | $1,034,914 | $1,127,460 | $1,161,283 | $1,196,122 | $1,232,006 | $1,268,966 |
| Food & Beverage Expense | $1,787,400 | $1,841,022 | $1,896,253 | $1,953,140 | $2,011,734 | $2,072,086 | $2,134,249 | $2,198,277 | $2,264,225 | $2,332,152 | $2,402,116 |
| Telephone Expense | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Health/Spa Expense | $81,250 | $83,688 | $86,198 | $88,784 | $91,448 | $94,191 | $97,017 | $99,927 | $102,925 | $106,013 | $109,193 |
| Gift Shop Expense | $32,200 | $33,166 | $34,161 | $35,186 | $36,242 | $37,329 | $38,448 | $39,602 | $40,790 | $42,014 | $43,274 |
| Activities Expense | $30,000 | $30,900 | $31,827 | $32,782 | $33,765 | $34,778 | $35,822 | $36,896 | $38,003 | $39,143 | $40,317 |
| Golf Expense | $300,000 | $309,000 | $318,270 | $327,818 | $337,653 | $347,782 | $358,216 | $368,962 | $380,031 | $391,432 | $403,175 |
| Other Expense | $167,500 | $162,475 | $157,601 | $152,873 | $148,287 | $143,838 | $139,523 | $135,337 | $131,277 | $127,339 | $123,519 |
| **Undistributed & Fixed Operating Expenses** | | | | | | | | | | | |
| Administrative Expense | $302,927 | $319,830 | $333,518 | $343,646 | $359,471 | $369,401 | $380,834 | $400,725 | $411,967 | $423,579 | $435,544 |
| Advertising & Sales | $410,213 | $433,103 | $452,994 | $466,354 | $486,784 | $500,231 | $527,900 | $542,649 | $557,873 | $573,585 | $589,799 |
| Repairs & Maintenance | $567,987 | $599,681 | $622,222 | $644,336 | $674,009 | $692,638 | $710,038 | $751,360 | $772,439 | $794,194 | $816,646 |
| Utilities | $631,097 | $666,313 | $696,913 | $715,529 | $748,399 | $769,586 | $812,194 | $834,844 | $858,265 | $882,438 | $907,383 |
| Management | $189,018 | $199,231 | $202,105 | $207,620 | $217,181 | $223,180 | $235,525 | $242,105 | $248,897 | $255,907 | $263,141 |
| Insurance | $169,329 | $180,859 | $190,859 | $208,859 | $230,089 | $251,069 | $229,069 | $232,863 | $239,306 | $239,032 | $243,243 |
| Real Estate Taxes | $137,337 | $140,084 | $142,885 | $145,743 | $148,658 | $151,631 | $154,664 | $157,757 | $160,912 | $164,130 | $167,413 |
| Reserves | $157,774 | $165,578 | $174,228 | $178,982 | $187,225 | $192,397 | $203,038 | $208,711 | $214,566 | $220,610 | $226,846 |
| **Total Operating Expenses** | $5,750,584 | $6,022,856 | $6,266,701 | $6,437,026 | $6,699,217 | $6,883,457 | $7,210,856 | $7,411,286 | $7,618,129 | $7,831,563 | $8,051,774 |
| **NET OPERATING INCOME** | $560,387 | $640,270 | $702,431 | $722,228 | $789,770 | $812,405 | $910,683 | $937,156 | $964,525 | $992,818 | $1,022,058 |
| **Assumptions:** | | | | | | | | | | | |
| Number of Rooms | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 |
| Occupancy | 45% | 48% | 50% | 50% | 52% | 52% | 53% | 53% | 53% | 55% | 55% |
| Occupied Rooms | 54,367 | 57,991 | 60,408 | 60,408 | 62,824 | 62,824 | 66,448 | 66,448 | 66,448 | 66,448 | 66,448 |
| Average Rate | $49.00 | $50.47 | $51.98 | $53.54 | $55.15 | $56.80 | $58.51 | $60.26 | $62.07 | $63.93 | $65.85 |

**Assumptions:**

| | |
|---|---|
| Number of Rooms | 331 |
| Average Rate | $49.00 |
| Room Rate Growth | 3.00% |
| Expenses Growth | 3.00% |
| Discount Rate | 12.00% |
| Terminal Cap Rate | 10.00% |
| Cost of Sale | 2.00% |

**NPV of the annual cash flow :**

| | |
|---|---|
| Holding Period (# of years): | 10 |
| Discount rate (Cash Flow): | 12.00% |
| Discount rate (Reversion): | 12.00% |
| NPV of Cash Flow, 2013-2023: | $4,287,382 |

**Calculation: lump sum reversion :**

| | |
|---|---|
| 11th year NOI: | $1,022,058 |
| Reversionary cap. rate: | 10.00% |
| Reversion: | $10,220,582 |
| less: | |
| Selling Costs (2%): | $204,412 |
| Alterations: | |
| Commissions: | |
| Net Sale Price: | $10,016,171 |

