UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re

                                                    Chapter 11

EVERYDAY LOGISTICS LLC,                        Case No. 10-22026 (RDD)

                    Debtor.
-----------------------------------------------------------------x


# DEBTORS SECOND AMENDED PLAN OF REORGANIZATION


**BACKENROTH, FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, New York  10017
(212) 593-1100
Counsel to the Debtor-in-Possession

## INTRODUCTION

Everyday Logistics, LLC ("Debtor"), proposes this Plan of Reorganization for the Debtor.  **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR, EACH OF THE DEBTOR'S CREDITORS, AND THE INTEREST HOLDERS (AS ALL SUCH TERMS ARE DEFINED BELOW)**.

### ARTICLE 1

### DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1     **"Administrative Expense"** Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(2) and allowed under section 503(b) of the Bankruptcy Code.

1.2     **"Administrative Expense Claim"** A claim for payment of an Administrative Expense.

1.3     **"Allowance Date"** shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

1.4     **"Allowed Claim"** shall mean a Claim against the Debtor: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

2

1.5    **"Allowed Secured Claim"** shall mean an Allowed Claim for which a Claimant asserts and is determined by a Final Order to hold a valid, perfected and enforceable Lien, security interest or other interest or encumbrance in property in which the Debtor has an interest not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law, or an Allowed Claim for which a Claimant asserts a setoff under Section 553 of the Bankruptcy Code and such Claim is allowed by Final Order, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property or to the extent of the amount subject to such setoff, as the case may be.

1.6    **"Allowed Unsecured Claim"** shall mean an Unsecured Claim to the extent same is allowed.

1.7    **"Bankruptcy Case"** shall mean this Chapter 11 bankruptcy case of the Debtor.

1.8    **"Bankruptcy Code"** shall mean Title 11 of the United States Code (11. U.S.C. §101 et. seq.), as in effect on the Petition Date and as amended during the Bankruptcy Case.

1.9    **"Bankruptcy Court"** shall mean the Court as defined below.

1.10    **"Cash"** shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

3

1.11 **"<u>Claim</u>"** shall mean a right to payment as set forth in §101(5) of the Bankruptcy Code.

1.12 **"<u>Claimant</u>"** shall mean the holder of a Claim.

1.13 **"<u>Confirmation Date</u>"** shall mean the date of the entry of the Confirmation Order.

1.14 **"<u>Confirmation Hearing</u>"** shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Court regarding the proposed confirmation of the Plan.

1.15 **"<u>Confirmation Order</u>"** shall mean the order of the Court confirming the Plan.

1.16 **"<u>Court</u>"** shall mean the United States Bankruptcy Court for the Southern District of New York.

1.17 **"<u>Creditor</u>"** shall mean any entity that holds a Claim against the Debtor.

1.18 **"<u>Debtor</u>"** shall mean Everyday Logistics, LLC.

1.19 **"<u>Disputed Claim</u>"** shall mean the whole or any portion of any Claim against the Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

4

1.20    **<u>Effective Date</u>** shall mean no later than the date upon which the Confirmation Order is a Final Order.

1.21    **<u>Estate</u>** shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.22    **<u>Executory Contracts</u>** shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

1.23    **<u>Final Order</u>** shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending. .

1.24    **<u>Forbearance Agreement</u>"** shall mean the agreement between Kennedy Funding, Inc., the Granit at the Hudson Valley Resort LLC and Eliot Spitzer, a copy of which is attached as Exhibit A hereto.

1.25    **<u>Interest</u>** shall mean an existing ownership interest in the Debtor.

1.26    **<u>Interest Holder</u>** shall mean a holder and owner of an existing Interest.

1.27    **<u>Legal Rate</u>"** shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Confirmation Hearing. .

1.28    **<u>Kennedy Funding</u>"** shall mean Kennedy Funding, Inc., and any successor or assign thereof, as agent under a certain Promissory Note, dated as of March 8, 2006 by and between the Debtor and Kennedy Funding.

5

1.29    **"<u>Lien</u>"** shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.30    **"<u>New Owner</u>"** shall mean the Granit at the Hudson Valley Resort LLC, the purchaser of the Property under the Plan.

1.31    **"<u>Petition Date</u>"** shall mean January 7, 2010, the date of the filing of the Bankruptcy Case by the Debtor.

1.32    **"<u>Plan</u>"** shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto. .

1.33    **"<u>Property</u>"** shall mean the Hudson Valley Resort and Spa located at 400 Granite Road, Kerhonkson, New York.

1.34    **"<u>Secured Claim</u>"** shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

1.35    **"<u>Secured Creditor</u>"** shall mean the owner or holder of a Secured Claim.

1.36    **"<u>Unsecured Claim</u>"** shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of the Debtor or the Debtor's Estate, (b) a right to setoff to secure the payment of such Claim, or (c) a Claim under section 506(a) of the Bankruptcy Code to the extent that a Creditor holds a Lien on Estate property and the value of such Creditor's interest in such property is less than the amount of such Creditor's Claim.  An Unsecured Claim also

6

includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code.

1.37    **<u>Unsecured Creditor</u>"** shall mean the owner or holder of an Unsecured Claim.

## ARTICLE 2)

## CLASSIFICATION AND TREATMENT OF CLAIMS

### <u>Class 1: Kennedy Funding</u>

2.1    **<u>Classification</u>** - Class 1 consists of the Secured Claim held by Kennedy Funding, the first mortgagee.

2.2    **<u>Treatment</u>** - The Secured Claim of Kennedy Funding is allowed in the amount of $17,676,110 as of July 2013 (including all principal, interest, default interest, late fees and other fees and charges) plus certain unliquidated costs and fees, without defense or set-off. The mortgage lien of Kennedy Funding (and all related obligations owed by the Debtor to Kennedy Funding) is deemed properly perfected, valid, and enforceable on the terms thereof. The mortgage lien and all related obligations shall survive confirmation of the Plan as restructured by the Forbearance Agreement and the Plan and shall remain a first priority lien and charge against the Property, regardless of any transfer of title to the Property pursuant to this Plan or otherwise.  Upon the timely and irrevocable payment by New Owner to Kennedy Funding of all payments and amounts due (and the timely satisfaction by New Owner of all obligations) as set forth in the Forbearance Agreement, on the terms and conditions set forth therein, the mortgage lien (and related obligations) shall be satisfied.  This provision shall

7

survive any dismissal of the Bankruptcy Case or its conversion to Chapter 7 and shall be binding

on any bankruptcy trustee.   In the event of any conflict between this provision and any other

provision of this Plan or otherwise, this provision shall prevail.   This provision may not be

modified without the express written consent of Kennedy Funding.   The Class 1 Claim shall be

paid pursuant to the Forbearance Agreement.   Without limiting or modifying the more detailed

terms of the Forbearance Agreement, certain essential terms are summarized as follows:

(a)    Borrower: the New Owner, the Granit at Hudson Valley Resort, LLC;

(b)    Maturity date: May 1, 2015;

(c)    Principal: $9,780,000;

(d)    Paydown Payments: $100,000 upon New Owner's execution of agreement (already paid) and $400,000 upon Effective Date (to be held in escrow with Debtor's counsel);

(e)    Interest rate: 6.5%;

(f)    Payment rate: $25,000.00 per month for the period June 1, 2013 through May 1, 2015;

(g)    Accrued Interest:  Any interest accrued ("Monthly Accruals") which is not required to be paid currently above shall be deferred and paid on the Maturity Date;

(h)    Payment on Maturity Date: all principal, interest and other sums due shall be due and payable in full on the Maturity Date;

(i)    Options to Payment in Full on Maturity Date.  Provided that no event of default shall have occurred, New Owner or its designee shall have the option to repay the obligation or purchase the obligations for the following amounts ("Purchase Price"):  (i) $10,450,000 less the Paydown Payments plus the Monthly Accruals if the tender is made on or before May 31, 2014, (ii) $10,650,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2014 and November 30, 2014, and (iii) $10,850,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2014 and May 31, 2015;

(j)    Option to Extend Maturity Date.  Provided that no event of default shall have occurred, borrower or its designee shall have the option to extend the Maturity Date on the following terms: (i) $250,000 payment due December 1, 2014, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (ii) $250,000 payment due March 1, 2015, to be applied to Purchase Price if Purchase Price paid  before June 1, 2015 (iii)

8

commencing June 1, 2015 monthly accruals cease (iv) monthly payments of $50,000 per month commencing June 1, 2015; (iv) $200,000 Purchase Price increase commencing June 1, 2015, (v) $200,000 Purchase Price increase commencing December 1, 2015 and (vi) final maturity date May 31, 2016.

(k)     Purchase Price Adjustment:  In the event a VLT License has been obtained, the Purchase Price shall be increased by $1,500,000, and in the event the Class III Casino License has been obtained, the Purchase Price shall be increased by $3,000,000.

(l)     In certain circumstances Kennedy Funding will be entitled to record a deed-in-lieu of foreclosure upon a monetary default, which will be held in escrow.

2.3    **Voting**    The holder of the Class 1 Claim is impaired and is entitled to vote to accept or reject the Plan.

**Class 2: Unsecured Claims**

2.4    **Classification** - Class 2 consists of Allowed Unsecured Claims.

2.5    **Treatment**    Each Class 2 Claimant shall be entitled to a pro-rata share of a distribution fund.  The distribution fund will be equal to 25% of annual net operating income after payment of all expenses (including interest and taxes), earned by the New Owner.  The distribution fund will be capped at a $750,000 aggregate total, over 4 years with the following distribution dates: May 31, 2014, May 31, 2015, and May 31, 2016 (the "Payment Schedule").  As set forth on Exhibit B, such distributions are projected to yield an aggregate 2.5% return to Unsecured Creditors.  However, distributions are contingent upon the availability of sufficient net operating income.  In the event the Property is sold before the Payment Schedule is complete, the difference between annual payments already made and the $750,000 aggregate capped amount shall be paid in full at closing.  In addition, if the Property is sold on or before May 31, 2016 to a buyer with a video lottery terminal license, an additional distribution shall be made at closing in the amount of $1,500,000 which is projected to yield a total 7.5% return to Unsecured

9

Creditors from the sale proceeds and distribution fund payments.  If the Property is sold on or

before May 31, 2016 to a buyer with a casino license, an additional distribution shall be made at

closing in the amount of $3,000,000 which is projected to yield a total 12.6% return to

Unsecured Creditors from the sale proceeds and distribution fund payments.

      2.6    **<u>Voting</u>**    Class 2 is impaired and is entitled to vote accept or reject the

Plan.

<b><u>Class 3: Interest Holders</u></b>

      2.7    **<u>Classification</u>**  Class 3 consists of the Debtor's Interest Holder.

      2.8    **<u>Treatment</u>** -- The Class 3 Interest Holder shall be entitled to no

distribution under the Plan, and the Debtor shall be dissolved after the Debtor has completed

claims objections and such other responsibilities as necessary and appropriate to implement the

Plan.

      2.9    **<u>Voting</u>**    The Class 3 Interest Holder is deemed to have rejected the Plan

under 1126(g) of the Bankruptcy Code.

<b>ARTICLE 3)</b>

<b>ADMINISTRATIVE EXPENSES, PRIORITY CLAIMS, AND STATUTORY FEES</b>

      3.1    Allowed Administrative Expenses shall be paid in full, in Cash on the later

of the Effective Date, or the date such Administrative Expense becomes Allowed, except to the

extent that the holder of an Allowed Administrative Expense agrees to a different treatment;

<u>provided</u>, <u>however</u>, that Allowed Administrative Expenses representing obligations incurred in

10

the ordinary course of business or assumed by the Debtor shall be paid in full or performed by the Debtor in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.

3.2    Allowed Priority Claims, including all Claims under Sections 507(a)(2), (3),(4),(5),(6),(7),and (8) of the Bankruptcy Code,  shall be paid in full in Cash on the Effective Date.  The Debtor estimates that the Allowed Priority Claims total approximately $1,200 on account of claims made by the State of New York and the United States Internal Revenue Service.

3.3    All outstanding United States Trustee fees and any applicable interest will be paid on or before the Effective Date.   Thereafter, all such fees and any interest shall be paid as they become due.

## ARTICLE 4)

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1    On the Effective Date of the Plan, the New Owner shall make the $400,000 Effective Date payment to Kennedy Funding as required by the Forbearance Agreement, and in addition shall fund payment of (a) Administrative Claims, in the estimated amount of $135,000, (b) Priority Claims, in the estimated amount of $1,200, and (c) fees payable to the Office of the United States Trustee, in the estimated amount of $50,000 (collectively, the "Effective Date Payments").  Projected post-Confirmation payments will be made by the New Owner from cash flow as set forth on the projections annexed as Exhibit B to the Plan.  In the event that actual operating results result in a default under the Forbearance Agreement, annexed

11

as Exhibit A to the Plan, Kennedy shall have the right to exercise its remedies as set forth in the Forbearance Agreement including recording a deed in lieu of foreclosure.  In the event that actual operating results do not permit payment to Unsecured Creditors, such payments will not be made.  Post-Confirmation payments due in the event of a sale of the Property will be due at closing by the New Owner as set forth more particularly in the Operating Agreement annexed hereto as Exhibit C.

4.2    The funds to be distributed under the Plan on the Effective Date shall be held in an IOLA account maintained by Backenroth Frankel & Krinsky, LLP until the Effective Date.  On the Effective Date, such funds will be turned over to the Debtor and the Debtor shall be the disbursing agent under the Plan for those funds.

4.3    **Transfer of Title to Property**   On the Effective Date, the New Owner shall acquire title to the Property free and clear of all Liens, claims and encumbrances, except the mortgage lien of Kennedy Funding as set forth in the Forbearance Agreement.     Post Confirmation Date, the New Owner shall be governed by its Operating Agreement, a copy of which is annexed to the Plan as Exhibit C.

4.4    **Good Faith Transfer**   In order to ensure consummation of the Plan, the Plan requires that  the Confirmation Order contain the following findings of fact and conclusions of law: (a) that the terms and conditions of the transfer of the Property to the New Owner are fair and reasonable, (b) that the transfer of the Property to the New Owner is non-collusive, fair and reasonable and was conducted openly and in good faith, (c) that the transfer of the Property to the New Owner represents an arm's-length transaction and was negotiated in good faith between

12

the parties, (d) that the New Owner, as transferee of the Property, is a good faith purchaser under Bankruptcy Code § 363(m) and, as such, is entitled to the full protection of Bankruptcy Code § 363(m), (e) the transfer of the Property to the New Owner was not controlled by an agreement among potential purchasers, (f) that no cause of action exists against the New Owner or with respect to the sale of the Property to the purchaser under Bankruptcy Code § 363(n), and (g) that any claims under Bankruptcy Code § 363(n) or any other claims as against the New Owner are hereby released, waived and discharged.