**Value is calculated as:**

| | |
|---|---|
| NPV of the Annual NOI: | $4,287,382 |
| NPV of the Reversion: | $3,224,939 |
| MARKET VALUE: | $7,512,321 |
| ROUNDED TO: | $7,500,000 |
| Implied Going-in Cap Rate: | 7.47% |
| Value Estimate Per Room: | $22,659 |
| Number of Rooms: | 331 |

Hilco Real Estate Appraisal, LLC

Prepared by: Hilco Real Estate Appraisal LLC

**Addendum F**

**NYS General Real Estate Appraiser's License & Qualifications**

*Page 63*



UNIQUE ID NUMBER
46000026600

*State of New York*
*Department of State*
DIVISION OF LICENSING SERVICES

FOR OFFICE USE ONLY
Control
No.    66623

PURSUANT TO THE PROVISIONS OF ARTICLE 6E OF THE
EXECUTIVE LAW AS IT RELATES TO R.E. APPRAISERS.

EFFECTIVE DATE
MO. 10 | DAY 08 | YR 12

HARLAND CHRIS L
C/O HILCO REAL ESTATE APPRAISA
668 COLUMBIA TPKE
STE 3
EAST GREENBUSH, NY 12061

EXPIRATION DATE
MO. 10 | DAY 07 | YR 14

HAS BEEN DULY CERTIFIED TO TRANSACT BUSINESS AS A
R.E. GENERAL APPRAISER

In Witness Whereof, The Department of State has caused
its official seal to be hereunto affixed.

CESAR A. PERALES
SECRETARY OF STATE

DOS-1090 (Rev 3/01)

Hilco Real Estate Appraisal, LLC

*Addenda*

### Qualifications for Chris L. Harland, MAI

Hilco Real Estate Appraisal, LLC
Northeast Regional Manager

*Scope of Experience:*

Chris L. Harland, MAI has been engaged in the appraisal, underwriting and analysis of real estate throughout the northeast for 22 years. Before joining Hilco Real Estate Appraisal, Mr. Harland was the President of Capstone Appraisal Group, a commercial appraisal company based in New York's Capital District, for 13 years. He was also employed at three national, multi-service real estate companies: Grubb & Ellis Landauer, CB Richard Ellis, and Holliday Fenoglio Fowler. He began his career at McGrath, Basciani & Associates in 1990.

Mr. Harland holds the MAI (commercial) designation with the Appraisal Institute, the acknowledged worldwide leader in commercial and residential real estate appraisal education, research, publishing, and professional membership designation programs. Mr. Harland also holds a Master of Science in Real Estate (MS) degree from New York University with a concentration in Valuation and Analysis. He has held a variety of Appraisal Institute leadership positions and is actively involved in litigation support through court testimony as an expert witness.

*Specialties:*

Mr. Harland has performed studies and appraisals involving a wide range of property types including golf courses, hotels, resorts, and other hospitality-related assets, regional malls, shopping centers, big box stores, drug stores, student housing projects, mobile home parks, healthcare facilities, office buildings, industrial development, distribution facilities, apartment and condominium projects, residential and commercial subdivisions, as well as special-use developments such as restaurants, banks, religious facilities, schools, cultural and entertainment facilities, camps, automobile dealerships, farms and marinas.

*Professional Activities & Affiliations:*
Appraisal Institute, Member (MAI) – Certificate No. 11294
Upstate NY Chapter – Appraisal Institute – President (2007)
Upstate NY Chapter – Appraisal Institute – Board of Directors (2002-2010)
Upstate NY Chapter – Appraisal Institute – Regional Representative (2008-2012)
Capital District Chapter – Appraisal Institute – District Chair (2002 & 2006)
Nominating Committee – Appraisal Institute – Region IV (2011 & 2012)
Grievance Committee Member – Ethics and Counseling Department – Appraisal Institute
Instructor – Upstate NY Chapter - Appraisal Institute Case Studies Seminars
Commercial and Industrial Real Estate Brokers (CIREB) – Principal Appraiser Member
National Association of Realtors – Member # 634078833

*Certifications/Licenses:*
State Certified General Real Estate Appraiser (New York) – License No. 46000026600
State Certified General Real Estate Appraiser (various states throughout the northeast)

*Formal Education:*
Master of Science in Real Estate (MS), New York University (The Real Estate Institute), New York, NY
Bachelor of Arts Degree in History (BA), Franklin & Marshall College, Lancaster, PA
Appraisal Institute – Fulfilled requirements of the Continuing Education Program (effective through 12/31/17).
James Felt Scholarship – New York University (The Real Estate Institute), New York, NY

*Qualified Before Courts & Administrative Bodies:*
Mr. Harland has provided expert witness testimony in numerous counties throughout New York State, as well as Massachusetts, Connecticut and Vermont.

Hilco Real Estate Appraisal, LLC
668 Columbia Turnpike, Suite 3
East Greenbush, NY 12061
518-472-0380 (Main)  518-472-0388 (Fax)
charland@hilcorealestate.com

Hilco Real Estate Appraisal, LLC