4.5    **Release of Liens**    Except as otherwise provided for in the Plan and in connection with the assumption and assignment of Kennedy Funding's mortgage, on the Effective Date, each holder of a Secured Claim, shall on the Effective Date (a) turn over and release to the New Owner any and all Collateral that secures or purportedly secures such Claim, as they pertain to the properties currently owned by the Debtor or such Lien shall automatically, and without further action by the Debtor or the New Owner, be deemed released, and (b) execute such documents and instruments as the Debtor or New Owner request to evidence such Claim holder's release of such property or Lien..

4.6    **Execution of Documents** -- The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

4.7    **Filing of Documents.**    Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all

documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and/or the Confirmation Order.

       4.8    **11 U.S.C. § 1146**.   Under the Plan, pursuant to Bankruptcy Code § 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Assets by Acquisition and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a) exemption, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded, any instrument of transfer of the title to the Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage tax, intangible tax or similar tax, including without limitation New York State Documentary Tax.

14

4.9 **Post-Confirmation Management**. The Debtor will be the disbursing agent for the Effective Date disbursement of Plan payments. Eliot Spitzer, as the managing member of Hotel K LLC, the Debtor's Managing Member shall be responsible for making such disbursements. Mr. Spitzer will manage the New Owner post-Confirmation Date. AAO Management LLC, an entity owned and controlled by Mr. Spitzer, will manage the Property Post Confirmation Date for the New Owner. AAO Management LLC will earn $200,000 annually for its services.

## ARTICLE 5)

## PROVISIONS FOR THE RETENTION, ENFORCEMENT AND SETTLEMENT OF CLAIMS BELONGING TO THE DEBTOR OR THE DEBTOR'S ESTATE

5.1 The Debtor does not believe that it has claims under Sections 544, 545, 546, 547, 548 or 549 of the Bankruptcy Code and does not intend to prosecute any such claims post-Confirmation.

## ARTICLE 6)

## PROVISIONS FOR THE RESOLUTION OF DISPUTED CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

6.1 **Objections to Claims**. The Debtor may object, on appropriate grounds, to the allowance of any Claim up to one hundred twenty (120) days following the Effective Date of the Plan subject to extension by Order of the Court for cause. Unless otherwise ordered by the Court, the Debtor reserves the exclusive right to, and shall object to the allowance of, Claims

15

listed in the Debtor's schedules or filed with the Court with respect to which it disputes liability

in whole or in part.  The Plan reserves the right of the Debtor to compromise, settle, withdraw or

resolve any such objections to Claims by any other method approved by the Court.

6.2     The Debtor may, at any time, request that the Court estimate any

contingent or unliquidated Claim pursuant to § 502(c) of the Bankruptcy Code regardless of

whether the Debtor previously objected to such Claim or whether the Court has ruled on any

such objection. The Court shall retain jurisdiction to estimate any such contingent or

unliquidated Claim at any time during litigation concerning any objection to any Claim,

including during the pendency of any appeal relating to any such objection.  All of the

aforementioned claim objection, estimation and resolution procedures are cumulative and are not

necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any

permitted method.

6.3     **Distribution on Disputed Claims**.  No distribution shall be made with

respect to a Disputed Claim until the resolution of such dispute by Final Order or by

compromise, settlement, withdrawal or resolution by any other method approved by the

Bankruptcy Court thereby becoming an Allowed Claim.  As soon as practicable after a Disputed

Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments

and/or distributions to which such holder is then entitled under the Plan.

6.4     **Reserve for Disputed Claims**.  If Disputed Claims exist as of the

Effective Date, the Debtor shall hold for the benefit of each holder of a Disputed Claim, cash in

amount equal to the distributions which would have been made to the holder of such Disputed

16

Claim if it were an Allowed Claim as of the Effective Date in an amount equal to the lesser of: (i) the amount listed in the schedules if no proof of claim was timely filed; (ii) the amount filed with the Bankruptcy Court; or (iii) the amount as estimated by the Bankruptcy Court pursuant to §502(c) of the Bankruptcy Code.

## ARTICLE 7)

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1    **Assumption**.  At least 10 days prior to the Confirmation Hearing, the Debtor shall designate those Executory Contracts that the Debtor shall seek to assume and assign to the New Owner.   Such designation shall be made by the filing of a notice in the docket of this case and by service by overnight delivery to the counterparties to such agreements.   All Executory Contracts not so designated shall be deemed rejected under the Plan as of the Confirmation Date.

7.2    **Claims Upon Rejection**.  In the event of a rejection of any Executory Contract which results in damage to the other party or parties to the Executory Contract, a Proof of Claim for such damages must be filed by the damaged party with the Court within sixty (60) days after the Effective Date.  All Allowed Claims arising from the rejection of any Executory Contract shall be treated as Unsecured Claims.

7.3    **Failure to File**.  Any Claim arising from the rejection of any Executory Contract not filed with the Court within the time period provided in the preceding paragraph above shall be deemed discharged and shall not be entitled to participate in any distribution under the Plan.

**ARTICLE 8)**

**RETENTION OF JURISDICTION**

8.1    **Retention of Jurisdiction**.    The Court shall have jurisdiction over all matters arising under, arising in, or relating to the Debtor or the Bankruptcy Case, including, but not limited to, proceedings:

8.1.1.    To consider any modification of the Plan under section 1127 of the Bankruptcy Code;

8.1.2.    To hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 28 U.S.C. § 1334 and 28 U.S.C. §157.

8.1.3.    To hear, determine and enforce all Claims and causes of action which may exist on behalf of the Debtor or the Estate, including, but not limited to, any right of the Debtor or the Estate to recover assets pursuant to the provisions of the Bankruptcy Code;

8.1.4.    To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

8.1.5.    To value assets of the Estate.

8.1.6.    To enforce the Confirmation Order, the final decree, and all injunctions therein;

8.1.7.    To enter an order concluding and terminating the Bankruptcy Case;

8.1.8.   To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

8.1.9.   To determine all questions and disputes regarding title to the assets of the Debtor and liens against such assets.

8.1.10. To re-examine Claims which may have been allowed for purposes of voting, and to determine objections which may be filed to any Claims;

## ARTICLE 9)

## GENERAL PROVISIONS

9.1     **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

9.2     **Contents of Confirmation Order**.  The Confirmation Order may contain such injunctions and other orders as may be necessary to implement the Plan.

9.3     **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a creditor holding a Disputed Claim, until such Claim, or any part thereof, becomes an Allowed Claim, if ever.

9.4     **Discharge of Claims not Classified**.   Any Claim not specifically classified within this Plan shall not receive distributions under the Plan on account of such Claim, and shall be deemed discharged and forever barred.

19

9.5    **Calculation of Time Periods**.    Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

9.6    **Other Actions**.    Nothing contained herein shall prevent the Debtor, Interest Holders, or Creditors from taking such actions as may be necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan.

## ARTICLE 10)

## MODIFICATIONS

10.1    **Modification of Plan.**    The Debtor may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Debtor may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE 11)

## INJUNCTION, DISCHARGE AND PROPERTY OF THE ESTATE

11.1    **Discharge**.  The confirmation of this Plan shall discharge the Debtor from any Claim that accrued or arose on or before the Confirmation Date, pursuant to 11 U.S.C. §1141(d)(1).

11.2    **Vesting of Property**.  Except as otherwise provided in the Plan, on the Effective Date title to all of the Debtor's assets shall pass to the New Owner free and clear of all Liens, Claims and Interests, including, without limitation, all Liens and mortgages subordinate to the Class 1 Claimant's mortgage, in accordance with Section 1141 of the Bankruptcy Code.

20

# ARTICLE 12)

## CLOSING THE CASE

12.1    Upon substantial consummation of the Plan, the Debtor may move for a

final decree to close the Bankruptcy Case and to request such other orders as may be just.

Dated:    New York, New York
          October 2, 2013

**Everyday Logistics, LLC, by Hotel K LLC,
its Managing Member**

By:    s/Eliot Spitzer, Managing Member

**BACKENROTH FRANKEL & KRINSKY,
LLP, Attorneys for the Debtor**

By:    s/Mark Frankel
       Mark A. Frankel
       489 Fifth Avenue
       New York, New York 10017
       (212) 593-1100

Exhibit A

# FORBEARANCE AGREEMENT

This **FORBEARANCE AGREEMENT** (this "Agreement") is executed as of the 1st day of June, 2013 (the "Effective Date"), by and among **KENNEDY FUNDING, INC.** ("Agent"), a New Jersey corporation having an address at 930 Sylvan Avenue, Suite 110, Englewood Cliffs, New Jersey 07632, as agent for the lenders identified on Schedule D to the Note (as defined below) and incorporated herein by reference, in each case having an address care of Kennedy Funding, Inc., 930 Sylvan Avenue, Suite 110, Englewood Cliffs, New Jersey 07632 (the aforesaid Agent and lenders are hereinafter collectively referred to as "Lender"), **THE GRANIT AT HUDSON VALLEY RESORT LLC,** a _____ limited liability company, having an address at 400 Granite Road, Kerhonkson, New York ____ (the "Borrower"), and **ELIOT SPITZER** residing at _____, ("Spitzer").

# BACKGROUND

A.      Lender previously made a loan to Everyday Logistics LLC ("Original Borrower") in the original principal amount of **NINE MILLION SEVEN HUNDRED EIGHTY THOUSAND ($9,780,000) DOLLARS** ("Loan"), which is evidenced by a Promissory Note, dated as of March 8, 2006, in the original principal amount of the Loan made payable to Lender ("Note").

B.      Lender is the holder of a Mortgage and Security Agreement, dated March 8, 2006 (the "Mortgage"), recorded in the Ulster County Clerk's Office in Book _____, Pages ____ on _____, encumbering certain real property and improvements commonly known as 400 Granite Road, Kerhonkson, New York _____ as more particularly described in _____ Title Report No. _____, as security for the Loan such real property and improvements being shown on the survey prepared by D.W. Hannig L.S., P.C. and attached hereto as Schedule A (the "Property").

C.      In addition to the Mortgage, the Loan is also secured by, among other things, that certain Loan and Security Agreement, dated March 8, 2006 (the "Loan Agreement") and that certain Guaranty, dated March 8, 2006 (the "Guaranty"), pursuant to which Spitzer irrevocably and unconditionally guaranteed to Lender payment and performance of the Loan.

D.      Following various defaults of its obligations under the Loan, Original Borrower filed for Chapter 11 protection in the United States Bankruptcy Court, Southern District of New York, Proceeding No. 10-22026 (the "Bankruptcy Proceeding").

E.      The Borrower and the Original Borrower will be seeking approval in the Bankruptcy Proceeding for a plan (the "Bankruptcy Plan").  Wherever in this Agreement approval of the Bankruptcy Plan is addressed, approval shall mean a final, non-appealable order approving the Bankruptcy Plan in the Bankruptcy Proceeding.

F.     Pursuant to the Bankruptcy Plan, Lender has agreed that Borrower may assume the Loan, which Borrower hereby acknowledges and agrees is due and payable to Lender by reason of the Events of Default described herein and Borrower and Guarantor have requested that Lender forbear from exercising certain of its rights and remedies pursuant to the Loan Documents to allow Borrower an opportunity to satisfy, in full, its payment obligations to Lender under the Loan Documents, and Lender is willing to so forbear on the terms and conditions hereinafter stated.

**NOW, THEREFORE**, the parties agree as follows:

1.     <u>Incorporation of the Recitals</u>.  All of the recitals set forth above are made a part of this Agreement and incorporated herein as if set at length in the text of this Agreement.

2.     <u>Definitions</u>.

(a)     "<u>Borrower</u>" shall mean The Granit at Hudson Valley Resort LLC**,** a _____ limited liability company.

(b)     "<u>Debtors</u>" shall mean the Borrower and the Guarantor collectively.

(c)     "<u>Deed Release Event of Default</u>" shall mean the failure to make any payment as and when due under Section 4(e)(ii) hereof; the failure to make any payment of local real property taxes on the Property after ninety (90) days has elapsed from the due date of such taxes and Lender has delivered a notice of default, in which case Borrower shall have an additional twenty (20) days in which to make payment of said taxes plus interest and penalties thereon, but said ninety (90) and twenty (20) day periods shall terminate immediately upon commencement of a foreclosure action by the appropriate governmental authority, or the failure to maintain the liability or property insurance for the Property required by the Loan Documents; unless Borrower fails to pay to Lender, within thirty (30) days after receipt of notice that Lender made payment to renew, reinstate or replace any such insurance policy, such payment to be in the amount of Lender's payments to renew, reinstate or replace plus 10% thereof.

(d)     "<u>Guarantor</u>" shall mean Eliot Spitzer.

(e)     "<u>Indebtedness</u>" shall mean (i) the Loan Amount plus (ii) all other amounts owed by Borrower and/or Guarantor to Lender in connection with the Loan Documents, the sum of which is the amount of [$17,676,109.52].

(f)     "<u>Lien</u>" shall mean any mortgage, pledge, assignment, hypothecation, security interest, encumbrance, lien, charge or deposit arrangement or other arrangement having the practical effect of the foregoing.

(g)     "<u>Loan</u>" shall mean that certain loan in the original principal amount of $9,780,000 made by Lender to Borrower.

(h)     "<u>Loan Amount</u>" shall mean $9,780,000, but shall be reduced to $9,280,000 upon the receipt by Lender of the Paydown Payments.

(i)     "<u>Loan Documents</u>" shall mean the Note, Guaranty, Mortgage, and Loan Agreement as amended to date, this Forbearance Agreement and all instruments, documents, mortgages and agreements executed in connection therewith or related thereto, and amendments, modifications, or supplements thereto, collectively.

(j)     "<u>Proceeds</u>" shall mean all "proceeds" as such term is defined in Section 9-306(1) of the Uniform Commercial Code as in effect in the State of New Jersey on the date hereof ("<u>UCC</u>").

(k)     All capitalized terms not otherwise defined herein shall have the meaning ascribed thereto in the Loan Documents.

3.     <u>Ratification of Existing Obligations</u>.  Borrower and Guarantor hereby ratify and confirm in all respects the obligations as evidenced by or otherwise arising under the Loan Documents including all of the terms, representations and undertakings set forth therein, in each case, as modified by this Agreement.  In the event of any inconsistency, this Agreement shall control.

4.     <u>Acknowledgement of the Indebtedness, Payments</u>.

(a)     <u>Confirmation of Indebtedness</u>.  Borrower hereby acknowledges and confirms it is indebted to Lender, without defense, setoff, claim or counterclaim under the Loan Documents, in the aggregate principal amount of $9,780,000, together with all accrued and unpaid interest thereon in the amount of $8,751,870.00 less a credit of $909,100 in respect of payments made subsequent to the commencement of the Bankruptcy Proceeding, plus all fees, costs and expenses (including attorneys' fees in the amount of $53,339.52) incurred to date, which amounts are absolutely and unconditionally owing without defense, setoff, claim, counterclaim or deduction of any nature.  Borrower acknowledges that the entire outstanding Indebtedness owed to Lender as of the date hereof is Seventeen Million Six Hundred Seventy-Three Thousand One Hundred Nine and 52/100 ($17,676,109.52) DOLLARS.

(b)     <u>Acknowledgment and Agreement of Payments</u>.  Borrower expressly acknowledges that all payments made to Lender or its counsel prior to the date hereof by Borrower, Original Borrower, or any other party, are fully earned and non-refundable.  Prior to the execution and delivery hereof, the Borrower has tendered $500,000 to Backenroth & Frankel as escrow agent ("the <u>Escrow Agent</u>").  Lender acknowledges that $100,000 of said deposit has been paid to it prior to execution and delivery hereof, which

Borrower acknowledges is fully earned and non-refundable. Upon approval of the Bankruptcy Plan in the Bankruptcy Proceeding the Escrow Agent shall pay to the Lender the balance in the amount of $400,000; provided that if the Bankruptcy Plan has not been approved by the following dates, then the respective amounts shall be paid on such dates: August 31, 2013, the amount of $50,000; September 30, 2013, the amount of $100,000; October 30, 2013, the amount of $100,000; November 31, 2013, the amount of $100,000; and December 30, 2013, the amount of $50,000. If the Bankruptcy Plan is approved prior to any such dates, the remaining balance of the $400,000 shall be paid on the date of such approval. Such $500,000 in payments are earned as of the date hereof and non-refundable, and shall be referred to herein as the "Paydown Payments" when actually received by Lender and shall reduce the principal amount of the Loan.

(c)    Certain Covenants. Borrower covenants that it shall, promptly following the Effective Date (i) use good faith to obtain a VLT License at its sole cost and expense, (ii) use good faith to obtain a Class III Casino License at its sole cost and expense, and (iii) cooperate fully with Lender in listing the Loan for sale with one or more brokers, and on such terms as approved by Lender in its discretion in accordance with the terms hereof.

(d)    Payment of Expenses. Debtors acknowledge and agree they are liable for all reasonable fees, costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with the documentation, preparation, interpretation and negotiation of this Agreement and any amendment, modification or supplement to this Agreement, the consummation and administration of the transactions contemplated hereby and thereby and the enforcement, preservation, protection or defense of any of the Lender's rights and remedies hereunder and under the Loan Documents. All such fees, costs and expenses are referred to herein as the "Expenses".

(e)    Interest Rate; Payments.

(i)    As of the Effective Date, interest shall accrue on the Loan Amount at a rate per annum equal to 6.5 %; provided, however, (A) if Borrower or Guarantor makes any attempt to repudiate in writing any of their obligations, including those obligations set forth herein; (B) if any federal or state bankruptcy, insolvency, or similar proceeding is initiated by or against Borrower or any Guarantor and not dismissed within sixty (60) days after the initiation thereof; or (C) upon an Event of Default under this Agreement (other than an Existing Default), then interest shall accrue retroactively on the outstanding principal balance of the Loan at the Default Rate from the Effective Date, until the date Lender receives repayment in full of the Loan and all other Indebtedness due and payable to Lender;

(ii)    Borrower shall pay to Lender as follows:

(A)    (1)  payments of $25,000 per month shall be made on the first day of each month, commencing on June 1, 2013 through May 1, 2015 (provided that in the event this Agreement is fully executed after June 1, 2013 all payments due prior to such execution shall be due retroactively and be paid upon such execution) and the balance in the amount of $25,267 shall be accrued monthly (the "Monthly Accruals");

(2)  payments of $50,267.00 per month shall be made on the first day of each month, commencing on June 1, 2015 through May 1, 2016;

(B)    (1)  the amount of $250,000 shall be paid to Lender on or before December 1, 2014 unless the Loan has been repaid in full prior to such date;

(2)  the amount of $250,000 shall be paid to Lender on or before March 1, 2015 unless the Loan has been repaid in full prior to such date.

(C)    the entire Indebtedness and all accrued and unpaid interest shall be paid on May 31, 2016 (the "Maturity Date"); and

(D)    upon payment in full of the Indebtedness or payment of the Purchase Price, Lender shall issue a satisfaction or assignment of the Loan, at no additional cost, subject to the right of Lender to maintain the lien of record for one year after such payment in order to secure only the payment described in Section 4(e)(iv) below )the "Maintained Lien").

(iii)    in the event that there has been no further default under the Loan and the Borrower tenders repayment in full of the Indebtedness, then the Borrower may repay or acquire the Indebtedness at the following amounts (the "Purchase Price") as set forth below:

(A)    $10,450,000 less the Paydown Payments plus the Monthly Accruals if the tender is made on or before May 31, 2014.

(B)    $10,650,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2014 and November 30, 2014. and

(C)    $10,850,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2014 and May 31, 2015.

(D)    $11,050,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between June 1, 2015 and November 30, 2015.

(E)    $11,250,000 less the Paydown Payments plus the Monthly Accruals if the tender is made between December 1, 2015 and May 31, 2016.

(iv)    In the event the VLT License has been obtained for the Property, the Purchase Price shall be increased by $1,500,000.  In the event the Class III Casino License has been obtained for the Property, the Purchase Price shall be increased by $3,000,000.  If neither the VLT License or the Class III Casino License has been obtained at the time the Purchase Price has otherwise been tendered, the Lender shall subordinate the Maintained Lien to the mortgage lien of the lender providing the refinancing proceeds.  If there is no possibility at such time for either such license to be granted, as evidenced by an affidavit of Eliot Spitzer, Lender shall release the Maintained Lien.  At any time after payment of the Purchase Price if Borrower pays to Lender an additional $500,000, Lender shall release the Maintained Lien.

(f)    Additional Terms.

(i)    All interest accrued but not required to be paid monthly pursuant to Section 4 (e) (i), (ii), or (iii) above shall be paid on the Maturity Date. All dates for payments required under the Loan are deemed to be of the essence. If any payment pursuant to Section 4 (e) (i), (ii) or (iii) is not made when due, the Loan shall be deemed to be irrevocably in default if such payment is not cured within 10 days of the date due by payment of the unpaid amount plus a late fee of 10% of the unpaid amount. No payment made pursuant to Section 4(e)(ii)(A) shall be applicable to the Purchase Price.  No payment made pursuant to Section 4 (e)(ii)(B) shall be applicable to the Purchase Price, unless the Loan is repaid in full prior to June 1, 2015 in which event the payments made pursuant to Section 4(e)(ii) Borrower shall reduce the Purchase Price.  In the event there is an uncured default under the Loan on or before May 31, 2016, the entire amount of $17,676,190.52 together with all accrued and unpaid interest, costs, and expenses shall be due and payable immediately

(ii)    All payments due to Lender shall be paid in immediately good funds by wire transfer to such account as Lender directs Borrower in writing.

5.    Borrower's Obligations.

(a)    Appointment of Independent Director.  As a condition to the effectiveness of this Agreement, Borrower shall deliver to Lender a written amendment to Borrower's constituent organizational documents in form and substance satisfactory to Lender providing for the appointment of an independent third-party manager whose affirmative vote shall be required prior to Borrower seeking any relief pursuant to the United States Bankruptcy Code or any state debtor-relief law or regulation.  The independent director shall be selected by Borrower and shall be subject to the approval of Lender.  The appointment of such independent director or directors shall occur prior to the execution of this Agreement by Borrower.

(b)    Payment of Expenses.  On or before the Effective Date, Borrower agrees to pay Lender the amount of _____ **and ___/100**

**($_____.00) DOLLARS** for payment of certain Expenses incurred by the Lender in connection with the documentation, preparation, interpretation and negotiation of this Agreement and the consummation and administration of the transactions contemplated hereunder.

(c)     <u>Liens</u>.  On or before the Effective Date, Borrower shall deliver evidence reasonably satisfactory to Lender that Borrower has paid and discharged any and all claims of lien recorded against the Mortgaged Property (other than the Mortgage and Liens of record against the Mortgaged Property as of the Closing Date which were acceptable to Lender on the Closing Date) or effect the release thereof by recording or delivering to Lender a surety bond in sufficient form and amount or provide Lender with other evidence, which Lender deems, in its sole discretion, to be in an amount and form sufficient and from a surety satisfactory for payment of such claims of lien, for the full and continuous protection of Lender from the effect of such liens.

(d)     <u>Updated Title Report and Endorsement to Lender's Title Policy</u>.  On or before the Effective Date, Borrower shall deliver to Lender a title report with respect to the Mortgaged Property from a title insurance company reasonably satisfactory to Lender evidencing that the Mortgage continues to constitute a first priority Lien on the Mortgaged Property and that no Lien exists against the Mortgaged Property other than those Liens of record against the Mortgaged Property as of the Closing Date which were acceptable to Lender on the Closing Date.

(e)     <u>Deed in Lieu of Foreclosure</u>.  Upon the execution and delivery of this Agreement:

(i)     Borrower shall duly execute a Deed in Lieu of Foreclosure in the form attached hereto as **Exhibit A** and made a part hereof for the Mortgaged Property ("<u>Deed in Lieu</u>"), together with all necessary forms sufficient to transfer fee title to the Mortgaged Property to Lender or Lender's assignee.  The Deed in Lieu shall be delivered to and held in escrow by Lender's counsel, Sills Cummis & Gross PC, in accordance with the terms and conditions of that certain Escrow Agreement executed and entered into simultaneously herewith.

(ii)     Borrower acknowledges and agrees that upon a Deed Release Event of Default pursuant to this Agreement (other than the Existing Defaults), Lender has the absolute right, but not the obligation, to release from escrow and record the Deed in Lieu, upon 20 days advance written notice to Borrower if the Deed Release Event of Default has not been cured, and to take any and all necessary measures to acquire title to the Mortgaged Property and to extinguish Borrower's interest in the Mortgaged Property. Without limiting any rights or powers granted to Lender by this Agreement and/or the Loan Documents, Borrower hereby appoints Lender the attorney-in-fact of Borrower, which appointment as attorney-in-fact is irrevocable and coupled with an interest, for the purpose of carrying out the provisions of this Agreement and the Deed in Lieu and taking

any action and executing any instruments which Lender may deem necessary or advisable to accomplish the purposes hereof including, without limitation, to execute, in connection with the conveyance of the Mortgaged Property to Lender pursuant to the Deed in Lieu, any endorsement, assignments, or other instruments of conveyance or transfer with respect to the Mortgaged Property. Borrower shall pay any and all transfer and/or recording taxes or fees associated with the filing of the Deed in Lieu and/or the transfer of title to the Mortgaged Property to Lender. Borrower shall cooperate fully with Lender, now and at all times in the future, to effect a prompt, complete and lawful conveyance and transfer to Lender or its designee of the Mortgaged Property pursuant to and as contemplated by the provisions of this Agreement and the Deed in Lieu, and promptly take all actions reasonably required by Lender to effect any such conveyance and transfer, including (without limitation) supplying information regarding the Mortgaged Property, completing and executing such further documentation as Lender may reasonably consider necessary or appropriate promptly to effect any such conveyance and transfer. The authorization and power of attorney granted to Lender pursuant to this paragraph shall be deemed coupled with an interest and shall be irrevocable.

(iii)    If Lender elects, in its sole discretion, to record the Deed in Lieu upon a Deed Release Event of Default, Borrower acknowledges and agrees the Deed in Lieu is intended to be and constitute an absolute conveyance of title to the Mortgaged Property and is not intended to be a mortgage, trust, conveyance or security of any kind. Borrower further agrees and acknowledges that the Mortgage shall not merge into the fee interest conveyed by the Deed in Lieu, but that the Mortgage shall survive and remain as a good and valid mortgage, separate and apart from any other interest of Lender in the Mortgaged Property. **IT IS FURTHER AGREED AND ACKNOWLEDGED THAT THE TRANSFER CONTEMPLATED BY THE DEED IN LIEU SHALL NOT CONSTITUTE A FULL OR PARTIAL SATISFACTION, WAIVER OR RELEASE OF THE INDEBTEDNESS EVIDENCED BY ANY INSTRUMENT SECURED BY OR MADE IN CONJUNCTION WITH THE MORTGAGE**.

(iv)    Notwithstanding the foregoing, provided that the Deed in Lieu has not been previously released from escrow in accordance with this Agreement and the Escrow Agreement, upon Lender's receipt of payment in full of the Indebtedness as set forth in this Agreement, then Lender shall promptly authorize the release of the Deed in Lieu from escrow and the delivery of same to the possession of Borrower or Borrower's attorney on behalf of Borrower.

(v)    Borrower and Lender shall duly execute a Consent Judgment of Foreclosure in the form attached hereto as Exhibit B in the case entitled Kennedy Funding, Inc. v. Everyday Logistics, LLC presently pending in Ulster County in [New York State Supreme Court], No. ___. The Consent Judgment of Foreclosure shall be held in escrow by Lender's counsel, and released from escrow, on the same terms and conditions as set forth with respect to the Deed in Lieu.

(vi)    The remedies of Lender described in this Section 5€shall be referred to as the "Deed Release Remedies".

(f)    Borrower Documents.  The following documents of Borrower, which shall be satisfactory to Lender in its sole discretion, shall be delivered to Lender upon execution of this Agreement:

(i)    Amendment to the Limited Liability Company Operating Agreement and Articles of Organization.  Certified copy of (A) the First Amendment to the Limited Liability Company Operating Agreement of the Borrower, and (B) the First Amendment to the Articles of Organization of Borrower, pursuant to which an independent third-party manager has been appointed whose affirmative vote shall be required prior to Borrower seeking any relief pursuant to the United States Bankruptcy Code or any state debtor-relief law or regulation, provided that this condition may be satisfied after execution of this Agreement, but prior to approval of the Bankruptcy Plan.

(ii)    Consents.  Written consents of (A) All of the members and managers of the Borrower authorizing the execution of this Agreement and the execution and delivery of all documents required pursuant hereto, and (B) all other parties deem necessary by Lender.

6.    Additional Covenants and Agreements.  The Debtors, jointly and severally, further covenant and agree with the Lender that:

(a)    Each Debtor shall comply with all terms, covenants and provisions contained in the Loan Documents as applicable and as modified by this Agreement; and

(b)    Each Debtor shall at any time or from time to time execute and deliver such further and additional instruments and documents, and take such further action as Lender may reasonably request, in each case to further the purposes of this Agreement and the Loan Documents.

(c)    The United States Bankruptcy Court shall retain jurisdiction with respect to the Loan and the obligations of the Original Borrower and the Debtors thereunder and under the Bankruptcy Plan. In the event of any dispute under this Forbearance Agreement, the parties shall submit to the jurisdiction of the United States Bankruptcy Court, unless another forum is chosen by Lender in its sole and absolute discretion.

7.    Reservation of Rights.  By agreeing to forbear from the exercise of those rights and remedies granted to Lender under the Loan Documents, Lender does not waive any of its rights or remedies with respect to the Existing Defaults.  All rights and remedies of the Lender with respect to the Existing Defaults are hereby preserved pending fulfillment of the Borrower's obligations under this Agreement and under the

Loan Documents.  The granting of the forbearance hereunder shall not, other than as expressly provided herein, be deemed a waiver of the Lender's rights and remedies or constitute a course of conduct or dealing on behalf of the Lender.  Upon an Event of Default, Lender shall have the right to exercise one or more of its rights and remedies hereunder or pursuant to the Loan Documents or at law or in equity.  Lender's agreements contained herein are limited to the express terms of this Agreement, and except as expressly set forth herein, shall not impair any right or remedy of Lender, or any of Borrower's obligations to Lender, as applicable, or Lender's right to enforce full and strict performance of all of the terms of the Loan Documents.

       8.    <u>Representations and Warranties</u>.  The Debtors, jointly and severally, represent and warrant to the Lender that:

       (a)    All warranties and representations made by the Original Borrower and Guarantor under the Loan Documents are hereby incorporated by reference and remain true and correct as of the Effective Date (except for those warranties and representations that are made as of a specific date which shall be true and correct as of such date and except that Original Borrower is operating pursuant to the Bankruptcy Proceeding).

       (b)    The execution and delivery by the Debtors of this Agreement and the performance by them of the transactions herein contemplated:

       (i)    are and will be within their respective powers;

       (ii)    have been authorized by all necessary organizational action; and

       (iii)    are not and will not be in contravention of any order of any court or other agency of government, of law or any other indenture, agreement or undertaking to which they are a party or by which their property is bound, or be in conflict with, result in a breach of, or constitute (with due notice and/or lapse of time) a default under any such indenture, agreement or undertaking or result in the imposition of any lien, charge or encumbrance of any nature on any of the properties of any Debtors.

       (c)    This Agreement is the valid and binding agreement of the Borrower and Guarantors, and is enforceable against each of them in accordance with its respective terms.

       (d)    No Event of Default, other than the Existing Defaults, has occurred under the Loan Documents.

9.    Default.

(a)    In addition to each of the Events of Default, other than the Existing Defaults, set forth in the Loan Documents, the (i) failure of any Debtor to comply with his or its representations, warranties, covenants or other undertakings under this Agreement, and (ii) occurrence or institution of any action or proceeding which may materially adversely affect the Borrower's ability to perform under this Agreement (as determined by Lender in its sole discretion exercised in good faith), but excluding the inability to obtain approval of the Bankruptcy Plan by _____, 2013 if approval of assignment of this Agreement to Original Borrower is approved in the Bankruptcy Proceeding by such date, shall be an Event of Default under this Agreement and the Loan Documents,  provided that Lender shall give notice and opportunity to cure any Event of Default other than a Deed Release Event of Default for a period of at least 60 days, and if default cannot be cured in 60 days, such reasonable additional time if Borrower is diligently pursuing a cure. Absent a Deed Release Event of Default, Lender's remedies shall not include termination of this Agreement, nor Lender's Deed Release Remedies.

(b)    Intentionally Deleted.

(c)    Any default, other than the Existing Defaults, by the Debtors under any of the Loan Documents, shall be considered an Event of Default hereunder and an Event of Default under all of the Loan Documents, and upon the occurrence of such an Event of Default, Lender shall have such rights remedies it is otherwise entitled to except as limited in Section 9 (a) above.

10.    Non-Waiver.  No omission or delay by the Lender in exercising any right or power under this Agreement, the Loan Documents or any related agreement will impair such right or power or be construed to be a waiver of any default or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and no waiver will be valid unless in writing and signed by the Lender and then only to the extent specified.  Lender's rights and remedies are cumulative and concurrent and may be pursued singly, successively or together.  No waiver of any event of default shall be construed to be a waiver of or acquiescence in or consent to any preceding or subsequent event of default.

11.    Release.  As further consideration for the Lender's agreement to grant the accommodations set forth herein, the Debtors hereby waive and release and forever discharge the Lender and its officers, directors, attorneys, agents, employees, affiliates, subsidiaries, successors and assigns from any liability, damage, claim, loss or expense of any kind that any of the Debtors may now or hereafter have against the Lender or any such other person arising out of or relating to events, actions or inactions occurring through and including the Effective Date with respect to the Indebtedness, this Agreement, the Note, or the other Loan Documents.

12. <u>Waivers</u>.

(a)     The Debtors will not, directly or indirectly, do any act or fail to do any act, which would impair or affect the Lender's security interest in any collateral or other security interests, nor will the Debtors, upon any default or Event of Default under this Agreement or the other Loan Documents, contest the Lender's right to obtain judgment against any Debtor or to foreclose upon any collateral or interests pledged to the Lender, nor will any Debtor move to vacate or enjoin such judgment or foreclosure.

(b)     The Debtors waive and renounce all rights which are waivable under Article 9 of the UCC, whether such rights are waivable before or after default, including, without limitation, those rights with respect to compulsory disposition of collateral (UCC §§9-610, 9-615 and 9-620), any right of redemption under UCC §9-623, and any right to notice relating to disposition of collateral under UCC §9-611.

(c)     The Debtors specifically agree that, for valuable consideration which Debtors acknowledge having been received herein, the Lender shall be entitled at all times to relief from the automatic stay under Section 362 of the Bankruptcy Code, any stay or other form of creditor restraint imposed under Section 105 or any other section of the Bankruptcy Code or any other stay or creditor restraint imposed under any other proceeding, any of which would adversely impact the rights and remedies that are available to the Lender under this Agreement, the other Loan Documents or applicable law.  The Debtors, to the fullest extent permitted by law, irrevocably and unconditionally consent to such relief and hereby irrevocably and unconditionally waive their rights to object to the foregoing relief.  In the event the Borrower files any bankruptcy or insolvency proceeding, the Borrower hereby consents and agrees that this Agreement shall be deemed to be a stipulation between Lender and Borrower that an order providing that Borrower shall not be entitled to use cash collateral (to the extent a claim is raised by the Debtors that any cash or other collateral actually constitute cash collateral which the Lender does not concede) in any manner shall be entered by the bankruptcy or other court, and the Borrower shall not oppose the entry of such an order by any bankruptcy or other court.

(d)     Borrower hereby represents and warrants that it has no present intention to currently or in the future file a voluntary petition for bankruptcy under any chapter of the Bankruptcy Code, or any other proceeding to liquidate, reorganize or rehabilitate under any state or other federal law or under any law of any foreign jurisdiction (collectively, an "<u>Insolvency Proceeding</u>").

(e)     In the event of a subsequent Insolvency Proceeding by, against or involving Borrower, Borrower shall not contest any claim or assertion by Lender that the Loan is binding between the parties, and that valuable consideration has been received by Borrower for same.

(f)     If, for any reason, Borrower becomes a debtor in a case under any chapter of the Bankruptcy Code, then Borrower hereby agree as follows:

(i)     Borrower acknowledges and agrees that, for the duration that the automatic stay may remain in effect in any such bankruptcy case, the minimum that would constitute "adequate protection" for the interests of Lender must, at a minimum, include each of the following:  (a) a cure of any and all prepetition monetary defaults under the Loan Documents within sixty (60) days from the commencement of the case; (b) the timely performance of all monetary obligations under the Loan Documents arising from and after the commencement of the case; and (c) the debtor in such case shall file, within ninety (90) days of the commencement of the case, a plan of reorganization which provides for treatment of Lender which is acceptable to Lender, or which leaves the interests of Lender unimpaired.  Under no circumstances shall Borrower seek any extension of such 90-day deadline pursuant to section 362(d)(3) of the Bankruptcy Code or any other statutory provision or equitable principle.  Failure to provide adequate protection on such terms shall constitute a separate and distinct cause for the termination of the automatic stay in any such bankruptcy case.

(ii)    Borrower shall not seek to modify, impair or limit the rights and remedies of Lender under sections 506(c) or 552(b) of the Bankruptcy Code or otherwise, and shall not seek to obtain credit or incur debt to be secured by a senior or equal lien on the Mortgaged Property, or any other property which constitutes collateral of the Lender under the Loan Documents pursuant to section 364(d) or otherwise.

(iii)   Notwithstanding the provisions of this Paragraph 12(f) to the contrary, Borrower and Guarantors acknowledge and agree that Lender shall in no way whatsoever be deemed to have waived any right to relief from the automatic stay under Section 362 of the Bankruptcy Code, any stay or other form of creditor restraint imposed under Section 105 or any other section of the Bankruptcy Code or any other stay or creditor restraint imposed under any other proceeding pursuant to Paragraph 12(c) hereof. Nothing in this Paragraph 12 shall be deemed in any way to limit or restrict any of Lender's rights to seek in the Bankruptcy Court any relief that Lender, in its sole discretion, may deem appropriate.

(iv)    Borrower acknowledges and confirms that the Mortgaged Property constitutes "single asset real estate" as such term is used in Section 362(d)(3) of the Bankruptcy Code.

(v)     Lender shall be deemed in the proceeding, to the extent it is determined that Section 552(a) of the Bankruptcy Code applies to limit Lender's interest under the Note, the other Loan Documents or this Agreement, to have a continuing post-bankruptcy interest in all leases or lettings or agreements for the use of the Mortgaged Property entered into after the filing of the petition or the order for relief, whichever is later.  Borrower agrees that if an order is in effect permitting it to use cash collateral,

Borrower shall (1) maintain at all times an adequate and appropriate amount and coverage of insurance covering its assets in amounts not less than that required under the Loan Documents, naming Lender as an additional insured and loss payee, as its interest may appear, and (2) during the entire course of the proceeding, pay adequate protection payments each month on the principal outstanding under the Note at the rate set forth in the Note.

(vi)     During the pendency of the case, if any of the rights granted hereunder or under the Loan Documents are challenged adversely to Lender as not being security interests or liens, they shall be deemed to be security interests, perfected and fully enforceable without the necessity of the filing of any additional documents or commencement of proceedings otherwise required under non-bankruptcy law for the perfection or enforcement of security interests, with such perfection and enforcement being binding upon Borrower and any subsequent appointed trustee, either in Chapter 11 or under any other Chapter of the Bankruptcy Code, and upon other creditors of Borrower who have or who may hereafter extend secured or unsecured credit to Borrower.

(vii)    Borrower agrees that if Borrower becomes a debtor under the Bankruptcy Code, the debtor's right to hire professionals under Section 327 of the Bankruptcy Code shall be subject to the following limitations (1) no professional hired by the debtor or the estate shall make application for professional compensation in excess of $300 per hour and said fee shall be deemed under Sections 327, 328, 329 and 330 of the Bankruptcy Code to be reasonable compensation which is equal to the cost of comparable services other than in a case under title 11, and (2) Borrower shall not use any revenues, rents, income or other payments which may now or hereafter be received, or become due or owing under leases of the Mortgaged Property, or any other amount due on account of the use of the Mortgaged Property, or any cash collateral for payment of professional fees or expenses.

(viii)   Borrower hereby acknowledges and agrees that (1) Borrower will not contest any proof of claim filed by Lender, (2) Borrower will not reclassify the debt owed to Lender or treat such debt as impaired under 11 U.S.C. Section 1124, (3) a reorganization under applicable bankruptcy laws will not be feasible and it hereby waives its rights to contest or allege that there is a reasonable likelihood of an effective reorganization, and (4) from the date of filing and thereafter, Borrower shall be deemed to have no equity in the Mortgaged Property.  Borrower acknowledges that the representations made by it in this Paragraph 12 are a material inducement to Lender to enter into this Agreement.

(g)     The Debtors will not present any defense and/or take any actions to delay the Lender's recording of the Deed in Lieu.  The Debtors hereby waive any and all right to challenge and/or object to the Lender's right to record the Deed in Lieu to the fullest extent of the law.  If Lender elects, in its sole discretion, to commence an action

against the Debtors, the Debtors acknowledge and agree that: (i) the Debtors have no claim or cause of action against the Lender arising from or in connection with the Loan Documents or otherwise; (ii) the Debtors have no offset or defense against any of their obligations to Lender, including the indebtedness owed to Lender pursuant to the Loan Documents; and (iii) Lender has properly performed and satisfied in a timely manner any obligations to Borrower.

13.    <u>General Conditions</u>.

(a)    <u>No Third-Party Benefits.</u>  This Agreement is made for the sole benefit of Borrower and Lender, their successors and assigns and no other person or persons shall have any rights or remedies under or by reason of this Agreement.

(b)    <u>Entire Agreement</u>.  The Note and the other Loan Documents are each hereby reaffirmed and ratified and constitute the entire understanding among the parties regarding the Loan.  The Loan Documents supersede all oral negotiations and prior writings concerning the subject matter of the Loan Documents.  If there is any conflict between the terms, conditions and provisions of this Agreement and those of any other agreement or instrument, including any of the Loan Documents, the terms, conditions and provisions of this Agreement shall prevail.  This Agreement may not be modified, amended or terminated except by a written agreement signed by each of the parties hereto.

(c)    <u>Notices</u>.  Any notice, request, direction or demand given or made under this Agreement shall be in writing, shall be sent to the parties at their respective addresses set forth below and shall be delivered personally, by Federal Express or other reputable overnight national courier service, by electronic facsimile transmission, or by certified U.S. Mail, return receipt requested, and shall be deemed given upon the earlier to occur of (i) actual receipt, (ii) the second business day after being deposited in the U.S. mail, (iii) the next business day after being deposited in Federal Express or another reputable overnight courier or (iv) the date sent, if sent by electronic facsimile transmission:

If to Lender:        Kennedy Funding, Inc.

_____

_____

Attention: _____

Facsimile No. _____

With a copy to:      Sills Cummis & Gross PC
One Rockefeller Plaza
New York, New York 10020
Attention:  Michael R. Leighton, Esq.
Facsimile No.:  (212) 643-6500

If to Borrower:     _____

                        _____

                        _____

With a copy to:     Yaron Kornblum, Esq.
926 RXR Plaza
Uniondale, New York 11556

And a copy to:     Daniel Cohen
c/o Law Offices of Allen Lebovitz, P.C.
266 Broadway, Suite 304
Brooklyn, New York 11211
Email: DCohen@LawALPC.com

(d)     Each party to this Agreement may designate a different address within the 48 contiguous United States of America as its address for receipt of notices hereunder, by notice given to all other parties not less than ten (10) days prior to the date such change of address is to become effective.

(e)     <u>Documentation</u>.  In addition to the instruments and documents mentioned or referred to herein, Borrower shall, at its own cost and expense, supply Lender with such other instruments, documents, information and data as may, in Lender's opinion, be reasonably necessary for the purposes hereof, all of which shall be in form and content acceptable to Lender.

(f)     <u>Survival</u>.  The representations, warranties and covenants herein shall survive and shall remain in force and effect until the Loan is paid in full.

(g)     <u>Relationship to Loan Documents</u>.  All terms and conditions of the Loan Documents shall be and remain in full force and effect until the Debt and all other amounts secured by the Loan Documents payable by Borrower to Lender hereunder shall have been paid in full.  Any reference to any of the Loan Documents from and after the Effective Date shall mean the Loan Documents as amended and modified by this Agreement.  In the event of any inconsistency between the provisions of this Agreement and the Loan Documents, the provisions of this Agreement shall control.

(h)     <u>Further Assurance</u>.  Borrower agrees to execute such documents and take such other action as requested by Lender to effectuate the purposes of this Agreement.

2294959 v9

(i)     Course of Dealing; Waivers.  No failure or delay by the Lender or its shareholders, directors, officers, employees or agents in the exercise of any right under this Agreement shall operate as a waiver thereof, and any single or partial exercise of any such right shall not preclude any later exercise of any such right.  The Lender's failure at any time to require strict performance by the Borrower of any provision of this Agreement shall not thereafter affect any right under this Agreement of the Lender to demand strict compliance and performance.  Any suspension or waiver of a right under this Agreement must be in writing signed by an officer or principal of the Lender.

(j)     Severability.  If any provision of this Agreement or the documents executed in connection herewith conflicts with applicable law, such provision shall be deemed severed from this Agreement or the documents executed in connection herewith, as the case may be, and the balance thereof shall remain in full force and effect.

(k)     Headings.  The headings used herein are for the convenience of the parties only and shall not be used to interpret the terms of this Agreement.

(l)     Attorneys' Fees.  If any action or proceeding at law or in equity, or an arbitration proceeding (collectively an "action"), shall be brought under this Agreement for or on account of any breach of or to enforce or interpret any of the terms, covenants, or conditions of this Agreement, Lender shall be entitled to recover from the Debtors all reasonable attorneys' fees and costs and expenses incurred in connection with the prosecution or defense of such action or the settlement of such controversy.

(m)     Waiver of Jury Trial.  LENDER AND DEBTORS EACH ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE LENDING RELATIONSHIP ESTABLISHED HEREBY WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES, AND THEREFORE,  DEBTORS AND LENDER EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING (INCLUDING ACTIONS SOUNDING IN TORT) TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT RELATING HERETO OR ARISING FROM THE TRANSACTION CONTEMPLATED HEREUNDER OR THE LENDING RELATIONSHIP ESTABLISHED HEREBY AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE AND NOT BY A JURY.

(n)     Choice of Law/Venue.  THIS AGREEMENT SHALL BE DEEMED TO BE A CONTRACT ENTERED INTO PURSUANT TO THE LAWS OF THE STATE OF NEW JERSEY AND SHALL IN ALL RESPECTS BE GOVERNED, CONSTRUED, APPLIED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW JERSEY AND ALL CLAIMS OR CAUSES OF ACTION

ARISING OUT OF THIS AGREEMENT SHALL BE PROSECUTED EXCLUSIVELY IN THE SUPREME COURT OF THE STATE OF NEW JERSEY, BERGEN COUNTY.

(o)    Advice of Counsel.  The Debtors acknowledge that they have consulted with independent legal counsel concerning this Agreement and the Debtors knowingly and voluntarily hereby waive the rights described therein or affected thereby. It is the intent of the parties hereto that no part of this Agreement is to be construed against any party because of the identity of the drafter.

(p)    Assignment.  This Agreement may not be assigned, pledged or otherwise transferred, directly or indirectly, by any Borrower or any Guarantors without the prior written consent of Lender, provided that in the event the Bankruptcy Plan is not approved by _____, 2013, the Borrower may assign this Agreement to Original Borrower upon 15 days advance written notice to Lender.  Lender hereby confirms its Knowledge that Original Borrower is operating in the Bankruptcy Proceeding and could possibly continue to do so after assignment of this Agreement, but Lender does not waive any default under this Agreement or the Loan Documents except as expressly provided herein.  Lender may assign, pledge or otherwise transfer this Agreement without the consent of any Borrower or any Guarantors.  Notwithstanding the foregoing, internal transfers in the Borrower shall be permitted so long as AAO Management LLC retains 5% of the equity in Borrower and Eliot Spitzer retains day-to-day and all other control of the Borrower.

(q)    Counterparts.  This Agreement may be executed in one or more counterparts by some or all of the parties hereto, and (i) each such counterpart shall be considered an original, and all of which together shall constitute a single Agreement, (ii) the exchange of executed copies of this Agreement by facsimile or Portable Document Format (PDF) transmission shall constitute effective execution and delivery of this Agreement as to the parties for all purposes, and (iii) signatures of the parties transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the parties hereto have executed this Forbearance Agreement the day and year first above written.

WITNESS:                                          **LENDER**:

                                                 **KENNEDY FUNDING, INC.,** as Agent


_____          By:_____
Print Name:                                          Name:
                                                     Title:

WITNESS:                                          **BORROWER:**
                                                 **GRANIT OWNER:**
                                                 The Granit at Hudson Valley Resort LLC,

                                                 By: AAO Management LLC


_____          By:_____
Name:                                                Name: Eliot Spitzer
                                                     Title: Managing Member

WITNESS:                                          **GUARANTOR:**


_____          _____
Name:                                            **ELIOT SPITZER**, an individual

# Exhibit B

*The Grand at Hudson Valley Resort*
*Four-Year Projection*

| | 2013 / 2014 | 2014 / 2015 | 2015 / 2016 | 2016 / 2017 | | |
|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | |
| | | | | | | |
| Leisure Room Revenue | 1,659,165 | 1,725,532 | 1,794,553 | 1,866,335 | | |
| Group Room Revenue | 2,940,778 | 3,058,409 | 3,180,745 | 3,307,975 | | |
| **Total Room Revenue** | **4,599,943** | **4,783,941** | **4,975,298** | **5,174,310** | | |
| | | | | | | |
| Outlet Food | 155,160 | 161,366 | 167,821 | 174,534 | | |
| Banquet Food | 2,852,933 | 2,967,050 | 3,085,732 | 3,209,162 | | |
| **Total Food** | **3,008,093** | **3,128,417** | **3,253,553** | **3,383,696** | | |
| | | | | | | |
| Banquet Service Charges | 74,088 | 77,052 | 80,134 | 83,339 | | |
| | | | | | | |
| Total Beverage | 483,132 | 502,457 | 522,556 | 543,458 | | |
| | | | | | | |
| **Total F&B** | **3,565,313** | **3,707,926** | **3,856,243** | **4,010,492** | | |
| | | | | | | |
| Meeting Room Revenue | 456,459 | 474,717 | 493,706 | 513,454 | | |
| Telephone | 410 | 426 | 443 | 461 | | |
| Health Club | 303,459 | 315,597 | 328,221 | 341,350 | | |
| Golf | 309,910 | 322,306 | 335,199 | 348,607 | | |
| Activities | 37,215 | 38,704 | 40,252 | 41,862 | | |
| Gift Shops | 22,494 | 23,394 | 24,330 | 25,303 | | |
| Other | 0 | 0 | 0 | 0 | | |
| Total Misc. Revenue | 1,129,947 | 1,175,145 | 1,222,151 | 1,271,037 | | |
| | | | | | | |
| **TOTAL REVENUE** | **$9,295,203** | **$9,667,011** | **$10,053,692** | **$10,455,839** | | |
| | | | | | | |
| **EXPENSES & PROFIT** | | | | | | |
| | | | | | | |
| Room Expenses: | | | | | | |
| Payroll | 777,174 | 800,489 | 824,504 | 849,239 | | |
| Operational | 216,234 | 222,721 | 229,403 | 236,285 | | |
| Travel / Commissions | 65,313 | 67,272 | 69,291 | 71,369 | | |
| Other | 0 | 0 | 0 | 0 | | |
| **Total Room Expenses** | **1,058,721** | **1,090,483** | **1,123,197** | **1,156,893** | | |
| **Room Departmental Profit** | **3,541,222** | **3,693,458** | **3,852,101** | **4,017,417** | | |
| | | | | | | |
| Food Expenses: | | | | | | |
| Payroll | 676,138 | 696,422 | 717,315 | 738,834 | | |
| Banquet Service | 458,753 | 472,516 | 486,691 | 501,292 | | |
| Cost of Food | 985,893 | 1,015,470 | 1,045,934 | 1,077,312 | | |
| Operational | 151,526 | 156,072 | 160,754 | 165,577 | | |
| Other/Contract | 7,631 | 7,860 | 8,096 | 8,339 | | |
| **Total Food Expenses** | **2,279,941** | **2,348,339** | **2,418,789** | **2,491,353** | | |
| **Food Departmental Profit** | **802,240** | **857,129** | **914,898** | **975,681** | | |
| | | | | | | |
| Beverage Expenses: | | | | | | |
| Payroll | 65,349 | 67,309 | 69,329 | 71,409 | | |
| Banquet Service | 20,532 | 21,148 | 21,782 | 22,436 | | |
| Cost of Beverage | 57,634 | 59,363 | 61,144 | 62,978 | | |
| Operational | 3,185 | 3,281 | 3,379 | 3,480 | | |
| Other/Contract | 0 | 0 | 0 | 0 | | |
| **Total Beverage Expenses** | **146,700** | **151,101** | **155,634** | **160,303** | | |
| **Beverage Departmental Profit** | **336,432** | **351,356** | **366,922** | **383,155** | | |
| | | | | | | |
| Meeting Room Expenses: | | | | | | |
| Payroll | 17,930 | 18,468 | 19,022 | 19,593 | | |
| Operational | 8,627 | 8,886 | 9,152 | 9,427 | | |
| Other | 0 | 0 | 0 | 0 | | |
| **Total Meeting Room Expenses** | **26,557** | **27,354** | **28,174** | **29,020** | | |
| **Meeting Room Departmental Profit** | **429,902** | **447,364** | **465,532** | **484,435** | | |
| | | | | | | |
| Telephone Expenses: | | | | | | |
| Service Contract | 4,910 | 5,057 | 5,209 | 5,365 | | |
| Operational | 86,991 | 89,601 | 92,289 | 95,057 | | |
| Other | 0 | 0 | 0 | 0 | | |
| Total Telephone Expenses | 91,901 | 94,658 | 97,498 | 100,423 | | |
| **Telephone Departmental Profit** | **(91,491)** | **(94,232)** | **(97,054)** | **(99,962)** | | |
| | | | | | | |
| Health Club Expenses: | | | | | | |
| Payroll | 82,674 | 85,154 | 87,709 | 90,340 | | |
| Contract Labor | 136,199 | 140,285 | 144,494 | 148,828 | | |
| Operational | 33,166 | 34,161 | 35,186 | 36,241 | | |
| Other | 0 | 0 | 0 | 0 | | |
| Total Health Club Expenses | 252,039 | 259,600 | 267,388 | 275,410 | | |
| **Health Club Departmental Profit** | **51,420** | **55,997** | **60,833** | **65,940** | | |
| | | | | | | |
| Golf Expenses: | | | | | | |
| Payroll - Golf | 108,126 | 111,370 | 114,711 | 118,152 | | |
| Payroll - Grounds | 185,260 | 190,818 | 196,542 | 202,439 | | |
| Lease of Equipment | 93,630 | 96,439 | 99,332 | 102,312 | | |
| Operational | 108,115 | 111,358 | 114,699 | 118,140 | | |
| Other | 5,204 | 5,360 | 5,521 | 5,687 | | |
| **Total Golf Expenses** | **500,335** | **515,345** | **530,805** | **546,730** | | |
| **Golf Departmental Profit** | **(190,425)** | **(193,039)** | **(195,607)** | **(198,123)** | | |
| | | | | | | |
| Activities Expenses: | | | | | | |
| Payroll | 50,405 | 51,917 | 53,475 | 55,079 | | |
| Rentals | 464 | 478 | 492 | 507 | | |
| Entertainment | 70,852 | 72,978 | 75,167 | 77,422 | | |
| Other | 3,719 | 3,831 | 3,945 | 4,064 | | |
| **Total Activities Expenses** | **125,440** | **129,203** | **133,079** | **137,072** | | |
| **Activities Departmental Profit** | **(88,225)** | **(90,500)** | **(92,828)** | **(95,210)** | | |
| | | | | | | |
| Gift Shop Expenses: | | | | | | |
| Payroll | 13,192 | 13,588 | 13,995 | 14,415 | | |
| Cost of Supplies | 14,557 | 14,994 | 15,444 | 15,907 | | |
| **Total Gift Shop Expenses** | **27,749** | **28,581** | **29,439** | **30,322** | | |
| **Gift Shop Departmental Profit** | **(5,255)** | **(5,188)** | **(5,109)** | **(5,019)** | | |
| | | | | | | |
| Other Expenses: | | | | | | |
| Payroll | 0 | 0 | 0 | 0 | | |
| Operational | 0 | 0 | 0 | 0 | | |
| Total Other Expenses | 0 | 0 | 0 | 0 | | |
| **Other Departmental Profit** | **0** | **0** | **0** | **0** | | |
| | | | | | | |
| **TOTAL DEPARTMENTAL PROFIT** | **$4,785,830** | **$5,022,347** | **$5,269,687** | **$5,528,315** | | |
| | | | | | | |
| Overhead Expenses: | | | | | | |
| Management | 282,219 | 290,686 | 299,406 | 308,388 | | |
| Advertising & Sales | 386,759 | 398,362 | 410,313 | 422,622 | | |
| Repairs & Maintenance | 681,399 | 701,841 | 722,896 | 744,583 | | |
| Heat, Light, & Power | 900,618 | 927,637 | 955,466 | 984,130 | | |
| Benefits | 532,837 | 548,822 | 565,287 | 582,245 | | |
| Health | 61,873 | 63,729 | 65,641 | 67,610 | | |
| Mandatory | 188,047 | 193,688 | 199,499 | 205,484 | | |
| **Total Overhead Expenses** | **3,033,752** | **3,124,765** | **3,218,507** | **3,315,063** | | |
| | | | | | | |
| **GROSS OPERATING PROFIT** | **$1,752,068** | **$1,897,582** | **$2,051,180** | **$2,213,252** | | |
| | | | | | | |
| Fixed Expenses: | | | | | | |
| Insurances | 200,096 | 206,099 | 212,282 | 218,650 | | |
| Taxes | 70,304 | 72,413 | 74,586 | 76,823 | | |
| Other - School Tax | 98,051 | 100,993 | 104,022 | 107,143 | | |
| **Total Fixed Expenses** | **368,451** | **379,505** | **390,890** | **402,616** | | |
| | | | | | | |
| **Debt Service** | **300,000** | **800,000** | **600,000** | **600,000** | | |
| | | | | | | |
| **NET OPERATING PROFIT** | **$1,083,617** | **$718,078** | **$1,060,290** | **$1,210,636** | | |
| | | | | | | |
| Return of Investment - Grand Investors LLC | 1,000,000 | 0 | 0 | 0 | **Distribution Recap** | |
| | | | | | | |
| **NET OPERATING PROFIT AFTER RETURN OF INVESTMENT** | **$83,617** | **$718,078** | **$1,060,290** | **$1,210,636** | **$3,072,620** | |
| | | | | | | |
| Grand Investors LLC - 70% | 58,532 | 502,654 | 742,203 | 847,445 | 2,168,989 | |
| General Unsecured Creditors - 25% ** | 20,904 | 179,519 | 265,072 | 284,504 | 750,000 | ** |
| AAO Management LLC - 5% | 4,181 | 35,904 | 53,014 | 60,532 | 153,631 | |
| | | | | | | |
| | $83,617 | $718,078 | $1,060,290 | $1,210,636 | $3,072,620 | |
| | | | | | | |
| **** Capped at $750,000** | | | | | | |

Exhibit C

# OPERATING AGREEMENT

## OF

## THE GRANIT AT HUDSON VALLEY RESORT LLC

## A NEW YORK LIMITED LIABILITY COMPANY

This Operating Agreement of The Granit at Hudson Valley Resort LLC, a limited liability company organized pursuant to the New York Limited Liability Company Law (the "Company"), is entered into and is effective as of the effective date, by and among the Company and the persons and entities executing this Agreement as Members.

## ARTICLE I

## DEFINITIONS

The terms and conditions used in this Agreement have the meanings set forth in Section 102 of the Act, or as set forth below (unless otherwise expressly provided here).

1.1.  "Act" means the New York Limited Liability Company Law, and all amendments.

1.2.  "Additional Member" means a Member other than an initial member or a substitute member who has acquired a Membership Interest in the Company.

1.3.  "Agreement" means this Operating Agreement, as originally executed and as it may be amended from time to time.

1.4.  "Articles of Organization" means the Articles of Organization of the Company filed or to be filed with the New York Secretary of State for the purpose of forming the Company, pursuant to Section 203 of the Act, as amended.

1.5.  "Assignee" means the transferee of a Membership Interest who has not been admitted as a substituted member.

1.6.  "Bankrupt Member" means a Member who (a) has become the subject for an order for relief under the United States Bankruptcy Code and similar state law, or (b) has initiated, either in an original Proceeding or by way of answer, a federal or state action for liquidation arrangements, composition, readjustment of debts, or similar relief.

1.7.  "Capital Account" as of any date means the Capital Contribution to the Company by a Member, adjusted as of that date pursuant of this Agreement.

1.8.  "Capital Contribution" means any Member's contribution to the capital of the Company in cash, property, services rendered or a promissory note or other binding

obligation to contribute cash or property or to render services.  "Initial Capital Contribution" means the initial contribution to the capital of the Company pursuant to this Agreement.

1.9.  "Code" means the Internal Revenue Code of 1986, as amended, or the corresponding provisions of any superseding federal revenue statute.

1.10.  "Company" refers to The Granit at Hudson Valley Resort LLC, and any successor limited liability company.

1.11.  "Company Property" means any Property owned by the Company.

1.12.  "Deficit Capital Account" means with respect to any Member, the deficit balance, if any, in that Member's Capital Account as of the end of the taxable year.

1.13.  "Distributable Cash" means all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company:  (i) all principal and interest payments on the Company's indebtedness and all other sums paid to lenders; (ii) all cash expenditures incurred incident to the normal operation of the Company's business, including management fees; and (iii) Reserves.

1.14.  "Disposition" ("Dispose") means any sale, assignment, exchange, mortgage, pledge, grant, hypothecation, or other transfer, absolute or as security or encumbrance (including dispositions by operation of law).

1.15.  "Disassociation" means any action that causes a Person or Entity to cease to be a Member as described in Article XII hereof.

1.16.  "Dissolution Event" means an event results in the dissolution of the Company under Article XIII unless the Members agree to the contrary.

1.17.  "Distribution" means any cash and other property paid by the Company to a Member in its capacity as a Member.

1.18.  "Economic Interest" means a Member's or Economic Interest Owner's share of one or more of the Company's net profits, net losses and distributions of the Company's assets pursuant to this Agreement and the Act, but it does not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members or Managers.

1.19.  "Economic Interest Owner" means the owner of an Economic Interest who is not a Member.

1.20.  "Entity" means any domestic or foreign general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust,

2

cooperative or association, or other business organization.

1.21. "Fiscal Year" means the fiscal year of the Company, which will be the year determined by the Manager.

1.22. "Majority Interest" means one or more interests of Members which, taken together, exceed fifty (50%) percent of the aggregate of all Membership Interests.

1.23. "Manager" means AAO Resort Management LLC or any other Person or Entity that succeeds it in that capacity. References to the Manager in the singular or as it, or other like references will also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

1.24. "Member" means each of the parties who executes a counterpart of this Agreement as a Member, and each of the parties who may subsequently become Members in accordance with Article XI. To the extent a Manager has acquired a Membership Interest in the Company, it will have all the rights of a Member with respect to that Membership Interest, and the term "Member" as used here includes a Manager to the extent it has purchased the Membership Interest in the Company. If a Person or Entity is a Member immediately prior to the purchase or other acquisition of an Economic Interest, such Person or Entity will have all the rights of a Member with respect to the purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be. The term includes initial Members, substituted Members and additional Members.

1.25. "Membership Interest" means a Member's entire interest in the Company, including Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement or as required by the Act.

1.26. "Net Losses" means the losses and deductions of the Company, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the Company's tax return filed for federal income tax purposes.

1.27. "Net Profits" means the Company's income and gains, determined in accordance with accounting principals consistently applied from year to year employed under the method of accounting adopted by the Company, and as reported separately or in the aggregate, as appropriate, on the Company's tax return filed for federal income tax purposes.

1.28. "Person" means any natural person. In addition, the term means the heirs, executors, administrators, legal representatives, successors and permitted assigns of that

3

"Person" where the context so permits.

1.29.   "Proceeding" means any judicial or administrative trial, hearing or other activity, civil, criminal or investigative, the result of which may be that a court, arbitrator or governmental agency may enter a judgment, order, decree or other determination that, if not appealed and reversed, would be binding on the Company, a Member or other Person or Entity subject to the jurisdiction of that court, arbitrator or governmental agency.

1.30.   "Property" means any property, real or personal, tangible or intangible, including money and any legal or equitable interest in property, but excluding services and promises to perform future services.

1.31.   "Reserves" means, with respect to any fiscal period, funds set aside or amounts allocated during that period to reserves that must be maintained in an amount deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service, or other costs or expenses incident to the ownership or operation of the Company's business.

1.32.   "Selling Member" means any Member or Economic Interest Owner who desires to or does sell, assign, pledge, hypothecate or otherwise transfers for a consideration all or any portion of the Member's Membership Interest or Economic Interest.

1.33.   "Transferring Member" means any Member or Economic Interest Owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise) all or any part of its Membership Interest or Economic Interest.

1.34.   "Taxing Jurisdiction" means any state, local or foreign government that collects tax, interest or penalties, however designated, and any Member's share of the income or gain attributable to the Company.

1.35.   "Treasury Regulations" means all proposed, temporary and final regulations promulgated under the Code as from time to time in effect.

## ARTICLE II

## ORGANIZATION

2.1.   <u>Formation</u>.  The Company was organized as a New York Limited Liability Company by executing and delivering Articles of Organization to the Secretary of State in accordance with and pursuant to the Act.

2.2.   <u>Name</u>.  The name of the Company is The Granit at Hudson Valley Resort LLC, and all business of the Company will be conducted under that name or any other name determined by the Manager, but in any case, only to the extent permitted by

applicable law.

2.3.   <u>Effective Date</u>.  This Agreement is effective on the date of its execution.

2.4.   <u>Principal Place of Business</u>.  The Company's principal place of business within the State of New York will be 400 Granite Road, Kerhonkson, New York 12446. The Company may establish any other places of business as the Manager deems advisable.

2.5.   <u>Term</u>.  The Company's term is perpetual from the date of filing of the Articles of Organization with the Secretary of State, unless the Company is dissolved and its affairs wound up in accordance with this Agreement.

## ARTICLE III

## BUSINESS OF COMPANY

3.1.   <u>Nature of Business</u>.  The Company's purpose and business is to engage in any lawful business, to take such actions that will at any time appear conducive to or expedient for the protection or benefit of the Company and its assets, to exercise all other powers necessary to or reasonably connected with the Company's business that may be legally exercised by limited liability companies under the Act, and to engage in all activities necessary, customary, or convenient, or incident to any of the foregoing.

## ARTICLE IV

## MEMBERS

4.1.   <u>Names and Addresses</u>.  The names, addresses and Membership Interest Percentages of the initial Members are set forth in Schedule A to this Agreement.

4.2.   <u>Additional Members</u>.  In the event that a Person or Entity is subsequently admitted as an Additional Member in accordance with Article XI, that Person's or Entity's name, address and Membership Interest Percentages shall be added to Schedule A.

4.3.   <u>Membership Certificates</u>.  The Company will not issue Membership Certificates.

## ARTICLE V

## MEMBER RIGHTS AND DUTIES

5.1.   <u>Management Rights</u>.  No Member, except the Manager if he is a Member, shall have any right to manage the affairs of the Company.

5.2.  <u>Voting</u>.  Except for nonwaivable provisions of the Act and as provided for in this Agreement, the Members shall not have any right to vote on any matter regarding the Company.

5.3.  <u>Limitation of Liability</u>.  Members are not liable for any debts, obligations or liabilities of the Company or each other, whether arising in tort, contract or otherwise, solely by reason of being a Member.  Each Member, however, remains personally liable for payment of its Capital Contribution as set forth in Section 502 of the Act or as otherwise provided in this Agreement.

5.4.  <u>Indemnification</u>.  The Company will indemnify the Members, the Manager, and their agents for all costs, losses, liabilities and damages paid or accrued by any Member, the Manager or any of their agents in connection with the Company's business, to the fullest extent permitted under the laws of New York.

5.5.  <u>Priority and Return of Capital</u>.  Except as expressly provided in Section 8.6 or Article XIII, no Member has priority over any other Member, whether for the return of a Capital Contribution or for Net Profits, Net Losses or a Distribution; provided, however, that this Section does not apply to loans or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

5.6.  <u>Liability to the Company</u>.  A Member who rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or subsequently provided by the Act or this Agreement.

5.7.  <u>Financial Adjustments</u>.  No Members admitted after the date of this Agreement are entitled to any retroactive allocations of losses, income or expense deductions incurred by the Company.  The Manager may, at the Manager's discretion, at the time a Member is admitted, close the Company's books and records (as though the Fiscal Year had ended) or make pro rata allocations of loss, income and expense deductions to that Member for that portion of the Fiscal Year in which that Member was admitted in accordance with the Code.

5.8.  <u>Representations and Warranties</u>.  Each Member, and in the case of an organization, the Person(s) or Entity executing the Agreement on the organization's behalf, represents and warrants to the Company and each other Member and the Manager that:  (a) if that Member is an organization, it is duly organized, validly existing, and in good standing under the law of its state of organization, and has full organizational power to execute and agree to the Agreement to perform its obligations under the Agreement; (b) the Member is acquiring its interest in the Company for the Member's own account as an investment and without intent to distribute the interest; and (c) the Member acknowledges that the interests have not been registered under the Securities Act of 1933, as amended, or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from those requirements.

5.9.  <u>Partition</u>.  Each Member waives any right they may have to institute or maintain an action with respect to the sale of Company Property.

5.10.  <u>Conflicts of Interest</u>.

(a)  A Member is entitled to enter into transactions that may be considered competitive with, or into a business opportunity that may be beneficial to, the Company, it being expressly understood that some of the Members may enter into transactions that are similar to the transactions into which the Company may enter.  Notwithstanding the foregoing, Members must account to the Company and hold as trustee for it any property, profit or benefit derived by the Member, without the consent of the other Members, in the conduct and winding up of the Company business or from a use or appropriation by the Member of Company Property, including information developed exclusively for the Company and opportunities expressly offered to the Company.

(b)  A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest.  A Member may lend money to and transact other business with the Company.  The rights and obligations of a Member who lends money to or transacts business with the Company are the same as those of a non-Member, subject to other applicable law.  No transaction with the Company will be voidable solely because a Member has a direct or indirect interest in the transaction if either (i) the transaction is fair to the Company, or (ii) disinterested Members, knowing the material facts of the transaction and the Member's interest, authorize, approve or ratify the transaction.

## ARTICLE VI

## MANAGER RIGHTS AND DUTIES

6.1.  <u>Management</u>.  The Company's business and affairs will be managed exclusively by the Manager.  The Manager will direct, manage and control the Company's business.  Except for situations in which Member approval is expressly required by this Agreement or by nonwaivable provisions of the Act, the Manager has full authority and discretion to manage and control the Company's business, affairs and properties, to make all decisions regarding those matters, and to perform any and all other acts or activities customary or incident to the management of the Company's business.  The Manager will be paid a management fee of $200,000.00 per annum.

6.2.  <u>Number and Tenure</u>.  Except as provided below, the Company will have one Manager, AAO Resort Management LLC or its successor.  The Manager shall hold office until it shall resign, it is dissolved, or it is the subject of an order of relief under the United States Bankruptcy Code or has initiated, either in an original Proceeding or by way of answer, a federal or state action for liquidation arrangements, composition, readjustment of debts, or similar relief ("Termination Events").  Upon the occurrence of a Termination Event, the Members holding a Majority Interest shall appoint a successor manager.  For as long as the Company is indebted Kennedy Funding, Inc., Kennedy

7

Funding, Inc. shall have the right to appoint an independent manager ("Independent Manager") who shall have no authority or power except that its consent shall be required in order for the Company to seek relief under the United States Bankruptcy Code or any state debtor relief law or regulation.  For as long as the company is indebted to Kennedy Funding, Inc., neither the Manager nor the Members may amend the provisions for the Independent Manager.


6.3    The Manager shall be responsible for policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company.  The Manager may be removed 'for cause' and replaced by a majority vote of the Members. The phrase 'for cause' shall mean either (i) the Manager 's conviction of or plea of guilty or nolo contendre to a felony whether or not in connection with the Company; (ii) an action by a Manager involving dishonesty, fraud, gross negligence, gross misconduct, embezzlement or any other crime in connection with his employment with the Company; or (iii) the death of a Manager.

6.4    Notwithstanding any other provision of this Agreement, the Company shall not make the following certain major decisions without the  prior written consent of 51% of the Membership interest of the Company:

(i)  any amendment to this Agreement (provided, however, that any amendment to this Agreement shall require the unanimous consent of each Member);

(ii) any change in the nature or character of the business of the Company or decision to acquire any additional Property except that the Manager may apply for Casino and VLT Licneses; and make renovations to property

(iii)    borrow money on behalf of the Company from any Person, including the execution and delivery of any loan documents relating to any such loan and any material amendments to the provisions thereof without providing fifteen (15) days written notice to the Members and providing a detailed break-down of the proposed usage thereof;

(iv)    lend any Company funds or other assets to any Person;

(v)    confess a judgment against the Company; settle, compromise or release, discharge or pay any claim, demand or debt in excess of $100,000.00, including claims for insurance;

(vi)    conduct any reorganization or recapitalization, excluding refinancing subject to section (iii) hereinabove, of the Company, whether directly or pursuant to a merger, consolidation, share exchange or otherwise;

(vii)    Intentionally Omitted.

(viii)    the admission of any other Member to the Company;

(ix)    any dissolution or winding-up of the Company;

(x)    filing, or consenting to the filing of, on behalf of the Company, a petition or other similar action in any bankruptcy or other similar proceeding under any present or future federal, state, local or other law;

(xi)    the execution of any contract or agreement, or the agreement to pay or the payment of any salary, compensation or other economic benefit (except for distributions made pursuant hereof), to any Member, Manager, officer or affiliate thereof;

(xii)    Intentionally deleted; or

(xiii) taking any action which could result in any personal liability for any Member.

6.4.    <u>Binding Authority</u>.  Unless authorized to do so by the Manager, no attorney-in-fact, employee or other agent of the Company has any power or authority to bind the Company in any way, to pledge its credit or to render it pecuniarily liable for any purpose.  No Member has any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the previous sentence.

6.5.    <u>Duty of Care</u>.  Each of the Manager and the Independent Manager must perform its duties as a manager in good faith, in a manner it reasonably believes to be in the best interest of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances.  The Manager and the Independent Manager who so performs the duties as a manager does not have any liability by reason of being or having been a manager of the Company.  The Manager and the Independent Manager do not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the Company operations.  Each of the Manager and the Independent Manager will not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage was the result of fraud, bad faith, gross negligence or willful misconduct of the Manager or the Independent Manager, as the case may be.

6.6.    <u>No Exclusive Duty to Company</u>.  The Manager and the Independent Manager are not required to manage the Company as their sole and exclusive function and they may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member has any right pursuant to this Agreement to share or participate in the other business interests or activities of the Manager or the Independent Manager or in the income or proceeds derived from them.  The Manager and the Independent Manager incur no liability to the

Company or any Member as a result of engaging in any other business interests or activities.

6.7. <u>Indemnification</u>. The Company must indemnify and hold harmless the Manager and the Independent Manager from and against all claims and demands to the fullest extent permitted under the laws of New York.

6.8. <u>Resignation</u>. The Manager or the Independent Manager may resign at any time by giving written notice to the Company. The resignation of any manager takes effect on receipt of notice by the Company or at any later time specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation is not necessary to make it effective. The resignation of a manager who is also a Member does not affect the manager's rights as a Member and does not constitute a withdrawal of the Member.

6.9. <u>Removal</u>. The Manager may be removed by the Members holding a Majority Interest (i) if the Manager breaches a material term of this Agreement and same is not cured within thirty (30) days after receipt of notice of breach or if the breach cannot be cured within thirty (30) days, the Manager commences to cure with thirty (30) days and diligently pursues the cure or (ii) the Manager engages in fraud or willful misconduct or acts in bad faith. Upon removal of the Manager, his successor as designated by him shall be the Manager and if the Manager has not designated a successor, the Members holding a Majority Interest shall appoint a successor manager. The Independent Manager may be removed by Kennedy Funding, Inc., and by the Manager if the Independent Manager has engaged in fraud or willful misconduct or acted in bad faith. The removal of a manager who is also a Member will not affect the manager's rights as a Member and will not constitute a withdrawal of the Member.

6.10. <u>Vacancies</u>. Except as otherwise provided in this Agreement, any vacancy in the Manager position shall be filled by the Entity or Person designated by the former Manager. If the former Manager has not designated a successor, the vacancy shall be filled by the Members holding a Majority Interest. A vacancy in the position of the Independent Manager shall only be filled by Kennedy Funding, Inc.

6.11. <u>Written Consent of the Managers</u>. Any action required or permitted to be taken by the Manager or the Independent Manager or the Manager and the Independent Manager may be taken without a meeting if all the managers whose consent is required consent in writing to the adoption of a resolution authorizing the action.

6.12. <u>Meeting by Teleconference</u>. The Manager and the Independent Manager may participate in a meeting of such managers by means of a conference telephone or similar equipment which allows all managers participating in the meeting to hear each other at the same time. Participation by such means shall constitute presence in person at such a meeting.

10

6.13.   <u>Appointment of Officers</u>.  The Manager may appoint the officers of the Company ("Officers").  The Officers shall have such titles and exercise and perform such powers and duties as shall be assigned to them from time to time by the Manager.  Each Officer shall hold office until a successor has been appointed by the Manager and qualified.  Any number of offices may be held by the same individual.

6.14.   <u>Indemnification</u>.  The Company shall indemnify and hold harmless any Officers from and against all claims and demands to the fullest extent permitted under the laws of New York.

## ARTICLE VII

## CONTRIBUTIONS AND CAPITAL CONTRIBUTIONS

7.1.   <u>Capital Contributions</u>.  Each Members capital contributions are set forth in the Company's records.

7.2.   <u>Capital Accounts</u>.  A Capital Account will be established and maintained for each Member and each Assignee.  Each Member's Capital Account will be increased by the value of each Capital Contribution made by the Member, allocations to the Member of the Net Profits and any other allocations to the Member of income pursuant to the Code.  Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, allocations to the Member of Net Losses, and other allocations to the Member pursuant to the Code.

7.3.   <u>Transfers</u>.  On a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring its Membership Interests will become the Capital Account of the Person or Entity to which or whom the Membership Interest is sold or transferred in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

7.4.   <u>Modifications</u>.  The manner in which Capital Accounts are to be maintained pursuant to this Article VII is intended to comply with the requirements of Section 704(b) of the Code.  If, in the opinion of the Manager, the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which Capital Accounts are maintained will be so modified; provided, however, that any change in the manner of maintaining Capital Accounts will not materially alter the economic agreement between or among the Members.

7.5.   <u>Deficit Capital Account</u>.  Except as otherwise required in the Act or this Agreement, no Member has any liability to restore all or any portion of a deficit balance in a Capital Account.

7.6.   <u>Withdrawal or Reduction of Capital Contributions</u>.  Except as set forth in Article X, no Member may withdraw from the Company until the dissolution and

winding up of the Company.  A Member will not receive from the Company any portion of its Capital Contribution until all indebtedness and liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of the Manager, sufficient to pay them.  A Member, irrespective of the nature of the Capital Contribution of that Member, has only the right to demand and receive cash in return for the Capital Contribution.

## ARTICLE VIII

## ALLOCATIONS AND DISTRIBUTIONS

8.1.    Allocations of Profits and Losses.  Except as provided by Sections 8.2, 8.3 and 8.4, the Profits and Losses of the Company shall be allocated all to Granit Investors LLC.  For income tax purposes only, each item of income, gain, loss and deduction of the Company shall be allocated among the Members in accordance with their respective shares of Profits and Losses (taking into account the special allocations set forth in Sections 8.2 through 8.4), subject to the rules of Section 704(c)(1)(A) of the Code and the Treasury Regulations promulgated thereunder.

8.2.    Minimum Gain Chargeback Allocations.  Except as otherwise provided in Treasury Regulation Section 1.704-2(f), notwithstanding any other provision of this Article VIII, if there is a net decrease in Company minimum gain as defined in the Treasury Regulations ("Company Minimum Gain") during any Company Fiscal Year, each Member shall be specifically allocated items of Company income and gain for such year (and, if necessary, for subsequent years) **in accordance with their respective shares of Profits and Losses**, to the extent required and in the manner provided by Section 1.704-2(g) of the Treasury Regulations.  The items to be so allocated shall be determined in accordance with Treasury Regulation Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 8.2 is intended to comply with the minimum gain chargeback provision of Treasury Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

8.3.    Qualified Income Offset.  Except as provided in Section 8.2, in the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), which create or increase an adjusted capital account deficit as defined in the Treasury Regulations ("Adjusted Capital Account Deficit"), items of Company income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit created by such adjustments, allocations, or distributions as quickly as possible; provided that an allocation pursuant to this Section 8.3 shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all allocations provided for in this Article VIII have been tentatively made as if this Section 8.3 were not in this Agreement.  This Section 8.3 is intended to constitute a "qualified income offset" within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(d).

12

8.4.   <u>Curative Allocations</u>.  The allocations set forth in Sections 8.2 and 8.3 (the "Regulatory Allocations") are intended to comply with certain requirements of Treasury Regulation Section 1.704-1(b).  The Regulatory Allocations may not be consistent with the manner in which the Members intend to divide Company Distributions.  Accordingly, the Members are hereby authorized to divide other allocations of Profits, Losses and other items among the Members as may be necessary so as to prevent the Regulatory Allocations from distorting the manner in which Company Distributions will be divided among the Members.  In general, the Members anticipate that this will be accomplished by specially allocating items of income, gain, loss and deduction among the Members so that the net amount of the Regulatory Allocations and such special allocations to such Member is zero.  However, the Members shall have discretion to accomplish this result in any reasonable manner.

8.5.   <u>Allocations and Distributions of Distributable Cash and Property</u>.  Except as provided in Sections 8.2, 8.3, and 8.4 Distributions of the Distributable Cash during any Fiscal Year shall be allocated and distributed as provided in Sections 8.1 and 8.6 and in Article XIII hereof (relating to the dissolution of the Company).

8.6.   <u>Distribution Rules</u>.

(i)   Distributions may be made in cash or in kind.  All distributions shall be made to Granit Investors LLC.  .  All Distributions pursuant to Section 8.6 hereof shall be made at such times and in such amounts as shall be determined by the Manager; provided, however, that the Manager shall cause the Company to distribute to the Members, if available, an amount of Distributable Cash as shall be sufficient to enable the Members to fund their federal, state and local income tax liabilities (using the highest Federal, state and local income tax rates applicable to any of the Members) attributable to their respective distributive shares of the taxable income of the Company.  Each Member shall simultaneously receive the same income tax distribution.

(ii)   All amounts withheld pursuant to the Code or any provision of any state or local law with respect to any payment, Distribution or allocation to the Company or the Members shall be treated as amounts distributed to the Members pursuant to this Article VIII for all purposes of this Agreement.  The Manager is authorized to withhold from Distributions, or with respect to allocations, to the Members and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provision of any other federal, state or local law and shall allocate such amounts to those Members with respect to which such amounts were withheld.

8.7.   <u>Distributions in Kind</u>.  A Member, regardless of his Capital Contribution, has no right to demand and receive any Distribution from the Company in any form other than cash.  A Member may not be compelled to accept a Distribution of any asset in kind from the Company to the extent that the percentage of the asset distributed to him exceeds a percentage of that asset that is equal to the percentage in which he shares in Distributions from the Company.

8.8.    <u>Limitations on Distributions</u>.

(i)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to a Member to the extent that, at the time of the Distribution, after giving effect to the Distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests and liabilities for which recourse of creditors is limited to specified property of the Company, exceed the fair market value of the assets of the Company, except that the fair market value of property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of such property exceeds such liability.  A Member who receives a Distribution in violation of this Section, and who knew at the time of Distribution that the Distribution violated this Section, shall be liable to the Company for the amount of the Distribution as provided for under the Act or this Agreement.

(ii)    This Section 8.8 shall not affect any obligation or liability of a Member under this Agreement or other applicable law for the amount of a Distribution.  Unless otherwise agreed, however, a Member who receives a wrongful Distribution from the Company shall have no liability under this Agreement or other applicable law for the amount of the Distribution after the expiration of three (3) years from the date of the Distribution.

8.9.    <u>Offset</u>.  The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member.

8.10.    <u>Limitation Upon Distributions</u>.  No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.

8.11.    <u>Interest on and Return of Capital Contributions</u>.  No Member shall be entitled to interest on his Capital Contribution or to a return of his Capital Contribution, except as specifically set forth in this Agreement.

8.12.    <u>Accounting Period</u>.  The accounting period of the Company shall be determined by the Manager.

8.13.    **<u>Distributions.</u>** After the repayment of all of the Company's obligations, including without limitation, any mortgages, promissory notes and interest, and any obligations to vendors, materialmen, professionals and the like, except the Unsecured Creditors, the Company shall make its first distributions to the Members/Manager not less than quarterly (or at the election of the Manager – at any other time) in the following order of priority:

(i)    To all Members, <u>pro rata</u> in proportion to the Capital Contributions, if any, made by them, until all Members who have made such Capital

14

Contributions have received aggregate Distributions pursuant to this Section 8.13(i) equal to their unrecovered Capital Contributions;

(ii)   Next, to all Members, pro rata, as follows: (a) 75% to The Granit Investors LLC; and (b) 25% to unsecured creditors of Everyday Logistics LLC ("Unsecured Creditors")  until the distribution hereunder the Unsecured Creditors equals $750,000.00. Thereafter, the Unsecured Creditors shall not be entitled to any further distributions and 100% of the Distributions shall go to The Granit Investors LLC.

Notwithstanding the foregoing, in the event the Company obtains a VLT License, the Unsecured Creditors shall receive a one-time payment of $1,500,000.00 reduced by all prior distributions made to them by the Company.

Notwithstanding the foregoing, in the event the Company obtains a Class 3 Casino License, the Unsecured Creditors shall receive a one-time payment of $3,000,000.00 reduced by all prior distributions made to them by the Company

## ARTICLE IX

## BOOKS, REPORTS AND TAXES

9.1.   <u>Books and Records</u>.  The Company shall keep or cause to be kept full and true books of account and such additional records required to be maintained pursuant to Section 1103 of the Act.  Such books of account shall at all times be maintained at the principal office of the Company and shall be open to the inspection, examination and copying of the Member, at reasonable intervals, upon at least five (5) days' prior written notice and at reasonable hours of the business day for any purpose reasonably related to a Member's interests.  The Company may require the Member to sign a confidentiality agreement prior to permitting an inspection to protect the Company's confidential information.

9.2.   <u>Annual Statements</u>. Members will receive annual financial statements within ninety days after the end of each Fiscal Year.  Such financial statements will include a balance sheet, a statement of profit and loss and such other information as the Manager shall decide. Information returns required by the Internal Revenue Service will be provided to Members in accordance with Internal Revenue Service reporting requirements.

9.3.   <u>Accounts of Company</u>.  All funds of the Company are to be deposited in the Company's name in such bank account or accounts as shall be designated by the Manager.  Withdrawals from any such bank account or accounts shall be made upon such signature or signatures as the Manager may designate.

9.4.   <u>Tax Returns</u>.  The Manager must cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Copies of such returns or pertinent

information from them, will be furnished to the Members within a reasonable time after the end of the Fiscal Year.  Each Member must furnish to the Manager all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.5.  <u>Tax Elections</u>.  Company will make the following elections on the appropriate tax returns:

        (a)      To adopt a Fiscal Year;

        (b)      To adopt a method of accounting and keep the Company's books and records on the income tax method;

        (c)      If a Distribution as described in Section 734 of the Code occurs, or if a transfer of a Membership Interest described in Section 743 of the Code occurs, on the written request of any Member, to elect to adjust the basis of the property of the Company pursuant to Section 754 of the Code;

        (d)      Any other election that the Manager deems appropriate and in the best interests of the Members.  Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement will be interpreted to authorize any such election.

9.6.  <u>Tax Matters Partners</u>.  The Manager shall be the "tax matters partner" of the Company pursuant to Section 6231 (a)(7) of the Code.  The Manager shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Section 6223 of the Code.

## ARTICLE X

## DISPOSITION OF INTERESTS

10.1.  <u>General</u>.  Except as otherwise specifically provided in this Agreement, no Member has the right to:

        (a)      Sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration (collectively, "Sell") all or any part of its Membership Interest.

        (b)      Transfer for no consideration, whether or not by operation of law, (a "Transfer") all or any part of its Membership Interest or Economic Interest.

10.2.  <u>Transfer of Membership Interest</u>.  A Transferring Member may Transfer all or any portion of its Membership Interest (without regard to Sections 10.3(a), 10.3(b) and 10.3(c)), provided that the transferee or other successor-in-interest complies with Section

10.4, and subject to Section 10.6.

10.3. <u>Sale of Membership Interest</u>.

(a)     If a Selling Member desires to Sell all or any portion of its Membership Interest to another Person or Entity, the Selling Member must obtain from such purchaser a bona fide written offer to purchase the interest, stating the terms and conditions on which the purchase is to be made.  The Selling Member must give written notice to the remaining Members of its intention to transfer the interest, with a copy of the bona fide written offer to purchase the interest.

(b)     Each of the remaining Members, on a basis pro rata to their Membership Interests or on a basis pro rata to the Membership Interests of those remaining Members exercising their right of first refusal, has the right to exercise a right of first refusal to purchase all (but not less than all) of the interest proposed to be sold by the Selling Member on the same terms and conditions as stated in the bona fide written offer to purchase by giving notice to the Selling Member of their intention to do so within thirty (30) days after receiving written notice from the Selling Member.  The failure of the remaining Members to so notify the Selling Member of their desire to exercise this right of first refusal with respect to all of the interest desired to be sold within thirty (30) days results in the termination of the right of first refusal, and the Selling Member is entitled to consummate the sale of its interest in the Company, or the portion of its interest, if any, with respect to which the right of first refusal has not been exercised, to the third party purchaser.

(c)     In the event the remaining Members (or any one or more of the remaining Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to Sell on the same terms and conditions as are stated in the bona fide written offer to purchase, the remaining Members have the right to designate the time, date and place of closing, provided that the date of closing will be the later of the date set forth for closing in the bona fide offer or within ninety (90) days after receipt of written notification from the Selling Member of the third party offer to purchase.

10.4. <u>Conditions of Transfer</u>.  In the event of either the purchase of the Selling Member's interest in the Company by a third party purchaser or a Transfer without consideration of an interest in the Company, and as a condition to recognizing one or more of the effectiveness and binding nature of any such Sale or Transfer and (subject to Section 10.6 below) substitution of a new Member as against the Company or otherwise, the Manager may require the Selling Member or transferring Member and/or the proposed purchaser, transferee or successor-in-interest to execute, acknowledge and deliver to the remaining Members, the instruments of transfer, assignment and assumption and other certificates, representations and documents, and to perform all other acts which the Manager deems necessary or desirable to:

17

(a)     Constitute the purchaser, transferee or successor-in-interest as a Member;

(b)     Confirm that the Person or Entity desiring to acquire an interest or interests in the Company, or to be admitted as a Member, has agreed to be subject and bound by all of the terms, obligations and conditions of this Agreement, as amended (whether such Person or Entity is to be admitted as a new Member or will merely be an Economic Interest Owner);

(c)     Preserve the Company after the completion of the sale, transfer, assignment, or substitution under the laws of each jurisdiction in which the Company is qualified, organized or does business;

(d)     maintain the status of the Company as a partnership for federal and state tax purposes; and

(e)     Assure compliance with any applicable state and federal laws, including securities laws and regulations.

10.5.  <u>Effective Date</u>.  Any sale or Transfer of a Membership Interest is deemed effective as of the last day of the calendar month in which the transferee or successor interest complies with the provisions of Section 10.4.  The Selling Member or transferring Member agrees, on request of the Manager, to execute certificates or other documents and perform other acts as reasonably requested by the Manager from time to time in connection with the sale, transfer, assignment or substitution.  The Selling Member or transferring Member indemnifies the Company and the remaining Members against any and all loss, damage or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article X.

10.6.  <u>Purchaser/Transferee Not Member in Absence of Consent of the Manager</u>.  Notwithstanding anything contained in this Agreement to the contrary (including, without limitation, Section 10.3), if the Manager does not approve the transferee who is not a Member immediately prior to the sale or transfer as a Member, then the proposed purchaser or Transferee has no right to participate in the management of the business and affairs of the Company and shall not be a Member.  The purchaser or transferee will be merely an Economic Interest Owner.

# ARTICLE XI

## ADMISSION OF ADDITIONAL
## MEMBERS AND ASSIGNEES

11.1.  <u>Admission of New Members or Assignees</u>.  From the date of the formation of the Company, any Person or Entity acceptable to the Manager may become a Member

in the Company, subject to the terms and conditions of this Agreement, either by the Company's issuance of Membership Interests for such consideration that the Manager has approved, or as an Assignee of a Member's Membership Interest or a portion of it.

11.2.  <u>No Retroactive Allocations</u>.  No new Members are entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at his option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Section 706(d) of the Code and the Treasury Regulations promulgated under it.

## ARTICLE XII

## DISSOCIATION OF MEMBER

12.1.  <u>Dissociation</u>.  A Person or Entity ceases to be a Member and becomes an Economic Interest Owner on the happening of any of the following events:

(a)    The withdrawal of a Member with the consent of the Manager;

(b)    a Member becoming a Bankrupt Member;

(c)    In the case of a Member who is a natural person, the death of the Member or the entry of an order by a court of competent jurisdiction adjudicating the Member incompetent to manage the Member's person estate;

(d)    In the case of a Member who is acting as a Member by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(e)    In the case of a Member that is a separate organization other than a corporation, the dissolution and commencement of winding up of the separate organization;

(f)    In the case of a Member that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation of its charter; or

(g)    In the case of a Member which is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

12.2.  <u>Rights of Dissociating Member</u>.  In the event any Member disassociates prior to the expiration of a stated term of existence as set forth in the Articles of Organization, or in Section 2.6 above the dissociated Member shall be an Economic Interest Owner for all purposes.  If the dissociation is a consensual withdrawal pursuant to Section 12(a), then the Disposition of the Member's Membership Interest is to be

provided in the terms of the consent to withdraw.

# ARTICLE XIII

# DISSOLUTION AND WINDING UP

13.1.  <u>Dissolution</u>.  The Company is dissolved and its affairs must be wound up upon the first to occur of the following Dissolution Events:

(a)     The vote or written consent of all Members;

(b)     The Manager decides in his sole discretion that the Company should be dissolved.

(c)     The date a Court dissolves the Company under Section 702 of the Act.

13.2.  <u>Winding Up</u>.  On dissolution of the Company, the Manager may, in the name of and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Company's business, dispose of and convey the Company's Property, discharge the Company's liabilities, and distribute to the Members and Economic Interest Holders any remaining assets of the Company, all without affecting the liability of Members and Economic Interest Owners.  On winding up of the Company, the assets are to be distributed as follows:

(a)     To existing creditors, including Kennedy Funding, Inc. (if a creditor), the unsecured creditors of Everyday Logistics LLC (if creditors) and any Member or Economic Interest Owner who is a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves, other than liabilities for distributions to Members or Economic Interest Owners under Section 507 or 508 of the Act;

(b)     To Members and Economic Interest Owners in satisfaction of liabilities for Distributions under Section 507 or 508 of the Act; and

(c)     To Members and Economic Interest Owners as follows:  first, for the return of Granit Investors LLC's Capital Contributions, to the extent not previously returned; second, to the return of AAO Resort Management LLC's, other Members' and other Economic Interest Holders' Capital Contributions, to the extent not previously returned; and third, to the Members and Economic Interest Holders on a pro rata basis based on their Membership and Economic Interests.

13.3.  <u>Articles of Dissolution</u>.  Within ninety (90) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, the Manager must file articles of dissolution with the New York Secretary of State pursuant to the Act.

13.4.  <u>Deficit Capital Account</u>.  On a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member has no obligation to make any Capital Contribution, and the negative balance of any Capital Account will not be considered a debt owed by the Member to the Company or to any other Person or Entity for any purpose.

13.5.  <u>Nonrecourse to Other Members</u>.  Except as provided by applicable law or as expressly provided in this Agreement, on dissolution, each Member will receive a return of his, her or its Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return any Capital Contribution of any Member, the Member will have no recourse against any other Member.

13.6.  <u>Termination</u>.  On completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company is deemed terminated.

## ARTICLE XIV

## INJUNCTIONS; SPECIFIC PERFORMANCE

14.1.  The attempted sale, assignment, hypothecation, transfer, pledge, encumbrance, gift or other Disposition of any Membership Interests or any interest therein by any Member in violation of this Agreement shall be void, and during the period of any such violation of this Agreement, no such Membership Interests shall be entitled to vote or to the payment of Distributions.  This prohibition on voting and Distributions shall be in addition to and not in lieu of any other remedies, legal or equitable, to enforce the terms of this Agreement.  No transfer of ownership of the Membership Interests shall be recorded on the books of the Company except for such transfers which are effected in compliance with all of the terms and conditions hereof and the provisions of the applicable laws of the State of New York.

14.2.  The parties recognize that the Company is a closely-held company and that irreparable harm will result from the breach of any of the provisions set forth in this Agreement and that money damages will be inadequate to fully remedy such injury.  Accordingly, the parties agree that (a) in the event of a breach or threatened breach of one or more of the provisions of this Agreement, the injured party or parties shall be entitled to an injunction restraining such breach or threatened breach or compelling the performance of obligations which, if not performed, constitute or would constitute such a breach, (b) in the event of a breach of an obligation to sell or to purchase created hereby, the injured party or parties shall be entitled to specific performance of the obligation so breached, and (c) the party against whom any such equitable action or Proceeding is brought hereby waives the claim or defense therein that such party or such legal

representative has an adequate remedy at law and such party shall not urge in any such equitable action or Proceeding the claim or defense that such remedy at law exists. The party seeking equitable or injunctive relief shall not be required to furnish a bond or other undertaking in connection with the application for such relief.

## ARTICLE XV

## GENERAL PROVISIONS

15.1.  <u>Notices</u>.  Any notice, demand or other communication required or permitted to be given pursuant to this Agreement is sufficiently given for all purposes if it is in writing and (a) delivered personally to the party, or (b) sent by messenger, or by overnight courier, or by registered or certified mail, postage prepaid, addressed to the Member, Manager or the Company at his or its address set forth in this Agreement, or such address as the Member, Manager or Company gives notice of.  Except as otherwise provided in this Agreement, any notice is deemed given, on delivery or refusal of delivery, except if sent by registered or certified mail, then five business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this section.

15.2  <u>Entire Agreement</u>.  This Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect to them, whether or not relied or acted on.  No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or not relied or acted on, and no usage of trade, whether or not relied or acted on, amends this Agreement or impairs or otherwise affects any Member's obligations pursuant to this Agreement or any rights and remedies of a Member pursuant to this Agreement.

15.3.  <u>Amendment</u>.  No amendment to this Agreement is effective unless made in a writing duly executed by all Members and specifically referring to each provision of this Agreement being amended.

15.4.  <u>No Partnership Intended for Nontax Purposes</u>.  The Members have formed the Company under the Act, and expressly do not intend to form a partnership under either the New York Partnership Law or the New York Revised Limited Partnership Act. The Members do not intend to be partners to one another, or partners as to any third party.  To the extent any Member, by work or action, represents to another Person or Entity that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation is liable to any other Member who incurs personal liability by reason of such wrongful representation.

15.5.  <u>Rights of Creditors and Third Parties Under Agreement</u>.  The Agreement is entered into between the Company and the Members for the exclusive benefit of the

22

Company, its Members, and their successors and permitted assignees. The Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person or Entity. Except and only to the extent provided by applicable statute, no such creditor or third party has any rights under the Agreement or any agreement between the Company and any Member with respect to any Capital Contribution or otherwise. Furthermore, the Unsecured Creditors shall have no Membership Interest nor any voting rights in the Company.

15.6. <u>Execution of Additional Instruments</u>. Each Member agrees to execute other and further statements of interests and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

15.7. <u>Construction</u>. Whenever the singular number is used in this Agreement, and when required by the context, the same includes the plural and vice versa, and the masculine gender includes the feminine and neuter genders and vice versa.

15.8. <u>Headings</u>. The headings in this Agreement are for convenience only and are not to be used to interpret or construe any provision of this Agreement.

15.9. <u>Waiver</u>. No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement constitutes a waiver of such right or remedy. No waiver by a Member of any right or remedy under this Agreement is effective unless made in a writing duly executed by the Member waiving such right or remedy and specifically referring to each such right or remedy being waived.

15.10. <u>Severability</u>. Whenever possible, each provision of this Agreement is to be interpreted to be effective and valid under applicable law. However, if any provision of this Agreement is prohibited by or invalid under such law, it is deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it is prohibited or invalid only to the extent of such prohibition or invalidity without the remainder of the Agreement or any other provision being prohibited or invalid.

15.11. <u>Binding</u>. This Agreement is binding on and inures to the benefit of all Members, and each of the successors and permitted assignees of the Members as provided for herein.

15.12. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original and all of which constitutes one and the same instrument.

15.13. <u>Governing Law</u>. This Agreement is governed by, and interpreted and construed in accordance with, the laws of the State of New York, without regard to principles of conflict of laws.

15.14 **<u>Right of First Refusal.</u>** (1) In the event that the Manager wishes, directly or indirectly, to transfer, sell, exchange, lease or assign the Premises through voluntary

sale or other disposition, the Manager shall first obtain a bona fide written offer from the proposed purchaser and notify members of Granit Investors LLC, of the identity of the proposed purchaser and the proposed price and terms of sale. The members  shall thereupon have right of first refusal to purchase the Premises at price offered by the proposed purchaser and on the terms offered by the proposed purchaser. In order to exercise such right, The members , must, within twenty one  (21) days after receiving such notice from the Manager, deliver to the Manager a written notice specifying its irrevocable election to exercise such rights and execute the same terms as the proposed offer within 10 days of such notice. If said members  wish to purchase the Premises, they shall have the right to purchase proportionately based on their respective membership interest.

       IN WITNESS WHEREOF, the undersigned have signed this Agreement below conclusively evidence their agreement to the terms and conditions of this Agreement by so signing this Agreement.

THE GRANIT AT HUDSON VALLEY
RESORT LLC

By: AAO Resort Management LLC
    (Manager and Member)


By: _____
    Eliot Spitzer, Manager


AAO RESORT MANAGEMENT LLC


By: _____
    Eliot Spitzer, Manager


GRANIT INVESTORS LLC


By: _____
    Name:
    Title:

# SCHEDULE A

## INITIAL MEMBERS

| Name and Address | Capital Contribution | Membership Interest Percentages |
|---|---|---|
| AAO Resort Management LLC<br>400 Granite Road<br>Kerhonkson, NY 12446 | $0 | 5% |
| Granit Investors LLC<br>400 Granite Road<br>Kerhonkson, NY 12446 | $1,000.000.00 | 95% |

2817043 v1